**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X

DIRECTV LATIN AMERICA, LLC,                  :
individually and in the right and on behalf   :    **08 Civ. _____**
of LATIN AMERICAN SPORTS, LLC,               :
                                             :
            Plaintiff,                        :    **DECLARATION OF**
                                             :    **MICHAEL HARTMAN IN**
        v.                                    :    **SUPPORT OF APPLICATION**
                                             :    **FOR A PRE-JUDGMENT**
PARK 610, LLC,                                :    **ATTACHMENT PURSUANT**
CARLOS VICENTE AVILA,                         :    **TO F.R.C.P.  RULE 64**
ROBERTO TIMISTIT,                             :
CARLOS PRATOLA,                               :
ALEJANDRO ZUNDA CORNELL and                   :
DOES 1 through 10,                            :
                                             :
            Defendants,                       :
                                             :
        and                                   :
                                             :
LATIN AMERICAN SPORTS, LLC,                   :
                                             :
        as a Nominal Defendant.               :

------------------------------------------------------------X

Michael Hartman, declares pursuant to 28 U.S.C. §1746, under the penalty of

perjury under the laws of the United States of America as follows:

1.    I am the Senior Vice President and General Counsel of DIRECTV Latin

America, LLC ("DIRECTV" or "Plaintiff").  I am fully familiar with the facts set forth

herein, and submit this Declaration in support of DIRECTV's application for the award

of a pre-judgment attachment against defendants Alejandro Zunda Cornell ("Zunda"),

Carlos Pratola ("Pratola") and Carlos Vincente Avila ("Avila").

2.    As set forth below, and for the reasons alleged in the complaint in this action, DIRECTV's application for pre-judgment attachment should be granted.  A copy of the complaint is annexed hereto as <u>Exhibit 1</u>.

3.    Zunda, Pratola and Avila are non-domiciliaries who participated in a conspiracy to defraud DIRECTV, causing it significant money damages.  Zunda's and Pratola's only known assets in New York are brokerage accounts that can be easily liquidated.  Avila also owns brokerage accounts in New York, and upon information and belief may directly or indirectly own a cooperative at 610 Park Avenue, New York, New York.  Finally, pre-judgment attachment is warranted because the amount that DIRECTV is demanding far exceeds all known counterclaims (of which there are none).

<u>Background of the Joint Venture</u>

4.    This action concerns a clandestine arrangement among the Defendants in connection with a joint venture between DIRECTV and Defendant Avila.

5.    As part of their joint venture, DIRECTV and Avila formed a limited liability company, Latin American Sports, LLC ("LAS"), the purpose of which was to create a Spanish language television channel to broadcast golf programming in Latin America (the "Channel").[1]

6.    Two of the Defendants, Carlos Pratola ("Pratola") and Zunda, who were senior officers of Plaintiff's subsidiary, DIRECTV Argentina, S.A., ("DIRECTV Argentina").  Pratola was the General Manager and Chief Executive Officer of

---

[1]    DIRECTV is engaged in the business of providing pay television services in Latin America, and through its subsidiaries has approximately 5 million subscribers in the region.

DIRECTV Argentina and Zunda was the Vice President of Marketing and Sales. They pitched the joint venture with Avila to Plaintiff's New York-based senior management as an opportunity for DIRECTV to develop the Channel in partnership with Avila, a prominent figure in Argentine sports media.

7.    Neither Avila, Zunda nor Pratola is a domiciliary of the State of New York. Upon information and belief, Zunda's domicile is Ruta Panamericana, Ramal Pilar, Km. 43.5, Barrio Ayres del Pilar, lote V16, (1669) Del Viso, Pilar, Provincia de Buenos Aires, in the Republic of Argentina. Pratola's domicile is Villanueva 1350 PB, (1426) Ciudad de Buenos Aires, Republica Argentina. Avila's domicile is Cabildo 480, General Pacheco, Partido de Tigre, Provincia Buenos Aires.

8.    In late 2007, DIRECTV discovered that Defendants Avila, Roberto Timistit ("Timistit"), Zunda and Pratola had conspired to transfer half of Avila's beneficial ownership in LAS to a Uruguayan corporation, Leraman S.A. ("Leraman") without DIRECTV's knowledge and in violation of agreements between Avila, Park 610 and DIRECTV. Upon information and belief, is owned by Pratola and Zunda. Accordingly, under my supervision, DIRECTV and its subsidiary, DIRECTV Argentina, S.A., commissioned a forensic examination of the computers used by Zunda and Pratola. As a result of the investigation, DIRECTV obtained e-mail correspondence and drafts of the Leraman transactional documents. True and correct copies of the e-mails and attached documents are attached to this Declaration as set forth below. Where such documents were originally sent in Spanish, I attach both the Spanish language original and a translation that was performed on DIRECTV's behalf by Ms. Rachel Wilkins, a

3

professional Spanish to English translator. Additionally, I am fluent in Spanish and am satisfied that the attached translations are accurate.

9.      As explained below (¶¶28-36), DIRECTV is in possession of substantial evidence that Leraman is controlled by Pratola and Zunda.

<u>Negotiation of the Memorandum of Understanding</u>

10.     In April 2006, Pratola suggested to his superiors at DIRECTV, Richard Nerod and Jacopo Bracco, that the DIRECTV could increase its subscriber base in the Latin American market by offering the Channel as part of its package of sports programming.

11.     At Pratola's urging, DIRECTV entered into discussions with Avila with a view toward forming a joint venture to develop and distribute the Channel in Latin America.

12.     In or about July 2006, on behalf of DIRECTV, Pratola took a lead role in negotiating a Memorandum of Understanding (the "MOU") between DIRECTV and Avila, as well as negotiating the definitive transactional documents, including the LLC Agreement. However, unbeknownst to DIRECTV, while it was negotiating with Avila, Pratola and Zunda were hatching their plan to defraud DIRECTV. (A true copy of the execution version of the MOU is attached to this Declaration as <u>Exhibit 2</u>. A copy of the executed version of the LLC Agreement is attached as <u>Exhibit 3</u>).

13.     Pursuant to its undertakings in the LLC Agreement, DIRECTV, in consideration for its 45% interest in LAS, had the obligation to provide up to $7 million of funding to LAS. DIRECTV contributed capital to the joint venture from its account in

4

New York. During the calendar year 2006, DIRECTV made a capital contribution of $1,500,000, exclusive of a pre-launch payment by DIRECTV Argentina made pursuant to the MOU. In 2007, DIRECTV contributed capital in the amount of $2,500,000. In 2008, DIRECTV paid an additional capital contribution of approximately $550,000. During the calendar year 2007, DIRECTV also extended $1,000,000 in loans to the joint venture.

14.    In addition to its financial contribution, DIRECTV has certain approval rights typical of a minority investor in a joint venture, and also participated in management decisions for the venture. While Avila was the Chairman of LAS, DIRECTV had the right to designate two members of the Board of Directors of LAS, whereas Avila designated three. DIRECTV further had the right, among other things, to consult with Avila regarding the selection of the venture's general manager (Roberto Timistit) and other key employees. DIRECTV was also the exclusive distributor of the Channel in the major Latin American television markets and reviewed and approved the budget.

15.    Although DIRECTV was supplying all of the funding and also provided the Channel with the initial distribution that would be critical to its success, it received only 45% of the membership interest in LAS, whereas Avila received 55%. (Ex. 2, 3). Pratola had convinced DIRECTV that Avila would not accept less than a majority stake in the venture in exchange for his contribution to the venture, which was consisted

principally of procuring the desired golf programming rights, producing the Channel, and selling advertising.[2]

16.     Avila has a long history of developing sports programming in Argentina, and his personal commitment to developing the Channel in the Latin American market was material to DIRECTV's decision to invest in the joint venture, as was the absence of corrupt DIRECTV insiders in the economics of the transaction.  DIRECTV insisted and made clear to Avila and his representatives that it was critical for DIRECTV that Avila not transfer any portion of his beneficial ownership in LAS without DIRECTV's knowledge and prior written consent.

17.     Consistent with this understanding, among the material terms of the LLC Agreement is that a "Change of Control" of LAS constitutes an Event of Default under Section 13.1(e) of the LLC Agreement.  (Ex. 3)

The Funding of the Channel

18.     Pursuant to the MOU, between the time when Avila and DIRECTV executed the MOU and closed the joint venture transaction, DIRECTV was to make a "pre-launch" advance of $350,000 to an entity designated by Avila for the purpose of commencing operations for the Channel.  (Ex. 2)

19.     On August 2, 2006, DIRECTV's loan was memorialized in a loan document and a promissory note made by New Holliwood Producciones, S.A., or New Hollywood Productions ("NHP"), an Avila-owned entity.

---

[2]     As it turned out, the larger Avila's share of LAS, the more room there was for Pratola and Zunda to secure a "broker's fee" from Avila in the form of the transfer of Tumely to Leraman.

20.    However, at the last minute, Pratola altered the financing arrangement, causing DIRECTV Argentina (of which he was the general manager) to wire the money in two payments, one to NHP in the amount of $200,000 (617,000 pesos) and the other in the amount of $150,000 (462,750 pesos) to Carlos Avila, personally, each on August 2, 2006. (Copies of the wire instructions are attached as Exhibit 4).

21.    On or about the same day, DIRECTV and Avila executed the MOU.

The Formation of Park 610 and LAS

22.    In August 2006, Defendant Park 610 was formed as a Delaware limited liability company.  Park 610 was the entity through which Avila would hold his interest in the joint venture.

23.    Park 610, in turn, was owned in equal portions by two Uruguayan corporations, Tumely S.A. ("Tumely") and Loraine S.A. ("Loraine").

24.    In response to requests from DIRECTV for confirmation as to Avila's ownership of Park 610, Avila's counsel, Matias de Larrechea, represented to DIRECTV by e-mail dated August 24, 2006 that Avila owned all of the equity of Tumely and Loraine.  (A copy of Mr. Larrechea's E-mail to DIRECTV Argentina's counsel, Francisco Barreto, is annexed hereto as Exhibit 5).   De Larrechea further advised that the shares of Tumely and Loraine were in bearer form, but that a subsequent change to the by-laws of the respective companies would change the form of stock ownership to registered form.[3]

---

[3]    Thus, delivery of bearer shares would be an easier way to conceal the Transfer, since the shares would not have to be re-registered.

7

25.    In fact, at the same time that Avila was preparing to finalize the definitive joint venture agreements with DIRECTV, he and Roberto Timistit (Avila's brother in law, and currently General Manager of LAS) were working with Pratola and Zunda to arrange a transfer of the ownership of Tumely to an entity to be formed by and on behalf of Pratola and Zunda.  DIRECTV has confirmed this by performing forensic analysis of Pratola's and Zunda's computers which yielded significant evidence including email correspondence and drafts of a Share Purchase Agreement and Shareholders Agreement between Timistit, Pratola and Zunda, all reflecting the parties' plan to transfer ownership of Tumely from Avila to Pratola and Zunda.

26.    Unfortunately, DIRECTV was not aware of its employees' self dealing. DIRECTV closed the transaction with Avila on or about September 18, 2006.

The Secret Side Deal to Convey Tumely to Pratola and Zunda

27.    In April 2006, around the same time that he introduced the joint venture proposal to DIRECTV, Pratola and Zunda were arranging with their own counsel to form a corporation called Leraman, S.A. ("Leraman"), which would become the beneficial owner of the shares of Park 610 then held by Tumely.  Following soon after DIRECTV and Avila closed their transaction in September 18, 2006, Pratola, Zunda and Timistit began to exchange email correspondence among themselves and with their respective counsel for the purpose of consummating Leraman's acquisition of Tumely.  Annexed hereto as Exhibit 6 are copies of e-mail correspondence recovered by DIRECTV from Zunda's computer, forwarding drafts of the Leraman transactional documents between

8

the conspirators and coordinating contact between Avila's and Pratola and Zunda's Uruguayan counsel for the transfer.

28.    The principal documents for this transaction consisted of: (i.) the "Tumely S.A. Share Purchase Agreement, by and between Carlos Vicente Avila (the "Seller") and Leramar S.A. (the "Buyer")(hereafter, the "Share Purchase Agreement") [4] and (ii.) the "Tumely S.A. Shareholders Agreement by and between Carlos Vicente Avila and Leramar S.A. (hereafter, the "Shareholders Agreement").[5] A copy of a retrieved draft of the Share Purchase Agreement, translated from the original Spanish translation, is annexed as Exhibit 7. A copy of the Shareholders Agreement is annexed as Exhibit 8.

29.    Upon information and belief, Timistit was actively engaged in discussions between Avila's counsel, Hector Viana, and the owners of Leraman regarding the negotiation and drafting of the Share Purchase Agreement and the Shareholders Agreement. The brazenness of the arrangement is revealed by one comment included in the blacklined Shareholders Agreement, directed from Viana to Timistit, which warned, "THIS MEANS A CHANGE OF CONTROL IN PARK 610 THAT IS IN VIOLATION OF THE LAS SHAREHOLDERS AGREEMENT. AS LONG AS THE RESTRICTION IS IN PLACE, AVILA MUST MAINTAIN MANAGEMENT." (*See* Exhibit 8 at p. 4)

30.    After Pratola and/or Zunda reviewed Mr. Viana's mark-up of the Shareholders Agreement, on October 12, 2006, Zunda asked Timistit to send him the

---

[4]    The title of the document discovered by DIRECTV is "Contrato de Compraventa de Acciones de Tumely S.A. Entre Carlos Vicente Ávila (el "Vendedor") Y Leramar S.A. (el "Comprador"). (Ex. 7).

[5]    The title of the document discovered by DIRECTV is "Convenio de Sindicación de Accionistas de Tumely." (Ex. 8)

contact information of "you guys' lawyer" in Uruguay (*i.e.*, Viana). The next day,
Zunda forwarded the information from Timistit to Pratola's personal e-mail account. *See*
Exhibit 8.

31.    Since any formal transfer of the shares of Tumely in the name of a
beneficial owner other than Avila would violate the LLC Agreement, Pratola's and/or
Avila's counsel contrived a stipulation in the Leraman Shareholders Agreement whereby
the shares of Tumely would ostensibly continue to be held nominally by Avila, but would
in actuality be held for the benefit of Leraman (*i.e.*, Pratola and Zunda). (*See* Share
Purchase Agreement, Exhibit 7 at Article 6.2).[6]

32.    Upon information and belief, the transaction whereby Avila conveyed all of
the shares of Tumely to Leraman closed on or about November 8, 2006.

33.    No notice was given to DIRECTV of the transfer of Tumely before it was
concluded.

34.    Upon information and belief, Leraman and Avila entered into an
amendment to the Share Purchase Agreement in December 2006 to correct the
misspelling of the name of Leraman in the execution copy of the document, in which it
had been misspelled "Leramar." (*See* Exhibit 9, the Rectification Agreement).

The Fleecing of LAS

35.    As part of the joint venture transaction, LAS entered into a "Management
Services Agreement" with Park 610. The Management Services Agreement provides for

---

[6]    Section 6.2 of the Leraman Share Purchase Agreement provides as follows: "The Seller shall keep the
Transferable Shares in its [his] name as long as the Restrictions remain in place, but for the account and
order of the Buyer." (Ex. 7, p. 4).

the payment to Park 610 of a management fee equal to 25% of all advertising sales generated by LAS (from the sale of commercial advertising on the Channel).

36.    Pratola led the negotiation with Avila on the structuring of the fee and its computation.

37.    In the late summer or early fall of 2007, advertising revenues were not materializing as planned, and sales were far below the amount that would generate a significant management fee.

38.    Avila therefore pressured DIRECTV to pay him an advance on the management fees in the amount of $30,000 per month. DIRECTV initially resisted, but after energetic lobbying by Pratola, DIRECTV agreed to pay an advance of $30,000 per month for six months and to reevaluate the arrangement thereafter.

39.    As had been the case of the pre-launch funding of the Channel, the payment of moneys to Avila was carried out under highly irregular circumstances. Timistit initially arranged for two transfers of $30,000 to a JPMorgan account held in the name of Avila, personally, rather than to Park 610, as would have been required under the Management Services Agreement. Another transfer in the amount of $30,000 transfer was made to an account at UBS with the beneficiary information titled as "Clemente," which, as a result of DIRECTV's investigation into the conduct and corruption of Zunda and Pratola, DIRECTV believes is an account that was set up by a Luis Clemente or his brother Diego Clemente for the benefit of Pratola and Zunda.[7] Timistit later set up three

---

[7] Following termination of Zunda's employment, DIRECTV's investigation has yielded significant information suggested that Zunda, on his own and Pratola's behalf, engaged in significant deceptions including receipt of

transfers of $20,000 to Avila's JPMorgan account and $10,000 to the "Clemente" account. (See wire transfer instructions, attached to this Declaration as Exhibit 10.)

40.     While Pratola should have had no particular concern in the matter, he attempted to persuade DIRECTV to continue the advance payments of the management fee for another six months. DIRECTV refused to acquiesce in any further pre-payments of the management fee.

41.     During the fall of 2007, Pratola learned of a potential business combination regarding LAS that, if consummated, would have involved the purchase of a significant portion of Park 610's interest in the joint venture. Pratola and Avila advised DIRECTV management that they thought the transaction could be accomplished on terms that would represent a significant increase in the valuation of LAS. Pratola immediately advised Zunda of the possibility. Zunda thereafter responded "*Estoy comprando velas a full*" ("I'm buying candles all-out"), a slang expression in Argentine Spanish, referring to the purchase of votive candles in church, that is used when one wants a wish or hope to come true, and which implies that Zunda was praying for the possibility. (See E-mail dated October 22, 2007, attached as Exhibit 11). The statement indicates that Zunda anticipate to benefit personally if such a transaction were consummated, even though Zunda's compensation from DIRECTV Argentina was not contingent upon LAS. Shortly thereafter, Avila wrote to Pratola, referring to the potential acquisition, saying, "Carlitos: Vamos bien, no?  Por favor llamame! Un abrazo, Carlos" ("Carlitos [Pratola], it's looking

---

kickbacks and entering into contracts on DIRECTV Argentina's behelf with companies set up by Zunda and his associates. These associates included two brothers who were close friends of Zunda, Luis and Diego Clemente.

good, right? Please give me a call!! A hug, Carlos [Avila]." (*See* E-mail dated October 23, 2007, attached as Exhibit 12).

42.     Shortly after, following the receipt of evidence indicating the Pratola and Zunda had engaged in the conspiracy with Avila and Timistit with regard to the Leraman transaction, DIRECTV confronted each of Pratola and Zunda about the transaction. When confronted with the evidence against them, neither Pratola nor Zunda offered a satisfactory explanation of their conduct.    Ultimately, DIRECTV Argentina fired Pratola and Zunda.

43.     The corrupt agreement among and between the several Defendants to entice DIRECTV into the joint venture under false pretenses, as well as to assist Avila in the improper collection of management fees, are evidenced by the above-cited communications and the overt acts of each of the conspirators. Each act of the several Defendants was undertaken at the direction and for the benefit of the other Defendants and caused injury to each of LAS and DIRECTV.

Zunda's New York Brokerage Accounts

44.     Following our investigation, we identified several bank accounts and other properties in New York belonging to Avila, Pratola and Zunda:

> Pratola:
> JPM Chase New York
> FBO LEHMAN BROTHERS INC.
> ACCT. 140-094-221
> SUB.ACCT. 743-28756-1-0-053 & SUB ACCT. 743-28755-1-1-053
>
> BNP PARIBAS New York, US
> (Swift: BNPAUS3N)
> ABA (FW) : 026007689

Account: 605544-001-69

Zunda:

Morgan Stanley
Bank: Citibank, 111 Wall Street, NY, NY
For Benefit of: Dean Witter Reynolds
Beneficiary acct: 509-020127-108

Morgan Stanley
SWIFT CODE: CITIUS33
Citibank, 111 Wall Street, NY, NY
For Benefit of: Morgan Stanley
Beneficiary acct: 40611172 - Alejandro G. Zunda Cornell

Banco UBS
Financial Service
1285 Ave. of the Americas, 19th
New York, New York (10019)

Avila:

JP Morgan Chase Bank
One Chase Manhattan Plaza
New York, New York 10005
# 400-654865

Also, upon information and belief, Avila owns real property at 610 Park Avenue.

Undertaking

DIRECTV is prepared to secure a bond (or any other undertaking acceptable to the court), and believes that the appropriate amount required to protect each of the Defendants from the remote possibility of damages is $500.

Conclusion

45.    No prior application for the relief requested herein or any other provisional remedy in this matter has been made to this or any other Court.

14

**WHEREFORE**, for the foregoing reasons, DIRECTV Latin America, LLC respectfully requests that the order of attachment be granted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at New York, New York on this 28th day of April, 2008

_Michael Hartman_
Michael Hartman

15



MINTZ & GOLD LLP
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, N.Y. 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X

DIRECTV LATIN AMERICA, LLC,
individually and in the right and on behalf
of LATIN AMERICAN SPORTS, LLC,

               Plaintiff,

        v.

PARK 610, LLC,
CARLOS VICENTE AVILA,
ROBERTO TIMISTIT,
CARLOS PRATOLA,
ALEJANDRO ZUNDA CORNELL and
DOES 1 through 10,

               Defendants,

         and

LATIN AMERICAN SPORTS, LLC,

               as a Nominal Defendant.

------------------------------------------------------X

08 Civ. **3987** (VM)

**VERIFIED COMPLAINT**

Plaintiff, DIRECTV Latin America, LLC ("DIRECTV"), through its attorneys,

Mintz & Gold LLP, as and for its Verified Complaint herein, brought derivatively on behalf of

Latin American Sports, LLC, and in its own right, alleges as follows:

**Nature of the Action**

1.      This action concerns a clandestine arrangement among the Defendants in connection with a joint venture between DIRECTV and Defendant Carlos Vicente Avila ("Avila").  As part of their joint venture, DIRECTV and Avila formed a limited liability company, Latin American Sports, LLC ("LAS"), the purpose of which was to create a Spanish language television channel to broadcast golf programming in Latin America (the "Channel"). Two of the Defendants, Carlos Pratola ("Pratola") and Alejandro Zunda Cornell ("Zunda"), who were senior officers of Plaintiff's subsidiary, DIRECTV Argentina, S.A., pitched the joint venture as an opportunity for DIRECTV to develop the Channel in partnership with Avila, a prominent figure in Argentine sports media.  As it turned out, however, what was supposed to be a profitable joint venture between Avila and DIRECTV turned out to be a scheme whereby Pratola, Zunda and Avila, with the assistance of Defendant Roberto Timistit ("Timistit"), secretly intended to exploit the arrangement to enrich themselves at LAS's and DIRECTV's expense.  The identities of the John Doe Defendants are not presently known to DIRECTV.

2.      In late 2007, DIRECTV discovered that Avila and Timistit had secretly arranged to transfer half of Avila's beneficial ownership in LAS to a Uruguayan corporation, Leraman S.A. ("Leraman").  Upon information and belief, Leraman is controlled by Pratola and Zunda. The transfer to Leraman constituted one or more Events of Default, as defined by the Limited Liability Company Agreement of LAS (the "LLC Agreement").  More fundamentally, the transfer betrayed a fundamental assumption underlying DIRECTV's decision to invest in the transaction in the first place, namely, that Avila would operate the Channel in Latin America in partnership with DIRECTV.  Instead, DIRECTV finds its economic interest in the Channel jeopardized by Avila's unilateral and undisclosed introduction into the partnership of two highly

2

objectionable co-venturers, namely Pratola and Zunda, two corrupt former employees of DIRECTV's subsidiary who had surreptitiously placed themselves on both sides of the transaction, in a flagrant violation of their duty of loyalty to their employer.

3.    In addition to the "bait and switch" described above, Defendants siphoned off vast sums from DIRECTV and its subsidiary under false pretenses.  Timistit, with the assistance of Pratola, arranged to wire vast sums of money to Avila's personal account as well as to one or more unknown parties, believed to include Pratola and/or Zunda.

4.    Upon an Event of Default, DIRECTV has the right to compel Park 610 to sell all of Park 610's shares in LAS to DIRECTV.   In the alternative, the conspiracy among the Defendants entailed the breach of various fiduciary duties owed to DIRECTV and LAS, entitling DIRECTV to damages, rescission of its agreements with Park 610 and restitution of all sums that DIRECTV expended in furtherance of the joint venture.

## The Parties

5.    DIRECTV Latin America, LLC, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1211 Avenue of the Americas, New York, N.Y. 10036.

6.    DIRECTV is engaged in the business of providing pay television services in Latin America, and through its subsidiaries has approximately 5 million subscribers in the region.

7.    The sole member of DIRECTV Latin America, LLC, is DIRECTV Latin America, Inc., a corporation organized under the laws of the State of California and having its principal place of business at 2230 East Imperial Highway, El Segundo, CA 90245.

8.    Defendant Park 610, LLC, is a limited liability company organized under the laws of the State of Delaware.  Upon information and belief, the principal place of business of Park 610 is located at 9999 Collins Avenue, Bal Harbour, FL 33154.

9.    Upon information and belief, Park 610 has two members, Tumely S.A. and Loraine S.A., each of which is a corporation organized and existing under the laws of Uruguay.

10.    Upon information and belief, Defendant Carlos Vicente Avila is a citizen of Argentina, having a domicile at Gelly 3650, Buenos Aires, Argentina.

11.    Avila is the Chairman of LAS.

12.    Upon information and belief, Defendant Roberto Timistit ("Timistit") is a citizen of Argentina, with a domicile at Cabildo 480, General Pacheco, Partido de Tigre, Provincia Buenos Aires.

13.    Timistit is the chief executive officer of LAS, and is the brother-in-law of Defendant Avila.

14.    Defendant Carlos Pratola is a citizen of Argentina, with a domicile at Villanueva 1350 PB (1426) Ciudad de Buenos Aires, Republica Argentina.  Until his employment was terminated, Pratola was the General Manager and Chief Executive Officer of DIRECTV Argentina, S.A.

15.    Defendant Alejandro Zunda is a citizen of the United States of America, with a domicile at Ruta Panamericana, Ramal Pilar, Km. 43.5, Barrio Ayres del Pilar, lote V16 (1669) Del Viso, Pilar, Provincia de Buenos Aires República Argentina.  Until his termination, Zunda was the Vice President of Marketing and Sales of DIRECTV Argentina, S.A.

16.     Nominal Defendant LAS is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at Balcarce 510, Buenos Aires, Argentina.

17.     LAS has two members, Defendant Park 610, LLC ("Park 610") and DIRECTV. Defendant Park 610 is the holder of 55% of the membership interest of LAS and DIRECTV holds the remaining 45% of LAS.

## Jurisdiction and Venue

18.     The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.  Accordingly, this Court possesses subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332.

19.     In the LLC Agreement, Defendant Park 610 irrevocably agreed to submit to the jurisdiction of the courts in New York, New York, and stipulated to the application of New York law.  Venue is otherwise proper as to all the other Defendants pursuant to 28 U.S.C. §§1391(a)(3) and 1391(d), as the Defendants are subject to personal jurisdiction in this District and/or are aliens.

## Substantive Allegations

Pratola Proposes the Joint Venture with Avila

20.     In April 2006, Pratola suggested to his superiors at DIRECTV, Richard Nerod and Jacopo Bracco, that the company could increase its subscriber base in the Latin American market by offering the Channel as part of its package of sports programming.

21.     At Pratola's urging, DIRECTV entered into discussions with Avila with a view toward forming a joint venture to develop and distribute the Channel in Latin America.

22.    In or about July 2006, on behalf of DIRECTV, Pratola took a lead role in negotiating a Memorandum of Understanding (the "MOU") between DIRECTV and Avila, as well as negotiating the definitive transactional documents, including the LLC Agreement.

23.    Among the issues that Pratola discussed with Avila was the structure of the joint venture, including the amount and proportion of DIRECTV's equity and debt funding for the Channel.

24.    Pursuant to its undertakings in the LLC Agreement, DIRECTV, in consideration for its 45% interest in LAS, had the obligation to provide up to $7 million of funding to LAS. DIRECTV contributed capital to the joint venture from its account in New York.  During the calendar year 2006, DIRECTV made a capital contribution of $1,500,000, exclusive of a pre-launch payment by DIRECTV Argentina made pursuant to the MOU.  In 2007, DIRECTV contributed capital in the amount of $2,500,000.  In 2008, DIRECTV paid an additional contribution of approximately $550,000.

25.    In addition, during the calendar year 2007, DIRECTV extended $1,000,000 in loans to the joint venture.

26.    In addition to its financial contribution, DIRECTV has certain approval rights typical of a minority investor in a joint venture.  While Avila was the Chairman of LAS, DIRECTV had the right to designate two members of the Board of Directors of LAS, whereas Avila designated three.  DIRECTV further had the right, among other things, to consult with Avila regarding the selection of the venture's general manager and other key employees. DIRECTV was also the exclusive distributor of the Channel in the major Latin American television markets and reviewed and approved the budget.

27.     Although DIRECTV was supplying all of the funding, it received only 45% of the membership interest in LAS, whereas Avila received 55%.  Pratola had convinced DIRECTV that Avila would not accept less than a majority stake in the venture in exchange for his contribution to the venture, which consisted principally of procuring the desired golf programming rights, producing the Channel, and selling advertising.[1]

28.     Avila has a long history of developing sports programming in Argentina, and his personal commitment to developing the Channel in the Latin American market was material to DIRECTV's decision to invest in the joint venture, as was the absence of corrupt DIRECTV insiders in the economics of the transaction.  DIRECTV insisted and made clear to Avila and his representatives that it was critical for DIRECTV that Avila not transfer any portion of his beneficial ownership in LAS without DIRECTV's knowledge and prior written consent.

29.     Consistent with this understanding, among the material terms of the LLC Agreement is that a "Change of Control" of LAS constitutes an Event of Default under Section 13.1(e) of the LLC Agreement.

30.     One of the events described in the LLC Agreement as a Change of Control is the following:

> (a)     any Person (other than the Person who controls a Member on the date hereof) becomes the beneficial owner, directly or indirectly, of more than 50% of the then outstanding voting shares or other equity rights of a Member;

31.     Upon information and belief, through the Leraman Shareholders Agreement, Avila secretly agreed indirectly to convey to Pratola and Zunda in excess of 50% of the "voting shares or other equity rights" of Park 610.

---

[1]     As it turned out, the larger Avila's share of LAS, the more room there was for Pratola and Zunda to secure a "broker's fee" from Avila in the form of the transfer of Tumely to Leraman.

32.     Furthermore, Avila's transfer of the Tumely shares violated the LLC Agreement irrespective of whether such transfer constituted a Change of Control.  An attempted transfer of the membership interests of LAS, other than in compliance with the LLC Agreement, constitutes an independent Event of Default pursuant to <u>Section 13.1(c)</u> of the LLC Agreement.[2]

33.     Furthermore, any other material breach of the Agreement would violate <u>Section 13.1(d)</u> of the LLC Agreement, subject to a cure provision.  Such a material breach would include, among other things, violations of the ethical prohibition set forth in <u>Section 12.5</u> of the LLC Agreement against dealing with persons having a conflict of interest (like Pratola and Zunda).

34.     Upon an Event of Default, the non-defaulting member has a right pursuant to <u>Section 13.2</u> of the LLC Agreement to require the defaulting member to sell all of its membership interests in LAS (the "Call Option").  Upon a Change of Control, the non-defaulting member has the right to compel the defaulting member to sell its shares for their net book value. In the event of a Transfer of membership interests in LAS other than in accordance with the LLC Agreement, the Call Option price is eighty percent (80%) of the net book value of the membership interests.

<u>The Funding of the Channel</u>

35.     Pursuant to the MOU, between the time when Avila and DIRECTV executed the MOU and closed the joint venture transaction, DIRECTV was to make a "pre-launch" advance

---

[2]     The LLC Agreement defined the term "Transfer" as: "(i) any sale, assignment or transfer of securities, (ii) a sale, assignment or transfer of any economic interest and/or a voting interest ("Interest") in an entity that, directly or indirectly, holds any securities, (iii) a pledge or hypothecation of securities or Interest or any interest therein, (iv) sale, assignment or a transfer of securities convertible into or exchangeable for or other options or rights to acquire securities or Interest or (v) any other direct or indirect, voluntary or involuntary, sale, assignment or transfer of securities or Interest or any interest therein, whether pursuant to a Change of Control or otherwise."

of $350,000 to an entity designated by Avila for the purpose of commencing operations for the Channel.

36.     On August 2, 2006, DIRECTV's loan was memorialized in a loan document and a promissory note made by New Hollywood Productions ("NHP"), an Avila-owned entity.

37.     However, at the last minute, Pratola altered the financing arrangement, causing DIRECTV Argentina (of which he was the general manager) to wire the money in two payments, one to NHP in the amount of $200,000 (617,000 pesos) and the other in the amount of $150,000 (462,750 pesos) to Carlos Avila, personally, each on August 2, 2006.

38.     On or about the same day, DIRECTV and Avila executed the MOU.

The Formation of Park 610 and LAS

39.     In August 2006, Defendant Park 610 was formed as a Delaware limited liability company.  Park 610 was the entity through which Avila would hold his interest in the joint venture.

40.     Park 610, in turn, was owned in equal portions by two Uruguayan corporations, Tumely S.A. ("Tumely") and Loraine S.A. ("Loraine").

41.     In response to requests from DIRECTV for confirmation as to Avila's ownerhip of Park 610, Avila's counsel, Matias de Larrechea, represented to DIRECTV by e-mail dated August 24, 2006 that Avila owned all of the equity of Tumely and Loraine.  De Larrechea further advised that the shares of Tumely and Loraine were in bearer form, but that a subsequent change to the by-laws of the respective companies would change the form of stock ownership to registered form.

42.     In fact, at the same time that Avila was preparing to close the joint venture with DIRECTV, Pratola and Zunda were working with Avila to arrange a transfer of the ownership of

Tumely to an entity to be formed by and on behalf of Pratola and Zunda. Thus, delivery of bearer shares would be an easier way to conceal the Transfer, since the shares would not have to be re-registered.

43. On or about September 18, 2006, DIRECTV closed the transaction with Avila.

<u>The Secret Side Deal to Convey Tumely to Pratola and Zunda</u>

44. Upon information and belief, in or about April 2006, around the same time that he introduced the joint venture proposal to DIRECTV, Pratola was arranging with his own counsel to form a corporation called Leraman, S.A. ("Leraman"), which would become the beneficial owner of the shares of Park 610 then held by Tumely.

45. Later, around the same time that the joint venture was about to close, Pratola's counsel, a law firm in Uruguay, was preparing two transactional documents: (i.) the "Tumely S.A. Share Purchase Agreement, by and between Carlos Vicente Avila (the "Seller") and Leramar S.A. (the "Buyer")(hereafter referred to in this Complaint as the "Stock Purchase Agreement")[3] and (ii.) the "Tumely S.A. Shareholders Agreement by and between Carlos Vicente Avila and Leramar S.A. (hereafter referred to in this Complaint as the "Shareholders Agreement").[4]

46. Upon information and belief, Timistit was actively engaged in discussions between Avila's counsel, Hector Viana, and the owners of Leraman regarding the negotiation and drafting of the Stock Purchase Agreement and the Shareholders Agreement. The brazenness of the arrangement is revealed by one comment included in a blacklined draft of the agreement, directed from Viana to Timistit, which warned, "THIS MEANS A CHANGE OF CONTROL IN

---

[3]    The title of the document discovered by DIRECTV is "Contrato de Compraventa de Acciones de Tumely S.A. Entre Carlos Vicente Ávila (el "Vendedor") Y Leramar S.A. (el "Comprador").

[4]    The title of the document discovered by DIRECTV is "Convenio de Sindicación de Accionistas de Tumely."

PARK 610 THAT IS IN VIOLATION OF THE LAS SHAREHOLDERS AGREEMENT.  AS

LONG AS THE RESTRICTION IS IN PLACE, AVILA MUST MAINTAIN

MANAGEMENT."

47.    After Pratola and/or Zunda reviewed Mr. Viana's mark-up of the Shareholders

Agreement, on October 12, 2006, Zunda asked Timistit to send him the contact information of

"you guys' lawyer" in Uruguay (*i.e.*, Viana).  The next day, Zunda forwarded the information

from Timistit to Praola's personal e-mail account.

48.    Since any formal transfer of the shares of Tumely in the name of a beneficial

owner other than Avila would violate the LLC Agreement, Pratola's and/or Avila's counsel

contrived a stipulation in the Leraman Shareholders Agreement whereby the shares of Tumely

would ostensibly continue to be held nominally by Avila, but would in actuality be held for the

benefit of Leraman (*i.e.*, Pratola and Zunda).

49.    Upon information and belief, the transaction whereby Avila conveyed all of the

shares of Tumely to Leraman closed on or about November 8, 2006.

50.    No notice was given to DIRECTV of the transfer of Tumely before it was

concluded.

51.    Upon information and belief, Leraman and Avila entered into an amendment to

the Purchase Agreement in December 2006 to correct the misspelling of the name of Leraman in

the execution copy of the document, in which it had been misspelled "Leramar."

52.    Upon information and belief, Avila has further agreed with Leraman to

restrictions upon the transfer of his shares in Loraine, and either to pledge his shares of Loraine

to Leraman and/or to deposit them with a third party as security for the performance of his

obligations under the Shareholders Agreement.

The Fleecing of LAS

53.    As part of the joint venture transaction, LAS entered into a "Management Services Agreement" with Park 610. The Management Services Agreement provides for the payment to Park 610 of a management fee equal to 25% of all advertising sales generated by LAS (from the sale of commercial advertising on the Channel).

54.    Pratola and Zunda led the negotiation with Avila on the structuring of the fee and its computation.

55.    In the late summer or early fall of 2007, advertising revenues were not materializing as planned, and sales were far below the amount that would generate a significant management fee.

56.    Avila therefore pressured DIRECTV to pay him an advance on the management fees in the amount of $30,000 per month. DIRECTV initially resisted, but after energetic lobbying by Pratola, DIRECTV agreed to pay an advance of $30,000 per month for six months and to reevaluate the arrangement thereafter.

57.    As had been the case of the pre-launch funding of the Channel, the payment of moneys to Avila was carried out under highly irregular circumstances. Timistit initially arranged for two transfers of $30,000 to a JPMorgan account held in the name of Avila, personally, rather than to Park 610, as would have been required under the Management Services Agreement. Another transfer in the amount of $30,000 transfer was made to an account at UBS with the beneficiary information titled as "Clemente," a nominee believed to serve as a laundering account for the benefit of Pratola and Zunda. Timistit later set up three transfers of $20,000 to Avila's JPMorgan account and $10,000 to the "Clemente" account.

58.     While Pratola should have had no particular concern in the matter, he attempted to persuade DIRECTV to continue the advance payments of the management fee for another six months.  DIRECTV refused to acquiesce in any further pre-payments of the management fee.

59.     Upon a "Change of Control" of Park 610, moreover, the Management Service Agreement would have terminated automatically.  Thus, the payments made to Avila (and Clemente) were not only irregular, and probably far in excess of what had actually been earned, but were not owed to Park 610 at all (much less to Avila himself, or the mysterious "Clemente") because the Change of Control had already happened in November 2006.

60.     During the fall of 2007, Pratola learned of a potential business combination regarding LAS that, if consummated, would have involved the purchase of a significant portion of Park 610's interest in the joint venture.  Pratola immediately advised Zunda of the possibility.  Zunda thereafter responded "I'm buying candles all-out," implying that he was praying for the possibility a transaction were consummated, even though Zunda's compensation from DIRECTV Argentina was not contingent upon LAS.  While the transaction did not come to pass, Pratola and Zunda already had an undisclosed personal stake in LAS through Leraman or otherwise, such that they would cash in on any gains realized on the acquisition of LAS.  Shortly thereafter, Avila wrote to Pratola, referring to the potential acquisition, saying, "Carlitos [Pratola], it's looking good, right?  Please give me a call!!  A hug, Carlos [Avila]."

61.     Shortly after, following the receipt of evidence indicating the Pratola and Zunda had engaged in the conspiracy with Avila and Timistit with regard to the Leraman transaction, DIRECTV confronted each of Pratola and Zunda about the transaction.  When confronted with the evidence against them, neither Pratola nor Zunda offered a satisfactory explanation of their conduct.   Ultimately, DIRECTV Argentina fired Pratola and Zunda for their self-dealing.

62.    By letter dated March 25, 2008, DIRECTV notified Avila that it had discovered his illicit transfer of Tumely to Leraman and exercised the Call Option at the price set forth in Section 13.4 of the LLC Agreement.  Avila denied that an Event of Default had taken place and has refused to tender his membership interests in LAS, as required by the LLC Agreement.

63.    The corrupt agreement among and between the several Defendants to entice DIRECTV into the joint venture under false pretenses, as well as to assist Avila in the improper collection of management fees, are evidenced by the above-cited communications and the overt acts of each of the conspirators.  Each act of the several Defendants was undertaken at the direction and for the benefit of the other Defendants and caused injury to each of LAS and DIRECTV.

## AS AND FOR A FIRST CAUSE OF ACTION
### For a Declaratory Judgment Against Park 610

64.    DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

65.    The transfer of ownership of the shares of Tumely and the pledge or deposit of Loraine's stock constituted a Change of Control of Park 610 within the meaning of the LLC Agreement because Leraman became the beneficial owner of more than 50% of the equity rights of Park 610, and Avila ceased to have the sole power to direct or cause the direction of the management and policies of Park 610.

66.    Even if the foregoing transaction did not amount to a Change of Control, it constituted a Transfer within the meaning of the LLC Agreement that was not in accordance with the terms of the LLC Agreement and/or a material breach of the LLC Agreement.

67.    In either case, Avila's transfer of the beneficial ownership of Park 610 constituted an Event of Default, as defined in Article XIII of the LLC Agreement.

68.     Despite being confronted with conclusive evidence of his conspiracy with the other Defendants, Avila has denied that the transactions described in this Complaint have taken place and has refused to comply with DIRECTV's exercise of the Call Option.

69.     Inasmuch as the majority of the directors of LAS are appointed by Avila, a demand upon the Board would be futile, Avila being personally interested in the transactions challenged herein.  The other members appointed by Avila are members of his family.

70.     By reason of the foregoing, there is an actual and justiciable controversy among the parties regarding DIRECTV's rights upon the event(s) of default arising from the Transfer of Park 610.  DIRECTV therefore seeks a judicial declaration of its rights pursuant to CPLR § 3001.

## AS AND FOR A SECOND CAUSE OF ACTION
### For Breach of Contract – Specific Performance of the LLC Agreement

71.     DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

72.     Upon an Event of Default on the part of Park 610, DIRECTV is entitled to exercise the Call Option in accordance with the procedures set forth in Article XIII of the LLC Agreement.

73.     The LLC Agreement is a valid contract between DIRECTV and Park 610.

74.     DIRECT has performed its contractual obligations under the LLC Agreement and is ready, willing, and able to fulfill its remaining obligations.

75.     Park 610 is able but unwilling to convey its membership interests in LAS.

76.     DIRECTV has no adequate remedy available at law.

77.     Accordingly, DIRECTV is entitled to a judgment directing Park 610 to comply with the Call Option and sell all of its membership interests in LAS to DIRECTV.

## AS AND FOR A THIRD CAUSE OF ACTION
__Against Avila and Timistit for Breach of Fiduciary Duty (Derivatively on Behalf of LAS)__

78.     DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

79.     In his capacity as Chairman of LAS, as well as the ultimate principal of Park 610, Avila was a control person of LAS and owed corresponding fiduciary duties of loyalty and disclosure.

80.     As the chief executive and as an employee of LAS, Timistit owed a direct fiduciary duty of loyalty to LAS.

81.     By arranging to pay management fees in excess of what LAS properly owed,  and by paying such fees to Avila and Clemente, Avila and Timistit committed a waste of LAS's assets, and failed to exercise due care to prevent such waste, and thereby breached their fiduciary duties to LAS.

82.     As a direct and proximate result of the foregoing, LAS has been damaged in an amount to be determined at the trial of this matter.

## AS AND FOR A FOURTH CAUSE OF ACTION
__Against Pratola and Zunda for Civil Conspiracy/__
__Aiding and Abetting a Breach of Fiduciary Duty__
__(Derivatively on Behalf of LAS)__

83.     DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

84.     Pratola and Zunda, with knowledge of the fact that the sums paid to Avila were excessive and were not properly paid under the Management Services Agreement or in reckless disregard of the facts known to them, intentionally assisted Avila and Timistit in carrying out their breach of fiduciary duties owed to LAS.

16

85.    As a direct and proximate result of the foregoing, LAS has been damaged in an amount to be determined at the trial of this matter.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against Avila and Park 610 – Breach of Fiduciary Duty

86.    DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

87.    As evidenced by the plain language of the MOU and the subsequent acts of the parties, Park 610 assumed the role of co-venturer with DIRECTV.  As DIRECTV's co-venturer, Park 610 had a fiduciary duty of loyalty, good faith and disclosure in all acts undertaken on behalf of, and with respect to the joint venture.

88.    As such, Park 610, and Avila as the sole control person of Park 610, had an obligation to refrain from misrepresenting facts and/or failing to disclose facts that would operate as a fraud upon DIRECTV and/or LAS, to refrain from committing corporate waste, and to refrain from entering into the side-deal with Pratola and Zunda.

89.    As a proximate and direct result of the foregoing breaches of fiduciary duty, DIRECTV has been damaged in an amount to be determined at trial.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Against All Defendants - Fraud

90.    DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

91.    As detailed above, Pratola and Zunda misrepresented to DIRECTV that the Channel would be conducted in the utmost good faith as a joint venture solely between DIRECTV and Avila, whereas in actuality they planned all along secretly to substitute themselves as the holders of part or all of Avila's stake in LAS.

92.    Avila and Timistit, through their participation in the negotiation of the MOU, the LLC Agreement and the other closing documents, and through Avila's counsel, reinforced Pratola's affirmative misrepresentations and omissions.

93.    The foregoing misrepresentations were made by each of the Defendants with the knowledge that the representations were false.

94.    Each of the Defendants intended to induce DIRECTV to enter into the joint venture in reliance upon the misrepresentations.

95.    DIRECTV was justified in relying upon the Defendants' representations.  But for the Defendants' misrepresentations regarding the structure and ownership of LAS, DIRECTV would not have entered into the joint venture with Park 610.

96.    As a consequence of the Defendants' fraud, DIRECTV expended approximately $4,550,000 in capital contributions and $1,000,000 in loans.

97.    In the event that specific performance is not ordered, DIRECTV therefore prays for a judgment rescinding all agreements with Defendants and restitution of all sums paid to Defendants and LAS, whether in the form of capital contributions, loans or otherwise.

**WHEREFORE**, for the reasons set forth above, it is respectfully requested judgment be entered herein:

    i.    On Plaintiff's First Cause of Action, a judgment declaring that that Park 610 has breached the LLC Agreement and has committed one or more Events of Default as defined therein;

    ii.    On Plaintiff's Second Cause of Action, an order of specific enforcement requiring Park 610 to convey all of its membership interests in LAS to

18

DIRECTV pursuant to the Call Option procedures set forth in Article XIII of

the LLC Agreement;

iii.  On Plaintiff's Third and Fourth Causes of action, an award of money

damages to LAS to compensate for the Defendants' breach of fiduciary duty

and their acts of aiding and abetting the breach of fiduciary duty;

iv.  On Plaintiff's Fifth Cause of Action, an award of money damages in an

amount to be determined at trial;

v.  On Plaintiff's Sixth Cause of Action, an order rescinding all agreements

between DIRECTV and the Defendants, restitution of sums paid by

DIRECTV to fund LAS, and money damages;

vi.  The costs and disbursements of this action, including reasonable attorneys'

fees;

vii.  An award of punitive damages; and

viii. Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       April 29, 2008

                    **MINTZ & GOLD LLP**

                    *Terence W. McCormick*
                    ─────────────────────────
                    Steven G. Mintz (SM 5428)
                    Terence W. McCormick (TM 2713)
                    470 Park Avenue South
                    10th Floor North
                    New York, New York 10016-6819
                    Tel:  (212) 696-4848
                    Fax: (212) 696-1231
                    mintz@mintzandgold.com
                    mccormick@mintzandgold.com
                    *Attorneys for Plaintiff*

## VERIFICATION

Plaintiff, DIRECTV Latin America, LLC, being duly sworn, deposes and says pursuant to 28 U.S.C. 1746, under the penalty of perjury under the laws of the United States, that deponent has read the foregoing Verified Complaint and knows the contents thereof; that the same are true to deponent's own knowledge, except as to those matters therein stated to be alleged on information and belief, and that as to those matters deponent believes them to be true.

Executed at New York, New York on this 28th day of April, 2008

Michael Hartman

**REVISED MEMORANDUM OF UNDERSTANDING**
**AUGUST 2, 2006**

| | | |
|---|---|---|
| 1. | <u>Parties</u> | **DIRECTV Latin America, LLC,** a limited liability company organized under the laws of Delaware with administrative offices at 1211 Sixth Avenue, New York, NY 10036 ("<u>DTVLA</u>"); |

and

**Carlos Avila**, an Argentine citizen.

Promptly following the execution of this Memorandum of Understanding (the "<u>MOU</u>"), Carlos Avila in consultation with DTVLA shall designate an existing corporate entity (or form a new special purpose vehicle) controlled directly or indirectly by him for the purpose of entering into the definitive agreements with DTVLA that are contemplated by the development and distribution of the Golf Channel as described herein. This new entity shall be referred to herein as the "<u>Avila Entity</u>" (and collectively with DTVLA, the "<u>Parties</u>").

| | | |
|---|---|---|
| 2. | <u>Purpose</u> | Together the Parties desire to create, produce and operate for distribution a television channel comprised of golf programming (the "<u>Channel</u>"), which shall be based primarily on the U.S. feed of "THE GOLF CHANNEL". The Channel shall be presented on a 24 hours-per-day/7 days-per week schedule and distributed in Latin America (including Brazil, Mexico and the rest of Central and South America)(the "<u>Territory</u>"). |

| | | |
|---|---|---|
| 3. | <u>Vehicle</u> | The Parties shall form a special purpose vehicle ("<u>Newco</u>") The Parties agree to continue analyzing and negotiating in good faith a tax efficient structure and jurisdiction of formation for Newco. The Avila Entity shall hold a 55% voting and economic interest in Newco and DTVLA shall hold the remaining 45% voting and economic interest. To extent they can be used by DTVLA, for each of the fiscal years of the Exclusive Period all tax losses of Newco shall be allocated to DTVLA. |

| | | |
|---|---|---|
| 4. | <u>Capital Stock</u> | Assuming launch of the Channel as contemplated in the Business Plan, DTVLA shall provide the funding requirements of Newco as established in the Budget for a minimum of two years in the form of equity and debt capital as set forth below. |

<u>Equity Contributions</u>: In exchange for its 45% ownership interest in Newco, DTVLA shall contribute funds to Newco as needed in an amount sufficient to cover Newco's operating and production costs (including pre-launch expenses) in accordance with the Business Plan, up to the following maximum amounts:

<u>Year</u>                                           <u>Maximum Amount</u>

| Aug 2006- Dec 2006 | $1,500,000 |
| Jan 2007- July 2007 | $1,500,000 |
| Aug 2007- Jan 2008 | $1,000,000 |
| Feb 2008- Jul 2008 | $1,000,000 |
| Aug 2008- Jan 2009 | $1,000,000 |
| Feb 2009- Jul 2009 | $1,000,000 |

Any portion of the above maximum equity contributions that is not funded by DTVLA during the corresponding period shall be carried over to the subsequent period and increase such next corresponding amount by the amount carried forward. For clarification, in no event shall the aggregate maximum amount of equity contribution exceed $7,000,000 unless otherwise agreed by the Parties.

DTVLA shall have the option to reduce such funding commitment by up to a year in connection with a reduction of the DTVLA exclusivity period for the distribution of the Channel (see "Distribution" below). The option shall be exercisable starting on the first anniversary of the Channel's launch. The option shall entitle DTVLA to limit its funding responsibilities to twelve months following exercise of such option. The Parties shall enter into a shareholders agreement (the "Shareholders Agreement") that shall include, among other items, a mechanism for DTVLA to sell its equity participation in Newco to the Avila Entity in the event that DTVLA desires to terminate the joint venture in connection with the exercise of the option to reduce the term of its funding commitment.

In exchange for its 55% ownership interest in Newco, the Avila Entity shall contribute to Newco the exclusive license from The Golf Channel of the necessary rights to distribute the Channel in the Territory for a period of five years.

Debt Financing: Any funding shortfall in excess of the budgeted DTVLA equity contribution described above shall be financed by DTVLA in the form of debt, subject to DTVLA's approval of any changes in the Budget. Nothwithstanding the above, but subject to a cap and other terms to be further defined in the Shareholders Agreement, DTVLA shall have the obligation to provide debt financing to Newco in an amount equal to any annual shortfalls in budgeted revenue as established in the Business Plan. The amount of any debt financing by DTVLA shall be mutually agreed by DTVLA and the Avila Entity, and any such amounts lent shall accrue interest at a market interest rate to be determined and shall be repaid by Newco in equal quarterly installments over two years commencing on one year after the end of the Exclusive Period (as defined below). Up to one million dollars of any Newco debt owed to DTVLA shall be convertible into equity in Newco at the option of DTVLA on or before maturity at ratio of $250,000 for 1% of Newco.

2

Upon the end of the Exclusive Period, the Avila Entity and DTVLA shall fund operating losses in proportion to their equity holdings in the Newco. If a party refuses to fund such losses, such party's interest in Newco shall be subject to dilution as provided in the Shareholders Agreement.

5.  Distribution

Newco shall provide the Channel to DTVLA and its affiliates for distribution on an exclusive basis in the Territory (excluding Mexico) for the first three years calculated from the launch date of the Channel unless DTVLA opts to limit its financing commitment as described above in "Capital Contributions", in which case DTVLA's exclusivity shall end upon the exercise of such option. Such period shall be referred to as the "Exclusive Period".

Newco (assisted by DTVLA) shall negotiate exclusively with Sky Mexico for distribution of the Channel in Mexico for a period of three months following the launch of the Channel. If no agreement is reached with Sky Mexico during the negotiation period, Newco may offer the Channel to other distributors in Mexico. Any license fees received by Newco from distribution in Mexico during the Exclusive Period shall reduce DTVLA's budgeted equity contribution dollar for dollar, net of the unbudgeted costs directly related to such distribution.

Additionally, any license fees or advertising revenue in excess of amounts budgeted in the Business Plan for any period following the exercise of DTVLA's option to terminate early its equity contribution commitment, shall first be applied to repayment of any outstanding indebtedness owed by Newco to DTVLA and second to reduce DTVLA's required equity contribution during the current year dollar for dollar.

6.  Extension of Exclusivity

After expiration of the Exclusive Period and provided that the option included in Section 4 has not been exercised, DTVLA shall have the option to extend its exclusive distribution rights for the Channel in the whole of the Territory for a fourth year. The price for extending the exclusivity shall be (a) an increase in the Avila Entity management fee from twenty-five percent to fifty percent of Newco's Advertising Revenues (as defined below) for such fourth year plus (b) DTVLA's commitment to extend its equity funding requirements on terms similar to those set forth in "Capital Stock" above up to a maximum amount of US$2,000,000.

DTVLA shall also have the option to extend its exclusivity on a country by country basis for a fourth year. The parties shall negotiate in good faith to agree upon (a) an increase in the Avila Entity management fee from twenty-five percent up to fifty percent of Newco's net Advertising Revenues and (b) an extension of DTVLA's debt funding commitment. The parties shall consider the degree to which DTVLA retains exclusivity in the Territory as the primary factor in negotiating the extent of the

increase in the Avila Entity's management fee and the extension of DTVLA's funding commitment.

| | | |
|---|---|---|
| 7. | DTVLA License Fee | During the Exclusive Period, Newco shall license the Channel to DTVLA and its affiliates (excluding Sky Mexico) free of charge (or at a price to be established by DTVLA, in its sole discretion, if advantageous to DTVLA for tax or other considerations). The license agreement(s) for the Channel between Newco and DTVLA and its affiliates shall define the responsibility of Newco and the licensee for delivery of the Channel to the licensees' broadcast facilities. |

After expiration of the Exclusive Period, DTVLA and Newco shall negotiate in good faith to agree on licensing fees for the Channel in the Territory for carriage on the DTVLA and SKY Brazil systems. The DTVLA License fee shall at all times benefit from "Most Favored Nation" protection that entitles it a price equivalent to the lowest net effective rate offered to any other distributor. DTVLA and its affiliates shall have the obligation to distribute the Channel in the Territory to a minimum of 750,000 subscribers in the Territory, excluding Brazil and Mexico. The parties shall negotiate a distribution and penetration model with respect to Brazil and Mexico consistent with the Business Plan.

| | | |
|---|---|---|
| 8. | Production | The Avila Entity shall control and be responsible for providing the day to day management of Newco, subject to the rights ascribed to DTVLA in the Shareholders Agreement. |
| 9. | Management Fee | Newco shall pay the Avila Entity a management fee equal to twenty-five percent of Newco's Advertising Revenues (as defined below) during the Exclusivity Period. During any extension of DTVLA's exclusive distribution of the Channel, the management fee is shall be increased to an amount agreed by the Parties pursuant to Section 6 above. "Advertising Revenues" shall mean all monies effectively received by Newco in connection with the sale of advertising, net of any discounts and VAT. For purposes of clarification, any discount granted to purchasers in the sale of advertising, shall not be considered as Advertising Revenues. |
| 10. | Business Plan | The Parties shall develop a comprehensive five-year business plan for Newco that shall set forth pro forma balance sheets, income statements, cash flow projections and capital budgets on intervals to be agreed by the Parties. The business plan shall also include a five-year budget (the "Budget") of capital expenditures, expenses, a cash flow forecast, amounts to be financed through DTVLA's equity contributions, and such other matters as the Parties deem appropriate. |
| 11. | Pre-Launch Broadcast of Content | Before the launch of the Channel, DTVLA shall include certain golf programming and tournament coverage provided by the Avila Entity (the "Pre-Launch Content") as shall be mutually agreed by the Parties. Carlos |

Avila represents that all copyrights, licenses and other rights necessary for DTVLA's broadcast and distribution of the Pre-Launch Content in the Territory have been secured. Carlos Avila shall cause the Pre-Launch Content to be provided to DTVLA for such broadcast and distribution free of charge. DTVLA shall promote the Channel's launch in its broadcast of the Pre-Launch Content.

12. **Pre-Launch Advance**    As promptly as practicable following the execution of this memorandum of understanding, DTVLA (directly or through an affiliate) shall lend an amount of up to US$350,000 (the "Pre-Launch Advance") to an entity to be designated by Carlos Avila (provided that such entity is acceptable to DTVLA in its sole discretion). The Pre-Launch Advance shall be applied for the purchase of equipment necessary for the production of the Channel and for other necessary expenses exclusively in connection with the launch of the Channel. The Pre-Launch Advance shall be subject to the execution of a promissory note and such other documentary conditions as DTVLA shall require in its sole discretion. The Parties acknowledge that the Pre-Launch Advance shall not constitute, be construed or imply a joint venture to produce and distribute the Channel, and that any such agreement is subject to negotiation and execution of definite legal documentation as further described in paragraph 13 below. In the event the parties agree upon a joint venture to produce and distribute the Channel, DTVLA shall have the right to apply the Pre-Launch Advance against the maximum equity contribution set forth in paragraph 4 above.

13. **Definitive Documentation**    The Parties shall work in good faith toward the negotiation and execution of definitive legal documentation embodying the terms and conditions set forth herein. Documentation shall include the Shareholders Agreement, a license agreement (for distribution of the Channel in the Territory by DTVLA) and a management agreement (between the Avila Entity and Newco) and shall contain conditions precedent, representations and warranties and other provisions consistent with the terms and conditions of this MOU to be mutually agreed by the parties.

14. **Confidentiality**    All information or documents exchanged between DTVLA and Carlos Avila, or developed by DTVLA or Carlos Avila in the course of completing the actions contemplated by this MOU, with the exception of publicly available data, shall be treated as confidential and proprietary and shall not be disclosed to any third parties without consent of the non-disclosing party. DTVLA and Carlos Avila shall attempt to specifically identify confidential information as such. In addition, neither DTVLA nor Carlos Avila shall issue any press releases or make any other disclosures relating to the transaction contemplated by this MOU without the prior consent of the other, and without consulting the other about the content and timing of such release or announcement. Carlos Avila shall cause the Avila Entity to abide by the provisions of this paragraph 6 *mutatis mutandis*.

15. <u>Exclusivity</u>    During the Term of this MOU, neither Carlos Avila nor DTVLA shall negotiate with or enter into an agreement or understanding with any third party relating to the creation, development and/or operation of a television programming service dedicated to golf related programs, tournaments and events. Carlos Avila shall cause the Avila Entity to abide by the provisions of this paragraph 7 *mutatis mutandis.*

16. Term of
<u>MOU</u>    This MOU is legally binding on both Parties, subject to the limitations contained in the following paragraph, and shall remain in effect for 30 days from the date hereof. This MOU shall be automatically extended for successive 30-day periods unless terminated in writing by either party prior to the end of the initial term or any extension thereof. This MOU shall be governed by the laws of the State of New York.

By signing below, this MOU shall constitute a binding legal agreement of the Parties with respect to paragraphs 11, 12, 13, 14, 15 and 16 and a non-binding statement of the Parties' mutual intent to negotiate in good faith towards the consummation of a joint venture with respect to the remaining paragraphs.

DIRECTV Latin America, LLC        Carlos Avila

By: _____    _____
Name: Jacopo Bracco
Title:  Senior Vice President

**EXECUTION COPY**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF LATIN AMERICAN SPORTS, LLC**

**AMONG**

**LATIN AMERICAN SPORTS, LLC,**

**DIRECTV LATIN AMERICA, LLC**

**AND**

**PARK 610, LLC**

**DATED**

**AS OF**

**AUGUST 22, 2006**

# TABLE OF CONTENTS

PAGE

**ARTICLE I    DEFINITIONS** .................................................................................1

**ARTICLE II    PURPOSE** ........................................................................................8
    2.1    Purpose ..................................................................................................8
    2.2    Concurrent Documents .........................................................................8
    2.3    Initial Plans ...........................................................................................8

**ARTICLE III    FORMATION, OWNERSHIP AND POWERS** ...........................8
    3.1    Formation ..............................................................................................8
    3.2    Name .....................................................................................................9
    3.3    Initial Capital Contribution ..................................................................9
    3.4    Office and Agent ...................................................................................9
    3.5    Property ..................................................................................................9
    3.6    Powers ...................................................................................................9

**ARTICLE IV    RESTRICTIONS ON MEMBERS** ..............................................9
    4.1    Restrictions on Members ......................................................................9

**ARTICLE V    BOARD OF DIRECTORS** ...........................................................10
    5.1    Directors ..............................................................................................10
    5.2    Meetings ..............................................................................................10
    5.3    Voting Rights; Quorum .......................................................................11
    5.4    Matters Requiring Supermajority Approval .......................................11
    5.5    Modification to Supermajority Approval After Exclusive Period Termination
          Date .....................................................................................................14
    5.6    Lack of Director Supermajority ..........................................................14
    5.7    Dispute Resolution; Escalation. ..........................................................14
    5.8    Remuneration and Reimbursement .....................................................14

**ARTICLE VI    MANAGEMENT MATTERS** .....................................................15
    6.1    Officers ................................................................................................15
    6.2    Annual Plan and Finance Plan ............................................................15
    6.3    Fiscal Year and Quarter ......................................................................15
    6.4    Personnel Policies. ..............................................................................15

**ARTICLE VII    CAPITAL AND FINANCE** ......................................................16
    7.1    Initial Capital Contributions ...............................................................16
    7.2    Percentage of Interest .........................................................................16
    7.3    DTVLA Capital Contributions. ..........................................................16
    7.4    Park 610 Contribution .........................................................................18
    7.5    Impact of Capital Contributions on Members' Percentage Interest .....18
    7.6    Mandatory Defaulting Member ...........................................................18

i

7.7     DTVLA Loan...........................................................................................19
7.8     Additional Capital................................................................................19
7.9     Books and Records ..............................................................................20
7.10    Annual Financial Statements ..............................................................21
7.11    Interim Financial Statements ..............................................................21
7.12    Inspection of Facilities and Records ...................................................21
7.13    Banking Matters...................................................................................21
7.14    Allocation of Income and Losses........................................................21

**ARTICLE VIII    CASH MANAGEMENT AND DIVIDEND POLICIES ...........................22**

**ARTICLE IX      BUSINESS OPERATIONS...............................................................22**
9.1     Business Dealings with the Company...................................................22
9.2     Other Activities of Members and Affiliates.........................................22

**ARTICLE X       RESTRICTIONS ON TRANSFER....................................................22**
10.1    Restrictions on Transfers Generally.....................................................22
10.2    Sale to Third Party and Right of First Offer. .....................................23
10.3    Transfer to Affiliates............................................................................24
10.4    Admission of a Transferee as a Member .............................................24
10.5    Mortgage, Pledge .................................................................................25
10.6    Non-Recognition of Certain Transfers.................................................25

**ARTICLE XI      TAG-ALONG RIGHT......................................................................25**
11.1    Transfers by Members .........................................................................25
11.2    Notification of Proposed Transfers ......................................................26
11.3    Non-cash Consideration .......................................................................26

**ARTICLE XII     COVENANTS..................................................................................26**
12.1    Implementation of Agreement .............................................................26
12.2    Non-Competition..................................................................................27
12.3    Members' Trademarks and Tradenames...............................................27
12.4    Company Trademarks and Tradenames................................................28
12.5    Ethics....................................................................................................28
12.6    Confidentiality .....................................................................................28
12.7    Employment of Company Employees ..................................................29

**ARTICLE XIII    DEFAULTS......................................................................................29**
13.1    Default..................................................................................................29
13.2    Effect of Default ..................................................................................30
13.3    Other Remedies ...................................................................................30
13.4    Call Procedure......................................................................................30
13.5    Put Option ............................................................................................31
13.6    Transition .............................................................................................32

**ARTICLE XIV     TERMINATION .............................................................................32**

**ARTICLE XV    DISSOLUTION**................................................................**32**
    15.1    No Dissolution ..................................................................32
    15.2    Procedure for Dissolution .................................................32
    15.3    Winding Up......................................................................33
    15.4    Survival of Obligations ....................................................33

**ARTICLE XVI    REPRESENTATIONS AND WARRANTIES** ......................**33**
    16.1    Representations of the Parties............................................33
    16.2    Representations of Park 610 ..............................................34

**ARTICLE XVII    INDEMNIFICATION** ............................................................**34**
    17.1    Indemnification by Members for Unauthorized Acts, Etc......................34
    17.2    Indemnification by Company of Individuals ......................35
    17.3    Indemnification by Member for Third Party Claims ..........35
    17.4    Insurance ..........................................................................35
    17.5    Indemnification of Member for Proportionate Liability......................35
    17.6    Indemnification Procedures. .............................................36
    17.7    Remedies Cumulative ......................................................38
    17.8    Survival of Indemnification .............................................38

**ARTICLE XVIII CHANGES REQUIRED BY LAW** ..................................**39**

**ARTICLE XIX    ALTERNATIVE DISPUTE RESOLUTION** ....................**39**
    19.1    Mediation .........................................................................39
    19.2    Litigation..........................................................................39

**ARTICLE XX    MISCELLANEOUS** ..............................................................**40**
    20.1    Subsidiary Companies ......................................................40
    20.2    Advice of Legal Counsel ..................................................40
    20.3    Language...........................................................................40
    20.4    Limitations on Damages ...................................................40
    20.5    Amendment.......................................................................40
    20.6    Waiver ..............................................................................40
    20.7    Notices .............................................................................40
    20.8    Counterparts .....................................................................41
    20.9    Further Assurances...........................................................41
    20.10  Headings ..........................................................................42
    20.11  Governing Law .................................................................42
    20.12  No Third Party Beneficiaries ...........................................42
    20.13  Entire Agreement .............................................................42
    20.14  Succession and Assignment..............................................42
    20.15  Severability ......................................................................42

The Appendices to this Agreement are:

A.     Certificate of Formation
B.     Management Services Agreement
C.     License Agreement
D.     Initial Annual Plan and Initial Finance Plan
E.     [Intentionally Omitted]
F.     Golf Channel Agreement
G.     [Intentionally Omitted]
H.     Initial Directors, Officers and Member Representatives
I.     Production Services Agreement
J.     Ownership Percentages

## LIMITED LIABILITY COMPANY AGREEMENT
## OF LATIN AMERICAN SPORTS, LLC

This LIMITED LIABILITY COMPANY AGREEMENT is made and entered into as of August 22, 2006, by and among LATIN AMERICAN SPORTS, LLC, a limited liability company organized under the laws of the State of Delaware, U.S.A. (the "Company"), DIRECTV Latin America, LLC, a limited liability company organized under the laws of the State of Delaware, U.S.A. ("DTVLA") and Park 610, LLC, a limited liability company organized under the laws of the State of Delaware, U.S.A. ("Park 610") and together with DTVLA, the "Members" and each, a "Member").

WHEREAS, the Members have organized the Company for the purpose of creating, producing and distributing in Latin America, a television channel comprised of golf programming and engaging in any and all lawful business activities related to or incidental to the foregoing; and

WHEREAS, the Company and the Members desire to regulate certain aspects of the relationships among each other and with respect to their ownership, management and control of the Company.

NOW, THEREFORE, in consideration of the mutual covenants, representations and warranties, and subject to the terms and conditions contained herein, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following capitalized terms, as used herein, shall have the meaning set forth below:

"Act" means the Delaware Limited Liability Company Act, as previously or hereafter amended.

"Affiliate" means, with respect to any Person, any other Person that, directly, or indirectly, controls, or is controlled by or is under common control with, such Person. For purposes of this definition, "control" (including the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of such Person, whether through the ownership of voting securities or by contract or agency or such similar arrangement. As applied to an individual, the term "Affiliate" shall include members of such individual's immediate family (spouse and children).

"Agreement" means this Limited Liability Company Agreement and the Appendices attached hereto, each of which is hereby made an integral part of this Agreement and any amendments or additions hereto.

"Annual Plan" is the initial or any subsequent annual business plan and budget approved by the Board of Directors in accordance with, and in the form specified in, Section 6.2, the initial form of which is attached as Appendix D.

"Park 610" is defined in the first paragraph of this Agreement.

"Board of Directors" and "Board" means the board of directors of the Company.

"Business" is defined in Section 2.1.

"Buying Member" is defined in Section 13.4.

"Call Option" is defined in Section 13.2.

"Call Membership Interests" is defined in Section 13.4.

"Capital Call" is defined in Section 7.8.

"Capital Contribution" means each contribution made by a Member to the Company as provided in Article VII.

"Certificate of Formation" means the certificate of formation of the Company, in the form of Appendix A.

"Chairman" means the Chairman of the Board of Directors of the Company.

"Change of Control" means the occurrence after the Effective Date of any of the following events:

(a) any Person (other than the Person who controls a Member on the date hereof) becomes the beneficial owner, directly or indirectly, of more than 50% of the then outstanding voting shares or other equity rights of a Member; or

(b) a Member consolidates with, or merges with or into, another Person or sells, assigns, conveys, transfers, leases or otherwise disposes of all or substantially all of its assets to any Person, or any Person consolidates with or merges with or into a Member where in such event, as a result of such transaction, the Persons who were stockholders of the parent (as defined under "Related Party") immediately prior to such transaction thereafter own securities representing 50% or less of the total combined voting power of the surviving or resulting Person or the Person to whom such assets are sold; or

(c) any stockholder, member or prospective stockholder or member of a Member is granted (i) supermajority voting rights as a stockholder, member or director, (ii) the right to appoint a majority of the members of the Board of Directors or (iii) otherwise obtains effective control of a Member, other than through this Agreement; or

(d)        the Board of Directors of a Member approves, or a Member enters into, an agreement providing for a transaction, event or development that constitutes (or would constitute if consummated) a Change of Control of a parent pursuant to (a), (b) and (c) above;

and,

(e)        with respect to Park 610, a Change of Control shall also be deemed to have occurred if, at any time after the date hereof, Carlos Avila, an Argentine citizen, ceases to own, directly or indirectly, the majority of the total voting power of the then outstanding voting equity of Park 610, unless Carlos Avila, directly or indirectly, maintains the power to direct or cause the direction of management and policies of Park 610.

"Company" is defined in the first paragraph of this Agreement.

"Competitor" means a Person engaged in Direct Competition.

"Concurrent Documents" are the documents listed in Section 2.2, as they may be hereafter amended from time to time.

"Confidential Information" is defined in Section 12.6.

"Default Rate" means a rate of interest equal to the rate per annum announced from time to time by Citibank, N.A. at its principal office as its prime rate (which rate shall change when and as such announced prime rate changes) plus 300 basis points but in no event more than the maximum rate of interest permitted to be collected from time to time under applicable usury laws.

"Defaulting Member" is defined in Section 13.1.

"Director" means a member of the Board of Directors of the Company.

"Director Supermajority" is defined in Section 5.4.

"Dispute" is defined in Section 5.7.

"Dispute Notice" is defined in Section 5.7.

"DTVLA" is defined in the first paragraph of this Agreement.

"DTVLA Loan" is defined in Section 7.7.

"Effective Date" is August 22, 2006.

"Event of Default" is defined in Section 13.1.

"Exclusive Period Termination Date" means the earlier of (a) August 1, 2009, except in the event that DTVLA exercises the option to extend such exclusivity pursuant to Section 5 of the License Agreement, in which case such date shall be August 1, 2010, or (b) the date on which DTVLA makes an election in accordance with Section 7.3(d).

3

"Fair Market Value", as to any property, means the price at which a willing seller would sell and a willing buyer would buy such property having full knowledge of the facts, and assuming each party acts on an arm's-length basis with the expectation of concluding the purchase or sale within a reasonable time in a transaction intended by the seller to maximize sale proceeds, both buyer and seller having reasonable knowledge of the facts and circumstances relevant to the Company; provided, however, that, in the case of Membership Interests, such price shall not include any premium for the control of the entity represented by such Membership Interests or any discount for the lack thereof. In any case where there is no agreement as to the Fair Market Value of any property among the Members, such dispute shall be determined by an appraiser selected jointly by the Members from among the reputable and globally recognized investment banks or other appropriate experts in the valuation of property such as the property in question or, if the Members are not able to agree on the selection of an appraiser within 30 days, each Member shall select an appraiser within 15 days after the expiration of such 30-day period, from among such investment banks or other experts (excluding the Company's certified public accountants at the time, and such accountants' Affiliates), who shall, in each case, independently determine the Fair Market Value of the property in question within 30 days from its or their respective appointment. The Fair Market Value determination of the single appraiser selected by agreement of the applicable Members shall be final and binding on the applicable Members. In the event of the selection of one appraiser by each of the relevant Members, (i) if the Fair Market Value determination of such appraiser with the higher determination is less than 120% of the Fair Market Value determination of such appraiser with the lower determination, Fair Market Value shall equal the average of the determinations by such appraisers, and such Fair Market Value determination shall be final and binding on the applicable Members, and (ii) otherwise, such appraisers shall, within 15 days after the last of their respective determinations is announced to the applicable Members, appoint another deadlock appraiser. The deadlock appraiser shall, within 15 days of its appointment, decide which one of the respective determinations of the previous appraisers more accurately reflects the Fair Market Value of the property in question and that determination shall constitute the "Fair Market Value". Such Fair Market Value determination of the deadlock appraiser shall be final and binding on the Members. If the appraisers are unable for whatever reason to appoint a deadlock appraiser within such 15-day period, any party may elect to have the matter resolved in accordance with the provisions of Article XIX. The Members shall share equally the expense of any appraiser jointly selected by them, and each shall bear the expense of the appraiser it individually selects, if any. If pursuant to this definition, there is a need to appoint a deadlock appraiser, the member whose appraiser's Fair Market Value determination was not selected as the Fair Market Value shall bear all costs and expenses of the deadlock appraiser.

"Finance Plan" means the initial or any subsequent finance plan approved by the Board of Directors in accordance with, and in the form specified in, Section 6.2, the initial form of which is attached as Appendix D.

"GAAP" means the then current generally accepted accounting principles as used in the U.S.A.

"General Manager" is defined in Section 6.1.

"Golf Channel Agreement" means the License Agreement dated as of September 1, 2006 between TGC Inc. and the Company, a copy of which is attached hereto as Appendix F, as it may be hereafter amended from time to time in accordance with the terms hereof.

"Governmental Authority" means any government or political subdivision or department thereof, any governmental or regulatory body, commission, board, bureau, agency or instrumentality or any court, whether domestic or foreign, federal, state or local.

"Income" has the meaning set forth in Section 7.14.

"Indebtedness" in defined in Section 5.4.

"Indemnifying Party" is defined in Section 17.6(a).

"Indemnitee" is defined in Section 17.6(a).

"Initial Annual Plan" means the initial business plan and budget of the Company attached as Appendix D.

"Initial Capital Contribution" is defined in Section 7.1.

"Initial Directors" means the individuals identified as initial director designees in Appendix H.

"Intention Notice" is defined in Section 10.2(a).

"Interest Notice" is defined in Section 10.2(b)(i).

"Interested Member" is defined in Section 10.2(b)(i).

"Latin America" means México, the Caribbean and Central and South America, including Brazil.

"License Agreement" means the signed and executed License Agreement between the Company and DTVLA, a copy of which is attached hereto as Appendix C and which is dated as of August 1, 2006, as it may be hereafter amended from time to time, pursuant to which the Company will provide DTVLA with all necessary rights to distribute the Channel in Latin America, excluding Mexico and Puerto Rico.

"Lien" means any lien, mortgage, encumbrance, pledge, charge, lease restriction, easement, servitude, right of others or security interest of any kind, including any thereof arising under conditional sales or other title retention agreements.

"Losses" has the meaning set forth in Section 7.14.

"Management Services Agreement" means the Management Services Agreement between the Company and Park 610 in the form of Appendix B and dated as of August 1, 2006

as it may be hereafter amended from time to time, pursuant to which Park 610 will perform day-to-day management services for the Company.

"Mandatory Defaulting Member" is defined in Section 7.6.

"Mediation Notice" is defined in Section 19.1.

"Member" and Members" are defined in the first paragraph of this Agreement and includes Member's permitted assigns.

"Member Representative" is defined in Section 5.7.

"Membership Interest(s)" means the limited liability company interests issued by the Company to the Members in consideration of Capital Contributions, and having the powers, rights, qualifications, limitations and restrictions set forth in this Agreement and under applicable law.

"Mexican Programming Fees" means the Dollar amount of any fees received by the Company in respect of the distribution of the Golf Channel Latin America in the United Mexican States, minus any taxes payable by the Company associated with such fees or costs associated with the distribution in Mexico which are not reflected in the Annual Plan.

"Non-Defaulting Member" is defined in Section 7.6(b).

"Offer Notice" is defined in Section 10.2(b).

"Offer Price" is defined in Section 10.2(b)(ii).

"Offering Member" is defined in Section 10.2(b).

"Option Exercise Period" is defined in Section 10.2(a)(i).

"Ownership Percentage" means the percentage of the total Membership Interests of the Company owned by a Member, as set forth on Appendix J, as the same may be adjusted from time to time in accordance with the terms hereof.

"Party" means any of the Company or the Members.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organizations or Governmental Authority.

"Production Services Agreement" means the Production Services Agreement between Latin American Sports, LLC and New Hollywood Producciones S.A., a copy of which is attached hereto as Appendix I and which is dated as of August 1, 2006, as it may be hereafter amended from time to time, pursuant to which TGC, Inc. will provide Latin American Sports, LLC the exclusive right to distribute certain golf-related programming.

"Proposed Purchaser" is defined in Section 11.1.

"Purchase Option" is defined in Section 10.2(a).

"Put Option" is defined in Section 7.3(e).

"Put Membership Interests" is defined in Section 13.5.

"Related Party" of any Person (other than an individual) shall mean (i) any person who is an individual, corporation, partnership or other entity owning all of the outstanding capital stock of such Person ("parent"), (ii) a wholly-owned subsidiary of the Person or any parent of such Person or (iii) a Person all of the ownership of which is held by one or more Related Parties. With respect to any individual, "Related Party" means members of such individual's immediate family and any trust all the beneficiaries of which are such individual or members of his immediate family.

"Remaining Members" are defined in Section 10.2(a).

"Required DTVLA Debt Limit" is defined in Section 7.7.

"Seller Group" is defined in Section 11.1.

"Selling Member" is defined in Section 10.2(a).

"Successor Member" is defined in Section 10.4.

"Tag-Along Members" is defined in Section 11.1.

"Tag-Along Notice" is defined in Section 11.2.

"Third Party Claim" is defined in Section 17.6(a).

"Transfer" means (i) any sale, assignment or transfer of securities, (ii) a sale, assignment or transfer of any economic interest and/or a voting interest ("Interest") in an entity that, directly or indirectly, holds any securities, (iii) a pledge or hypothecation of securities or Interest or any interest therein, (iv) sale, assignment or a transfer of securities convertible into or exchangeable for or other options or rights to acquire securities or Interest or (v) any other direct or indirect, voluntary or involuntary, sale, assignment or transfer of securities or Interest or any interest therein, whether pursuant to a Change of Control or otherwise.

"U.S.A." means the United States of America.

"US$" or "Dollars" means lawful currency of the United States of America.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phase "without limitation." The word "will"

shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all referenced herein to Articles, Sections, and Appendices shall be construed to refer to Articles and Sections of, and Appendices to, this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## ARTICLE II
## PURPOSE

2.1    Purpose.  The purpose of the Company is to create, produce, promote and operate a Spanish and Portuguese language television Channel comprised of golf programming for distribution in Latin America and to engage in such other lawful activities as the Members may determine in accordance with the terms hereof (the "Business").

2.2    Concurrent Documents.  Prior to or contemporaneous herewith, the following documents (the "Concurrent Documents") have been executed and delivered by the Members and/or the Company and/or the relevant third party:

(i)    The Certificate of Formation in the form of Appendix A (delivered to the Members);

(ii)    The Management Services Agreement set forth on Appendix B (executed by the Company and Park 610);

(iii)    The License Agreement set forth on Appendix C (executed by the Company and DTVLA);

(iv)    The Production Services Agreement set forth on Appendix I (executed by the Company and New Hollywood Producciones S.A.); and

(v)    The Golf Channel Agreement between TGC, Inc. and the Company set forth on Appendix F.

2.3    Initial Plans.  The Members hereby adopt (i) the Initial Annual Plan in the form of Appendix D and (ii) the Finance Plan in the form of Appendix D.

## ARTICLE III
## FORMATION, OWNERSHIP AND POWERS

3.1    Formation.  The Company was organized as a limited liability company under the laws of the State of Delaware, effective August 22, 2006.  The Members caused to be

executed and filed a certificate of formation (a copy of which is attached hereto as Appendix A) on such date in the Office of the Secretary of State of Delaware.  From time to time, the Company shall execute and cause to be filed, and the members agree to execute, such certificates, filings and documents in such jurisdictions as may be necessary or appropriate in connection with the conduct of the Business.

        3.2    <u>Name</u>.  The business of the Company shall be conducted under the name "Golf Channel Latin America" or such other or additional name or names and variation thereof as all the Members may from time to time determine.

        3.3    <u>Initial Capital Contribution</u>.  Appendix J sets forth the Ownership Percentage in the Company of each Member, which shall be adjusted from time to time to the extent necessary to reflect accurately any exchanges, redemptions, capital contributions, admission of additional members or similar events having an effect on the Members' Ownership Percentage.

        3.4    <u>Office and Agent</u>.  The Company shall continuously maintain a registered office and a designated and duly qualified agent for service of process on the Company in the State of Delaware.

        3.5    <u>Property</u>.  Except as otherwise provided in this Agreement, the Concurrent Documents or any other contract to which the Company is or becomes a party and as to which the Members have consented or the procedures of Section 5.4 have been followed, (i) all assets and property, whether real, personal or mixed, tangible or intangible, including contractual rights, owned or possessed by the Company shall be owned or possessed in the name of and by the Company and (ii) no Member individually shall have any separate ownership or right of possession in such assets, property or rights.

        3.6    <u>Powers</u>.  Subject to and modified by the terms and conditions of this Agreement and the Certificate of Formation, the Company may exercise all of the powers and privileges granted by this Agreement and by law (including, without limitation, the Act) to the Company.

## ARTICLE IV
## RESTRICTIONS ON MEMBERS

        4.1    <u>Restrictions on Members</u>.  No Member may, without the written consent of the other Members:

        (i)    confess a judgment against the Company;

        (ii)    make any agreement with any third party on behalf of, or otherwise purport to bind, the other Members or the Company or do any act which binds the other Members or the Company, except as otherwise permitted pursuant to this Agreement;

(iii)    do any act that would make it impossible for the Company to carry on the Business;

(iv)    assign the property of the Company or any rights to such property (a) in trust for creditors of such Member, (b) pursuant to the assignee's promise to pay the debts of the Member, or (c) for any other reason whatsoever, or otherwise cause any property of the Company to be encumbered by any Lien;

(v)    release any of its Affiliates, from any obligation under, or related to, this Agreement or the Concurrent Documents; or

(vi)    waive the Company's rights to sue or enforce such rights.

## ARTICLE V
## BOARD OF DIRECTORS

5.1    Directors.  Except as explicitly set forth in Article VI, the management of the business and affairs of the Company is reserved to, and vested in, the Board of Directors. The Board of Directors shall consist of five (5) members; two (2) members shall be designated by DTVLA and three (3) members shall be designated by Park 610.  The Initial Director designees and the Chairman are identified in Appendix H.

The Company shall use its best efforts to assure the election of all such designees. Each Member hereby consents to and approves the election of the Initial Directors as directors effective as of the date set forth in Appendix H to serve in such capacity until their successors are duly elected and qualified or until their earlier resignation or removal.

The Board of Directors shall elect from among the Directors a Chairman who shall preside at all meetings of the Board and shall remain as Chairman until he or she is removed due to death or disability, retires or resigns or is removed by a vote of the Board in accordance with the terms hereof.  Each Member shall have the right to remove any or all of its designated Directors, including the Chairman, at any time; provided that if such Director is the Chairman, the Board shall elect a new Chairman in accordance with the requirements of Section 5.4 hereof.  Any such removal shall be effective upon notice to the Company.  Such notice shall set forth the name, address, and telephone and facsimile numbers of the individual(s) to replace the removed person(s).  Any Directors, including the Chairman, may resign from the Board of Directors.  Such resignation shall be effective upon written notice to the Company.  Upon any such resignation or death of a Director, the Member that originally designated such Director shall designate a successor therefor; provided that if such Director is the Chairman, the Board shall elect a new Chairman in accordance with the requirements of Section 5.4 hereof.  The removal of or resignation by a Director shall not invalidate any act of such Director taken prior to the receipt of the applicable notice by the Company.

5.2    Meetings.  The Board of Directors shall hold regular meetings as the Board may determine and such other meetings as the Board of Directors deems appropriate, and shall establish meeting times, dates, places and requisite notice requirements and adopt rules or procedures consistent with the terms of this Agreement, which shall include rules and procedures

10

for the dissemination of written information to the Directors concerning the items to be acted upon at any regular or special meeting of the Board.  Any meeting notice shall include a proposed agenda for the meeting.  Any Director may call a special meeting of the Board for any purpose by giving the other Directors at least ten (10) calendar days' notice thereof, except in the case of an emergency, in which case, such notice as is practicable shall be sufficient.  Regular meetings of the Board of Directors shall be held at the Company's main office unless otherwise determined by the Board.  The Chairman shall preside at all meetings of the Board of Directors.

        5.3     <u>Voting Rights; Quorum</u>.  Each Director shall be entitled to cast one vote in voting on all matters submitted to the Board of Directors.  Three (3) Directors, including at least one (1) Director designated by DTVLA, shall constitute a quorum, provided, however, that if at least one Director named by DTVLA does not attend a scheduled meeting of the Board of Directors, the Chairman shall immediately call another meeting in accordance with the terms hereof to be held within the next seven (7) days.  The agenda for the subsequent meeting shall be identical in all respects to the proposed agenda previously sent to the Directors.  The quorum for such meeting shall be three (3) Directors, regardless of whether any of such Directors was designated by DTVLA.  Under no circumstances, however, shall this reduction in the quorum requirements have any impact on the Director Supermajority requirements under Section 5.4. Provided a quorum is present and except as provided in Section 5.4 and elsewhere in this Agreement, the affirmative vote, either in person or by proxy, of three (3) of the Directors shall be the act of the Directors.

        5.4     <u>Matters Requiring Supermajority Approval</u>.  Notwithstanding anything herein to the contrary, the affirmative vote, either in person or by proxy, of at least four (4) of the Directors, including both Directors designated by DTVLA, and two Directors designated by Park 610 (a "<u>Director Supermajority</u>") shall be required to take action on any of the following matters:

        (i)     any material change to the overall basic business policy and direction of the Company set forth in the Initial Annual Plan, a copy of which is set forth on Appendix D;

        (ii)     approval, amendment or revision of the Annual Plan and the Finance Plan;

        (iii)     distribution of cash or other property of the Company to the Members;

        (iv)     approval of any contract or commitment not included in the approved Annual Plan which (i) obligates the Company to spend or commit to spend in excess of US$50,000 (or its equivalent in other currencies), individually or, together with all other contracts or commitments entered into and not included in the Annual Plan, US$150,000 (or its equivalent in other currencies) in the aggregate, or (ii) has a term longer than three years;

        (v)     entering into, amending or terminating a contract or agreement or otherwise entering into, amending or terminating any transaction or dealings with a Member, a Director or an Affiliate of a Member or Director, including, without limitation

the Management Services Agreement (in a form other than that attached hereto as Appendix B), the License Agreement attached hereto as Appendix C and the Production Services Agreement attached hereto as Appendix I, except as otherwise provided herein;

(vi)    amending, assigning, extending or terminating the Golf Channel Agreement or any of the rights granted thereunder, or entering into any discussions regarding such actions with TGC Inc. or any other holder of the rights granted under the Golf Channel Agreement, except as otherwise provided herein;

(vii)    unless previously approved in an Annual Plan or a Finance Plan, acceptance of the terms of any bonds, loans, guarantees, or indebtedness of the Company, individually or in the aggregate, in excess of US$30,000 or the issuance by the Company of a guarantee of the obligations of any other Person (collectively, "Indebtedness");

(viii)    adoption and amendment of employee benefit and compensation plans for employees of the Company;

(ix)    material change of the Business of the Company;

(x)    determination of the policy for the distribution and use of the excess cash flow and the covering of the losses of the Company, other than as provided in this Agreement and the applicable Annual Plan;

(xi)    establishment and maintenance of a policy for a risk management program (including insurance) for (a) all assets and properties of the Company, (b) all potential legal liabilities arising out of Company activities, (c) all statutory or other legal responsibilities regarding employees and (d) other possible exposures of the Company;

(xii)    decisions with respect to the hiring and firing of key personnel and setting or changing the annual compensation of key personnel, including, in each case and without limitation, the General Manager;

(xiii)    decisions with respect to any filings with or public comments to any Governmental Authority;

(xiv)    approval of any significant action or transaction not in the ordinary course of the Business of the Company and not previously approved in an Annual Plan or a Finance Plan;

(xv)    entering into any agreement or commitment the effect of which is to make the Company liable for special, punitive or consequential damages;

(xvi)    creation of any Liens upon any assets or properties of the Company, other than (a) any imperfections of title or other liens that, individually or in the aggregate, are not substantial in character or amount and do not materially impair the value of or materially interfere with the use of any of the assets or properties subject thereto or (b) liens relating to obligations approved under this Section 5.4;

(xvii)    adoption of the financial statements of the Company for each Fiscal Year;

(xviii)    alteration of any provision of the Certificate of Formation or the passing of any resolution inconsistent herewith or the amendment of this Agreement;

(xix)    any call for additional capital and the form thereof (whether debt, equity or capital contribution) not previously included in and approved with respect to an Annual Plan or Finance Plan and not otherwise contemplated by Section 7.3(f) or Section 7.7(a);

(xx)    subscription, purchase or acquisition of stock or any other equity interest in, or all or substantially all of the assets of, another corporation, partnership, trust, limited liability company, or other entity (other than a temporary investment of cash in marketable securities);

(xxi)    voluntary winding up, dissolution or liquidation of the Company, the filing of a petition in bankruptcy or for reorganization under any bankruptcy law, consent to having an order for relief entered against it under any bankruptcy or similar law, or otherwise having the Company adjudicated bankrupt or insolvent, the making of an assignment for the benefit of creditors, or the appointment of a receiver, trustee or custodian for a substantial portion of its business or properties by virtue of an allegation of insolvency or any similar action under any law;

(xxii)    creation, issuance, grant, or sale of any Membership Interest or rights to subscribe for, convert into or otherwise acquire a Membership Interest except authorized Transfers as permitted under this Agreement;

(xxiii)    reorganization, consolidation, combination or merger, or sale, transfer or other disposition of all or substantially all of the assets of the Company;

(xxiv)    consolidation, sub-division, increase, reduction, diminution, redemption or cancellation of any Membership Interest;

(xxv)    incorporation of any subsidiary;

(xxvi)    decisions with respect to and supervision of any investments made by, or on behalf of the Company, except as provided in the Annual and Financial Plans;

(xxvii)    decisions with respect to any agreement in principle to initiate (including the filing of a counterclaim) or settle any legal or regulatory proceedings or arbitration, other than routine debt collection, or to initiate arbitration, where the amount in controversy or the value to the Company (as determined by the Chairman) exceeds US$30,000 (or its equivalent in other currencies);

(xxviii)    appointment or removal of the accountants or auditors or any counsel to the Company;

13

(xxix)     naming the Chairman of the Board of Directors;

(xxx)     entering into any agreement to license or distribute (a) the content produced by the Company or (b) rights held by the Company to any third party; and

(xxxi)     entering into any agreement to effect any of the above.

5.5     <u>Modification to Supermajority Approval After Exclusive Period Termination Date</u>.  After the Exclusive Period Termination Date, the matters listed in subsections (iv), (viii), (xi), (xii), (xxviii), (xxix) and (xxx) of Section 5.4 shall not be subject to Supermajority Approval and, therefore, shall be adopted by the affirmative vote of the simple majority of the Directors, subject always to the remaining terms of this Agreement.

5.6     <u>Lack of Director Supermajority</u>.  If a resolution concerning any of the matters in Section 5.4 is proposed and not agreed to by a Director Supermajority, the officers of the Company may, and shall have the responsibility to, continue to manage the day-to-day affairs of the Company in the Company's sole best interest within the bounds of the specifically approved matters of the Company's then current Annual Plan.

5.7     <u>Dispute Resolution; Escalation</u>.

(a)     In the event a resolution concerning matters in Section 5.4 has been proposed at a meeting of the Board of Directors and has not been passed by a Director Supermajority, unless such resolution is either withdrawn or otherwise dealt with to the satisfaction of a Director Supermajority, said matter (a "<u>Dispute</u>") shall, upon written request of any Director given to the Board (the "<u>Dispute Notice</u>"), immediately be referred to the principal representative of each Member (as identified on Appendix H hereto (each a "<u>Member Representative</u>")).  If the Member Representatives have not resolved the Dispute within fifteen (15) days of the delivery of the Dispute Notice to the Board, the Member Representatives shall refer the Dispute to the principal officer of Park 610 and a Senior Vice President of DTVLA, respectively (or successors to such persons having similar functions), who shall attempt to resolve the dispute.

(b)     In the event that any Dispute referred to above is not resolved at the end of the 30-day period following delivery to the Board of a Dispute Notice, the Parties shall continue to cooperate in good faith to attempt to resolve the Dispute.

5.8     <u>Remuneration and Reimbursement</u>.  No Director, unless working for the Company on a full-time basis, shall be remunerated for services to the Company.  The Company shall reimburse reasonable travel and other costs and expenses incurred by Directors, or committee members in connection with attending meetings of the Board of Directors and other services performed for or on behalf of the Company upon presentation of receipts for such reimbursable costs and expenses.

# ARTICLE VI
# MANAGEMENT MATTERS

6.1    <u>Officers</u>.  The day to day operations of the Business conducted by the Company in Latin America, including, but not limited to, affiliate and advertising sales and promotion policies and actions and the hiring and relationship with the production service provider, shall be conducted by a general manager to be appointed by Park 610 in consultation with DTVLA and approved by the Board of Directors in accordance with Section 5.4 (the "<u>General Manager</u>").  The General Manager, will have the authority to appoint such other officers as may be necessary or desirable to carry out the day-to-day management of the Business of the Company in Latin America.   A list of the initial officers of the Company is included on Appendix H attached hereto.

6.2    <u>Annual Plan and Finance Plan</u>.  The Parties have approved a five (5) year business plan, which is attached hereto as Appendix D (the "<u>Initial Annual and Finance Plan</u>"). The General Manager shall prepare or cause to be prepared the Annual Plan and the Finance Plan at least ninety (90) calendar days in advance of the commencement of each Fiscal Year.  The Annual Plan and the Finance Plan shall be subject to the approval of the Board of Directors in accordance with Section 5.4 hereof.

Each subsequent Annual Plan shall include a three (3) year business and marketing plan for the Company which shall set forth pro forma balance sheets, income statements, cash flow projections and capital budgets on a quarterly basis for the first two (2) years and on an annual basis for the final year.  The Annual Plan shall also include production and personnel plans and such other matters as the Board of Directors deems appropriate.  The Finance Plan shall include a three (3) year budget of capital expenditures, expenses, a cash flow forecast, amounts to be financed through Member capital contributions, and third party borrowings on a quarterly basis for the first two (2) years and on an annual basis for the final year, and such other matters as the Board of Directors deems appropriate.

The Members shall cause their respective employees and Directors to cooperate in good faith to finalize by the thirtieth day before the end of the then current fiscal year any Annual Plan or Finance Plan to be submitted for Board of Directors approval.  The production planning schedules shall be approved by the Board of Directors prior to the commencement of each annual period.

6.3    <u>Fiscal Year and Quarter</u>.  The fiscal year of the Company shall begin January 1st and end December 31st.  Fiscal quarters shall be calendar quarters.

6.4    <u>Personnel Policies</u>.

(a)    The General Manager shall determine the employment needs of the Company in accordance with the Annual Plan.  The General Manager shall determine whether to fulfill such needs by hiring independent employees of the Company or by requesting the secondment of employees from the Members.

15

(b)     Any seconded employees when performing such services for the Company, shall report to and take direction from the General Manager or his designees.  Unless the parties otherwise agree, the seconded employees shall, however, at all times remain employees of DTVLA or Park 610 or their respective Affiliates, as the case may be, for the purposes (without limitation) of employment, termination of employment, compensation for loss of office, statutory employment rights, benefits, and other personnel policies.

(c)     Each Member shall be compensated on a monthly basis (or on such other periodic basis as such Member and the Company may agree) by the Company for the costs, including salary, benefits and other compensation (including travel and lodging) associated with any seconded employees and shall provide the Company with an invoice itemizing such costs.

(d)     The Company shall seek to deal directly with its employees, without any external intermediary parties, and shall cause the adoption of such personnel policies and practices as appropriate in order to reasonably achieve such results.  The Company shall establish personnel practices that fairly reward employees for services rendered in a manner consistent with common business practices in their location of employment.

(e)     Employees of the Company shall execute agreements regarding the confidentiality of information learned by them in the course of their employment, and other matters deemed appropriate by the Board of Directors.  No Member shall recruit employees of the Company in a manner intended to circumvent restrictions on disclosure of proprietary or confidential information used in the Company.

### ARTICLE VII
### CAPITAL AND FINANCE

7.1     Initial Capital Contributions.  The dollar amounts or other property or obligations shown in the Initial Annual Plan as "Paid In Capital" shall constitute each Member's respective initial capital contribution (the "Initial Capital Contribution").  The values of such Initial Capital Contribution set forth below and in the Initial Annual Plan will be deemed to be the amount of such Member's Initial Capital Contribution.

7.2     Percentage of Interest.  The Members in the aggregate shall own all of the Membership Interests in the Company.  The initial Ownership Percentage of each Member in the Company shall be as follows: Park 610, 55%; and DTVLA, 45%.  Such Ownership Percentages may change from time to time in accordance with the terms hereof in which case Appendix J shall be amended to reflect such change.

7.3     DTVLA Capital Contributions.

(a)     Subject to Section 7.3(b) and 7.3(d), in exchange for its 45% ownership interest in the Company, DTVLA shall contribute funds to the Company as needed in an amount sufficient to cover the Company's acquisition of programming rights and its operating and production costs (including pre-launch expenses approved by DTVLA) set forth in the Initial Annual Plan, up to the following maximum amounts, except as contemplated in Section 7.3(f):

| Period | Maximum Amount |
|---|---|
| July 1, 2006 to December 31, 2006 | US$1,500,000 |
| January 1, 2007 to July 31, 2007 | US$1,500,000 |
| August 1, 2007 to January 31, 2008 | US$1,000,000 |
| February 1, 2008 to July 31, 2008 | US$1,000,000 |
| August 1, 2008 to January 31, 2009 | US$1,000,000 |
| February 1, 2009 to July 31, 2009 | US$1,000,000 |

(b)      DTVLA's Capital Contributions shall be made in U.S. dollars, in cash or immediately available funds, up to the maximum amounts described above and as established in the Initial Annual Plan pursuant to mandatory capital calls of the General Manager on no less than thirty (30) days' prior notice to DTVLA.  The notice shall specify the amount of funds to be provided, the date on which funds are to be provided and the account of the Company to which such funds are to be transmitted.

(c)      Any portion of the above maximum capital contributions that is not funded by DTVLA during the corresponding period shall be carried over to the subsequent period and shall increase DTVLA's obligations for such subsequent period by the amount carried forward.  Subject to the provisions of Section 7.3(f) below, in no event shall DTVLA's aggregate maximum amount of capital contributions exceed US$7,000,000 unless otherwise agreed by DTVLA.

(d)      DTVLA shall have the option to reduce such funding commitment by up to a year and below the aggregate limit set forth above in connection with a reduction of the DTVLA exclusivity period for the distribution of the Golf Channel in Latin America, as provided in the License Agreement.  The option shall entitle DTVLA to limit its funding responsibilities to the amounts required during the twelve months immediately following the exercise of such option.  At any time on or after August 1, 2007, DTVLA may, by written notice to the Company and each other Member, elect that its capital contributions under Section 7.3(a) shall cease on the first anniversary of the Exclusive Period Termination Date.  For the avoidance of doubt, none of the foregoing shall cause DTVLA's 45% Ownership Percentage to be reduced or its rights hereunder revised.

(e)      If DTVLA makes an election under Section 7.3(d), DTVLA shall also have the right to require Park 610 to purchase its Membership Interests (the "Put Option") as provided in Section 13.5 and Park 610 shall have the right to require DTVLA to sell its Membership Interests (the "Call Option") as provided in Section 13.4.

(f)      If the Exclusive Period (as defined in the License Agreement) is extended for all of Latin America for a fourth year (from August 1, 2009 to July 31, 2010) pursuant to Section 5 of the License Agreement, DTVLA's capital contribution obligations shall

17

be increased by a maximum aggregate amount of US$2,000,000 (but only to the extent such funds are required by the Company), which shall be paid in accordance with the terms hereof during such additional year of the Exclusive Period.

(g)     For any period for which DTVLA has an obligation to contribute funds under Section 7.3(a) or 7.3(f), the obligation of DTVLA to make contributions under Section 7.3(a) or 7.3(f) shall be reduced by an amount equal to the Mexican Programming Fees received by the Company during such period or any prior period, which were not previously used to offset DTVLA's funding obligations, in each case net of any unbudgeted costs directly related to the distribution of the Golf Channel in Mexico.  In addition, to the extent not already applied to reduce DTVLA's capital contributions, the Company shall refund to DTVLA an amount equal to all Mexican Programming Fees received at any time that relate to periods for which DTVLA made capital contributions under Section 7.3(a) or 7.3(f), up to a maximum of the total capital contributions made by DTVLA for such period.

7.4     Park 610 Contribution.   In exchange for its Membership Interest, Park 610 has procured and negotiated the Golf Channel Agreement for execution by the Company and provided other valuable consideration, the receipt and sufficiency of which are recognized by each of the Company and DTVLA.

7.5     Impact of Capital Contributions on Members' Percentage Interest.  In the event that the Members make their respective contributions pursuant to Sections 7.3 and 7.4 (including, without limitation, the contribution established in Section 7.3(f)), then no additional Membership Interests shall be issued in connection with such contributions and each Member's Ownership Percentage shall remain the same as prior to the making of such contribution.

7.6     Mandatory Defaulting Member.  If any Member (the "Mandatory Defaulting Member") fails to contribute timely all or any portion of the mandatory contributions as per Sections 7.3 and 7.4., the Company may after giving such Mandatory Defaulting Member five (5) days to cure such default, elect to exercise one of the following remedies (provided, however, that a Mandatory Defaulting Member (or its designee on the Board) shall not be permitted to vote with respect to the election of any of the following remedies by the Company):

(a)     Taking such action, including court proceedings, as the Board may deem appropriate to obtain payment by the Mandatory Defaulting Member of the portion of the Mandatory Defaulting Member's Mandatory Capital Contribution that is in default, together with interest thereon at the Default Rate from the date that the capital contribution was due until the date that payment is made, all at the cost and expense of the Mandatory Defaulting Member; or

(b)     Causing the Company to reduce the Ownership Percentage of the Mandatory Defaulting Member and increase the Ownership Percentage of the other Member (the "Non-Defaulting Member"), and permitting the other Member to advance all or any portion of the capital contribution required of the Mandatory Defaulting Member.  The percentage decrease in the Ownership Percentage of the Mandatory Defaulting Member under these circumstances (and the concomitant percentage increase in the Ownership Percentage of the Non-Defaulting Member) shall be determined by dividing the dollar amount that the Mandatory Defaulting Member failed to contribute by the Fair Market Value (as defined in this Agreement) of the

Company at the time of calculation (after giving effect to any portion of the Defaulting Member's Mandatory Capital Contribution made by the Non-Defaulting Member).

7.7    DTVLA Loan.

(a)    If, at any time prior to the Exclusive Period Termination Date, the Board of Directors determines that the capital contribution provided by DTVLA under Section 7.3(a) is insufficient to cover the Company's operating and production costs due to a shortfall in the projected revenues contained therein, upon notice from the Company of such circumstances, DTVLA shall provide debt financing to the Company (each such financing, a "DTVLA Loan") in an amount to be agreed by the Members up to a maximum aggregate amount (per calendar year) of US$1,000,000 (the "Required DTVLA Debt Limit").  Amounts loaned to the Company under a DTVLA Loan shall accrue interest at a market interest rate to be determined by the Parties and shall be repaid by the Company in equal quarterly installments over two years commencing from the first anniversary of the Exclusive Period Termination Date.

(b)    Upon request by the Company or the Board of Directors, DTVLA shall have the option to provide a DTVLA Loan to the Company in circumstances other than those set forth in Section 7.7(a) above, including, without limitation, in an amount greater than the Required DTVLA Debt Limit or in the event of increased costs or changes in the Annual Plan that are approved in accordance with Section 5.4 above, DTVLA's exercise of such option shall be in its sole discretion.

(c)    At any time on or before the third anniversary of the Exclusive Period Termination Date, DTVLA may, at its option, require the Company to convert any accrued and unpaid amounts due under any DTVLA Loan, in a net aggregate amount of up to US$1,000,000, into Membership Interests at the ratio of US$250,000 of debt for Membership Interests equaling one percent (1%) of the total number of Membership Interests issued and outstanding at such time.  The Members agree to cause the Certificate of Formation to be amended so as to modify the authorized capital structure as may be required to effect such a conversion.

7.8    Additional Capital.

(a)    The anticipated financing needs of the Company for the next five (5) years are set forth in the Initial Finance Plan.  If, at any time on or after the Exclusive Period Termination Date, the Board of Directors determines that it is not possible or economically desirable or feasible (due, for example, to high interest rates or unfavorable terms) for the Company to obtain third party financing and there is no agreement between the parties to use a DTVLA Loan pursuant to Section 7.7(b), the Board of Directors shall notify the Members of the amount of additional capital needed by the Company (subject to the approval of the Board as set forth in Section 5.4) and whether such capital will be in the form of debt, equity or capital contribution (a "Capital Call").  Each Capital Call also shall specify the intended use of the funds and, assuming approval by the Members, the Company shall be authorized to use such funds only for the purposes so specified and approved.  Each Member shall provide additional capital to the Company in the form agreed by the Board of Directors on a pro rata basis in accordance

19

with each Member's Ownership Percentage in the amounts and at the times specified by the Board of Directors.

(b)    If a Member intends not to fund a Capital Call approved by the Board of Directors, such Member shall promptly notify the Chairman who will promptly notify the other Members.  In addition, if a Member fails to fund the approved Capital Call when due, the Chairman shall promptly provide written notice of such failure to the other Members no later than the day following the date such funds were due.  Any Member may fund all or any part of the unfunded commitment, pro rata in accordance with such Member's Ownership Percentage, provided such funding is made within twenty (20) days following receipt of written confirmation of the dilution value to be applied pursuant to Section 7.8(c).  In the event any other Member does not fund its respective pro rata portion of the unfunded commitment, any remaining unfunded amount shall be offered to those Members who chose to fund their pro rata portion of the unfunded commitment, pro rata based upon their Ownership Percentage.

(c)    Any Member that fails to fund a Capital Call approved by the Board of Directors shall be deemed to have breached its obligations under this Agreement and, notwithstanding any preemptive rights and rights of first refusal in respect of Membership Interests of the Company, its Ownership Percentage shall be diluted and the Ownership Percentages of the Other Members will be increased pro rata.  The non-participating Member and the participating Member shall use reasonable and good faith efforts to agree to a fair and equitable dilution formula within ten (10) Business Days after the date of the capital contribution.  If they are unable to agree to a formula, the participating Member shall appoint a single appraiser, at the non-participating Member's cost and expense, to determine the Fair Market Value of the Company using the methodology set forth in the definition of Fair Market Value (except for the provisions dealing with the naming of appraisers).  Such single appraiser's determination of Fair Market Value shall be conclusive and binding on the Parties, and the Members' Ownership Percentages will be adjusted to reflect the capital contribution of the participating Members using a valuation of the Company equal to 80% of the Fair Market Value determined by the single appraiser.

7.9    Books and Records.  The books of account for the Company shall be kept and maintained at the principal office of the Company or at such other place as the Board of Directors may determine from time to time.  The books of account shall be maintained on an accrual basis in accordance with GAAP consistently applied with reference to all Company transactions.  The books and records shall include the designation and identification of any property in which the Company owns a beneficial interest.  Such records shall also include, without limitation, the ownership of property (real, personal, and mixed), as well as any property in which the Company owns an interest and the title to which has been recorded or is maintained in the name of one of the Members without designation of the Company.  The Company shall keep full and complete books of account, which shall be maintained in a manner that provides sufficient assurance that the transactions of the Company are recorded in a manner to comply with this Agreement and all applicable laws.  The Parties shall cause the Company to preserve all relevant books and records for not less than five years from the date of their creation or for such period as required by law.

7.10    Annual Financial Statements.  No later than forty (40) days following the end of each fiscal year, the General Manager shall cause to be prepared and delivered to each Member a profit and loss statement for the Company and a statement of changes in financial position for such fiscal year, and a balance sheet for the Company, prepared in accordance with GAAP.  Independent auditors shall be appointed to audit the annual financial statements of the Company.  The initial independent auditors shall be selected by the Board of Directors in accordance with Section 5.4 hereof, and the Board of Directors may appoint other independent auditors in their place from time to time in the same manner, provided, however, that notwithstanding any other provision of this Agreement, such independent auditor shall be a "Big Four" internationally recognized accounting firm.  The independent auditors shall audit the financial statements prepared by the Company in accordance with GAAP.

7.11    Interim Financial Statements.  (a)  As soon as practicable (but no later than ten (10) days) after the end of each month, the General Manager shall cause to be prepared and delivered to each Member, an income statement for the Company and a statement of changes in financial position for such month and for the portion of the Fiscal Year then ended, and a balance sheet for the Company as at the end of such month, prepared in accordance with GAAP and on a basis consistent with the Company's Annual Financial Statements.

(b)    As soon as reasonably practicable after the end of each Fiscal Year of the Company, and in any event no later than six (6) months after the end of such Fiscal Year, the Company shall provide each Member with the appropriate Schedule K-1 setting forth such Member's share of the profits or losses of the Company (subject to Section 7.14 below) for the prior Fiscal Year, in a form acceptable to such Member.

7.12    Inspection of Facilities and Records.  Each Member shall have the right to inspect the facilities of the Company and to examine the books of account and records of the Company at all reasonable times during usual business hours.  Each Member also shall have the right to audit the Company's compliance with any policies adopted by the Company.  Such right may be exercised through any agent, employee or representative of such Member designated by it, or by an independent public accountant.  The Member conducting such examination or inspection shall bear all costs and expenses incurred in connection therewith.

7.13    Banking Matters.  Funds of the Company shall be deposited in such banks or other depositories as determined by the General Manager.  Checks or other orders of withdrawal shall be drawn upon the Company's account or accounts only for purposes of the Company and shall be signed by such officers or authorized representatives as are designated by the Board of Directors, subject to any conditions or limitations which it may set.

7.14    Allocation of Income and Losses.  During the Exclusive Period (as the same may be extended from time to time), and to the extent they may be utilized by DTVLA in any manner, all Losses shall be allocated to DTVLA.  Except as set forth in the preceding sentence, or as otherwise may be agreed by the Members in writing from time to time, the Income and Losses of the Company for each taxable year of the Company shall be allocated among the Members in accordance with each Member's Ownership Percentage. The terms "Income" and "Losses" shall mean the amounts determined for the Company for each taxable year of the Company in accordance with the accounting method followed by the Company for

21

federal income tax purposes and in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Section 703(a)(1) shall be included in taxable income or loss).

## ARTICLE VIII
## CASH MANAGEMENT AND DIVIDEND POLICIES

In the event cash or cash equivalents held by the Company exceed the net anticipated cash requirements (excluding such items as reserves and capital expansion plans) of the Company for the immediately following semi-annual period (as set forth in the Annual Plan or any subsequent approved budget), such excess cash shall be applied in the following order: (i) to the repayment of all outstanding loans from Members or other debt owed by the Company to the Members on a pro rata basis and (ii) to the Members as a distribution in accordance with applicable law (including the Act).

## ARTICLE IX
## BUSINESS OPERATIONS

9.1     Business Dealings with the Company.  A Member or any Affiliate thereof may enter into contracts or agreements with the Company and otherwise enter into transactions or dealings with the Company on an arm's-length or other reasonable basis and derive and retain profits therefrom, provided that any such contract or agreement or other transaction or dealing is approved by the Board of Directors pursuant to Section 5.4(v).  The validity of any such approved contract, agreement, transaction or dealing or any payment or profit related thereto or derived therefrom shall not be affected by any relationship between the Company and such Member or any of its Affiliates.

9.2     Other Activities of Members and Affiliates.  No Director, employee of the Company or seconded employee shall be obligated to reveal confidential or proprietary information belonging to any Member or a Member's Affiliates without the consent of such Member or its Affiliate, as applicable.

9.3     Business Operations.  During the Exclusive Period, whenever the Company, either directly or indirectly, or through a third-party, seeks to obtain programming rights, it shall do so for all of Latin America and shall not enter into any programming agreements that do not include rights for all of Latin America without prior written consent of DTVLA.

## ARTICLE X
## RESTRICTIONS ON TRANSFER

10.1    Restrictions on Transfers Generally.  No Member shall Transfer all or any part of its Membership Interests to any Person except as specifically permitted herein or pursuant to the Golf Channel Agreement.  Notwithstanding the provisions of this Article X, in no event shall a Transfer be allowed to:

(i)        a Competitor without the prior written approval of DTVLA and Park 610; or

(ii)        any other Person or entities that will purchase the Membership Interests for reasons other than bona fide investments, such as to gain sensitive or protected information of the Company or the Members; or

(iii)        any person who is prohibited by law or regulation from being a participant in the Business.

10.2    Sale to Third Party and Right of First Offer.

(a)        In the event a Member ("Selling Member") desires to transfer all or any part of its Membership Interests to a person other than an Affiliate and has received a bona fide offer from such proposed transferee, the Selling Member shall deliver notice to the other Members ("Remaining Members") of its intention to transfer ("Intention Notice"), together with a copy of the offer, which shall include the purchase price and any other material terms of such offer, and the Remaining Members shall have an option ("Purchase Option") to purchase such Membership Interests at the price and conditions included in the offer.

(i)        A Member may exercise the Purchase Option by giving written notice to the Selling Member of its intention to purchase the Selling Member's Membership Interests within 30 days after receipt of the Intention Notice ("Option Exercise Period").  The purchase shall be made within 30 days after giving the written notice to the Selling Member.  The purchase will be made in cash and on the same terms as the Selling Member proposed to sell the Membership Interests to the proposed transferee or as otherwise agreed by the parties.

(ii)        If the Purchase Option is not exercised within the time provided in subsection (i), the Selling Member may sell its Offered Membership Interests to the proposed transferee at a price not less than that provided in the offer and on the terms and conditions no more favorable to the third party than those set forth in the offer, within 60 days after the expiration of the Option Exercise Period (or such longer period as may be necessary to obtain any approvals required by government authorities). Notwithstanding the foregoing, the Remaining Member shall have the right to exercise its tag-along rights with respect to any such transaction in accordance with Article XI.

(b)        In the event a Member ("Offering Member") desires to transfer all or any part of its Membership Interests to a person other than an Affiliate but has not received a bona fide offer from a third party, the Offering Member must first offer its Membership Interests to the Remaining Member.  The Offering Member shall deliver a notice to the Remaining Member of its desire to sell its Membership Interests and the price at which it proposes to sell its Membership Interests ("Offer Notice").

(i)        The Remaining Member shall have the option to give notice of interest in purchasing the Membership Interests ("Interest Notice") within 30 days after

23

receipt of the Offer Notice. In its Interest Notice, the Remaining Member giving such notice ("Interested Member") may agree to the price stated in the Offer Notice.

        (ii)      If the Interested Member does not agree to the price stated in the Offer Notice, the Interested Member and the Offering Member shall negotiate a mutually acceptable price, which shall become the "Offer Price." Unless the parties agree to the price stated in the Offer Notice, the purchase price shall be the Offer Price. The purchase, if any, shall be made in cash.

        (iii)     If the Interested Member does not agree to the price stated in the Offer Notice and an Offer Price is not determined within 15 days after the period for the giving of an Interest Notice, the Offering Member may withdraw its offer within 5 days after the expiration of such 15-day period.

        (iv)     If all of the Membership Interests in the Offer Notice are not purchased by the Remaining Member, the Offer shall be deemed to have expired.

        (c)      The options of the Members to purchase Membership Interests under Section 10.2(a) or Section 10.2(b) shall be exercisable pro rata in accordance with their Ownership Percentage at the time of the offer of Membership Interests. In exercising any purchase option under Section 10.2(a) or 10.2(b), a Member may purchase all, but not less than all, of its pro rata share of the number of Membership Interests proposed for sale by the Selling Member or Offering Member in its Intention Notice or Offer Notice, as applicable (its first round pro rata share). If less than all of the Members exercise their options, those Members that did exercise their options may, within the next five days, elect to purchase the offered Membership Interests for which options were not exercised, in proportion to their Ownership Percentages. This process shall be repeated until the entire amount of offered Membership Interests is purchased or until no Member elects to purchase any further offered Membership Interests. If all of the offered Membership Interests are not elected for purchase by the Members who had purchase options, those Members that did elect to purchase Membership Interests shall by mutual agreement among them locate another transferee(s) to purchase any or all remaining offered Membership Interests.

        10.3    Transfer to Affiliates. Subject to Section 10.1 and Section 10.4, a Member may at any time, upon notice to the other Members, Transfer all, or any part, of its Membership Interests to an Affiliate; provided, however, that the transferor Member shall remain responsible to the other Members for all of its duties and obligations hereunder and hereby guarantees the performance by its transferee of all of such transferor Member's duties and obligations hereunder. In the event an Affiliate to which Membership Interests have been Transferred ceases to be an Affiliate, then such Affiliate shall, upon or prior to ceasing to be an Affiliate, transfer such Membership Interests back to the Member from which it acquired the Membership Interests.

        10.4    Admission of a Transferee as a Member. If, in accordance with this Agreement, a Member Transfers its Membership Interests to a transferee other than a Member (the "Successor Member"), the admission of the Successor Member as a member of the Company shall be conditioned upon the receipt by the non-affiliated Member of the following:

(i)        The Successor Member's agreement in writing to be bound by all of the terms of this Agreement, assuming the rights, duties and obligations of the transferor Member hereunder and thereunder;

(ii)        Such other documents or instruments as may be required in order to effect its admission as a Member under this Agreement and applicable law; and

(iii)        An opinion of counsel of the transferee or transferor Member, reasonably satisfactory to the other Members, that such transfer shall not cause a dissolution of the Company, and with respect to such other matters as such other Members shall reasonably request.

In the event Membership Interests of a Member are Transferred as contemplated in this Section, the Successor Member shall (unless the transferor Member remains liable therefor) assume all obligations of the transferor Member under this Agreement, and of any other Affiliate thereof under the Concurrent Agreements which are assigned, and for any Indebtedness to the Company.

Upon a transfer pursuant to the terms of this Section, the admission of the Successor Member as a member of the Company shall occur, and for all purposes shall be deemed to have occurred, immediately prior to the Transfer of its Membership Interests by the Member.  Upon such Transfer, the transferor Member shall cease to be a Member of the Company.

10.5    Mortgage, Pledge.  No Member, without the consent of the other Members, shall create or permit to arise any mortgage, charge, pledge, lien or other encumbrance on its Membership Interests.

10.6    Non-Recognition of Certain Transfers.  Notwithstanding any other provision of this Agreement, any Transfer of an interest in the Company in contravention of any of the provisions of this Article shall be void and ineffective ab initio, and shall not bind or be recognized by the Company.

## ARTICLE XI
## TAG-ALONG RIGHT

11.1    Transfers by Members.  With respect to any proposed Transfer of Membership Interests by any Member and/or any Affiliates of such Member that directly or indirectly own Membership Interests or any interest therein and/or any Related Party of any of the foregoing (such persons being hereinafter referred to collectively as the "Seller Group") to a person or persons (the "Proposed Purchaser"), no such proposed Transfer shall be permitted to be made unless and until the proposed transferor shall have given each of the other Members (the "Tag-Along Members") the right and opportunity to Transfer Membership Interests held by such Tag-Along Members to the Proposed Purchaser.  Each Tag-Along Member shall have the right to Transfer to the Proposed Purchaser a portion of its Ownership Percentage determined by multiplying (i) the Ownership Percentage of such Tag-Along Member by (ii) a fraction, the numerator of which is the total Ownership Percentage proposed to be purchased by the Proposed

Purchaser and the denominator of which is the Ownership Percentage of the Seller Group.  The Selling Member shall, prior to any proposed Transfer, notify, or cause to be notified, all Tag-Along Members in writing of such proposed Transfer.  Such notification shall be in accordance with Section 11.2.  Notwithstanding the foregoing, the tag-along right provided in this Section 11.1 shall not apply to any Permitted Transfers.

      11.2    <u>Notification of Proposed Transfers</u>.  In the event of a proposed Transfer pursuant to Section 11.1, the proposed transferor shall notify in writing all Tag-Along Members of the proposed Transfer.  Such notice shall be delivered on the date of the expiration of the Option Exercise Period as set forth in Section 10.2(a)(i) and shall set forth: (i) the name of the proposed transferor, the Ownership Percentage and the percentage of the transferor's total Membership Interest proposed to be sold, (ii) the name and address of the Proposed Purchaser, (iii) the proposed amount and form of consideration and terms and conditions of payment offered by such Proposed Purchaser and (iv) that the Proposed Purchaser has been informed of the tag-along right provided for in this Article XI and has agreed to purchase additional Membership Interests in accordance with the terms hereof.  The Tag-Along Members' rights may be exercised by any Tag-Along Member by delivery of a written notice to the Company and the proposed transferor (a "<u>Tag-Along Notice</u>") within 30 days following receipt of the notice specified in the immediately preceding sentence.  The Tag-Along Notice shall state the portion of its Ownership Percentage that the Tag-Along Member wishes to include in such Transfer to the Proposed Purchaser.  In the event that the Proposed Purchaser does not purchase such Membership Interests on the same terms and conditions set forth in the proposed transferor's notice, then the proposed transferor shall not Transfer its Membership Interests to the Proposed Purchaser and any such attempted Transfer by the proposed transferor to such Proposed Purchaser shall be invalid.  In the event no Tag-Along Members exercise their tag-along rights within the 30-day period, upon expiration of such 30-day period, the proposed transferor shall have the right, thereafter, for an additional 30-day period to Transfer the Membership Interests on the terms and conditions set forth in the proposed transferor's notice or on terms and conditions no more favorable then those offered by the Proposed Purchaser.

      11.3    <u>Non-cash Consideration</u>.  For the purpose of Section 11.1, if the proposed transferor has agreed to Transfer any Membership Interests for consideration which includes securities or other property, the consideration to be received by each Tag-Along Member for the sale of its Membership Interests shall be its pro-rata share of such non-cash consideration; provided that if any such non-cash consideration consists of securities of a non-public entity no such Transfer will be permitted unless any Tag-Along Member who is to receive such consideration is given the same rights with respect to any such securities that such Tag-Along Member has under Articles XI and XII of this Agreement so as not to diminish the ability of the Members to Transfer their membership interests in such entity on terms that are comparable to those set forth in this Agreement.

**ARTICLE XII**
**COVENANTS**

      12.1    <u>Implementation of Agreement</u>.  Each Member agrees that it will at all times:

26

(a)      use all means reasonably available to it (including its voting power, direct or indirect, in relation to the Company) so as to ensure that the Company and any Director nominated by it shall implement the provisions of this Agreement relating to the Company;

(b)      cause the Company to comply with all applicable laws;

(c)      cause the Business to be conducted in accordance with sound and good business practice and the highest ethical standards;

(d)      cooperate in good faith and execute such documents and take such action as may be reasonably required to give full effect to the provisions and intent of this Agreement; and

(e)      use its best endeavours to develop and expand the business of the Company.

12.2      Non-Competition.  Except as set forth below, any Member and any Affiliate thereof may engage in other business ventures and dealings of every nature, independently or with others, and the Company shall have no right in such ventures or dealings or to the income and profits derived therefrom; provided, however, that so long as a Member is a member of the Company and for a period of two years thereafter, such Member shall not, and Park 610 shall not permit any of its Affiliates to participate in any manner in the production and distribution of a television channel devoted primarily to golf programming which is competitive with the programming offered by the Company to distributors in Latin America ("Direct Competition").

Each of DTVLA, Park 610 and their respective Affiliates acknowledges, for itself and such Affiliates:  (i) that DTVLA, Park 610 and the Affiliates of Park 610, alone or in joint ventures and other business relationships with other persons, is or may be presently engaged, and may in the future be engaged, in all types of television programming ventures including the production and distribution of sports programming that may include some golf content and which are or may be competitive with the Business (but which are not in Direct Competition); (ii) that DTVLA, Park 610 and the Affiliates of Park 610 may make investments in other businesses which may be competitive with the Business as described in clause (i) above; and (iii) DTVLA sells and may sell equipment and services to entities that are or may be competitive with the Business (including those that are in Direct Competition).  The activities described in clauses (i), (ii) and (iii) shall not be considered competitive to the Business and shall not constitute a violation of this Agreement.

12.3      Members' Trademarks and Tradenames.  Except for the trademarks and trade names licensed by TGC Inc. pursuant to the License Agreement and unless otherwise provided in this or related agreements, no trademark, trade name or other trade identity owned or employed by any Member or their respective Affiliates shall be used in connection with the activities or business of the Company without the express written consent of such Member.  The Company shall execute any documents necessary to ensure that any agreed use of such trade identity is properly attributed to that Member or its Affiliates.  In the event a Member ceases to

27

hold Membership Interests in the Company, the remaining Members shall take such steps as may be necessary to cause the Company to remove any reference to the withdrawing Member's trademarks or other names from any business description of the Company or other products or materials used in the Company's business.

        12.4   <u>Company Trademarks and Tradenames</u>.  Any trademark, trade name or other trade identity developed by the Company, whether solely or jointly with the Members or their Affiliates, shall be owned by the Company.  Upon dissolution or other material changes in ownership of the Company, all Members shall agree on disposition of the rights to the Company's trademarks, tradenames or trade identity.  Absent agreement, all use of such trademarks, tradenames and trade identity by the Company or any Member shall cease and shall not be used thereafter.

        12.5   <u>Ethics</u>.  No Member, the Company nor any of their respective officers, directors, members, employees or agents shall offer, pay or give anything of value in respect of the Business, either directly or indirectly, to a government official, political party or candidate for political office to influence such person or entity in the discharge of his, her or its official duties, unless such kind of conduct complies with all applicable written laws.  The Members will not do business with any joint venture partner, distributor, agent, customer, or other person where a Member knows or suspects that payoffs or similar practices are involved in doing business and will not have a relationship with a customer or any other person that results in a conflict of interest or embarrassment to the Company or any of the Members.

        12.6   <u>Confidentiality</u>.  So long as a Member is a member of the Company and for a period of five years thereafter, each Member shall maintain confidential all Confidential Information exchanged among them during the course of both their negotiations and their performance of this Agreement.  During such period, no Member shall disclose such Confidential Information to any third party, either directly or indirectly, without the prior written consent of the Member disclosing such Confidential Information, except such disclosures to its employees or other persons as are necessary in connection with the performance of the Business or for any other proper purpose under this Agreement or as required by law.  Each Member shall take all necessary measures to procure that all persons to whom it discloses the Confidential Information as permitted hereunder is made aware of and complies with the Member's obligations of confidentiality under this Agreement as if such persons were parties to this Agreement.  "<u>Confidential Information</u>" means all information of the Company or any of the Members designated as such, whether orally or in writing, except such information which:

        (i)     is or becomes publicly known through no wrongful act on the receiving party's part; or

        (ii)     is, at the time of disclosure under this Agreement, already known to the receiving party without restriction on disclosure; or

        (iii)     is, or subsequently becomes, rightfully and without breach of this Agreement, in the receiving party's possession without any obligation restricting disclosure; or

(iv)      is independently developed by the receiving party without breach of this Agreement; or

(v)      is explicitly approved for release by written authorization of the disclosing party.

12.7    <u>Employment of Company Employees</u>.  Each Member agrees not to actively solicit for employment by it any active Company employee or any employee of the other party who becomes known to it as a result of the Company activities, without prior approval of the other party.

### ARTICLE XIII
### DEFAULTS

13.1    <u>Default</u>.  Each of the following events shall constitute an "<u>Event of Default</u>" hereunder:

(a)      the failure by a Member to fund a Capital Call in accordance with the terms of Sections 7.3 or 7.8 and such failure shall have continued unremedied for a period of thirty days after notice of default;

(b)      a breach or violation of Section 12.5;

(c)      the attempt by a Member to Transfer any of its Membership Interests other than in accordance with the terms of this Agreement;

(d)      any other material breach of this Agreement (not otherwise referred to in this Section 13.1) which is not cured after 30 days notice and opportunity to cure (provided if the breach is of a nature that it cannot be cured within 30 days, this period shall be extended so long as the Defaulting Party or the Company is making reasonable best efforts to cure such default);

(e)      occurrence of a Change of Control of a Member;

(f)      a Member fails to pay its debts generally as they become due or make an assignment for the benefit of its creditor generally;

(g)      the voluntary filing of a petition or action in bankruptcy or insolvency or the like by a Member, or the entry of a final judgment or order sustaining a petition or action taken by a Member creditors; and

(h)      the liquidation, dissolution or winding up of or ceasing by a Member to conduct business.

The Member committing the Event of Default is referred to as the "<u>Defaulting Member</u>" and the other Members are each referred to as a "<u>Non-Defaulting Member</u>" and collectively as the "<u>Non-Defaulting Members</u>."

29

13.2    <u>Effect of Default</u>.  Any Non-Defaulting Member shall have the right to require the Defaulting Member to sell all of its Membership Interests (the "<u>Call Option</u>") as provided in Section 13.4.

13.3    <u>Other Remedies</u>.  Subject to any restrictions contained in this Agreement, each Party shall be entitled to pursue any and all remedies which it has at law or in equity upon the breach by a Party of any other provision of this Agreement.

13.4    <u>Call Procedure</u>.  Upon the exercise of a Call Option in accordance with this Article XIII, the Defaulting Member shall become bound to sell all and not less than all of its Membership Interests in accordance with the terms set forth in this section.  Likewise, upon the exercise of a Call Option by Park 610 in accordance with Section 7.3(e) hereof, DTVLA shall become bound to sell all and not less than all of its Membership Interests in accordance with the terms set forth in this section.  The Membership Interests required to be sold by the Defaulting Member or DTVLA, as the case may be, are referred to herein as the "<u>Call Membership Interests</u>".

(a)    The purchase price of the Call Membership Interests shall be:

(i)    in the case of an Event of Default under Section 13.1(e), Section 13.1(f), Section 13.1(g) or Section 13.1(h), their net book value;

(ii)    in the case of an Event of Default under any other Section eighty percent (80%) of the net book value of the Call Membership Interests; and

(iii)    in the case of the exercise by Park 610 of its rights under Section 7.3(e), the Fair Market Value of the Call Membership Interests.

(b)    The Non-Defaulting Members or, in the case of a Call Option exercised by Park 610 pursuant to Section 7.3(e), the Members other than DTVLA, shall be entitled to purchase the Call Membership Interests pro-rata in accordance with their Ownership Percentage; provided, however, that in the event a Non-Defaulting Member or other Member does not exercise its Call Option, the Non-Defaulting Members or other Members who do exercise their Call Option (the "<u>Buying Members</u>") will have the right to purchase the remaining Call Membership Interests pro rata based upon the Ownership Percentage of each Buying Member.

(c)    (i)    In the case of the Call Option that may be exercised after the occurrence of an Event of Default, the Company shall promptly notify the Non-Defaulting Members in writing of the occurrence of an Event of Default and of the identity of the Defaulting Member.  The Non-Defaulting Members must give written notice to the Chairman (who shall give such written notice to all the Members, including the Defaulting Member) of their intent to exercise the Call Option within 30 days of the Company's notice.  Failure by a Non-Defaulting Member to deliver this notice within such 30-day period shall constitute a waiver by a Non-Defaulting Member to exercise its Call Option.  The Non-Defaulting Members must exercise their Call Option within 60 days of the notice of the Company to the Non-Defaulting Members, otherwise their

30

corresponding Call Options shall be deemed to have expired; provided, however, in the event a Buying Member shall fail to complete its portion of the call within such 60-day period, the remaining Buying Members shall have an additional 10 days from the expiration of such 60-day period to complete the purchase of all Call Membership Interests.

(ii)     In the case of the Call Option that may be exercised by Park 610 pursuant to Section 7.3(e) hereof, Park 610 must give written notice to the Chairman (who shall give such written notice to all the Members, including DTVLA) of its intent to exercise the Call Option within 30 days of receipt of DTVLA's notice provided pursuant to Section 7.3(d).  Failure by Park 610 to deliver this notice within such 30-day period shall constitute a waiver by Park 610 of its right to exercise the Call Option under these circumstances.  Park 610 must exercise its Call Option within 60 days after the end of the Exclusive Period, otherwise its Call Option shall be deemed to have expired, unless the failure to exercise the Call Option is due to failure by DTVLA to cooperate in a timely manner in order to expedite the closing of the transfer of the Call Membership Interests or the failure to have determined the Fair Market Value in accordance with the definition thereof (due to no fault of Park 610), in which case Park 610's right to exercise the Call Option shall be extended for such reasonable time as is necessary to determine the Fair Market Value.

(d)     The Buying Members shall be entitled to receive the Call Membership Interests duly endorsed by the Defaulting Member or DTVLA, as the case may be, and the Defaulting Member or DTVLA, as the case may be, shall deliver such Call Membership Interests to the Buying Members upon payment therefor.

13.5     Put Option.   Upon the exercise of a Put Option by DTVLA, Park 610 shall become bound to purchase all but not less than all of the Membership Interests of DTVLA ("Put Membership Interests") in accordance with the terms set forth in this section.

(a)     The purchase price of the Put Membership Interests shall be their Fair Market Value.

(b)     In the case of the Put Option that may be exercised by DTVLA pursuant to Section 7.3(e) hereof, DTVLA must give written notice to Park 610 of its intent to exercise the Put Option within 30 days of issuance of  the notice provided pursuant to Section 7.3(d).  Failure by DTVLA to deliver this notice within such 30-day period shall constitute a waiver by DTVLA of its right to exercise the Put Option.  DTVLA must exercise its Put Option within 60 days after the end of the Exclusive Period, otherwise its Put Option shall be deemed to have expired, unless the failure to exercise the Put Option is due to failure by Park 610 to cooperate in a timely manner in order to expedite the closing of the transfer of the Put Membership Interests.

(c)     For the avoidance of doubt, the Put Option and the Call Option pursuant to Section 7.3(e) may be exercised and effective simultaneously, and the expiration of one shall not affect the validity and effectiveness of the other.

31

(d)    Upon receipt of title to the Membership Interests, Park 610 shall deliver to DTVLA an amount in cash equal to the Fair Market Value of the Membership Interests.

13.6    <u>Transition</u>.  In the event of an exercise of a Call Option or Put Option, the Members shall work together for an orderly transition of seconded employees to return to the Member whose Membership Interests are purchased by the other Members or the Company, as the case may be, and the Member whose Membership Interests are purchased shall retain its seconded employees in the Company for up to one year, at the option of the Buying Members or the Company, as the case may be.

**ARTICLE XIV**
**TERMINATION**

Unless otherwise terminated as provided hereunder, this Agreement shall continue for so long as the Company maintains its corporate existence.  Except for Sections that provide that such Sections shall survive termination, this Agreement shall terminate as a result of any of the following occurrences provided that, until dissolution is completed in accordance with Article XV, the relationship of the parties shall continue to be governed by this Agreement;

(a)    upon the order of any Governmental Authority having jurisdiction and authority to order the termination of this Agreement;

(b)    with respect to any Member, upon such Member and its Affiliates ceasing to be a Member of the Company by reason of a Transfer of Membership Interests permitted hereunder; or

(c)    with respect to all of the Members, upon the Company being wound up or otherwise dissolved.

**ARTICLE XV**
**DISSOLUTION**

15.1    <u>No Dissolution</u>.  Except as otherwise permitted herein, no Member shall permit to exist any event of dissolution under applicable law within its control and in the event of any event of dissolution of the Company other than pursuant to Section 5.4, the Members agree to cause the reformation of the Company in the form existing immediately prior to such event of dissolution.

15.2    <u>Procedure for Dissolution</u>.  The Company shall be dissolved and its affairs shall be wound-up if agreed by the Board of Directors in accordance with Section 5.4.  In such event, the Members shall proceed as promptly as practicable to wind-up the affairs of the Company and to distribute the assets thereof in accordance with any agreement of the Members and applicable law, but the business and assets of the Company shall be liquidated in an orderly and business-like manner, and final accounting shall be made by the Company.  The accountants to the Company shall review the final accounting and shall render their opinion with respect thereto.

32

15.3     Winding Up.  Dissolution of the Company shall be effective on the day on which the event giving rise to the dissolution occurs, but the Company shall not terminate until the assets of the Company shall have been distributed as provided herein.  The business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement until the Company is terminated as aforesaid.  Upon the dissolution of the Company:

(a)     All non-cash assets of the Company shall be liquidated for cash for the best value realizable under the circumstances, provided that the Members shall have a preemptive right to purchase such non-cash assets for the same price and for the same convertible currency which the Company could have obtained from a third party in accordance with the applicable laws and regulations.

(b)     After all such assets of the Company have been converted to cash, within each class of priority of the creditors of the Company, and to the extent permitted by the applicable laws and regulations, foreign convertible currency assets shall be used first to discharge liabilities in the same foreign convertible currency and then in any other foreign convertible currency.

(c)     Any surplus of the Company's assets in cash, which is remaining after the settlement of the Company's debts, shall be distributed to the Members in proportion to their respective Interest Percentage.

15.4     Survival of Obligations.  The Members further agree that all obligations under this Agreement which require, by their terms, performance after the termination of this Agreement for any reason whatsoever, including but not limited to the payment to the Members of their respective shares of the dividends of the Company shall be considered to survive the termination hereof until their performance has been completed.  In addition, the obligations set forth in Article 20 hereof shall be considered to survive the termination hereof indefinitely.

## ARTICLE XVI
## REPRESENTATIONS AND WARRANTIES

16.1     Representations of the Parties.  Each of the Members and the Company represents and warrants to the others as follows:

(a)     it is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and it has the power to enter into this Agreement and all of the Concurrent Documents to which it is a party and to carry out the transactions contemplated herein and therein;

(b)     the execution, delivery and performance of this Agreement and the Concurrent Documents to which it is a party have been duly authorized and no further internal authorization is necessary on its part;

(c)     this Agreement and the Concurrent Documents to which it is a party are legally binding on and enforceable against it in accordance with the terms of such agreements, subject to the limitations imposed by the laws of bankruptcy, reorganization and

creditors' rights generally and except as enforcement thereof may be limited as to certain equitable remedies;

(d) the entering into of this Agreement and the Concurrent Documents to which it is a party does not, and the consummation by it of the transactions contemplated herein and therein shall not violate or cause a default under or breach of (a) its certificate of formation, or other charter or governing documents, (b) any material judgment, order or decree applicable to it or its properties and assets or (c) any material contract, agreement, indenture or other instrument to which it is a party or by which it or its property is bound;

(e) no consent, approval, authorization of, or designation, declaration or filing with any Governmental Authority or with any person not a party to this Agreement is required to be obtained by it in connection with the valid execution, delivery and performance of this Agreement and the Concurrent Documents to which it is a party;

(f) there is no action, suit or proceeding pending or, to its knowledge, threatened, against or affecting it in any court or before or by any Governmental Authority which would materially and adversely affect its performance of its obligations hereunder or under any of the Concurrent Documents to which it is a party; and

(g) (i) it is not involved in any transaction or other situation with any employee, officer, director or Affiliate which may be generally characterized as a "conflict of interest," including, but not limited to, direct or indirect interests in the business of Competitors, suppliers or customers of the Company and (ii) there are no situations with respect to the Company which involved or involves (A) the use of any corporate assets for unlawful contributions, gifts, entertainment or other unlawful expenses related to political activity, (B) the making of any direct or indirect unlawful payments to government officials or others from corporate funds or the establishment or maintenance of any lawful or unrecorded funds, (C) the violation of any of the provisions of The Foreign Corrupt Practices Act of 1977, as amended, or any rules or regulations promulgated thereunder of the United States, (D) the receipt of any illegal discounts or rebates or any other violation of the antitrust laws, as amended, (E) any investigation by any Government Authority which could subject the other Parties to any damage or penalty in any civil, criminal or governmental litigation or proceeding or which would have an adverse effect on the Company or the Business or (F) any action which would violate any of the provisions of this Agreement.

(h)    Representations of Park 610.  Park 610 represents and warrants to each of the other Parties that Carlos Avila indirectly owns 100% of the economic and voting interests in Park 610.

## ARTICLE XVII
## INDEMNIFICATION

17.1    Indemnification by Members for Unauthorized Acts, Etc.  Each Member shall indemnify and hold the other Members, each Affiliate, officer, director and employee thereof and the Company harmless from and against any and all claims, causes of action, payments, obligations, expenses (including without limitation reasonable fees and disbursements

34

of counsel) and losses (collectively "Losses") arising out of or in any way connected with any action, commitment, contract, covenant or undertaking of such Member for and on behalf of the Company which (i) was not within the scope of its authority hereunder, (ii) required the approval of the Members or the Board of Directors, but for which no such approval was obtained, (iii) was in violation of the terms of this Agreement or any Concurrent Document to which such Member is a party, (iv) was a breach of any representation or warranty set forth in this Agreement or any Concurrent Document or any certificate delivered pursuant hereto or (v) was in non-fulfillment by it of any covenant under this Agreement or any Concurrent Document.

17.2    <u>Indemnification by Company of Individuals</u>.  The Company, shall, to the fullest extent permitted by applicable law, indemnify any individual made, or threatened to be made, a party to an action or proceeding whether civil or criminal (including an action or proceeding by or in the right of the Company or any other Person for which any member of the Board of Directors, any committee or any officer of the Company served in any capacity at the request of the Company), by reason of the fact that such individual (or such individual's testator or intestate) was a Member or officer or served another Person in such capacity by reason of such request, against judgments, fines, amounts paid in settlement and reasonable expenses, including attorney's fees actually and necessarily incurred as a result of such action or proceeding, or any appeal therein, in each case except to the extent that such individual's actions or inactions constituted gross negligence or willful misconduct.  Such indemnification shall be a contract right and shall include the right to be paid advances of any expenses reasonably expected to be incurred by such individual in connection with such action, suit or proceeding, consistent with the provisions of applicable law in effect at any time.  Indemnification shall be deemed to be "permitted" within the meaning of the first sentence of this Section if it is not expressly prohibited by applicable law.

17.3    <u>Indemnification by Member for Third Party Claims</u>.  Each Member shall indemnify and hold the Company harmless from and against Losses by seconded employees or employees of such Member relating to employee benefits, violations or labor laws such as, for example, wrongful discharge, discrimination and harassment, or any laws relating to an employees' tenure with the Member.

17.4    <u>Insurance</u>.  The Company may, to the full extent permitted by law, purchase and maintain insurance against any liability that may be asserted against any Person entitled to indemnity pursuant to Section 17.2.

17.5    <u>Indemnification of Member for Proportionate Liability</u>.

(i)    Each Member agrees to, and does hereby indemnify and hold harmless the other Members, and to the extent set forth below the Member and other Affiliates of the other Member, from and against all Losses arising out of a liability or obligation of the Company to the extent necessary to accomplish the result that no Member (together with its Affiliates) shall bear any portion of a liability or obligation of the Company in excess of such Member's Ownership Percentage.  Without limiting the generality of the foregoing, a Loss shall be deemed to arise out of a Company liability or obligation if it arises out of or is based upon the conduct of the business of the Company or the ownership of the property of the Company.

35

(ii)     The foregoing indemnification shall be available to an Affiliate of a Member with respect to a Loss arising out of a Company liability or obligation which is paid or incurred by such Affiliate as a result of such Affiliate directly or indirectly owning or controlling a Member or as a result of the fact that an individual employed or engaged by the Company is also a director, officer or employee of such Affiliate.

(iii)     The foregoing shall not inure to the benefit of any Member (or an Affiliate of a Member) in respect of any Loss which: (i) arises out of or is based upon the gross negligence or willful misconduct of such Member (or an Affiliate of such Member); or (ii) is a tax, levy or similar governmental charge not imposed upon the Company or on its property.  It is understood and agreed that, for the purposes of the foregoing sentence, no Loss shall be deemed to arise out of or be based upon the gross negligence or willful misconduct of any Member (or any such Affiliate) solely because it arises out of or is based upon the gross negligence or willful misconduct of a director, officer or employee of such Member or Affiliate if at the time of such negligence or misconduct such director, officer or employee was an employee assigned to the Company or was a member of the Board of Directors.

17.6     <u>Indemnification Procedures</u>.

(i)     <u>Procedures for Indemnification of Third Party Claims</u>.

(a)     If a person entitled to indemnification hereunder (an "<u>Indemnitee</u>") shall receive notice or otherwise learn of the assertion by a Person (including, without limitation, any Governmental Authority) who is not a party to this Agreement, of any claim or of the commencement by any such Person of any action (a "<u>Third Party Claim</u>") with respect to which another party (an "<u>Indemnifying Party</u>") may be obligated to provide indemnification pursuant hereto, such Indemnitee shall give such Indemnifying Party written notice thereof promptly after becoming aware of such Third Party Claim, provided that the failure of any Indemnitee to give such notice shall not relieve the related Indemnifying Party of its obligations under this Article, except to the extent that such Indemnifying Party is prejudiced by such failure to give notice.  Such notice shall describe the Third Party Claim in reasonable detail and, if ascertainable, shall indicate the amount (estimated if necessary) of the Loss that has been or may be sustained by such Indemnitee.

(b)     An Indemnifying Party may elect to defend or to seek to settle or compromise, at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, any Third Party Claim.  Within 30 days of the receipt of notice from an Indemnitee in accordance with Section 17.6(i)(a) (or sooner, if the nature of such Third Party Claim so requires), the Indemnifying Party shall notify the Indemnitee of its election whether the Indemnifying Party shall assume responsibility for defending such Third Party Claim, which election shall specify any reservations or exceptions.  After notice from an Indemnifying Party to an Indemnitee of its election to assume the defense of a Third Party Claim, such Indemnifying Party shall not be liable to such Indemnitee under this

36

Article for any legal or other expenses (except expenses approved in advance by the Indemnifying Party) subsequently incurred by such Indemnitee in connection wit the defense thereof; provided that if, in the Indemnitee's reasonable judgment, a conflict of interest between the Indemnitee and such Indemnifying Party exists in respect of such claim, the Indemnitee shall have the right to employ separate counsel to represent such Indemnitee at its own expense who shall be entitled to participate in such defense.  If an Indemnifying Party elects not to assume responsibility for defending a Third Party Claim, or falls to notify an Indemnitee of its election as provided in this Section such Indemnitee may defend or (subject to the remainder of this Section 17.6(i)(b)and Section 17.6(i)(d)) seek to compromise or settle such Third Party Claim at the expense of the Indemnifying Party.  Neither an Indemnifying Party nor an Indemnitee shall consent to entry of any judgment or enter into any settlement of any Third Party Claim which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnitee, in the case of a consent or settlement by an Indemnifying Party, or the Indemnifying Party, in the case of a consent or settlement by the Indemnitee, of a written release from all liability in respect of such Third Party Claim.

(c)    If an Indemnifying Party chooses to defend or to seek to compromise or settle any Third Party Claim, the related Indemnitee shall make available to such Indemnifying Party (in a manner that shall not unreasonably interfere with the conduct of the Indemnitee's business) any personnel or any books, records or other documents within its control or which it otherwise has the ability to make available that are necessary or appropriate for such defense, settlement or compromise, and shall otherwise cooperate in the defense, settlement or compromise of such Third Party Claim.

(d)    Notwithstanding anything in this Section 17.6(i) to the contrary, (A) neither an Indemnifying Party nor an Indemnitee shall, without the written consent of the other party, settle or compromise or consent to the entry of any judgment with respect to any Action or Third Party Claim if the effect thereof is to admit any criminal liability by, or to permit any injunctive relief or other order providing non-monetary relief to be entered against, the other party and (B) other than as provided in clause (A), neither an Indemnifying Party nor an Indemnitee may settle or compromise any claim without the consent of the other which shall not be unreasonably withheld.  Subject to clause (A) of this paragraph (d), if an Indemnifying Party notifies the related Indemnitee in writing of such Indemnifying Party's desire to settle or compromise a Third Party Claim on the basis set forth in such notice (provided that such settlement or compromise includes as an unconditional term thereof the giving by the claimant or plaintiff of a written release of the Indemnitee from all liability in respect thereof) and the Indemnitee shall notify the Indemnifying Party in writing that such Indemnitee declines to accept any such settlement or compromise, such Indemnitee may continue to contest such Third Party Claim, free of any participation by such Indemnifying Party, at such Indemnitee's sole expense.  In such event, the

obligation of such Indemnifying Party to such Indemnitee with respect to such Third Party Claim shall be equal to (1) the costs and expenses of such Indemnitee prior to the date such Indemnifying Party notifies such Indemnitee of the offer to settle or Compromise (to the extent such costs and expenses are otherwise indemnifiable hereunder) plus (2) the lesser of (x) the amount of any offer of settlement or compromise which such Indemnitee declined to accept and (y) the actual out-of-pocket amount such Indemnitee is obligated to pay subsequent to such date as a result of such Indemnitee's continuing to pursue such Third Party Claim.

(e)     In the event of payment by an Indemnifying Party to any Indemnitee in connection with any Third Party Claim, such Indemnifying Party shall be subrogated to and shall stand in the place of such Indemnitee as to any events or circumstances in respect of which such Indemnitee may have any right or claim relating to such Third Party Claim against any claimant or plaintiff asserting such Third Party Claim or against any other Person. Such Indemnitee shall cooperate with such Indemnifying Party in a reasonable manner, and at the cost and expense of such Indemnifying Party, in prosecuting any subrogated right or claim.

(ii)     <u>Other Procedures for Indemnification</u>.

(a)     Any claim on account of a Loss which does not result from a Third Party Claim shall be asserted by written notice given by the Indemnitee to the related Indemnifying Party. Such Indemnifying Party shall have a period of 30 days after the receipt of such notice within which to respond thereto. If such Indemnifying Party does not respond within such 30 day period, such Indemnifying Party shall be deemed to have refused to accept responsibility to make payment. If such Indemnifying Party does not respond within such 30 day period or rejects such claim in whole or in part, such Indemnitee shall be free to pursue such remedies as may be available to such party under this Agreement or under applicable law.

(b)     If the amount of any Loss shall, at any time subsequent to the payment required by this Agreement, be reduced by recovery, settlement or otherwise, the amount of such reduction, less any expenses incurred in connection therewith, shall promptly be repaid by the Indemnitee to the Indemnifying Party.

17.7     <u>Remedies Cumulative</u>. The remedies provided in this Article XVII shall be cumulative and shall not preclude assertion by an Indemnitee of any other rights or the seeking of any and all other remedies against any Indemnifying Party.

17.8     <u>Survival of Indemnification</u>. The agreements contained in this Article XVII shall survive any liquidation a or dissolution of the Company; provided, however, in no event shall any Member be liable for any liability or obligation incurred by the Company following such liquidation or dissolution.

## ARTICLE XVIII
## CHANGES REQUIRED BY LAW

This Agreement and the obligations and performance of the Members shall be subject to all laws, both present and future, of any Government having competent jurisdiction over the Members, and to orders, regulations licenses, directions or requests of any such Government, or any department, or agency thereof.  In the event any such Government, department, or agency requires changes to the transactions contemplated by this Agreement, the Members shall enter into good faith negotiations to modify this Agreement to meet such objections or make such changes as are required to satisfy these objections or required changes. If such negotiations cannot be successfully completed within thirty (30) days of the receipt of notification of such objections or required changes, this Agreement and all the Concurrent Documents shall terminate in accordance with the termination provisions contained herein and therein.

## ARTICLE XIX
## ALTERNATIVE DISPUTE RESOLUTION

19.1    <u>Mediation</u>.  Prior to commencing any formal litigation, the Members shall attempt to settle any dispute arising out of this Agreement through good faith consultations and negotiations.  If those attempts fail, any Member may demand mediation of such dispute by written notice to the other Members (the "<u>Mediation Notice</u>").  The Members shall select a mediator within 15 days of receipt of such Mediation Notice by such other Members.  No Member may unreasonably withhold consent to the selection of a mediator, and the Members shall share the cost of the mediation equally.  The Parties may also agree to replace mediation with some other form of alternative dispute resolution, such as neutral fact-finding or a mini-trial.  Mediation shall take place in New York, New York by a mutually acceptable mediator. Prior to mediation, the Members and the neutral advisor shall use their best efforts to agree on a set of ground rules for mediation.  At the conclusion of mediation, the Members or designated spokesperson of the respective Members shall meet and attempt to resolve the matter.

19.2    <u>Litigation</u>.  If any dispute cannot be resolved by the Members through negotiation, mediation or another form of alternative dispute resolution within three (3) months of the Mediation Notice, the dispute may be submitted to a court of competent jurisdiction located in New York, New York for resolution.  The use of any alternative dispute resolution procedures shall not be construed under the doctrine of laches, waiver or estoppel to adversely affect the rights of either Member.  Nothing in this paragraph shall prevent either Member from commencing formal litigation proceedings if (i) good faith efforts to resolve the dispute under these procedures have been unsuccessful or (ii) any delay resulting from efforts to mediate such dispute could result in serious and irreparable injury to such Member.

In the event of any litigation under this Agreement, the prevailing party shall be entitled to costs and reasonable attorney's fees.  The parties hereto irrevocably waive trial by jury.  In the event of any litigation, the parties hereto agree that the courts in New York, New York shall have exclusive jurisdiction to resolve any dispute, with each party hereto irrevocably consenting to such jurisdiction and venue.

**ARTICLE XX**
**MISCELLANEOUS**

20.1    Subsidiary Companies.  The Member agree that a Member or a wholly owned subsidiary of any Member may designate an employee to be a Director of the Company pursuant to Section 5.1 or to be an employee pursuant to Section 6.4.

20.2    Advice of Legal Counsel.  Each Member acknowledges and represents that, in executing this Agreement, it has had the opportunity to seek advice to its legal rights from legal counsel.  This Agreement shall not be construed against any Member by reason of the drafting or preparation hereof.

20.3    Language.  In the event that this Agreement or any of the Concurrent Documents are translated into any language other than English, the English version shall always control.

20.4    Limitations on Damages.  IN ANY ACTION FOR DAMAGES RELATING TO THIS AGREEMENT, NO PARTY HERETO OR PARENT OR AFFILIATE THEREOF OR BENEFICIARY HEREUNDER SHALL SEEK OR BE ENTITLED TO CONSEQUENTIAL, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES.

20.5    Amendment.  This Agreement may be amended or modified only by a writing executed by the Parties.

20.6    Waiver.  The failure by any Party at any time or times to require performance of any provision hereof shall in no manner effect such Party's right at a later time to enforce the same.  No waiver by any Party of any provision of this Agreement whether by conduct or otherwise, in any one or more instances shall be deemed a further or continuing waiver of such provision.

20.7    Notices.  All notices, requests, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered or when received if notice is given by facsimile or within five days after deposited in the mails, first class postage prepaid, addressed as follows or to such other address as shall have been designated in writing by the Party to receive notice.

If to the Company:

Latin American Sports, LLC
c/o Corporation Services Company
2711 Centerville Road, Suite 400
Wilmington, DE  19808

With Copies to:

DIRECTV Latin America
Office of General Counsel

40

1211 Avenue of the Americas, 6th Floor
New York, NY 10036
Facsimile: 212-462-5060

Severgnini, Robiola, Grinberg & Larrechea
Reconquista 336, 2º piso
(C1003ABH) - Buenos Aires
ARGENTINA
Attention: Matías de Larrechea
Facsimile: 5411-4394-7263

If to DTVLA:

DIRECTV de Argentina S.A.
Av. Corrientes 485, piso 5
C1043AAE) Ciudad de Buenos Aires
República Argentina
Attention: Chief Financial Officer
Facsimile: 5411-4321-2596

With a copy to:

DIRECTV Latin America, LLC
Office of General Counsel
1211 Sixth Avenue, 6th Floor
New York, NY 10036
Facsimile: 212-462-5080

if to Park 610:

Park 610, LLC
9999 Collins Ave. #17H
Bal Harbour, FL 33154
Attention: Carlos Vicente Avila
Facsimile: 305-866-6478

20.8    Counterparts.  This Agreement and any written consents required to be executed by all Parties hereunder may be executed by the Parties, in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same document.

20.9    Further Assurances.  Each of the Members agrees to execute and deliver all such other and additional instruments and documents and to do such other acts and things as may be necessary to more fully effectuate this Agreement and the Company created hereby and to carry on the business of the Company in accordance with this Agreement.

41

20.10   Headings.  The Article and Section headings herein are for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

20.11   Governing Law.  The laws of the State of New York shall apply to this Agreement.

20.12   No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Company and the Members and their respective successors and permitted assigns.

20.13   Entire Agreement.  This Agreement, including the Concurrent Documents, constitutes the entire agreement among the Parties, and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.

20.14   Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.  No Member may assign either this Agreement or any of its rights, interest, or obligations hereunder except pursuant to the terms hereof.

20.15   Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

IN WITNESS WHEREOF, the undersigned parties have duly executed this Agreement as of the date first set forth above.

LATIN AMERICAN SPORTS, LLC

By: _____
Name: _CARLOS AVILA_
Title: _CHAIRMAN_

By: _____
Name: Jacopo Bracco
Title: Senior Vice President- Panamericana

PARK 610, LLC

By: _____
Name: _CARLOS AVILA_
Title: _CHAIRMAN_

DIRECTV LATIN AMERICA, LLC

By: _____
Name: Jacopo Bracco
Title: Senior Vice President- Panamericana

43

**APPENDIX A**

Certificate of Formation of Latin American Sports, LLC

**APPENDIX B**

## MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement (this "Agreement") is made and entered into as of August 1, 2006 (the "Effective Date"), by and between Park 610, LLC, a Delaware limited liability company ("Park 610") and Latin American Sports, LLC ("LAS"), a Delaware limited liability company.

WHEREAS, Park 610 and LAS desire to enter into this Agreement relating to the provision by Park 610 of certain management and advisory services as set forth herein;

WHEREAS, the Board of Directors of LAS has approved an initial plan and budget for LAS, and an initial finance plan for LAS (the "Initial Plans"), each of which is attached as an Appendix to the Limited Liability Company Agreement of LAS, dated as of August 22, 2006, among LAS, Park 610 and DIRECTV Latin America, LLC (the "LLC Agreement");

WHEREAS, LAS is in the business of creating, producing, promoting and operating a Spanish and Portuguese language television Channel comprised of golf programming (the "Business");

WHEREAS, LAS' Members and Board of Directors have determined that Park 610 can provide valuable assistance to LAS in connection with the implementation of the Initial Plans; and

WHEREAS, the provision of Management Services (as defined below) by Park 610 shall constitute a portion of the consideration provided by Park 610 in exchange for its 55% ownership interest in LAS.

NOW, THEREFORE, the parties, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agree as follows:

1.      Management Services.  During the Term of this agreement, Park 610 shall, within the parameters set forth in the Initial Plans (and any subsequent budgets and plans adopted in accordance with the LLC Agreement), the LLC Agreement and as directed by the General Manager of LAS, perform management and advisory services for LAS relating to the Business (the "Management Services").  Park 610 shall perform the Management Services in good faith, in the best interest of the Company and in a professional manner in accordance with industry standards for similar companies.

2.      Management Fees.  The Management Services to be performed hereunder by Park 610 shall serve as partial consideration for the 55% Ownership Percentage in LAS granted to Park

610 under the LLC Agreement.  In addition, in consideration of the Management Services to be provided hereunder, LAS shall pay Park 610 a management fee equal to twenty-five percent (25%) of the Advertising Revenues (as defined below) of LAS during the Exclusivity Period (as such term is defined in the LLC Agreement).  Notwithstanding the foregoing, if the Exclusivity Period is extended for a fourth year pursuant to the terms of the license agreement between LAS and DIRECTV Latin America, LLC dated August 22, 2006, LAS and Park 610 shall negotiate in good faith an increased management fee for such fourth year of up to fifty percent of LAS's Advertising Revenues.   The parties shall consider the degree to which DTVLA retains exclusivity of the distribution of the golf channel produced by LAS in Latin America as the primary factor in negotiating the extent of the increase in the management fee.

"Advertising Revenues" shall mean all monies effectively received by LAS in connection with the sale of advertising, net of any discounts and VAT.   For purposes of clarification, any discount granted to purchasers in the sale of advertising, shall not be considered as Advertising Revenues.

The Management Fees shall be paid by LAS to Park 610 monthly in arrears, within 30 days following the receipt of a satisfactory invoice relating thereto.  All sums payable by LAS hereunder shall be due and payable in United States dollars and paid by wire transfer to such bank account as Park 610 may hereafter designate in writing.  Park 610 shall notify LAS of its bank account details at least five (5) days prior to LAS's next scheduled payment unless the account remains unchanged since the last payment  was made.  Payments to Park 610 shall be free from any deduction, whether for tax (municipal, provincial, federal or otherwise), customs, bank, transfer or similar fees or charges.

3.      Term and Termination.  This Agreement will terminate at the earlier of (a) termination by LAS (which may occur any time after the expiration of the Exclusive Period in LAS' discretion) or (b) a Change of Control (as defined in the LLC Agreement) of Park 610.

4.      Corporate Opportunities; Non-solicitation.  For the Term of this Agreement, Park 610 shall not, without the prior written consent of LAS and LAS' Board of Directors, (a) divert to any Competitor of LAS, any potentially profitable opportunities related to the Business, or (b) solicit or encourage any officer, employee or consultant of LAS to leave its employ.

5.      Confidential Information; Rights in Data.  Section 12.6 of the LLC Agreement is hereby incorporated by reference, *mutatis mutandis*.  Park 610 also agrees that all work product produced under this Agreement in the course of performing the Management Services is work for hire and the sole and exclusive property of LAS, and not Park 610.  Such work product includes, but is not limited to, any inventions, improvements, methods, discoveries, designs and know-how, whether or not suitable for trade secret, copyright or patent protection, and any formulas, recommendations, analyses, software programs or packages, or any other type of information or material developed, conceived, or reduced to practice (whether planned or unplanned) in the course of performing the Management Services.  Park 610 agrees to assign and hereby assigns to LAS (or any person or entity designated by LAS) all its right, title and interest in and to all work product and all related patents, patent applications, copyrights and copyright applications.  Park 610 agrees to cooperate with the efforts of LAS to protect and secure its rights

2

in any and all such work product.  Park 610 further agrees to return or dispose of any and all such work product as directed by LAS upon termination of this Agreement or at any other time at the request of LAS.

8.     <u>No Assignment</u>.  Neither party may assign its rights or obligations hereunder to any third party without the prior written consent of the other party, and any purported assignment in violation hereof shall be null and void.

7.     <u>Independent Contractor; No Authority</u>.  The parties hereto acknowledge and agree that Park 610 shall perform Management Services hereunder as an independent contractor, retaining control over and responsibility for its own operations and personnel.  Neither Park 610, any of its Affiliates or any of its members, employees, or agents shall be considered employees or agents of LAS for any purpose solely as a result of this Agreement.

8.     <u>Notices</u>.  Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by first class mail postage prepaid and return receipt requested) or sent by reputable overnight courier service (charges prepaid), or faxed, to the recipient at the address below indicated:

<u>To LAS</u>:

Latin American Sports, LLC
c/o Corporation Services Company
2711 Centerville Road, Suite 400
Wilmington, DE  19808


<u>To Park 610</u>:

Park 610, LLC
9999 Collins Ave. #17H
Bal Harbour, FL 33154
Attention:  Carlos Vicente Avila
Facsimile: 305-866-6478


or such other address or to the attention of such other Person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Agreement shall be deemed to have been given when personally delivered, one business day after sent by reputable overnight courier service, five days after deposit in the U.S. mail or at such time as it is transmitted via facsimile, with receipt orally confirmed.

9.     <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced

in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

10.     Complete Agreement.  This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

11.     Counterparts; Facsimile Transmission.  This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.  Delivery of executed signature pages hereof by facsimile transmission shall constitute effective and binding execution and delivery of this Agreement.

12.     Amendment and Waiver.  The provisions of this Agreement may be amended and waived only by an instrument in writing signed by each of the parties hereto, and with the approval of the Board of Directors of LAS.

13.     Governing Law.  This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of New York.

14.     Definitions.  Capitalized terms used herein and not otherwise defined shall have the respective meanings given such terms in the LLC Agreement.

*     *     *     *     *

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

LATIN AMERICAN SPORTS, LLC

By:     _____
Name:   _____
Its:    _____


By:     _____
Name:   _____
Its:    _____


PARK 610, LLC

By:     _____
Name:   _____
Its:    _____

4

## License Agreement

The following License Agreement is entered into as of August 1, 2006 between Latin American Sports, LLC ("Licensor"), a Delaware limited liability company organized and existing under the laws of Delaware and DIRECTV Latin America, LLC ("Licensee"), a Delaware limited liability company organized and existing under the laws of Delaware for the royalty-free license to distribute the television channel produced by the Licensor entitled "The Golf Channel Latin America" (the "Channel") over Licensee's direct-to-home satellite service ("Service") throughout Latin America (which shall include the Caribbean and Central and South America), excluding Puerto Rico and Mexico, subject to any necessary territorial limitations resulting from license agreements between Licensor and the content providers as informed by Licensor to Licensee from time to time (the "Territory").

1. <u>Grant of License</u>.  Licensor hereby grants an irrevocable and royalty-free license to Licensee to receive and distribute the Channel via its Service during the Term (as defined in Section 4) for reception in the Territory.  Such license shall be exclusive with respect to the Territory as provided in Section 5 below.

2. <u>Distribution and Delivery</u>.  Licensee shall redistribute the Channel as transmitted by Licensor, in its entirety, as delivered by the Licensor without any intentional and willful editing, delays, alterations, interruptions, deletions or additions and with a signal quality equivalent to those of other channels distributed on the Licensee's DTH system.  Licensor agrees that the encryption and decryption that is normally part of Licensee's signal processing does not constitute an alteration and/or other modification of the Channel.  Licensor and Licensee expressly agree that neither party will charge the other for the Channel and that Licensor will provide to Licensee a decoder box or otherwise provide Licensee with sufficient technology to receive the Channel at Licensee's uplink center located at Lima 1262, in the city of Buenos Aires, Argentina, and the Licensee shall, at its sole cost and expense, obtain and maintain sufficient distribution facilities to transmit the Channel to its subscribers.

3. <u>The Channel</u>.  The Channel shall consist of the entire broadcast signal of the Licensor presented on a 24-hour per day schedule, and of commercial, promotional or other announcements.  Licensor and Licensee agree that no right or title in and to any content of the Channel shall vest or accrue in favor of Licensee.  The parties further agree that Licensor shall retain 100% of the advertising revenues from the Channel.

4. <u>Term</u>.  The term (the "Term") of this Agreement shall be co-extensive with the Exclusive Period as defined below.

5. <u>Exclusivity</u>.  The license to distribute the Channel granted by Licensor to Licensee pursuant to Section 1 of this agreement shall be exclusive, with the exception of the Caribbean, to the Licensee in the Territory as from the date hereof of this agreement until July 31, 2009 (the "Exclusive Period"), provided, however, that if the Licensee exercises its right to limit its capital

contribution to the Licensor as provided in Section 7.3(d) of the Limited Liability Company Agreement of Licensee dated as of August 22, 2006 (the "LLC Agreement"), the Exclusive Period shall end twelve months after the date of such exercise, and provided, further, that the Licensee shall have the option (exercisable in its sole discretion) to extend the Exclusive Period to July 31, 2010 in exchange for an increase in its capital contribution obligations as set forth in Section 7.3(f) of the LLC Agreement.

6.  Rights Required for the Distribution of the Channel.  Licensor has obtained or will obtain all necessary, trademarks, copyrights, licenses and any all other proprietary, intellectual property, music production, music performing rights and other rights necessary, in connection with or for Licensee's distribution of the Channel throughout the Territory, including, without limitation, the right to use the name of or logo of "The Golf Channel" or the names, titles or logos of the Channel or any of its programs, or the names, photographs, music likeliness or biographies of any individual participant or performers in, or contributor to, any program or any variation thereof and to perform its obligations hereunder and grant the rights granted pursuant to Section 1.  For purposes of clarification, Licensee shall be responsible for the payment to any music performing rights society or agency or author's literary and dramatic rights society or agency of such rights strictly related to the broadcast of the Channel by Licensee in the Territory.

7. Intellectual Property.    (a)  All right, title and interest in and to the Channel and the programming contained therein, including all promotional spots or other advertising materials produced or supplied by the Channel, ideas, formats and concepts contained therein or used in connection therewith (including all copyrights) shall be, as between the parties, at all times the sole and exclusive property of the Licensor, and Licensee shall not make any claim to the contrary.  Licensee shall not make any copies of any portion of the Channel and shall use its best efforts to prevent unauthorized reception of the Channel in the Territory.

(b)  The trademarks, service marks, logos and trade names "The Golf Channel", and all other names, service marks, trade names, logos and trademarks related to or associated with The Golf Channel, the Channel or designated by Licensor from time to time (collectively, the "Marks") are the sole and exclusive property of Licensor or have been licensed to the Licensor and nothing herein shall be deemed to give Licensee any proprietary right, title, or interest in or to the Marks, provided that Licensor hereby grants Licensee the limited right to use the Marks solely in connection with the promotion of the Channel during the Term of this Agreement.  Any promotional or publicity material prepared by, or for, Licensee that mentions or uses the Marks shall be in good taste and consistent with the philosophy and concept of the Channel.  Should Licensee become aware of any unauthorized copying or use of the Marks, in the Territory, it shall promptly notify Licensor in writing and shall provide Licensor with all assistance reasonably requested by Licensor in any investigation or actions taken with respect to such unauthorized conduct.  Upon the termination or expiration of this Agreement for any reason, this non-exclusive right to use the Marks in connection with the promotion of the Channel shall automatically terminate, and Licensee shall not thereafter use the Marks for any purpose whatsoever and shall return to Licensor or, at Licensor's direction, destroy any promotional or publicity materials or documents in its possession, power, custody or control that contain the Marks.

2

8.  <u>Indemnification by Licensor</u>.  Licensor shall indemnify and hold harmless Licensee, its Affiliated Companies (as defined below), Licensee's contractors, subcontractors and authorized distributors, local operators authorized to market, distribute and to provide Licensee's DTH services in Latin America (the "<u>Local Operators</u>"), and the directors, officers, employees, and agents of Licensee, such Affiliated Companies and such contractors, subcontractors, distributors and Local Operators (collectively, the "<u>Licensee Indemnified Parties</u>") from and against all claims, damages, liabilities, costs, expenses (including reasonable attorneys' and experts' fees) incurred in connection with any claim against a Licensee Indemnified Party arising our of or in connection with (A) Licensor's breach of any provision of this Agreement, (B) material or programming supplied by Licensor pursuant of this Agreement, including but not limited to compliance with any applicable laws or regulations applicable to the content of programming or the amount or type of advertising included in the Channel (C) the distribution or broadcast of any programming of the Channel which violates or requires payment for the use or performance or dramatic rights, (D) Licensor's advertising and marketing of the Channel and/or (E) any other materials, including advertising or promotional copy, supplied or permitted by Licensor.

In addition, Licensor shall pay and hold all Licensee Indemnified Parties harmless from any international, national, federal, district, provincial, state or local taxes or fees which are based upon revenues derived by, or the operations of, Licensor.  For the purposes of this Agreement, "<u>Affiliated Companies</u>" shall mean, with respect to any person or entity, any other person or entity directly or indirectly controlling, controlled by or under common control (i.e., the power to direct affairs by reason of ownership of voting stock, by contract or otherwise) with such person or entity and any member, director, officer or employee of such person or entity.

9.  <u>Indemnification by Licensee</u>.  Licensee shall indemnify and hold harmless Licensor, its Affiliated Companies (as defined above), and contractors, subcontractors, and each participant therein and the directors, officers, employees and agents of Licensor, (collectively, the "<u>Licensor Indemnified Parties</u>") from and against all claims, damages, liabilities, costs, expenses (including reasonable attorneys' and experts' fees) incurred in connection with any claim against a Licensor Indemnified Party arising our of or in connection with (A) Licensee's breach of any provision of the Agreement, including but not limited to any unauthorized distribution of the Product by Licensee outside of the Territory, (B) Licensee's advertising and marketing of the Channel (except with respect to claims relating to the specific content of advertising and marketing for which Licensor is solely responsible), and (C) any other materials, including advertising or promotional copy supplied or permitted by Licensee.

10.  <u>No Warranties or Commitments</u>.  Licensee represents and Licensor hereby agrees that the Direct-To-Home television service is a highly complex state of the art delivery system, subject to a potentially wide range of technical regulatory and other issues, and that any such issues could interfere with Licensee's distribution of the Channel.  Licensee shall not provide backup transponders or other backup equipment in orbit insurance or other means of assuring delivery of its signal.  Neither Licensee nor its Local Operators shall have any liability to any other person or entity with respect to any failure of Licensee or its Local Operators in the Territory to transmit or distribute the Channel or perform its obligations hereunder for any reason, including but not limited to failure which is due to (i) any failure or degradation in

performance of the feed source or the DTH satellite(s) or transponders on such satellites (as applicable) or of the Licensee's DTH distribution system, or of any scrambling/descrambling equipment or any other equipment. (ii) any failure at the origination and uplinking center used by Licensee, (iii) any labor dispute, fire, earthquake, flood, riot, government intervention, legal enactment, government regulation or any material change in applicable law(s),  (iv) any act of war or act of God, or (v) any other cause beyond the reasonable control of Licensee or its Local Operators, as the cause may be (each a "Force Majeure").

11. Limitation of Liability.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT SHALL ANY PARTY BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER FORESEEABLE OR NOT (INCLUDING WITHOUT LIMITATION, THOSE ARISING FROM NEGLIGENCE), OCCASIONED BY ANY FAILURE TO PERFORM OR BREACH OF ANY OBLIGATION UNDER THIS AGREEMENT FOR ANY CAUSE WHATSOEVER.

12. Laws of New York.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

13. Arbitration.  The parties agree to submit any disputes arising out of, relating to, or in connection with, the interpretation, execution or performance of this agreement to final and binding arbitration in accordance with the rules of the American Arbitration Association in effect on the date of this agreement.  The place of arbitration will be New York, New York and the English language will be used throughout the arbitral proceedings.  By this agreement the parties waive their right to any form of appeal or resource to a court of law or other judicial authority to the fullest extend permitted by law.

IN WITNESS WHEREOF, the undersigned parties have caused this Agreement to be executed by their duly authorized representative as of August 1, 2006.


LATIN AMERICAN SPORTS, LLC          DIRECTV LATIN AMERICA, LLC



By: _____          By: _____
Name:                                Name:
Title:                               Title:

By: _____
Name:
Title:

**APPENDIX D**

**[INITIAL PLAN TO BE INSERTED IN EXECUTION VERSION OF DOCUMENT]**

<u>**APPENDIX F**</u>

**GOLF CHANNEL AGREEMENT**

**APPENDIX H**

**INITIAL DIRECTORS AND OFFICERS OF THE COMPANY**

**EFFECTIVE AS OF AUGUST 22, 2006**

**INITIAL DIRECTORS OF THE COMPANY**:

**Park 610 Directors**

Carlos Vicente Avila
Celeste Avila
Juan Cruz Avila

**DTVLA Directors**
Jacopo Bracco (Richard Nerod, alternate)
Carlos Pratola

**INITIAL OFFICERS OF THE COMPANY:**
Carlos Avila, Chairman
Roberto Timistit, General Manager

**MEMBER REPRESENTATIVE:**

**For Park 610**:
Carlos Avila

**For DTVLA**:
Jacopo Bracco

**APPENDIX I**

**PRODUCTION SERVICES AGREEMENT**

This Production Services Agreement (the "<u>Agreement</u>"), dated as of August 1, 2006, is between Latin American Sports, LLC ("<u>Latin American Sports</u>"), a Delaware limited liability company, and New Hollywood Producciones, S.A. ("<u>New Hollywood</u>"), a *sociedad anónima* organized under the laws of the Republic of Argentina.

1. **Recitals.**

WHEREAS, New Hollywood is in the business of producing and supplying television programming for use in subscription television services, among other things, and has access to facilities used in the production and transmission of golf related programming and other audiovisual material;

WHEREAS, LAS, and Park 610 have entered into a Limited Liability Company Agreement of LAS dated as of August 22, 2006, pursuant to which they have agreed to create, produce, promote and operate a Spanish and Portuguese language television channel comprised of golf programming, which shall initially be based in part on the U.S. feed of "The Golf Channel" for distribution in Latin America (the "<u>Channel</u>"); and

WHEREAS, LAS wishes to acquire certain technical services and access to subscription television production and transmission facilities in connection with its operation of the Business and New Hollywood has agreed to provide such services and access to facilities to LAS in accordance with the terms and conditions set forth in this Agreement.

2. **Production and Delivery.**

New Hollywood shall provide the production and technical services requested by LAS from time to time in connection with the production and distribution by LAS of the Channel. New Hollywood shall perform any and all services pursuant to this Agreement in good faith and in a timely and professional manner in accordance with industry standards. Production services provided by New Hollywood shall be of the highest production quality, meeting or exceeding LAS's production standards for its broadcasts and of a standard of quality which is commercially reasonable based upon the then-prevailing industry standard in connection with the production and transmission of subscription television services other than the Channel in the Territory.

3. **No Agency.**

New Hollywood shall not have any right to enter into agreements on behalf of, or otherwise bind, LAS.

4. **Fees.**

4.1 Latin American Sports will pay to New Hollywood for its services rendered hereunder such fees as the parties may agree from time to time for specific production and procurement services and projects related to the Channel. Any fees payable by Latin American Sports to New Hollywood shall only be payable if approved by Latin American Sports and documented in an invoice in a form reasonably satisfactory to LAS.

4.2 The Fees payable under this Agreement will be inclusive of any and all applicable commissions, back up withholding taxes, income tax withholding at source, sales taxes, import or export taxes, import or export permit fees or similar taxes or charges imposed or levied against Latin American Sports, and Latin American Sports may withhold and pay any such taxes or charges to the appropriate collecting authority.

5. **Intellectual Property**. As between LAS and New Hollywood, LAS shall own all right, title and interest in all footage, promotional and other materials produced or developed in connection with the services provided by New Hollywood pursuant to this Agreement (the "LAS Material"), including without limitation, the right to use, display, modify, edit, cut, distribute or otherwise use the LAS Material in any way for any reason under any trademarks or tradenames with no additional compensation payable to New Hollywood.

New Hollywood hereby assigns to LAS, without the necessity of additional action being taken, all of the New Hollywood's right, title and interest, if any, in such LAS Material. Without limiting the generality of the foregoing, New Hollywood agrees that any material produced by it which is eligible for United States copyright protection or protection under any international treaty or foreign law covering the protection of proprietary rights including, without limitation, the Universal Copyright Convention, the Berne Copyright Convention and/or the Buenos Aires Copyright Convention shall be a work made for hire and ownership of all copyrights (including all renewals and extensions) therein shall vest in LAS. If any of the LAS Material is deemed not to be a work made for hire for any reason, the New Hollywood hereby grants, transfers and assigns all right, title and interest in the LAS Material and all copyrights in such work and all renewals and extensions thereof to LAS.

New Hollywood agrees to provide all assistance reasonably requested by LAS in the establishment, preservation and enforcement of the foregoing rights; *provided however* that LAS shall advance and/or refund any and all costs New Hollywood incurs in providing such assistance unless the enforcement thereof results from a breach or misrepresentation of New Hollywood of the terms of this Agreement.

2

The New Hollywood hereby agrees to and does hereby waive the enforcement of all moral rights with respect to the LAS Material, including without limitation any and all rights of identification of authorship and any and all rights of approval, restriction or limitation on use or subsequent modifications.

New Hollywood hereby grants an exclusive unlimited license to LAS for the use and inclusion of any content or material provided to LAS in any live broadcast or future rebroadcast of such content or material.

6. **Term**.  The term of this Agreement (the "Term") shall be two (2) years from the date hereof. However, the Term shall be automatically extended for additional periods of one year absent thirty calendar day's notice prior to the end of the Term by one party to the other that is desires to terminate this Agreement.

7. **Non-Competition.**   During the Term and for a period of one year thereafter, New Hollywood shall not, and shall not permit any of its affiliates, to participate in any manner in the production and distribution of a television channel devoted to golf programming which is competitive with golf programming distributed by LAS from time to time.

8. **Representations and Warranties.**  LAS represents and warrants to NH that:

(i)    the transmission content delivered to NH by LAS (and not produced by NH) for the Channel:

(a)    libel, slander or defame any Person;

(b)    violate or infringe any Person's statutory, contractual or common law rights, including any Person's copyright or other intellectual property; or

(c)    contravene any law, rule or regulation imposed from time to time by any authority or agency having jurisdiction over the television programming comprising the transmission content.

9. **Indemnification**. LAS and NH shall indemnify each other and their respective shareholders, members, directors, officers, employees and agents and agrees to hold each of them harmless at all times from and after the Effective Date against and in respect of any and all losses resulting from any misrepresentation, breach of warranty or obligation of the other under this Agreement.

10. **Independent Contractors**.  New Hollywood is an independent contractor under this Agreement.  Neither party shall be deemed an agent of the other nor will either party have authority to enter into agreements of any kind on behalf of the other.  New Hollywood, and not LAS, shall be responsible for reporting, withholding and paying all employer obligations in the nature of payroll taxes, income taxes, workers' compensation, and similar requirements of employers with respect to the New Hollywood's employees who render service to LAS or for LAS's benefit.

3

**11.  Miscellaneous.**

(a)  Litigation.  If any dispute arising out of this Agreement cannot be resolved by the Parties through negotiation, mediation or another form of alternative dispute resolution within three (3) months, the dispute may be submitted to a court of competent jurisdiction located in New York, New York for resolution.  The use of any alternative dispute resolution procedures shall not be construed under the doctrine of laches, waiver or estoppel to adversely affect the rights of either party.  Nothing in this paragraph shall prevent either party from commencing formal litigation proceedings if (i) good faith efforts to resolve the dispute under these procedures have been unsuccessful or (ii) any delay resulting from efforts to mediate such dispute could result in serious and irreparable injury to such party.

In the event of any litigation under this Agreement, the prevailing party shall be entitled to costs and reasonable attorney's fees.  The parties hereto irrevocably waive trial by jury.  In the event of any litigation, the parties hereto agree that the courts in New York, New York shall have exclusive jurisdiction to resolve any dispute, with each party hereto irrevocably consenting to such jurisdiction and venue.

(b)  Choice of Law.  This Agreement shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

(c)  Notices.  Any notice, demand or other communications (each, a "Notice") which may be or is required to be sent pursuant to this Agreement must be in writing and must be:  (i) mailed by first-class mail, registered or certified, return receipt requested, postage prepaid; (ii) hand delivered personally by independent courier with the capacity to verify receipt of delivery; (iii) sent by a recognized overnight courier service (such as Federal Express or DHL); or (iv) transmitted by facsimile, with electronic confirmation of delivery, to the parties at the following addresses:

if to Latin American Sports:

Latin American Sports, LLC
c/o Corporation Services Company
2711 Centerville Road, Suite 400
Wilmington, DE  19808

if to New Hollywood Producciones S.A.:

New Hollywood Producciones S.A.
Balcarce 510
Buenos Aires (C1064AAL)
Argentina
Facsimile: 5411-43494804

Either party may designate a new address to which any Notice should be given by so notifying

4

the other party in writing. Each Notice that is sent in the manner described above will be deemed received for all purposes at such time as it is delivered to the addressee (with the return receipt, the courier delivery receipt or the facsimile answerback confirmation being deemed conclusive evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

(d)    Entire Agreement.  This Agreement and any attachment hereto, constitutes the full and complete understanding of the parties with respect to its subject matter and supersedes all prior written and oral agreements and understandings of any kind.

(e)    Modification / Waiver.  This Agreement may not be amended or modified or any provision or obligation waived or changed except by a writing executed by the party sought to be charged thereby.

(f)    Severability.  If any provision of this Agreement is to be held by a court of competent jurisdiction, for any reason, to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provision of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained herein.  The parties will endeavor to negotiate in good faith to replace the invalid, illegal or unenforceable provisions with valid provisions that will give effect to the original intentions of the parties.

(g)    No Waiver.  No failure or delay of any party in exercising any power or right under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.

(h)    Captions.  The titles of the Sections of this Agreement are for reference and convenience only and will not in any way affect the intent or interpretation this Agreement.

(i)    Successors and Assigns.  The obligations and benefits of this Agreement shall not be assignable or otherwise transferable by a party without the written consent of the other party hereto.

(j)    Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together will constitute one single agreement between the parties.

IN WITNESS WHEREOF, New Hollywood and LAS have executed this Agreement as of the date first written above to constitute a binding contract between them.

NEW HOLLYWOOD PRODUCCIONES S.A.    LATIN AMERICAN SPORTS, LLC

By: _____    By: _____
Its: _____    Its: Member

    By: _____
    Its: Member

**APPENDIX J**

**OWNERSHIP PERCENTAGES**

**EFFECTIVE AS OF AUGUST 22, 2006**

Park 610, LLC, 55%

DIRECTV Latin America, LLC, 45%



**DIRECTV**

Buenos Aires, 02 de agosto de 2006

Señores:
*CITIBANK N. A.*
Presente

De nuestra consideración:

Por medio de la presente, autorizamos a Uds. a debitar de nuestra Cta. Cte. en Pesos Nro.: 0/808547/015 la suma de $ 462.750,00 (Pesos Cuatrocientos sesenta y dos mil setecientos cincuenta con 00/100).

Asimismo solicitamos a Uds. Transferir dichos fondos según las siguientes instrucciones:

Carlos Vicente Avila.
Banco Frances, sucursal 118
Cuenta Corriente Nro. 11270/7
CBU 0170118620000001127072
20-18751158-6
REF.: DIRECTV ARGENTINA S.A.

Código de la transferencia (*): DL I
Concepto de la transferencia (motivo de la trasferencia): PAGO A TERCEROS
Clave Bancaria Única (CBU) ordenante: 0168888-1 00008085470154
CUIT del Ordenante: 30-68588939-7
Ordenante : DIRECTV ARGENTINA S.A.

Sin otro particular saludamos a Uds. muy Atte.

*DIRECTV ARGENTINA S. A.*
*APODERADOS*



DIRECTV

-2 AGO 06 16:XX 09

RECIBIDO

Buenos Aires, 02 de agosto de 2006

Señores:
**CITIBANK N. A.**
Presente

De nuestra consideración:

Por medio de la presente, autorizamos a Uds. a debitar de nuestra Cta. Cte. en Pesos Nro.: 0/808547/015 la suma de $ 617.000 (Pesos seiscientos diecisiete mil con 00/100).

Asimismo solicitamos a Uds. Transferir dichos fondos según las siguientes instrucciones:

New Hollywood Producciones S.A..
Banco Francés, sucursal 118
Cuenta Corriente Nro. 11930/2
CBU 0170118620000001193022
CUIT 30-70734184-6
REF.: DIRECTV ARGENTINA S.A.

Código de la transferencia (*): DL1
Concepto de la transferencia (motivo de la trasferencia): PAGO A TERCEROS
Clave Bancaria Única (CBU) ordenante: 0168888-1 00008085470154
CUIT del Ordenante: 30-68588939-7
Ordenante : DIRECTV ARGENTINA S.A.

Sin otro particular saludamos a Uds. muy Atte.

DIRECTV ARGENTINA S. A.
**APODERADOS**

 **Desktop**

<u>Web</u>  <u>Images</u>  <u>Video</u>  <u>News</u>  <u>Maps</u>  **Desktop**  **more »**

carlos vicente avila loraine    Search | <u>Desktop Preferences</u>
<u>Advanced Search</u>

## Cached messages

Message 1 of 1 in conversation

<u>Reply</u> | <u>Reply to all</u> | <u>Forward</u> | <u>View in Outlook</u>

### ✉ RE: Avila Representation

From: Matías de Larrechea <<u>MDL@srgl.com.ar</u>>
To: Francisco Barreto <<u>FBarreto@directvla.com.ar</u>>
CC: Markham, Jason <<u>JMarkham@DIRECTVLA.com</u>>
Date: Aug 24 2006 - 6:23pm

Francisco,


Te confirmo que Carlos Vicente Avila es el único titular del 100% de las acciones de Loraine
S.A. y Tumely S.A. Lo cierto es que por ahora los titulos son al portador, pero se va a
modificar el estatuto para que sean nominativos.



Saludos,

Matías



Matías de Larrechea

Severgnini, Robiola, Grinberg & Larrechea

Reconquista 336, 2° piso

(C1003ABH) - Buenos Aires

Tel.: 5411 5550-9970

Dir.: 5411 5550-9948

Fax: 5411 4394-7263

HYPERLINK "<u>http://www.srgl.com.ar</u>"<u>www.srgl.com.ar</u>

NOTICE. This message contains information which is confidential and the copyright of our
company or a third party. If you are not the intended recipient of this message please delete it
and destroy all copies. If you are the intended recipient of this message you should not
disclose or distribute this message to third parties without the consent of our company. Any

views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of his company. Our company does not represent, warrant and/or guarantee that the integrity of this message has been maintained nor that the communication is free of errors, virus, interception or interference. The liability of our company is limited by our General Conditions of Services.

---

De: Francisco Barreto [mailto:FBarreto@directvla.com.ar]
Enviado el: Jueves, 24 de Agosto de 2006 04:40 p.m.
Para: Matias de Larrechea
Asunto: RE: Avila Representation
Carácter: Confidencial

Matías,

Te ruego que por favor nos hagas saber la composición accionaria de estas sociedades. En especial, identificar quiénes serían los accionistas minoritarios.

Saludos,

FB

-----Mensaje original-----
De: Matias de Larrechea [mailto:MDL@srgl.com.ar]
Enviado el: Jueves, 24 de Agosto de 2006 04:00 p.m.
Para: Francisco Barreto
Asunto: RE: Avila Representation
Importancia: Alta
Carácter: Confidencial

Francisco,

Los titulares de Park 610, son Loraine S.A. y Tumely S.A., sociedades controladas por Carlos Vicente Avila.

Saludos,

Matías

Matías de Larrechea

Severgnini, Robiola, Grinberg & Larrechea

APR-28-2008 13:35 from Google Desktop: RE: Avila Representation    Case 1:08-cv-03987-VM-GWG    Document 6-6    Filed 05/12/2008    Page 3 of 3

http://127.0.0.1:4664/cache?event_id=26314&schema_id=1&q=carl...

Reconquista 336, 2º piso

(C1003ABH) - Buenos Aires

Tel.: 5411 5550-9970

Dir.: 5411 5550-9948

Fax: 5411 4394-7263

HYPERLINK "http://www.srgl.com.ar"www.srgl.com.ar

NOTICE. This message contains information which is confidential and the copyright of our company or a third party. If you are not the intended recipient of this message please delete it and destroy all copies. If you are the intended recipient of this message you should not disclose or distribute this message to third parties without the consent of our company. Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of his company. Our company does not represent, warrant and/or guarantee that the integrity of this message has been maintained nor that the communication is free of errors, virus, interception or interference. The liability of our company is limited by our General Conditions of Services.

———

De: Francisco Barreto [mailto:FBarreto@directvla.com.ar]
Enviado el: Jueves, 24 de Agosto de 2006 03:11 p.m.
Para: Matias de Larrechea
Asunto: RV: Avila Representation

tenés esta información?

abrazo y gracias,

-----Mensaje original-----
De: Markham, Jason [mailto:JMarkham@DIRECTVLA.com]
Enviado el: Jueves, 24 de Agosto de 2006 03:10 p.m.
Para: Francisco Barreto
Asunto: Avila Representation

1.        1.        16.2 Representations of Park 610.  Park 610 represents and warrants to each of the other Parties that 100% of the membership interests in Park 610 are owned by [_____], which is directly or indirectly controlled by [Carlos Avila].Carlos Avila and [add others].

Can you please complete rep from agreement with correct names?  If we put "members of his immediate family", is that accurate?

From:              Alejandro Zunda Cornell
Sent:              Thursday, October 12, 2006 11:52 AM
To:                cpratola@ciudad.com.ar
Subject:           Fwd:  Drafts
Attachments:       Tumely Shareholders Agreement, version 2; Tumely Share Purchase
                   Agreement, version 2


Follow-up Flag:    Follow-up
Flag Status:       Flagged



From:              Timistit Roberto
Sent:              Thursday, October 12, 2006 10:31 AM
To:                Alejandro Zunda Cornell
Subject:           Drafts

Tumely Shareholders Agreement, version 2; Tumely Share Purchase Agreement, version 2

**VH**

| | |
|---|---|
| **From:** | Alejandro Zunda Cornell |
| **Sent:** | Friday, October 13, 2006 10:06 AM |
| **To:** | Carlos Pratola |
| **Subject:** | RV: Borradores |
| **Attachments:** | Convenio de Sindicación de Accionistas deTumely140906 v2.doc; Contrato de CV de Acciones Tumely S A 140906 v2.doc |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |
| **Categories:** | Important |

**De:** Alejandro Zunda Cornell
**Enviado el:** Jueves, 12 de Octubre de 2006 12:52 p.m.
**Para:** cpratola@ciudad.com.ar
**Asunto:** RV: Borradores

**De:** Timistit Roberto [mailto:rtimistit@GolfChannel-LA.com]
**Enviado el:** Jueves, 12 de Octubre de 2006 10:31 a.m.
**Para:** Alejandro Zunda Cornell
**Asunto:** Borradores

<<Convenio de Sindicación de Accionistas deTumely140906 v2.doc>> <<Contrato de CV de Acciones Tumely S A 140906 v2.doc>>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- -- Este mensaje es confidencial. Puede contener información amparada por el secreto profesional. Si usted ha recibido este e-mail por error, por favor comuníquenoslo inmediatamente vía e-mail y tenga la amabilidad de eliminarlo de su sistema; no debera copiar el mensaje ni divulgar su contenido a ninguna persona. Muchas Gracias.

- -- This message is confidential. It may also contain information that is privileged or otherwise legally exempt from disclosurre. If you have received it by mistake please let us know by e-mail immediately and delete it from your system; you should also not copy the message or disclose its contents to anyone. Thanks
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**VH**

| | |
|---|---|
| From: | Carlos Pratola |
| Sent: | Friday, October 13, 2006 10:08 AM |
| To: | Emilio Vogelius (evogelius@beccarv.com.ar) |
| Subject: | RV: Borradores |
| Attachments: | Convenio de Sindicación de Accionistas deTumely140906 v2.doc; Contrato de CV de Acciones Tumely S A  140906 v2.doc |

| | |
|---|---|
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- -- Este mensaje es confidencial. Puede contener información amparada por el secreto profesional. Si usted ha recibido este e-mail por error, por favor comuníquenoslo inmediatamente vía e-mail y tenga la amabilidad de eliminarlo de su sistema; no debera copiar el mensaje ni divulgar su contenido a ninguna persona. Muchas Gracias.


- -- This message is confidential. It may also contain information that is privileged or otherwise legally exempt from disclosurre. If you have received it by mistake please let us know by e-mail immediately and delete it from your system; you should also not copy the message or disclose its contents to anyone. Thanks
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1

**TUMELY S.A. SHARE PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CARLOS VICENTE ÁVILA**
**(the "Seller")**

**and**

**LERAMAR S.A.**
**(the "Buyer")**

October 2006

Deleted: September

1

## SHARE PURCHASE AGREEMENT

**AS ONE PARTY,** CARLOS VICENTE ÁVILA, identity document [number], domiciled at [address] (hereinafter the "Seller"); and **AS THE OTHER PARTY,** LERAMAR S.A., represented herein by [name], domiciled at [address] (hereinafter the "Buyer") agree to enter into this Tumely S.A. share purchase agreement (hereinafter the "Agreement"):

### FIRST: Recitals

1.1    The Seller owns all of the paid-in capital of Tumely S.A., which is represented by [number] common bearer shares at a par value of $1 (one Uruguayan Peso) each, as described in Schedule I (hereinafter the "Shares").

1.2    Tumely S.A. is a juristic person incorporated and existing under the laws of the Oriental Republic of Uruguay, registered in the Public Commercial Registry under [number] (hereinafter the "Company").

1.3    Seller is interested in selling and transferring all of its shareholdings in the Company (the "Transferable Shares").

1.4    Buyer wishes to buy and accept the Transferable Shares in the terms and subject to the conditions stipulated herein.

### SECOND: Purpose

Seller hereby sells, assigns and transfers [number] bearer shares to Buyer for a total par value of $[number] ([____] Uruguayan Pesos), representing all of the paid-in capital of the Company.  Buyer acquires such bearer shares.  The Transferable Shares are sold and transferred free of any usufruct, pledge, attachment or other lien and from any claim, transfer restriction (save as stipulated in Section Six below) or option, preemptive or third-party right. All rights and benefits inherent to the Shares are also transferred. ,

**Deleted:** A description of the Transferable Shares is provided in Schedule I.

2

**THIRD:  Purchase Price**

3.1     The Seller hereby receives the sum of US$50,000 (fifty thousand American dollars) (the "Purchase Price") as the total purchase price for the sale and transfer of all the Transferable Shares.

3.2     Buyer hereby issues a complete and effective acquittance for such sum received for the total price of the Transferable Shares.

**FOURTH:  Delivery of Transferable Shares**

By way of transfer, Seller delivers the certificates of [number] shares to Buyer for a par value of $[number] ([      ] Uruguayan Pesos), representing all paid-in capital of the Company.  Such certificates are received by Buyer.  ~~IT SEEMS TO ME THAT THERE SHOULDNT BE DELIVERY HOW WOULD VOTING WORK AT A MEETING?  THE TRANSFER SHOULDNT BE REGISTERED UNTIL THE RESTRICTIONS ARE LIFTED~~[Roberto:  After our conversation, we decided that the shares would continue to be in "bearer" form.  Please confirm.]

| Comment [JM1]: Translator's note: [OF SHARES] |
| --- |
| Deleted: THERE |
| Deleted: A |
| Deleted: TRANSFER LIKE THIS |
| Deleted: TO VOTE IN |
| Deleted: |

**FIFTH:  Representations and Warranties**

Seller represents and warrants to Buyer that the following representations and warranties are true and genuine on the date hereof:

A)     <u>Ownership of Shares:</u>  Seller owns all of the Shares and the Company.  Such shares are currently fully paid in and free of any usufruct, pledge, attachment or other lien and from any claim, transfer restriction (save as stipulated in Section Six below) or option, preemptive or third-party right or any other type of assessment.

B)     <u>Ownership of shares in Park 610 and other companies.</u>  The Company holds a 50% share package in Park 610 LLC ("Park 610"), a company incorporated in accordance with

3

the laws of the State of Delaware, U.S.A., and through this latter, it also holds a 55% share package in Latin American Sport LLC, a company incorporated in accordance with the laws of the State of Delaware, U.S.A. The Park 610 shares are currently fully paid in and free of any usufruct, pledge, attachment or other lien and from any claim, transfer restriction (save as stipulated in Section Six below) or option, preemptive or third-party right or any other type of assessment.

C)    Good Standing. Both the Company and Park 610 are in good standing and properly incorporated pursuant to their respective laws of incorporation.

D)    Irrevocable Contributions.   There are no irrevocable or any other type of contributions in the Company or Park 610 or amounts or contributions pending capitalization by the Seller or anyone else in the Company or Park 610.

E)    Compliance. The Company has complied faithfully and diligently with each and every one of the obligations it had to fulfill through today's date (including tax and social security obligations) and it has paid all sums due and payable through today's date and is not in any way in default.

**SIXTH: Share Transfer Restrictions**

6.1    The parties understand and expressly accept the restrictions on the transfer of the Shares assessed on the Park 610 shareholders in the Shareholders Agreement, signed by Park 610 and [name] in relation to their interests in Latin American Sports (the "Restrictions").

6.2    The Seller shall keep the Transferable Shares in its name as long as the Restrictions remain in place, but for account and order of Buyer.

6.3    The Seller promises to give notice to Buyer when the Restrictions are lifted, in a period of 2 business days after occurrence.

4

---

*Margin annotations:*

**Deleted:** it

**Deleted:** (hereinafter Park 610 and Latin American Sport will be collectively called the "Related Companies")

**Deleted:** one

**Deleted:** the Related Companies

**Deleted:** Related Companies

**Deleted:** Syndication

**Deleted:** [name]

6.4    Until the Restrictions are lifted: (a) the Company will conduct its business as it usually does, according to prevailing business practice, and make reasonable commercial efforts to maintain its rights; (b) unless it has prior written consent of Buyer, the Company shall refrain from reforming its Bylaws or other charter documents~~, save as required by law or administrative resolution, and save in regard to the bylaw amendment to make the shares nominal and not bearer, as they presently are~~; (c) unless it has prior written consent of Buyer, the Company shall refrain from authorizing the issuance, from issuing, selling, delivering or agreeing or promising to issue, sell or deliver shares or any type of interest in the Company (either through the issuance or grant of options or otherwise); and (d) unless it has prior written consent of the Buyer, the Company shall refrain from becoming indebted or assuming any type of liability.

~~6.5    All payments in relation to operation of the Company (taxes, commissions, fees, tariffs, expenses and any other type) will be the expense of the Buyer. IN THIS CASE, DOES THE BUYER ACQUIRE HIS OBLIGATIONS TO PAY THE EXPENSES AND DEBTS OF THE COMPANY BY LAW, OR WOULD IT HAVE TO BE EXPRESSLY STIPULATED?~~

**Formatted:** Strikethrough

## SEVENTH: Automatic Delinquency

The parties stipulate that delinquency shall be automatic and occur *ipso jure*, without any need for a protest, interpellation or proceeding, by the mere fact that periods expire or any act or deed is committed or omitted that results in doing or not doing something contrary to the stipulations herein.

## EIGHTH: Deposit of Transferable Shares

Simultaneous to this instrument, the parties are signing an agreement. During the term of said agreement, the Transferable Shares shall be deposited with [indicate]. ~~THE SAME QUESTION...HOW COULD I ATTEND A MEETING FORMALLY AND PROVE~~

**Deleted:** Shareholders

**Deleted:** A

5

~~OWNERSHIP IF I DON'T HAVE THE SHARES?~~ [The Depositary's acceptance must be stipulated in the agreement.]

Formatted: Strikethrough

**NINTH: Special Domiciles and Notices**

Notices or communications made in writing by registered telegram or fax (with acknowledgement of receipt) at the addresses indicated by each party as its own in the preamble shall be deemed valid and authentic for purposes hereof.

**TENTH: Governing Law. Arbitration**

10.1    The Parties agree that the laws of the Oriental Republic of Uruguay shall govern this agreement.

Deleted: A

10.2    All differences, disagreements and/or disputes arising among the parties as a result of this agreement shall be resolved definitively by arbitration. The provisions in the Rules of Arbitration of the Arbitration and Conciliation Center, of the International Court of Arbitration for Mercosur, of the Uruguayan Stock Exchange shall be observed in the appointment of arbitrators and in the arbitration procedure.

Deleted: A

The Arbitral Court shall be comprised of three arbitrators and it will seated in Montevideo. The arbitration procedure will be conducted in the Spanish language and the ruling will be rendered pursuant to law. The ruling thereof will not be appealable.

**ELEVENTH: Confidentiality**

11.1    The Parties promise to maintain an absolute and total secrecy regarding the terms of this agreement. They further undertake to conduct proceedings that are necessary or reasonable in order for their executives, officers, directors or employees to comply with the provisions in this section according to governing rules.

Deleted: A

**TWELFTH: Costs and Expenses**

The parties shall each pay their own costs and expenses, including, without limitation, fees and expenses of legal and financial counsel, consultants, accountants and notaries, that are incurred in relation to the preparation and execution of this agreement and the consummation of the transactions herein contemplated.

In witness whereof, the parties sign two counterparts of the same text, in the place and on the date indicated beside each signature.

Notarial certification of the signatures is requested.

**Carlos Vicente Ávila**
Buenos Aires, Republic of Argentina, [DATE]

**for Leramar S.A.**
[Name]
Montevideo, Oriental Republic of Uruguay. [DATE]

7

# CONTRATO DE COMPRAVENTA DE ACCIONES DE

# TUMELY S.A.

**Entre**

## CARLOS VICENTE ÁVILA
### (el "Vendedor")

**Y**

## LERAMAR S.A.
### (el "Comprador")

**Octubre ~~Setiembre~~ de 2006**

## CONTRATO DE COMPRAVENTA DE ACCIONES

**POR UNA PARTE:** CARLOS VICENTE ÁVILA, Documento de Identidad [......], con domicilio en [......] de esta ciudad, (en adelante el "Vendedor") y **POR OTRA PARTE:** LERAMAR S.A., –representada en este acto por el Cr. [......], con domicilio en [........] de esta ciudad (en adelante el "Comprador"); acuerdan en celebrar el presente contrato de compraventa de acciones de Tumely S.A. (en adelante, el "Contrato"):

**PRIMERO (Antecedentes):**

1.1.    El Vendedor es titular de la totalidad del capital integrado de la sociedad denominada "Tumely S.A.", el que se encuentra representado por [......] acciones ordinarias, al portador de un valor nominal de $ 1 (Pesos Uruguayos Uno) cada una, según se detalla en el Anexo I (en adelante las "Acciones").

1.2.    Tumely S.A. es una persona jurídica creada y existente bajo las leyes de la República Oriental del Uruguay, inscripta en el Registro Público de Comercio con el número [......] (en adelante la "Sociedad").

1.3.    Corresponde al interés del Vendedor vender y hacer tradición del 100% de su participación accionaria en la Sociedad ("las Acciones a Transferir").

1.4    El Comprador desea comprar y aceptar las Acciones a Transferir, todo de acuerdo con los términos y sujeto a las condiciones que en este documento se estipulan.

**SEGUNDO (Objeto):**

El Vendedor por el presente, vende, cede y transfiere al Comprador y este adquiere [......] acciones al portador, de un valor nominal total de $ ............

2

(Pesos Uruguayos [..........................], representativas del 100% del capital integrado de la Sociedad. Las Acciones a Transferir se venden y transfieren libres de todo usufructo, prenda, embargo u otro gravamen y de todo reclamo; restricción a la transferencia (salvo lo previsto en la cláusula Sexta del presente), o derecho de opción o preferencia, o derecho a favor de cualquier tercero, cediéndose también todos los derechos y beneficios inherentes a las Acciones. ~~Un detalle de las Acciones a Transferir se adjunta como Anexo I.~~

**TERCERO (Precio de Compra):**

3.1    En contraprestación por la venta y transferencia de todas las Acciones a Transferir, el Vendedor recibe en este acto como precio de compra total la suma de U$S 50.000 (dólares americanos cincuenta mil) (el "Precio de Compra").

3.2    Por el presente, el Comprador otorga total y eficaz carta de pago por la suma recibida en concepto de precio total de las Acciones a Transferir.

**CUARTO (Entrega de las Acciones a Transferir):**

En este acto, en señal de tradición el Vendedor entrega al Comprador los títulos representativos de [.......] de acciones por un valor nominal de $ ................. (Pesos Uruguayos [...........................], representativas del 100% del capital integrado de la Sociedad, quien las recibe. ~~[ME PARECE QUE NO DEBERÍA HABER TRADICION. COMO HACE PARA VOTAR EN UNA ASAMBLEA? SI LAS ACCIONES VAN A SER NOMINATIVAS, NO SE DEBERIA INSCRIBIR LA TRANSFERNECIA HASTA TANTO CESEN LAS RESTRICCIONES]~~[Roberto: De nuestra conversación quedamos en que las acciones permanecían "al portador". Por favor confirmar]

**QUINTO (Declaraciones y garantías):**

3

El Vendedor declara y garantiza al Comprador que a la fecha del presente Contrato, las siguientes declaraciones y garantías son fieles y auténticas:

A)    <u>Titularidad de las Acciones</u>. El Vendedor es el propietario de la totalidad de las Acciones y de la Sociedad, las que se encuentran en la actualidad totalmente integradas y libres de todo usufructo, prenda, embargo u otro gravamen y de todo reclamo; restricción a la transferencia (salvo lo dispuesto en la cláusula Sexta del presente), derecho de opción o preferencia, derecho a favor de cualquier tercero, o cualquier otro tipo de afectación.

B)    <u>Titularidad de las acciones de Park 610 y otras sociedades</u>. La Sociedad es titular del 50% del paquete accionario de Park 610 <u>LLC ("Park 610"), una sociedad constituida de conformidad con las leyes del Estado de Delaware, EE.UU.,</u> y, <u>ésta última</u> ~~a través de ésta,~~ <u>a su vez es titular</u> del 55% del paquete accionario de Latin American Sport<u>s LLC, una sociedad constituida de conformidad con las leyes del Estado de Delaware, EE.UU.</u> ................... ~~(en adelante, Park 610 y Latin American Sport conjuntamente las "Sociedades Vinculadas"),~~ ~~Las acciones~~ acciones <u>de</u> Park 610 ~~que~~ se encuentran en la actualidad totalmente integradas y libres de todo usufructo, prenda, embargo u otro gravamen y de todo reclamo; restricción a la transferencia (salvo lo dispuesto en la cláusula Sexta del presente), derecho de opción o preferencia, derecho a favor de cualquier tercero, o cualquier otro tipo de afectación.

C)    <u>Vigencia.</u> Tanto la Sociedad como Park 610 ~~las Sociedades Vinculadas~~ se encuentran vigentes y debidamente constituidas conforme a sus respectivas leyes de constitución.

D)    <u>Aportes Irrevocables.</u> No existen ni en la Sociedad ni en <u>Park 610</u> ~~las Sociedades Vinculadas~~, aportes irrevocables o de ninguna otra naturaleza

4

ni montos o contribuciones pendientes de capitalización en la Sociedad ni en Park 610 por parte del Vendedor o de persona alguna.

E) <u>Cumplimiento de Obligaciones</u>. La Sociedad ha cumplido fiel y diligentemente con todas y cada una de las obligaciones que debía cumplir hasta el día de la fecha (incluyendo sus obligaciones tributarias y previsionales) y ha pagado todas las sumas adeudadas y exigibles hasta el día de la fecha, y no se encuentra en incumplimiento alguno.

**SEXTO (Restricciones a la transferencia de las Acciones):**

6.1    Las partes conocen y aceptan expresamente las restricciones a la transferencia de las Acciones <u>que afecta a los accionistas titulares</u> de Park 610, en virtud del ~~en del~~ Convenio de Sindicación de Accionistas suscrito entre Park 610 [.......] y [......] con relación a su participación en Latin American Sport<u>s</u> ("las Restricciones").

6.2    Mientras las Restricciones permanezcan vigentes, el Vendedor tendrá las Acciones a Transferir a su nombre, pero por cuenta y orden del Comprador.

6.3    El Vendedor se obliga a notificar al Comprador el cese de las Restricciones en un plazo de 2 días hábiles de ocurrido el mismo.

6.4    ~~6.4~~ Hasta tanto se levanten las Restricciones: (a) la Sociedad conducirá sus operaciones de acuerdo con el curso normal y usual de sus actividades y según las prácticas comerciales vigentes y realizará ~~sus~~ esfuerzos razonables desde el punto de vista comercial para mantener sus derechos; (b) la Sociedad, a menos que cuente con el previo consentimiento escrito del Comprador, se abstendrá de reformar su Estatuto u otros documentos de su organización,

5

excepto que ello le sea requerido por ley o por resolución administrativa, y salvo en lo que respecta a la modificación del estatuto para hacer que las acciones sean nominales y no al portador tal como ocurre en la actualidad; (c) la Sociedad, a menos que cuente con el previo consentimiento escrito del Comprador, se abstendrá de autorizar la emisión, emitir, vender, entregar o acordar o comprometerse a emitir, vender o entregar (ya sea a través de la emisión u otorgamiento de opciones o de cualquier otra forma) acciones o cualquier tipo de participación en la Sociedad; y (d) la Sociedad, a menos que cuento con el previo consentimiento escrito del Comprador, se abstendrá de endeudarse u contraer cualquier tipo de pasivo.

6.4 6.5 Todos los pagos relativos al funcionamiento de la Sociedad (tributos, comisiones, honorarios, tarifas, gastos y cualquier otro concepto) serán de cargo del Comprador.[EL COMPRADOR ADQUIERE POR LEY EN ESTE CASO SUS OBLIGACIONES DE CONTRIBUIR CON LOS GASTOS Y OBLIGACIONES DE LA SOCIEDAD, O HABRÍA QUE PREVERLO EXPRESAMENTE?]

## SÉPTIMO (Mora automática):

Las partes estipulan que la mora operará de forma automática, produciéndose la misma de pleno derecho, sin necesidad de protesto, interpelación ni gestión alguna, por el solo vencimiento de los plazos o por la realización u omisión de cualquier acto o hecho que se traduzca en hacer o no hacer algo contrario a lo estipulado.

## OCTAVO (Depósito de las Acciones a Transferir):

Conjuntamente con el presente, se suscribe entre las partes un cConvenio, de Sindicación de Accionistas. Durante el plazo de vigencia del referido convenio, las las Acciones a Transferir permanecerán depositadas con [......].[LA MISMA PREGUNTA, COMO SE HARIA FORMALMENTE PARA CONCURRIR A UNA ASAMBLEA Y DEMOSTRAR TITULARIDAD SI NO TENGO LAS ACCIONES?] [Hay que prever la aceptación del Depositario en el convenio]

6

**NOVENO (Domicilios especiales y notificaciones):**

A los efectos del presente, se considerarán válidas y fehacientes las notificaciones o comunicaciones hechas por escrito a través de telegrama colacionado o fax (con acuse de recibo) en los domicilios que cada parte indicó como suyos en la comparecencia.

**DÉCIMO (Ley aplicable. Arbitraje):**

10.1   Las Partes acuerdan que la ley aplicable al presente cConvenio será la de la República Oriental del Uruguay.-

10.2   Todas las diferencias, desavenencias y/o controversias que se produzcan entre las partes, derivadas de este contrato, serán resueltas definitivamente mediante arbitraje, observándose, tanto para la designación de los árbitros como para el procedimiento arbitral, las disposiciones contenidas en el Reglamento de Arbitraje del Centro de Conciliación y Arbitraje, Corte de Arbitraje Internacional para el Mercosur, de la Bolsa de Comercio, del Uruguay.

El Tribunal Arbitral estará compuesto por tres árbitros, tendrá sede en Montevideo, el procedimiento arbitral se desarrollará en idioma español y se fallará por Derecho. Su fallo será inapelable.

**UNDÉCIMO (Confidencialidad):**

11.1 Las Partes se obligan a mantener absoluta y total reserva de los términos del presente contrato. Las partes se comprometen, además, a realizar las gestiones necesarias o razonables a fin de que sus profesionales, funcionarios, directores o empleados den cumplimiento a las disposiciones de esta cláusula de acuerdo a las normas vigentes.

7

**DUODECIMO (Costos y Gastos):**

Las partes soportarán sus respectivos costos y gastos, incluyendo sin carácter taxativo, las remuneraciones y gastos de asesores legales, financieros, consultores, contadores y escribanos, incurridos en relación con la preparación y celebración de este cContrato y la consumación de las transacciones contempladas en el mismo.

En fe de lo acordado las partes suscriben dos ejemplares del mismo tenor en el lugar y fecha indicados junto a cada firma.

Se solicita la certificación notarial de las firmas.

**Carlos Vicente Ávila**
Buenos Aires, República Argentina, [FECHA]

**p. Leramar S.A.**
[Nombre]
Montevideo, República Oriental del Uruguay, [FECHA]

AGREEMENT

Deleted: TUMELY S.A. SHAREHOLDERS

BY AND BETWEEN

CARLOS VICENTE ÁVILA (pro se and on behalf of Loraine S.A.)

and

LERAMAR S.A.

October 2006

Deleted: September

1

**AGREEMENT [Roberto: In the understanding that Carlos sells all shares in Tumely S.A. to Leramar, then Leramar would become the only shareholder and there would be no need for a shareholders agreement]**

Deleted: SHAREHOLDERS

**AS ONE PARTY**, CARLOS VICENTE ÁVILA, identity document [number], domiciled at [address], pro se and on behalf of Loraine S.A.; and **AS THE OTHER PARTY**, LERAMAR S.A., represented herein by [name], domiciled at [address] (hereinafter collectively called the "Parties") agree to enter into this Agreement (hereinafter the "Agreement") regarding Tumely S.A. (the "Company") and Park 610 LLC ("Park 610"), subject to the stipulations hereinbelow:

Deleted: the "Shareholders" or

Deleted: the interests each holds in

Deleted: in the related companies in which Tumely S.A. or Carlos Vicente Avila, as the case may be, have an interest

## FIRST: Recitals

1.1    The Company is a juristic person incorporated and existing under the laws of the Oriental Republic of Uruguay, registered in the Public Commercial Registry under [number].

1.2    Carlos Vicente Avila holds all of the share package in the Company in his own name, but for account and to the order of Leramar S.A., as stipulated in the Share Purchase Agreement signed by the Shareholders on today's date (Schedule I).  The Shares are deposited with [indicate].

1.3    The Company owns 50% of the share package in Park 610 ("Park 610" and together with the Company, hereinafter the "Related Companies"), a company incorporated and existing under the laws of the State of Delaware, United States of America.  The remaining 50% of that package in Park 610 is owned by Loraine S.A., a company incorporated and existing under the laws of the Oriental Republic of Uruguay.  Loraine S.A. is wholly-owned by Carlos Vicente Avila.

1.4    Park 610 also owns 55% of the share package in Latin American Sports LLC ("LAS"), a company incorporated and existing under the laws of the State of Delaware, United States of America.  An organization chart of the relations between the Company,

Deleted: (hereinafter, together with Park 610 and Loraine S.A., the "Related Companies")

Deleted: the Shareholders.

2

Loraine S.A., Park 610 and LAS, is provided in Schedule II, which is deemed a part hereof upon being initialed by the Parties.

Deleted: and the Related Companies

1.5     By virtue of the foregoing, the Parties agree to execute this Agreement.

Deleted: p

## SECOND:  Purpose

The Parties undertake to comply with the stipulations herein and to respect and cause compliance with the covenants herein and the resolutions adopted in application of this Agreement.

Deleted: the Company and Related Companies to comply

## THIRD:  Term

This Agreement will be in effect as long as the restrictions agreed upon in the LAS shareholders agreement continue in effect. [THIS MUST NOT BE A POSSIBILITY AS LONG AS THE RESTRICTIONS CONTINUE IN EFFECT UNDER THE LAS AGREEMENT, UNLESS THE BUYER GRANTS A PURCHASE OPTION TO THE SELLER FOR $50,000 SHOULD HE WISH TO WITHDRAW.]

Deleted: for fifteen (15) years, automatically extendible for successive periods of five (5) years each unless one of the parties states its desire to terminate it by prior notice given a minimum of one (1) year in advance of the expiration of the original term or a subsequent extension.

Formatted: Strikethrough

## FOURTH:  Scope of the Agreement

The Agreement, to the extent applicable, encompasses all (i) the agreements between Mr. Carlos Avila and Leramar S.A. regarding the Company; and (ii) of the equity interests held now by the Company and Loraine S.A. in Park 610 and any other interest that any of the Shareholder(s) or assigns thereof may come to hold in the future in any way in Park 610 by any form or means, including, by way of example:  the collection of dividends in shares, the capitalization of reserves or any other equity account, new issues, the conversion and/or capitalization of contributions for future capital payments, the issue of new shares because of theft or loss.

Deleted: Shareholders in the

Deleted: pro se or through the Related Companies, in the Related Companies

Deleted: the Related Companies or

Deleted: the Company or Related Companies

## FIFTH:  Right to Veto

3

Save as provided in Section Seven hereof, ~~Mr. Carlos Avila, in respect of Loraine S.A.,~~ ~~Leramar S.A., in respect of the Company, and the Company and Loraine S.A. in respect of~~ ~~Park 610~~ may not, unless under specific written authorization of ~~the other~~ [THIS MEANS A CHANGE IN CONTROL IN PARK 610 THAT IS IN VIOLATION OF THE LAS SHAREHOLDERS AGREEMENT. AS LONG AS THE RESTRICTION IS IN PLACE, AVILA MUST MAINTAIN MANAGEMENT]:

a)      transfer their ~~respective interests~~ in Loraine S.A., ~~in the Company or in Park 610~~ to a third party or establish real rights thereon ~~or transfer assets owned by any thereof~~.

b)      ~~take measures for Park 610 to~~ transfer the ~~interests held by Park 610 in~~, Latin America Sport to a third party or establish real rights thereon ~~or allow the sale of other assets of LAS~~.

c)      reorganize, merge, split, wind up, make a bylaw reform ~~or~~, change the business of ~~Loraine S.A.~~, the Company, ~~Park 610 or LAS~~ or do anything else that gives a dissident shareholder the right to withdraw under governing laws or the Bylaws of one or the other.

**SIXTH: Capital Increase in Park 610**

6.1      Should the paid-in capital of Park 610 ~~through Loraine S.A.~~ be increased for any reason, said capital increase shall be allocated in equal proportions to Loraine S.A. and the Company while maintaining the actual interests in the capital of Park 610.   The corresponding shares will be issued.

6.2      Such capital increases will be paid by Leramar S.A. on account of future dividends from Park 610. ~~[?]. The increases must be paid by Leramar.~~ [Roberto: I am proposing this other alternative since the payment of the sale price for the shares in the Company is in the same act, so I do not see how it can be withheld.]

4

**Deleted:** Leramar S.A. will have the right to veto and Carlos Vicente Avila

**Deleted:** . in relation to the company and Related Companies, either pro se or through any of the Related Companies

**Deleted:** Leramar S.A.

**Deleted:** shares he owns

**Deleted:** b) . transfer the shares or any other asset owned by the Company in Park 610 to a third party or establish real rights thereon.¶
¶
c) . transfer the shares or any other asset owned by Loraine S.A. in Park 610 to a third party or establish real rights thereon.¶

**Deleted:** d

**Deleted:** shares or any other asset owned by Park 610 in

**Deleted:** c

**Deleted:** .

**Deleted:** or Related Companies

**Deleted:** Carlos Vicente Avila increase

**Deleted:** or the price received by Leramar S.A. at the time it sells the shares in the Company or the Park 610 Shares owned by the Company under the conditions stipulated herein, which shall be withheld from the purchase price

**SEVENTH: Share Transfers**

7.1     If Leramar S.A., in respect of the Company, Carlos Vicente Avila, in respect of Loraine S.A., and the Company and Loraine S.A. in respect of Park 610, wish to sell or transfer all or part of their interests in the Company, in Loraine S.A. or in Park 610 in any way to third parties outside this Agreement (the "Offered Shares"), they shall give notice of such intent to the other party (i.e., to Carlos Avila, in the case of the Company, to Leramar S.A., in the case of Loraine S.A., and to either the Company or Loraine S.A., in the case of Park 610) by reliable means, indicating the purchaser's name and the conditions of the transaction, under the signature of the potential transferee. [Let's talk about this.]

7.2     Upon receiving the notice, the recipient may chose to buy all of the Offered Shares at the same price and under the same conditions offered by the third party ("Right of First Refusal").

7.3     The recipient must, in order to exercise the Right of First Refusal, give notice of such fact to the other party within 10 business days after receipt of the notice indicated in Section 7.2 above.

7.4     Upon expiration of such period without exercise of the Right of First Refusal in respect of all the Offered Shares, the other party shall be at liberty to transfer its interest to third parties, without prejudice to the stipulations in Section 7.5 below.

7.5     Should an offer be received as provided in Section 7.1 above and the notified party decide not to exercise the Right of First Refusal, this latter will have the right (but not the obligation) to require the seller to include all or the same proportion of the interests of the notified party in the sale to the third party who proposed purchasing the interests, for the same price and under the same conditions obtained by the seller for its interests (the "Tag-Along Right"), always provided the notified party gives notice to the seller of its intent to exercise the Tag-Along Right in the period set for exercise of the Right of First Refusal.

---

Margin change markers:

Deleted: or

Deleted: either pro se or through any of the Related Companies, shall, when either

Deleted: es

Deleted: Shares

Deleted: or Related Companies

Formatted: Strikethrough

Deleted: 1

Deleted: Shares

Deleted: Carlos Vicente Avila

Deleted: an offer

Deleted: Leramar S.A.

Deleted: Carlos Vicente Avila or the corresponding Related Company

Deleted: shares in the Company in the name of Carlos Vicente Avila, but for account and order of Leramar S.A. (Section 1.2 hereof),

Deleted: shares owned by Carlos Vicente Avila or the corresponding Related Company

Deleted: Carlos Vicente Avila or the corresponding Related Company

Deleted: their

Deleted: shares

Deleted: Leramar S.A.

Deleted: Carlos Vicente Avila

The transfer under this Tag-Along Right must be consummated in 120 calendar days after notice of the exercise of said right.

**Deleted:** , after which Carlos Vicente Avila or the corresponding Related Company may not transfer the shares forming part of the Right of First Refusal

**EIGHTH:  Automatic Delinquency**

8.1    The Shareholders shall become delinquent *ipso jure* because of any action or omission contrary to the stipulations herein or because of expiration of the stipulated periods, with no need for any type of judicial or extrajudicial interpellation.

**NINTH:  Pledge**

9.1    ,

[Roberto:  It would be convenient, for a better implementation of this Agreement, to deposit the shares with a third party.[

**TENTH:  Governing Law.  Arbitration**

**Deleted:** Carlos Avila establishes a real right of pledge in favor of Leramar S.A. in respect of the shares in Loraine S.A. described in Schedule III, which forms an integral part hereof, the purpose being to guarantee fulfillment of the obligations stipulated herein and of the right of Leramar S.A. to the shares in the Company (Section 1.2).¶
¶
9.2 . The pledged shares will be deposited with [indicate] (hereinafter the "Depositary") for the entire term of this Agreement, for purposes of perfecting the real right of pledge regarding such shares.¶
¶
9.3 . Upon request, the Depositary shall issue the corresponding certificates of deposit of the shares to the Shareholder in order for such Shareholders to exercise the rights inherent to their condition of shareholder.¶
¶
9.4 . The Depositary's fees and expenses will be paid by [indicate].

**Formatted:** Font: Bold

10.1    The Parties agree that the laws of the Oriental Republic of Uruguay shall govern this Agreement.

10.2    All differences, disagreements and/or disputes arising among the parties as a result of this agreement shall be resolved definitively by arbitration.  The provisions in the Rules of Arbitration of the Arbitration and Conciliation Center, of the International Court of Arbitration for Mercosur, of Uruguayan Stock Exchange shall be observed in the appointment of arbitrators and in the arbitration procedure.

The Arbitral Court shall be comprised of three arbitrators and it will seated in Montevideo. The arbitration procedure will be conducted in the Spanish language and the ruling will be rendered pursuant to law.  The ruling thereof will not be appealable.

**ELEVENTH:        Inconsistencies**

6

The parties agree that the provisions in this Agreement shall prevail when there is any inconsistency between a provision in this Agreement and a provision in any agreement related to this Agreement, including the provisions in the bylaws.

Deleted: subordinate

Deleted: of the Company

## TWELFTH: Confidentiality

The Parties promise to maintain an absolute and total secrecy regarding the terms of this agreement. They further undertake to conduct proceedings that are necessary or reasonable in order for their executives, officers, directors or employees to comply with the provisions in this section according to governing rules.

## THIRTEENTH: Domiciles and Notices

13.1    For the pertinent purposes of this Agreement, the parties establish their domiciles as those indicated to be theirs in the preamble.

13.2    Such domiciles shall be considered to be valid and real for all purposes through ten business days after any of the parties reliably notifies the others of a change in domicile.

13.3    The parties accept a registered telegram as a reliable means of notice.

## FOURTEENTH: Execution

Three counterparts of this instrument are issued of the same text and one single effect, in the place and on the date indicated beside each signature.

**Carlos Vicente Ávila (pro se and on behalf of Lorraine S.A.)**

7

Buenos Aires, Republic of Argentina, [DATE]

**for Leramar S.A.**
[Name]
Montevideo, Oriental Republic of Uruguay, [DATE]

[The Depositary, [name], signs by way of acceptance of the position assigned in Section Nine hereof.]

Signature:
[PLACE, DATE]

8

# CONVENIO ~~DE SINDICACIÓN DE ACCIONISTAS~~
# ~~DE TUMELY S.A.~~

**Entre**

# CARLOS VICENTE ÁVILA <u>(por sí y en representación de Loraine S.A.)</u>

**Y**

# LERAMAR S.A.

<u>Octubre</u> ~~Setiembre~~ de 2006

**CONVENIO ~~DE SINDICACIÓN DE ACCIONISTAS~~[Roberto:  En el entendido que Carlos vende todas las acciones en Tumely S.A. a Leramar, entonces Leramar pasa a ser la única accionista, y no cabría hablar entonces de acuerdo de accionistas]**

Entre, por una parte, **Carlos Vicente Ávila,** documento de identidad [......], con domicilio en [......] de esta ciudad, por sí y en representación de Loraine S.A.; ~~y~~ y por otra parte, **Leramar S.A.,** representada en este acto por [......], con domicilio en [......] de esta ciudad (en adelante, denominados conjuntamente ~~los "Accionistas" o~~ las "Partes"), convienen en celebrar el presente Convenio (en adelante "el "Convenio") respecto de ~~sus respectivas participaciones en~~ Tumely S.A. (la "Sociedad") y de Park 610 LLC ("Park 610") ~~y en las sociedades vinculadas en las cuales Tumely S.A. o Carlos Vicente Ávila en su caso, tienen participación,~~ sujeto a las estipulaciones que se establecen a continuación:

**PRIMERO (Antecedentes):**

1.1.    La Sociedad es una persona jurídica creada y existente bajo las leyes de la República Oriental del Uruguay, inscripta en el Registro Público de Comercio con el número [......].

1.2    Carlos Vicente Ávila es titular del 100% del paquete accionario de la Sociedad a nombre propio, pero por cuenta y orden de Leramar S.A., de acuerdo a lo previsto en el Contrato de Compraventa de Acciones suscrito entre los Accionistas en el día de la fecha (Anexo I). Las Acciones se encuentran depositadas en [......].

1.3    La Sociedad es titular del 50% del paquete accionario de Park 610 ~~("Park 610" y conjuntamente con la Sociedad, en adelante las "Sociedades Vinculadas")~~, una sociedad creada y existente bajo las leyes del Estado de Delaware, Estados Unidos de América. El restante 50% del paquete accionario de Park 610 es

2

propiedad de Loraine S.A., una sociedad creada y existente bajo las leyes de la República Oriental del Uruguay, cuyo único accionista es Carlos Vicente Ávila.

1.4    Asimismo, Park 610 es titular del 55% del paquete accionario de Latin American Sports LLC ("LAS"), una sociedad creada y existente bajo las leyes del Estado de Delaware, Estados Unidos de América ~~(en adelante, junto con Park 610 y Loraine S.A., las "Sociedades Vinculadas")~~. Un organigrama de la vinculación de ~~los Accionistas,~~ la Sociedad, Loraine S.A., Park 610 y LAS, ~~y las Sociedades Vinculadas,~~ se adjunta como Anexo II, que inicialado por las Partes se considera integrando el presente.

1.5    En virtud de los antecedentes descritos, las ~~P~~partes acuerdan en la celebración del presente Convenio.

**SEGUNDO (Objeto):**

Las Partes se obligan a cumplir lo establecido en el presente Convenio, obligándose a respetar y hacer cumplir ~~por la Sociedad y las Sociedades Vinculadas,~~ lo aquí acordado y las resoluciones que se adopten en aplicación del presente Convenio.

**TERCERO (Plazo):**

Este Convenio estará vigente en tanto las restricciones acordadas en el convenio de accionistas de LAS continúen. ~~tendrá una duración de quince (15) años, prorrogables automáticamente por períodos sucesivos de cinco (5) años cada uno, siempre que alguna de las partes no manifieste su deseo de poner fin al mismo con un preaviso mínimo de un (1) año al vencimiento del plazo original o de sus sucesivas prórrogas [ESTA POSIBILIDAD NO DEBERÍA EXISTIR HASTA TANTO SIGAN VIGENTES LAS RESTRICCIONES EN VIRTUD DEL CONVENIO DE LAS. SALVO QUE EL COMPRADOR OTORGUE UN DERECHO DE COMPRA AL~~

3

VENDEDOR POR LA SUMA DE $50.000 EN EL SUPUESTO QUE SE QUIERA RETIRAR].

**CUARTO (Alcance del Convenio):**

El Convenio, en lo que resulte aplicable, alcanza a (i) lo acordado entre el Sr. Carlos Ávila y Leramar S.A. respecto de la Sociedad, y (ii) la totalidad de las participaciones sociales que la Sociedad y Loraine S.A.)los Accionistas tengan actualmente en Park 610las Sociedades Vinculadas Sociedad y, por si o a través de las Sociedades Vinculadas, en las propias Sociedades Vinculadas, así como a cualquier otra participación que, a cualquier título, cualquiera de el/los Accionistas Accionistas o las Sociedades Vinculadas o sus cesionarios, pudieran llegar a adquirir en el futuro en Park 610la Sociedad o en las Sociedades Vinculadas, por cualquier título o modo, a vía de ejemplo, y entre otros: cobro de dividendos en acciones, capitalización de reservas o cualquier otro rubro patrimonial, nuevas emisiones, conversión y/o capitalización de aportes para futuras integraciones de capital, emisión de nuevas acciones por hurto y extravío.

**QUINTO (Derecho de Veto):**

Salvo lo dispuesto en la cláusula Séptimae del presente, el Sr. Carlos Ávila, respecto de Loraine S.A. Leramar S.A. respecto de la Sociedad, Leramar S.A. tendrá derecho de veto y el Sr. Carlos Vicente Ávila, y la Sociedad y Loraine S.A., respecto de Park 610por sí o a través de alguna de las Sociedades Vinculadas, no podrán sin la autorización expresa y por escrito de la otra:Leramar S.A. en el ámbito de la Sociedad y las Sociedades Vinculadas [ESTO SIGNIFICA UN CAMBIO DE CONTROL EN PARK 610, QUE ES VIOLATORIO DEL CONVENIO DE ACCIONISTAS DE LAS, MIENTRAS EXISTA LA RESTRICCION AVILA DEBE MANTENER EL MANAGEMENT]:

a)    Transferir a un tercero sus respectivas participaciones sociales ~~las acciones en de~~ Loraine S.A~~.~~, en la Sociedad o en Park 610 ~~de su propiedad~~ o constituir sobre las mismas derechos reales, o transferir activos de propiedad de cualesquiera de éstas;~~.~~

~~b)    Transferir a un tercero las acciones de Park 610 propiedad de la Sociedad o cualquier otro activo de su propiedad o constituir sobre las mismas derechos reales.~~

~~c)    Transferir a un tercero las acciones de Park 610 propiedad de Loraine S.A. o cualquier otro activo de su propiedad o constituir sobre las mismas derechos reales.~~

b~~d~~)    Tomar las medidas para que Park 610 transfiera ~~Transferir~~ a un tercero las participaciones sociales ~~acciones~~ de Park 610 en Latin American Sport ~~propiedad de Park 610~~ o ~~cualquier otro activo de su propiedad~~ o constituir sobre las mismas derechos reales, o para permitir la venta de otros activos de LAS.

c~~e~~)    Transforma~~r~~ción, fusiona~~rón~~, escindir~~escisión~~, liquidar~~liquidación~~, reformar los ~~de~~ estatutos~~,~~ o cambiar~~o~~ de giro de Loraine S.A., la Sociedad, Park 610 o LAS~~la Sociedad o de las Sociedades Vinculadas~~, o cualquier otro acto que, bajo las leyes aplicables o sus Estatutos, otorguen al accionista disidente derecho de receso.

**SEXTO (Aumento de Capital de Park 610):**

6.1    Si por cualquier circunstancia, se ~~Carlos Vicente Ávila a través de Loraine S.A.~~ aumentara el capital integrado de capital Park 610, dicho aumento de capital se imputará por partes iguales a Loraine S.A. y a la Sociedad, manteniéndose las actuales proporciones en el capital de Park 610 y emitiéndose las acciones correspondientes.

5

6.2    El monto de los referidos aumentos de capital será pagado por Leramar S.A. con cargo a <u>futuros</u> dividendos <u>de Park 610.</u> ~~o con cargo al precio recibido por Leramar S.A. al momento de venta de las acciones de la Sociedad o de las Acciones de Park 610 propiedad de la Sociedad en las condiciones previstas bajo el presente, reteniéndose del precio de compra. [¿?] El monto de los aumentos debería ser integrado por Leramar~~[Roberto: <u>saco esta otra alternativa, ya que el cobro del precio de venta de acciones de la Sociedad es en el acto, por lo que no veo que sea posible retener</u>]

**SÉPTIMO (Transferencia de Acciones):**

7.1    Si Leramar S.A.<u>., respecto de la Sociedad,</u> ~~o~~ Carlos Vicente Ávila ~~por sí o a través de cualquiera de las Sociedades Vinculadas~~<u>, respecto de Loraine S.A., y la Sociedad y Loraine S.A., respecto de Park 610,</u> quisieran vender o enajenar a cualquier título, ya sea total o parcialmente, <u>sus participaciones sociales en</u> ~~las Acciones de~~ la Sociedad<u>, en o de Loraine S.A. o en Park 610</u> ~~las Sociedades Vinculadas~~ a terceros ajenos a este Convenio ("Acciones Ofrecidas"), deberán hacerlo saber a la otra parte <u>(es decir, en el caso de la Sociedad, a Carlos Ávila, en el caso de Loraine S.A. a Leramar S.A., y en el caso de Park 610 a la Sociedad o a Loraine S.A.)</u> por medio fehaciente, con indicación del nombre del adquirente y de las condiciones en la que se dispone a realizar la operación, con la firma del potencial adquirente. <u>[hablemoslo]</u>

7.2    Recibida la notificación, la parte notificada podrá optar por comprar totalmente las Acciones Ofrecidas<u>,</u> al mismo precio y en las mismas condiciones ofrecidas por el tercero ("Opción Preferente").

7.3    Para ejercer la Opción Preferente, la parte deberá así notificarlo a la otra dentro de los 10 días hábiles de recibida la notificación prevista en el numeral 7.<u>2</u>~~1~~ anterior.

6

7.4    Vencido el plazo establecido sin haber sido ejercida la Opción Preferente sobre todas las Acciones Ofrecidas,  la otra parte quedará en libertad de enajenar su participación social s Acciones a terceros, sin perjuicio de lo dispuesto en el numeral 7.5 de la presente cláusula.

7.5    En caso que se Carlos Vicente Ávila reciba una oferta de acuerdo a lo dispuesto en numeral 7.1 anterior y la parte notificada Leramar S.A., decida no ejercer la Opción Preferente, esta última estará facultada (aunque no obligada) a requerir a la parte vendedora Carlos Vicente Ávila o a la Sociedad Vinculada correspondiente que incluya en la venta a favor del tercero que propuso la adquisición de las participaciones sociales acciones propiedad de Carlos Vicente Ávila o de la Sociedad Vinculada correspondiente, todas o la misma proporción de las participaciones sociales de la parte notificada acciones de la Sociedad a nombre de Carlos Vicente Ávila pero por cuenta y orden de Leramar S.A. (cláusula 1.2 del presente), por el mismo precio y bajo las mismas condiciones obtenidas por la parte vendedora Carlos Vicente Ávila o la Sociedad Vinculada correspondiente por sus participaciones sociales acciones ("Tag Along"), siempre y cuando la parte notificada Leramar S.A., le comunique a la parte vendedora Carlos Vicente Ávila su intención de ejercer el Tag Along dentro del plazo establecido para ejercer la Opción Preferente. La transferencia objeto de este Tag Along, deberá completarse en 120 días corridos desde la comunicación de ejercicio del referido derecho, transcurridos los cuales Carlos Vicente Ávila o la Sociedad Vinculada correspondiente no podrá transferir las acciones objeto de la Opción Preferente.

**OCTAVO (Mora automática):**

8.1    Los Accionistas caerán en mora de pleno derecho, por cualquier acción u omisión contraria a lo estipulado en el presente Convenio, o por el vencimiento de los plazos pactados, y sin necesidad de interpelación judicial o extrajudicial de especie alguna.

7

**NOVENO (Garantía prendaria):**

9.1 ~~En garantía del cumplimiento de las obligaciones pactadas en este Convenio, del derecho de Leramar S.A. sobre las acciones de la Sociedad (cláusula 1.2), Carlos Ávila constituye derecho real de prenda a favor de Leramar S.A. sobre las acciones de Loraine S.A. detalladas en el Anexo III que forma parte integrante de este Convenio.~~

~~-~~

9.2 ~~Las acciones prendadas quedarán depositadas con [......] (en adelante, el Depositario) por todo el plazo de vigencia del presente Convenio, a los efectos del perfeccionamiento del derecho real de prenda sobre las referidas acciones.~~

~~-~~

9.3 ~~Cada vez que le sea requerido, el Depositario emitirá a los Accionistas los correspondientes certificados de depósito de las acciones, a los efectos del ejercicio por parte de los mismos de los derechos inherentes a su calidad de accionistas.~~

~~-~~

9.4 ~~Los honorarios y gastos del Depositario serán pagados por [......]~~
**[Roberto: Sería conveniente, para mejor ejecución de este Convenio, dejar las acciones depositadas en manos de un tercero]**

**DÉCIMO (Ley aplicable. Arbitraje):**

10.1 Las Partes acuerdan que la ley aplicable al presente Convenio será la de la República Oriental del Uruguay.

10.2 Todas las diferencias, desavenencias y/o controversias que se produzcan entre las partes, derivadas de este contrato, serán resueltas definitivamente

mediante arbitraje, observándose, tanto para la designación de los árbitros como para el procedimiento arbitral, las disposiciones contenidas en el Reglamento de Arbitraje del Centro de Conciliación y Arbitraje, Corte de Arbitraje Internacional para el Mercosur, de la Bolsa de Comercio, del Uruguay.

El Tribunal Arbitral estará compuesto por tres árbitros, tendrá sede en Montevideo, el procedimiento arbitral se desarrollará en idioma español y se fallará por Derecho. Su fallo será inapelable.

**UNDÉCIMO (Disposiciones inconsistentes):**

En caso de que una disposición de este Convenio fuera inconsistente con las disposiciones de cualquier acuerdo relacionado subordinado al presente, incluyendo las disposiciones de los estatutos de la Sociedad, los comparecientes acuerdan que las disposiciones de este Convenio prevalecerán sobre cualquiera de dichas inconsistencias.

**DUO DÉCIMO (Confidencialidad):**

Las Partes se obligan a mantener absoluta y total reserva de los términos del presente contrato. Las Ppartes se comprometen, además, a realizar las gestiones necesarias o razonables a fin de que sus profesionales, funcionarios, directores o empleados den cumplimiento a las disposiciones de esta cláusula de acuerdo a las normas vigentes.

**DÉCIMO TERCERO (Domicilios y notificaciones):**

13.1    A todos los efectos que pudiera dar lugar este Convenio, los comparecientes constituyen domicilios en los indicados como respectivamente suyos en la comparecencia.

9

13.2    Dichos domicilios serán considerados, a todos los efectos, como vigentes y válidos, hasta diez días hábiles después que alguna de las partes notifique a los demás comparecientes, en forma fehaciente, el cambio de domicilio.

13.3    Las partes aceptan el telegrama colacionado como medio de notificación fehaciente.

**DÉCIMO CUARTO (Otorgamiento):**

Se extiende el presente en 3 ejemplares de un mismo tenor y a un solo efecto, en el lugar y fecha indicados junto a cada firma.

**Carlos Vicente Ávila (por sí y en representación de Loraine S.A.]**────

Buenos Aires, República Argentina, [FECHA]

**p. Leramar S.A.**
[Nombre]
Montevideo, República Oriental del Uruguay, [FECHA]

[El Depositario, [......] firma en señal de aceptación del cargo conferido en virtud de la cláusula Noveno del presente.]

Firma:
[LUGAR], [FECHA]

10

# RECTIFICATION AGREEMENT

## BY AND BETWEEN

## CARLOS VICENTE ÁVILA

## AND

## LERAMAN S.A.

## DECEMBER 2006

# RECTIFICATION AGREEMENT

AS ONE PARTY:   CARLOS VICENTE ÁVILA, identity card number ..............., domiciled at ............... in this city; and AS THE OTHER PARTY: LERAMAN S.A., represented herein by ......................., domiciled at ................... in this city (together with Carlos Vicente Ávila, hereinafter the "Parties"), who agree to enter into this Agreement:

## FIRST: RECITALS

On [date], the Parties signed an agreement for the purchase of shares in Tumely S.A. (the "Company") and an agreement on their respective interests in the Company and in the related companies in which the Company or Carlos Vicente Ávila, as the case may be, holds an interest (hereinafter the "Agreements").

## SECOND: PURPOSE

2.1     The Parties hereby rectify an error in the Agreements and substitute the name of Leramar by the name of Leraman wherever such name appears in the Agreements.

2.2     The Parties represent that this Agreement does not amend the terms and conditions contained in the Agreements, except as provided in Section 2.1 above, and all obligations assumed by the Parties under the Agreements remain in effect.

## THIRD:  SPECIAL DOMICILES AND NOTICES

For purposes hereof, the notices or correspondence in writing by certified telegram or fax to the addresses indicated by each party in the preamble to be their own shall be considered valid and authentic.

In witness whereof, the parties sign two counterparts of the same text, in the place and on the date indicated beside each signature.

Carlos Vicente Ávila
Buenos Aires, Republic of Argentina, [date]



for Leraman S.A.
[Name]
Montevideo, Oriental Republic of Uruguay, [date]

# CONVENIO RECTIFICATIVO

**Entre**

## CARLOS VICENTE ÁVILA

**Y**

## LERAMAN S.A.

**Diciembre de 2006**

## CONVENIO RECTIFICATIVO

**POR UNA PARTE:** CARLOS VICENTE ÁVILA, Documento de Identidad [......], con domicilio en [......] de esta ciudad, y **POR OTRA PARTE:** LERAMAN S.A., representada en este acto por el Cr. [......], con domicilio en [........] de esta ciudad (en adelante, conjuntamente con Carlos Vicente Ávila, "las Partes"); acuerdan en celebrar el presente convenio:

### PRIMERO (Antecedentes):

Con fecha [......], las Partes suscribieron un contrato de compraventa de acciones de Tumely S.A. (la "Sociedad") y un convenio respecto de sus respectivas participaciones en la Sociedad y en las sociedades vinculadas en las cuales la Sociedad o Carlos Vicente Ávila en su caso, tiene participación (en adelante, "los Contratos").

### SEGUNDO (Objeto):

2.1     Por la presente, las Partes rectifican un error padecido en los Contratos, sustituyendo el nombre "Leramar" por el de "Leraman", cada vez que dicho nombre se indica en los Contratos.

2.2     Las Partes, declaran que este convenio no modifica los términos y condiciones contemplados en los Contratos, salvo lo dispuesto en la cláusula 2.1. anterior, manteniéndose vigentes todas las obligaciones asumidas por las Partes bajo los Contratos.

### TERCERO (Domicilios especiales y notificaciones):

A los efectos del presente, se considerarán válidas y fehacientes las notificaciones o comunicaciones hechas por escrito a través de telegrama colacionado o fax en los domicilios que cada parte indicó como suyos en la comparecencia.

2

En señal de otorgamiento, las Partes suscriben dos ejemplares del mismo tenor en el lugar y fecha indicados junto a cada firma.

Carlos Vicente Ávila
Buenos Aires, República Argentina, [FECHA]

p. Leraman S.A.
[Nombre]
Montevideo, República Oriental del Uruguay, [FECHA]

B)   Titularidad de las acciones de Park 610 y otras sociedades. La Sociedad es titular del 50% del paquete accionario de Park 610 LLC ("Park 610"), una sociedad constituida de conformidad con las leyes del Estado de Delaware, EE.UU., y, ésta última, a su vez es titular del 55% del paquete accionario de Latin American Sports LLC, una sociedad constituida de conformidad con las leyes del Estado de Delaware, EE.UU.. Las acciones de Park 610 se encuentran en la actualidad totalmente integradas y libres de todo usufructo, prenda, embargo u otro gravamen y de todo reclamo; restricción a la transferencia (salvo lo dispuesto en la cláusula Sexta del presente), derecho de opción o preferencia, derecho a favor de cualquier tercero, o cualquier otro tipo de afectación.

C)   Vigencia. Tanto la Sociedad como Park 610 se encuentran vigentes y debidamente constituidas conforme a sus respectivas leyes de constitución.

D)   Aportes Irrevocables. No existen ni en la Sociedad ni en Park 610, aportes irrevocables o de ninguna otra naturaleza ni montos o contribuciones pendientes de capitalización en la Sociedad ni en Park 610 por parte del Vendedor o de persona alguna.

E)   Cumplimiento de Obligaciones. La Sociedad ha cumplido fiel y diligentemente con todas y cada una de las obligaciones que debía cumplir hasta el día de la fecha (incluyendo sus obligaciones tributarias y previsionales) y ha pagado todas las sumas adeudadas y exigibles hasta el día de la fecha, y no se encuentra en incumplimiento alguno.

**SEXTO (Restricciones a la transferencia de las Acciones):**

6.1   Las partes conocen y aceptan expresamente las restricciones a la transferencia de las Acciones que afecta a los accionistas de Park 610, en virtud del Convenio de Constitución de Latin American Sports LLC suscrito entre Park 610 y Directv Latin América LLC con relación a su participación en Latin American Sports ("las Restricciones").

6.2   Mientras las Restricciones permanezcan vigentes, el Vendedor tendrá las Acciones a Transferir a su nombre, pero por cuenta y orden del Comprador.

6.3   El Vendedor se obliga a notificar al Comprador el cese de las Restricciones en un plazo de 2 días hábiles de ocurrido el mismo.

1

6.4    Hasta tanto se levanten las Restricciones: (a) la Sociedad conducirá sus operaciones de acuerdo con el curso normal y usual de sus actividades y según las prácticas comerciales vigentes y realizará esfuerzos razonables desde el punto de vista comercial para mantener sus derechos; (b) la Sociedad, a menos que cuente con el previo consentimiento escrito del Comprador, se abstendrá de reformar su Estatuto u otros documentos de su organización, excepto que ello le sea requerido por ley o por resolución administrativa; (c) la Sociedad, a menos que cuente con el previo consentimiento escrito del Comprador, se abstendrá de autorizar la emisión, emitir, vender, entregar o acordar o comprometerse a emitir, vender o entregar (ya sea a través de la emisión u otorgamiento de opciones o de cualquier otra forma) acciones o cualquier tipo de participación en la Sociedad; y (d) la Sociedad, a menos que cuento con el previo consentimiento escrito del Comprador, se abstendrá de endeudarse u contraer cualquier tipo de pasivo.

6.5    Todos los pagos relativos al funcionamiento de la Sociedad (tributos, comisiones, honorarios, tarifas, gastos y cualquier otro concepto) serán de cargo del Comprador.

**SÉPTIMO (Mora automática):**

Las partes estipulan que la mora operará de forma automática, produciéndose la misma de pleno derecho, sin necesidad de protesto, interpelación ni gestión alguna, por el solo vencimiento de los plazos o por la realización u omisión de cualquier acto o hecho que se traduzca en hacer o no hacer algo contrario a lo estipulado.

**OCTAVO (Domicilios especiales y notificaciones):**

A los efectos del presente, se considerarán válidas y fehacientes las notificaciones o comunicaciones hechas por escrito a través de telegrama colacionado o fax (con acuse de recibo) en los domicilios que cada parte indicó como suyo en la comparecencia.

**NOVENO (Ley aplicable. Arbitraje):**

9.1    Las Partes acuerdan que la ley aplicable al presente convenio será la de la República Oriental del Uruguay.

9.2    Todas las diferencias, desavenencias y/o controversias que se produzcan entre las partes, derivadas de este contrato, serán resueltas definitivamente mediante arbitraje, observándose, tanto para la designación de los árbitros como para el procedimiento arbitral, las disposiciones contenidas en el Reglamento de Arbitraje del Centro de Conciliación y Arbitraje, Corte de Arbitraje Internacional para el Mercosur, de la Bolsa de Comercio, del Uruguay.

El Tribunal Arbitral estará compuesto por tres árbitros, tendrá sede en Montevideo, el procedimiento arbitral se desarrollará en idioma español y se fallará por Derecho

**DÉCIMO (Confidencialidad):**

Las Partes se obligan a mantener absoluta y total reserva de los términos del presente contrato. Las partes se comprometen, además, a realizar las gestiones necesarias o razonables a fin de que sus profesionales, funcionarios, directores o empleados den cumplimiento a las disposiciones de esta cláusula de acuerdo a las normas vigentes.

**UNDÉCIMO (Costos y Gastos):**

Las partes soportarán sus respectivos costos y gastos, incluyendo sin carácter taxativo, las remuneraciones y gastos de asesores legales, financieros, consultores, contadores y escribanos, incurridos en relación con la preparación y celebración de este contrato y la consumación de las transacciones contempladas en el mismo.

En fe de lo acordado las partes suscriben cuatro ejemplares del mismo tenor en el lugar y fecha indicados junto a cada firma.

**Carlos Vicente Ávila**
Buenos Aires, República Argentina, 8 de Noviembre de 2006.

Gustavo Veiga
**p. Leramar S.A.**

6

Montevideo, República Oriental del Uruguay, 8 de Noviembre de 2006

## DOMESTIC WIRE USING MODEL

**WIRE:** From Account: **3200557259**  Currency: **US Dollars**

Status:  **Processed** - Confirmation Number is **1410051236**.
Wire Fee: **$12.50**

| Beneficiary<br>UBS-FIN.SVCS.CLEMENTE | Financial Institution |
|---|---|
| | Name: **UBS FINANCIAL SERVICES R.I.**<br>(through UBS AG.) |
| | Address: **1285 Avenue of the Americas 19th**<br>**New York**<br>**New York** |
| Intermediary<br>Bank: | ABA: **026007993**<br>Name: **UBS AG.**<br>State:<br>Financial Institution's Account<br>at Intermediary Bank : |

Beneficiary's Account number: A/C **UBS-FIN.SCVS. AE 06118**

Amount: **$10,000.00**

Date of transfer(s): **May 21, 2007**

Save as model      Model Name:  UBS-FIN.SVCS.CLEMENTE

Process another Wire

Page 1 of 1

Help

## DOMESTIC WIRE USING MODEL

**WIRE:**   From Account: **3200557259**   Currency: **US Dollars**

**Status:**   **Processed - Confirmation Number is 1410051136.**
**Wire Fee: $12.50**

| Beneficiary | Bank |
|---|---|
| **CARLOS VICENTE AVILA**<br>Paseo Colon 505 piso 2<br>Buenos Aires<br>Argentina<br><br>Phone: 5411-52354815 | Name: **JPMORGAN CHASE BANK, NA**<br>ABA: **021000021**<br>Address: **1211 Ave of the Americas**<br>**NEW YORK**<br>**New York** |

Beneficiary's Account number: **400-654865**

Amount: **$20,000.00**

Date of transfer(s): **May 21, 2007**

Save as model     Model Name:  CARLOS VICENTE AVILA

Process another Wire

.in Menu > Transfers and Payments >                                          Help

## COMPLETED WIRES

| Here is the wire information: | |
|---|---|
| Setup By: | ROBERTO TIMISTIT |
| Date: | September 13, 2007 |
| Amount: | $20,000.00 |
| Source Account: | 3200557259 (Checking) |
| Beneficiary Name: | CARLOS VICENTE AVILA |
| Address: | Paseo Colon 505 piso 2<br>Buenos Aires<br>Argentina |
| Phone: | 5411-52354815 |
| Bank Name: | JPMORGAN CHASE BANK, NA |
| Bank ABA#: | 021000021 |
| Branch Address: | 1211 Ave of the Americas |
| Branch City: | NEW YORK |
| State: | NY |
| CARLOS VICENTE AVILA's account at JPMORGAN CHASE BANK, NA: | 400-654865 |
| Special Instructions (Invoice#, Purchase Order#, etc.): | |

◄ Back

—

Page 1 of

Menu > Transfers and Payments >

Hel

## DMESTIC WIRE USING MODEL



WIRE: From Account: **3200557259**  Currency: **US Dollars**

Status: **Processed** - Confirmation Number is **2560062251**.
Wire Fee: **$12.50**

| Beneficiary<br>UBS-FIN.SVCS.CLEMENTE | Financial Institution<br>Name: **UBS FINANCIAL SERVICES R.I.**<br>(through UBS AG.)<br>Address: **1285 Avenue of the Americas 19th<br>New York<br>New York** |
|---|---|
| | Intermediary<br>Bank: |

ABA: **026007993**
Name. **UBS AG.**
State:
Financial Institution's Account
at Intermediary Bank :

Beneficiary's Account number: A/C **UBS-FIN.SCVS. AE 06118**

Amount: **$10,000.00**

Date of transfer(s): **September 13, 2007**

Save as model     Model Name: UBS-FIN SVCS.CLEMENTE

Process another Wire

**EG**

| | |
|---|---|
| **From:** | Alejandro Zunda Cornell |
| **Sent:** | Lunes, 22 de Octubre de 2007 05:42 p.m. |
| **To:** | Carlos Pratola |
| **Subject:** | Re: |

~~Estoy~~ ~~~~ ~~reteve a~~ Bill

~~-----Original Message-----~~
From: Carlos Pratola
To: Alejandro Zunda Cornell
Sent: Mon Oct 22 18:40:24 2007
Subject: RE:

parece

~~-----Mensaje original-----~~
De: Alejandro Zunda Cornell
Enviado el: Lunes, 22 de Octubre de 2007 06:40 p.m.
Para: Carlos Pratola
Asunto: Re:

Bien, no?

~~-----Original Message-----~~
From: Carlos Pratola
To: Alejandro Zunda Cornell
Sent: Mon Oct 22 18:33:41 2007
Subject: RV:

De: Bracco, Jacopo ( DIRECTVLA ) [mailto:Jacopo@directvla.com] Enviado el: Lunes, 22 de
Octubre de 2007 06:21 p.m.
Para: Carlos Avila
CC: Rick Nerod; Carlos Pratola; Roberto Timistit
Asunto: RE:

Estimado Carlos:

REDACTED

Gracias por tu correo.  Me parece estamos avanzando bien en las discusiones con       y
me parece positiva la reacción de                    Carlos puede avanzar con Roberto en
conceptualizar un MOU.  El se ocupará de coordinar esto con Rick.  Además de esto, me
gustaría saber que piensa (          en relación al precio de compra de su participación
en el canal.  Te ha indicado algo?

REDACTED

A propósito de la cena con            esta semana, por coincidencia Rick estará en
Miami también y me parece seria interesante si el se pudiera juntar a Uds.

Nos vemos semana próxima en Buenos Aires,

Jacopo

**From:**     Carlos Avila[cavila@golfchannel-la.com]
**Sent:**     Tuesday, October 23, 2007 8:18 AM
**To:**       Carlos Pratola
**Subject:**  RV:

Carlitos:

Vamos bien, no? Por favor llamáme!
Un abrazo,

Carlos

---

**De:** Nerod, Richard C ( DIRECTVLA ) [mailto:RCNerod@directvla.com]
**Enviado el:** lun 22/10/2007 20:16
**Para:** Carlos Avila
**CC:** Pratola, Carlos; Roberto Timistit; Bracco, Jacopo ( DIRECTVLA )
**Asunto:** RE:

Carlos,

Entiendo que la cena con el          y ,    se ha cambiado a una reunión en la tarde, pero yo igualmente puedo fácilmente subir de Miami a Orlando para participar.  Si te parece bien, déjame saber donde y a que hora es la reunión, y yo coordinare mis planes para estar allí.

Saludos,

Rick

# REDACTED

---

**From:** Bracco, Jacopo ( DIRECTVLA )
**Sent:** Monday, October 22, 2007 5:21 PM
**To:** Carlos Avila
**Cc:** Nerod, Richard C ( DIRECTVLA ); Pratola, Carlos; Roberto Timistit
**Subject:** RE:

Estimado Carlos:

Gracias por tu correo.  Me parece estamos avanzando bien en las discusiones co        ' me parece positiva la reacción de           .  Carlos puede avanzar con Roberto en conceptualizar un MOU.  El se ocupará de coordinar esto con Rick.  Además de esto, me gustaría saber que piensa          en relación al precio de compra de su participación en el canal.  Te ha indicado algo?

À propósito de la cena con          esta semana, por coincidencia Rick estará en Miami también y me parece seria interesante si el se pudiera juntar a Uds.
Nos vemos semana próxima en Buenos Aires,

Jacopo

---

**From:** Carlos Avila [mailto:cavila@golfchannel-la.com]
**Sent:** Wednesday, October 17, 2007 6:51 PM

Translation of e-mail chain starting with 10/23/07 email from Avila to Pratola:

10/23/07

Carlitos,

All is going well for us, right?  Please call me!

A hug,

Carlos

---

10/22 Nerod to Avila

Carlos,

I understand that the dinner with the **[REDACTED]** and **[REDACTED]** has been changed to a meeting in the afternoon, but I can still easily come up from Miami to Orlando to participate.  If that suits you, let me know where and what time the meeting is, and I will coordinate my plans to be there.

Regards,
Rick

---

10/22/07 from Bracco to Avila:

Dear Carlos,

Thank you for your e-mail.  It seems to me that we are advancing well in the discussions with **[REDACTED]**and I think **[REDACTED]**'s reaction is positive.  Carlos [Pratola] can advance with Roberto [Timistit] in putting together an MOU.  He will handle coordinating with Rick on this.  In addition to this, I'd like to know what [REDACTED] thinks about the purchase price of an interest in the channel.  Has he indicated anything to you?

On the topic of the dinner with **[REDACTED],** by coincidence Rick will also be in Miami and I think it would be interesting if he could join you.

See you next week in Buenos Aires,

Jacopo

**To:** Bracco, Jacopo ( DIRECTVLA )
**Cc:** Nerod, Richard C ( DIRECTVLA ); Pratola, Carlos; Roberto Timistit
**Subject:**

Hola Jacopo:

Fue muy lindo encontrarte en París.  Hemos tenido una buena reunión con

Como quedó claro, creo que la decisión quedó en manos de Direct TV de preparar el MOU.   En caso de que el precio sea el correcto, yo me quedaría con hasta un 20% y como consensuamos en la reunión,   asumiría hasta un 51%.  En consecuencia, yo entendí que la única previsión es proteger a Direct TV en la distribución y un precio correcto en el pago por abonado de la señal de Direct TV.   Roberto Timistit colaborará con quien vos indiques, supongo que con Carlos Prátola, a efectos de preparar el MOU entre

REDACTED

Además estuve en Sportel donde                        difundió en forma extraoficial su firme intención, que compartió con su jefe Russel, de adquirir participación en

     fue informado por parte mía y a pedido de                          de la posible operación y contamos con su beneplácito.

También hemos mantenido una cena con                                  el martes y le anticipamos la posible operación. En dicha cena, \        nos felicitó por la rapidez y eficiencia con que hemos lanzado la señal al mercado y hemos sido tomados como modelo para otras operaciones                            en otras regiones como por ejemplo Singapur.

El jueves 25 de octubre mantendremos una cena en Orlando, Florida USA con el nuevo presidente de

     , que proviene de         dueño de la señal, a la que también asistirá

y agente comercial de                 , que ya está informado de la eventual operación con         El nuevo

Presidente de         según me informaron               , tiene vocación de crecer internacionalmente con la señal del golf.  Eventualmente, podría ser otro player si lo de        lo cierra.   La idea de

Tabanera, en caso de llegar a un rápido acuerdo lo más pronto posible, es anunciarlo en el

ia que se jugará la primera semana de diciembre.

Creo que estamos en el buen camino. Roberto Timistit, si estás de acuerdo, se contactará con Prátola para

armar un borrador del acuerdo ya que Guillermo Tabanera le bajó línea a        REDACTED

de Nueva York, con quien Roberto ya estuvo conversando.

Espero tu comentario.

Atentamente,

Carlos


Dear Jacopo:


It was very nice meeting you in Paris. We have had a good meeting with        REDACTED


As we made it clear, the decision to prepare the MOU is up to Direct TV.   In case the price is right, I would

keep up to 20% and, as we agreed in the meeting,        ould take on up to 51%. Consequently, I understood

that the only concern is to protect Direct TV regarding the distribution and correct price per viewer of the Direct

TV signal. Roberto Timistit will cooperate with whoever you tell us, I guess Carlos Prátola, to prepare the

MOU between

In addition, I was in Sportel, where ι                    spoke off-the-record about his expressed intention,

which he shared with his boss Russel, of getting a participation in the

                         . was informed by me and upon                    's request of the possible operation and

we have his support.

We also had dinner with                    from            ael on Tuesday and we talked to him about the possible

operation. At this dinner, Wayne congratulated us on our speed and efficiency to launch the signal to the

market and we were taken as models for other operations ol                              in other regions such as

Singapore.