MINTZ & GOLD LLP
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, N.Y. 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------X

| | |
|---|---|
| DIRECTV LATIN AMERICA, LLC, individually and in the right and on behalf of LATIN AMERICAN SPORTS, LLC, | : : : : |
| Plaintiff, | : **08 Civ. 3987 (VM)(GWG)** |
| | : |
| v. | : |
| | : **AMENDED VERIFIED COMPLAINT** |
| PARK 610, LLC, CARLOS VICENTE AVILA, ROBERTO TIMISTIT, CARLOS PRATOLA, ALEJANDRO ZUNDA CORNELL and DIEGO CLEMENTE, DOES 1 through 10, | : : **ECF CASE** : : : : : : |
| Defendants, | : : |
| and | : : |
| LATIN AMERICAN SPORTS, LLC, | : : |
| as a Nominal Defendant. | : |

-----------------------------------------------------X

Plaintiff, DIRECTV Latin America, LLC ("DIRECTV"), through its attorneys,

Mintz & Gold LLP, as and for its Amended Verified Complaint herein, brought derivatively on

behalf of Latin American Sports, LLC, and in its own right, alleges as follows:

**Nature of the Action**

1.      This action concerns a clandestine arrangement among the Defendants in connection with a joint venture between DIRECTV and Defendant Carlos Vicente Avila ("Avila").  As part of their joint venture, DIRECTV and Avila formed a limited liability company, Latin American Sports, LLC ("LAS"), the purpose of which was to create a Spanish language television channel to broadcast golf programming in Latin America (the "Channel"). Two of the Defendants, Carlos Pratola ("Pratola") and Alejandro Zunda Cornell ("Zunda"), who were senior officers of Plaintiff's subsidiary, DIRECTV Argentina, S.A., pitched the joint venture as an opportunity for DIRECTV to develop the Channel in partnership with Avila, a prominent figure in Argentine sports media.  As it turned out, however, what was supposed to be a profitable joint venture between Avila and DIRECTV turned out to be a scheme whereby Pratola, Zunda and Avila, with the assistance of Defendant Roberto Timistit ("Timistit"), secretly intended to exploit the arrangement to enrich themselves at LAS's and DIRECTV's expense.  The identities of the John Doe Defendants are not presently known to DIRECTV.

2.      In late 2007, DIRECTV discovered that Avila and Timistit had secretly arranged to transfer half of Avila's beneficial ownership in LAS to a Uruguayan corporation, Leraman S.A. ("Leraman").  Upon information and belief, Leraman is controlled by Pratola and Zunda. The transfer to Leraman constituted one or more Events of Default, as defined by the Limited Liability Company Agreement of LAS (the "LLC Agreement").  More fundamentally, the transfer betrayed a fundamental assumption underlying DIRECTV's decision to invest in the transaction in the first place, namely, that Avila would operate the Channel in Latin America in partnership with DIRECTV.  Instead, DIRECTV finds its economic interest in the Channel jeopardized by Avila's unilateral and undisclosed introduction into the partnership of two highly

objectionable co-venturers, namely Pratola and Zunda, two corrupt former employees of DIRECTV's subsidiary who had surreptitiously placed themselves on both sides of the transaction, in a flagrant violation of their duty of loyalty to their employer.

3.      In addition to the "bait and switch" described above, Defendants siphoned off vast sums from DIRECTV and its subsidiary under false pretenses.  Timistit, with the assistance of Pratola, arranged to wire large sums of money to Avila's personal account as well as to one or more unknown parties, believed to include Pratola and/or Zunda.

4.      Upon an Event of Default, DIRECTV has the right to compel Park 610 to sell all of Park 610's shares in LAS to DIRECTV.   In the alternative, the conspiracy among the Defendants entailed the breach of various fiduciary duties owed to DIRECTV and LAS, entitling DIRECTV to damages, rescission of its agreements with Park 610 and restitution of all sums that DIRECTV expended in furtherance of the joint venture.

<u>**The Parties**</u>

5.      DIRECTV Latin America, LLC, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1211 Avenue of the Americas, New York, N.Y. 10036.

6.      DIRECTV is engaged in the business of providing pay television services in Latin America, and through its subsidiaries has approximately 5 million subscribers in the region.

7.      The sole member of DIRECTV Latin America, LLC, is DIRECTV Latin America, Inc., a corporation organized under the laws of the State of California and having its principal place of business at 2230 East Imperial Highway, El Segundo, CA 90245.

8.      Defendant Park 610, LLC, is a limited liability company organized under the laws of the State of Delaware.  Upon information and belief, the principal place of business of Park 610 is located at 9999 Collins Avenue, Bal Harbour, FL 33154.

9.      Upon information and belief, Park 610 has two members, Tumely S.A. and Loraine S.A., each of which is a corporation organized and existing under the laws of Uruguay.

10.     Upon information and belief, Defendant Carlos Vicente Avila is a citizen of Argentina, having a domicile at Gelly 3650, Buenos Aires, Argentina.

11.     Avila is the Chairman of LAS.

12.     Upon information and belief, Defendant Roberto Timistit ("Timistit") is a citizen of Argentina, with a domicile at Cabildo 480, General Pacheco, Partido de Tigre, Provincia Buenos Aires.

13.     Timistit is the chief executive officer of LAS, and is the brother-in-law of Defendant Avila.

14.     Defendant Carlos Pratola is a citizen of Argentina, with a domicile at Villanueva 1350 PB (1426) Ciudad de Buenos Aires, Republica Argentina.  Until his employment was terminated, Pratola was the General Manager and Chief Executive Officer of DIRECTV Argentina, S.A.

15.     Defendant Alejandro Zunda is a citizen of the United States of America, with a domicile at Ruta Panamericana, Ramal Pilar, Km. 43.5, Barrio Ayres del Pilar, lote V16 (1669) Del Viso, Pilar, Provincia de Buenos Aires República Argentina.  Until his termination, Zunda was the Vice President of Marketing and Sales of DIRECTV Argentina, S.A.

4

16.     Upon information and belief, Defendant Diego Clemente is a citizen of Argentina with a domicile at Panamericana Ramal Pilar, Km. 43.5, AYRES del PILAR, Lote K 10, (1629) Pilar, Provincia de Buenos Aries, República Argentina.

17.     Nominal Defendant LAS is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at Balcarce 510, Buenos Aires, Argentina.

18.     LAS has two members, Defendant Park 610, LLC ("Park 610") and DIRECTV. Defendant Park 610 is the holder of 55% of the membership interest of LAS and DIRECTV holds the remaining 45% of LAS.

## Jurisdiction and Venue

19.     The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.  Accordingly, this Court possesses subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332.

20.     In the LLC Agreement, Defendant Park 610 irrevocably agreed to submit to the jurisdiction of the courts in New York, New York, and stipulated to the application of New York law.  Venue is otherwise proper as to all the other Defendants pursuant to 28 U.S.C. §§1391(a)(3) and 1391(d), as the Defendants are subject to personal jurisdiction in this District and/or are aliens.

## Substantive Allegations

Pratola Proposes the Joint Venture with Avila

21.     In April 2006, Pratola suggested to his superiors at DIRECTV, Richard Nerod and Jacopo Bracco, that the company could increase its subscriber base in the Latin American market by offering the Channel as part of its package of sports programming.

22.    At Pratola's urging, DIRECTV entered into discussions with Avila with a view toward forming a joint venture to develop and distribute the Channel in Latin America.

23.    In or about July 2006, on behalf of DIRECTV, Pratola took a lead role in negotiating a Memorandum of Understanding (the "MOU") between DIRECTV and Avila, as well as negotiating the definitive transactional documents, including the LLC Agreement.

24.    Among the issues that Pratola discussed with Avila was the structure of the joint venture, including the amount and proportion of DIRECTV's equity and debt funding for the Channel.

25.     Pursuant to its undertakings in the LLC Agreement, DIRECTV, in consideration for its 45% interest in LAS, had the obligation to provide up to $7 million of funding to LAS. DIRECTV contributed capital to the joint venture from its account in New York.  During the calendar year 2006, DIRECTV made a capital contribution of $1,500,000, exclusive of a pre-launch payment by DIRECTV Argentina made pursuant to the MOU.  In 2007, DIRECTV contributed capital in the amount of $2,500,000.  In 2008, DIRECTV paid an additional contribution of approximately $550,000.

26.    In addition, during the calendar year 2007, DIRECTV extended $1,000,000 in loans to the joint venture.

27.    In addition to its financial contribution, DIRECTV has certain approval rights typical of a minority investor in a joint venture.  While Avila was the Chairman of LAS, DIRECTV had the right to designate two members of the Board of Directors of LAS, whereas Avila designated three.  DIRECTV further had the right, among other things, to consult with Avila regarding the selection of the venture's general manager and other key employees.

DIRECTV was also the exclusive distributor of the Channel in the major Latin American television markets and reviewed and approved the budget.

28.     Although DIRECTV was supplying all of the funding, it received only 45% of the membership interest in LAS, whereas Avila received 55%. Pratola had convinced DIRECTV that Avila would not accept less than a majority stake in the venture in exchange for his contribution to the venture, which consisted principally of procuring the desired golf programming rights, producing the Channel, and selling advertising.[1]

29.     Avila has a long history of developing sports programming in Argentina, and his personal commitment to developing the Channel in the Latin American market was material to DIRECTV's decision to invest in the joint venture, as was the absence of corrupt DIRECTV insiders in the economics of the transaction. DIRECTV insisted and made clear to Avila and his representatives that it was critical for DIRECTV that Avila not transfer any portion of his beneficial ownership in LAS without DIRECTV's knowledge and prior written consent.

30.     Consistent with this understanding, among the material terms of the LLC Agreement is that a "Change of Control" of LAS constitutes an Event of Default under Section 13.1(e) of the LLC Agreement.

31.     One of the events described in the LLC Agreement as a Change of Control is the following:

> (a)     any Person (other than the Person who controls a Member on the date hereof) becomes the beneficial owner, directly or indirectly, of more than 50% of the then outstanding voting shares or other equity rights of a Member;

---

[1]     As it turned out, the larger Avila's share of LAS, the more room there was for Pratola and Zunda to secure a "broker's fee" from Avila in the form of the transfer of Tumely to Leraman.

7

32.     Upon information and belief, through the Leraman Shareholders Agreement, Avila secretly agreed indirectly to convey to Pratola and Zunda in excess of 50% of the "voting shares or other equity rights" of Park 610.

33.     Furthermore, Avila's transfer of the Tumely shares violated the LLC Agreement irrespective of whether such transfer constituted a Change of Control.  An attempted transfer of the membership interests of LAS, other than in compliance with the LLC Agreement, constitutes an independent Event of Default pursuant to Section 13.1(c) of the LLC Agreement.[2]

34.     Furthermore, any other material breach of the Agreement would violate Section 13.1(d) of the LLC Agreement, subject to a cure provision.  Such a material breach would include, among other things, violations of the ethical prohibition set forth in Section 12.5 of the LLC Agreement against dealing with persons having a conflict of interest (like Pratola and Zunda).

35.     Upon an Event of Default, the non-defaulting member has a right pursuant to Section 13.2 of the LLC Agreement to require the defaulting member to sell all of its membership interests in LAS (the "Call Option").  Upon a Change of Control, the non-defaulting member has the right to compel the defaulting member to sell its shares for their net book value. In the event of a Transfer of membership interests in LAS other than in accordance with the LLC Agreement, the Call Option price is eighty percent (80%) of the net book value of the membership interests.

---

[2]     The LLC Agreement defined the term "Transfer" as: "(i) any sale, assignment or transfer of securities, (ii) a sale, assignment or transfer of any economic interest and/or a voting interest ("Interest") in an entity that, directly or indirectly, holds any securities, (iii) a pledge or hypothecation of securities or Interest or any interest therein, (iv) sale, assignment or a transfer of securities convertible into or exchangeable for or other options or rights to acquire securities or Interest or (v) any other direct or indirect, voluntary or involuntary, sale, assignment or transfer of securities or Interest or any interest therein, whether pursuant to a Change of Control or otherwise."

<u>The Funding of the Channel</u>

36.    Pursuant to the MOU, between the time when Avila and DIRECTV executed the MOU and closed the joint venture transaction, DIRECTV was to make a "pre-launch" advance of $350,000 to an entity designated by Avila for the purpose of commencing operations for the Channel.

37.    On August 2, 2006, DIRECTV's loan was memorialized in a loan document and a promissory note made by New Hollywood Productions ("NHP"), an Avila-owned entity.

38.    However, at the last minute, Pratola altered the financing arrangement, causing DIRECTV Argentina (of which he was the general manager) to wire the money in two payments, one to NHP in the amount of $200,000 (617,000 pesos) and the other in the amount of $150,000 (462,750 pesos) to Carlos Avila, <u>personally</u>, each on August 2, 2006.

39.    On or about the same day, DIRECTV and Avila executed the MOU.

<u>The Formation of Park 610 and LAS</u>

40.    In August 2006, Defendant Park 610 was formed as a Delaware limited liability company.  Park 610 was the entity through which Avila would hold his interest in the joint venture.

41.    Park 610, in turn, was owned in equal portions by two Uruguayan corporations, Tumely S.A. ("Tumely") and Loraine S.A. ("Loraine").

42.    In response to requests from DIRECTV for confirmation as to Avila's ownerhip of Park 610, Avila's counsel, Matias de Larrechea, represented to DIRECTV by e-mail dated August 24, 2006 that Avila owned all of the equity of Tumely and Loraine.  De Larrechea further advised that the shares of Tumely and Loraine were in bearer form, but that a subsequent change

to the by-laws of the respective companies would change the form of stock ownership to registered form.

43.     In fact, at the same time that Avila was preparing to close the joint venture with DIRECTV, Pratola and Zunda were working with Avila to arrange a transfer of the ownership of Tumely to an entity to be formed by and on behalf of Pratola and Zunda.  Thus, delivery of bearer shares would be an easier way to conceal the Transfer, since the shares would not have to be re-registered.

44.     On or about September 18, 2006, DIRECTV closed the transaction with Avila.

The Secret Side Deal to Convey Tumely to Pratola and Zunda

45.     Upon information and belief, in or about April 2006, around the same time that he introduced the joint venture proposal to DIRECTV, Pratola was arranging with his own counsel to form a corporation called Leraman, S.A. ("Leraman"), which would become the beneficial owner of the shares of Park 610 then held by Tumely.

46.     Later, around the same time that the joint venture was about to close, Pratola's counsel, a law firm in Uruguay, was preparing two transactional documents: (i.) the Tumely S.A. Share Purchase Agreement, by and between Carlos Vicente Avila (the "Seller") and Leramar S.A. (the "Buyer")(hereafter referred to in this Amended Verified Complaint as the "Stock Purchase Agreement") [3] and (ii.) the Tumely S.A. Shareholders Agreement, by and between Carlos Vicente Avila and Leramar S.A. (hereafter referred to in this Amended Verified Complaint as the "Shareholders Agreement").[4]

---

[3]     The title of the document discovered by DIRECTV is "Contrato de Compraventa de Acciones de Tumely S.A. Entre Carlos Vicente Ávila (el "Vendedor") Y Leramar S.A. (el "Comprador").

[4]     The title of the document discovered by DIRECTV is "Convenio de Sindicación de Accionistas de Tumely."

47.    Upon information and belief, Timistit was actively engaged in discussions between Avila's counsel, Hector Viana, and the owners of Leraman regarding the negotiation and drafting of the Stock Purchase Agreement and the Shareholders Agreement.  The brazenness of the arrangement is revealed by one comment included in a blacklined draft of the agreement, directed from Viana to Timistit, which warned, "THIS MEANS A CHANGE OF CONTROL IN PARK 610 THAT IS IN VIOLATION OF THE LAS SHAREHOLDERS AGREEMENT.  AS LONG AS THE RESTRICTION IS IN PLACE, AVILA MUST MAINTAIN MANAGEMENT."

48.    After Pratola and/or Zunda reviewed Mr. Viana's mark-up of the Shareholders Agreement, on October 12, 2006, Zunda asked Timistit to send him the contact information of "you guys' lawyer" in Uruguay (*i.e.*, Viana).  The next day, Zunda forwarded the information from Timistit to Praola's personal e-mail account.

49.    Since any formal transfer of the shares of Tumely in the name of a beneficial owner other than Avila would violate the LLC Agreement, Pratola's and/or Avila's counsel contrived a stipulation in the Leraman Shareholders Agreement whereby the shares of Tumely would ostensibly continue to be held nominally by Avila, but would in actuality be held for the benefit of Leraman (*i.e.*, Pratola and Zunda).

50.    Upon information and belief, the transaction whereby Avila conveyed all of the shares of Tumely to Leraman closed on or about November 8, 2006.

51.    No notice was given to DIRECTV of the transfer of Tumely before it was concluded.

52.    Upon information and belief, Leraman and Avila entered into an amendment to the Purchase Agreement in December 2006 to correct the misspelling of the name of Leraman in the execution copy of the document, in which it had been misspelled "Leramar."

53.    Upon information and belief, Avila has further agreed with Leraman to restrictions upon the transfer of his shares in Loraine, and either to pledge his shares of Loraine to Leraman and/or to deposit them with a third party as security for the performance of his obligations under the Shareholders Agreement.

The Fleecing of LAS

54.    As part of the joint venture transaction, LAS entered into a "Management Services Agreement" with Park 610.  The Management Services Agreement provides for the payment to Park 610 of a management fee equal to 25% of all advertising sales generated by LAS (from the sale of commercial advertising on the Channel).

55.    Pratola and Zunda led the negotiation with Avila on the structuring of the fee and its computation.

56.    In the late summer or early fall of 2007, advertising revenues were not materializing as planned, and sales were far below the amount that would generate a significant management fee.

57.    Avila therefore pressured DIRECTV to pay him an advance on the management fees in the amount of $30,000 per month.  DIRECTV initially resisted, but after energetic lobbying by Pratola, DIRECTV agreed to pay an advance of $30,000 per month for six months and to reevaluate the arrangement thereafter.

58.    As had been the case of the pre-launch funding of the Channel, the payment of moneys to Avila was carried out under highly irregular circumstances.  Timistit initially arranged

for two transfers of $30,000 to a JPMorgan account held in the name of Avila, personally, rather

than to Park 610, as would have been required under the Management Services Agreement.

Another transfer in the amount of $30,000 transfer was made to an account at UBS with the

beneficiary information titled as "Clemente," which, as a result of DIRECTV's investigation into

the conduct and corruption of Zunda and Pratola, DIRECTV believes is an account that was most

likely set up by Defendant Diego Clemente or his brother Luis Clemente for the benefit of

Pratola and Zunda.[5]

59.     On May 11, 2007, Defendant Clemente sent wire instructions to Zunda for

payment to Banco UBS Financial Services at an address of 1285 Avenue of the Americas, New

York, New York, with UBS A.G. identified as an intermediary bank.

60.     On the same day, Timistit later set a transfer in the amount of $30,000 to the

"Clemente" account.  Timistit later arranged wire transfers on three subsequent occasions, in

each case in the amount of $20,000 to Avila's JPMorgan account and $10,000 to the "Clemente"

account.

61.     While Pratola should have had no particular concern in the matter, he attempted to

persuade DIRECTV to continue the advance payments of the management fee for another six

months.  DIRECTV refused to acquiesce in any further pre-payments of the management fee.

62.     Upon a "Change of Control" of Park 610, moreover, the Management Service

Agreement would have terminated automatically.  Thus, the payments made to Avila (and

Clemente) were not only irregular, and probably far in excess of what had actually been earned,

---

[5]     Following the termination of Zunda's employment, DIRECTV's investigation yielded information
suggesting that Zunda, on his own and Pratola's behalf, engaged in significant self-dealing, including the
receipt of kickbacks and entering into contracts on DIRECTV Argentina, S.A.'s behalf with companies set
up by Zunda and his associates.  These associates included two brothers who were close friends of
Defendant Zunda, Defendant Diego Clemente and his brother Luis.

but were not owed to Park 610 at all (much less to Avila himself, or the mysterious "Clemente")
because the Change of Control had already happened in November 2006.

63.    During the fall of 2007, Pratola learned of a potential business combination
regarding LAS that, if consummated, would have involved the purchase of a significant portion
of Park 610's interest in the joint venture.  Pratola immediately advised Zunda of the possibility.
Zunda thereafter responded "I'm buying candles all-out," implying that he was praying for the
possibility a transaction were consummated, even though Zunda's compensation from
DIRECTV Argentina was not contingent upon LAS.  While the transaction did not come to pass,
Pratola and Zunda already had an undisclosed personal stake in LAS through Leraman or
otherwise, such that they would cash in on any gains realized on the acquisition of LAS.  Shortly
thereafter, Avila wrote to Pratola, referring to the potential acquisition, saying, "Carlitos
[Pratola], it's looking good, right?  Please give me a call!!  A hug, Carlos [Avila]."

64.    Shortly after, following the receipt of evidence indicating the Pratola and Zunda
had engaged in the conspiracy with Avila and Timistit with regard to the Leraman transaction,
DIRECTV confronted each of Pratola and Zunda about the transaction.  When confronted with
the evidence against them, neither Pratola nor Zunda offered a satisfactory explanation of their
conduct.   Ultimately, DIRECTV Argentina fired Pratola and Zunda for their self-dealing.

65.    By letter dated March 25, 2008, DIRECTV notified Avila that it had discovered
his illicit transfer of Tumely to Leraman and exercised the Call Option at the price set forth in
Section 13.4 of the LLC Agreement.  Avila denied that an Event of Default had taken place and
has refused to tender his membership interests in LAS, as required by the LLC Agreement.

66.    The corrupt agreement among and between the several Defendants to entice
DIRECTV into the joint venture under false pretenses, as well as to assist Avila in the improper

collection of management fees, are evidenced by the above-cited communications and the overt

acts of each of the conspirators.  Each act of the several Defendants was undertaken at the

direction and for the benefit of the other Defendants and caused injury to each of LAS and

DIRECTV.

**AS AND FOR A FIRST CAUSE OF ACTION**
**<u>For a Declaratory Judgment Against Park 610</u>**

67.    DIRECTV repeats and realleges each and every allegation in the preceding

paragraphs of this Complaint as if fully set forth herein.

68.    The transfer of ownership of the shares of Tumely and the pledge or deposit of

Loraine's stock constituted a Change of Control of Park 610 within the meaning of the LLC

Agreement because Leraman became the beneficial owner of more than 50% of the equity rights

of Park 610, and Avila ceased to have the sole power to direct or cause the direction of the

management and policies of Park 610.

69.    Even if the foregoing transaction did not amount to a Change of Control, it

constituted a Transfer within the meaning of the LLC Agreement that was not in accordance with

the terms of the LLC Agreement and/or a material breach of the LLC Agreement, *e.g.*, in that it

violated the ethics covenants of the LLC Agreement.[6]

70.    In either case, Avila's transfer of the beneficial ownership of Park 610 constituted

an Event of Default, as defined in Article XIII of the LLC Agreement.

---

[6]    For example, the LLC Agreement required each Member to "(c) cause the Business to be conducted in
accordance with sound and good business practice and the highest ethical standards" (¶12.1(c)) and to
refrain from doing "business with any joint venture partner, distributor, agent, customer, or other person
where a Member knows or suspects that payoffs or similar practices are involved in doing business and will
not have a relationship with a customer or any other person that results in a conflict of interest or
embarrassment to the Company or any of the Members." (LLC Agreement at ¶12.5).

71.    Despite being confronted with conclusive evidence of his conspiracy with the other Defendants, Avila has denied that the transactions described in this Complaint have taken place and has refused to comply with DIRECTV's exercise of the Call Option.

72.    Inasmuch as the majority of the directors of LAS are appointed by Avila, a demand upon the Board would be futile, Avila being personally interested in the transactions challenged herein.  The other members appointed by Avila are members of his family.

73.    By reason of the foregoing, there is an actual and justiciable controversy among the parties regarding DIRECTV's rights upon the event(s) of default arising from the Transfer of Park 610.  DIRECTV therefore seeks a judicial declaration of its rights pursuant to CPLR § 3001.

### AS AND FOR A SECOND CAUSE OF ACTION
### For Breach of Contract – Specific Performance of the LLC Agreement

74.    DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

75.    Upon an Event of Default on the part of Park 610, DIRECTV is entitled to exercise the Call Option in accordance with the procedures set forth in Article XIII of the LLC Agreement.

76.    The LLC Agreement is a valid contract between DIRECTV and Park 610.

77.    DIRECTV has performed its contractual obligations under the LLC Agreement and is ready, willing, and able to fulfill its remaining obligations.

78.    Park 610 is able but unwilling to convey its membership interests in LAS.

79.    DIRECTV has no adequate remedy available at law.

80.    Accordingly, DIRECTV is entitled to a judgment directing Park 610 to comply with the Call Option and sell all of its membership interests in LAS to DIRECTV.

16

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Avila and Timistit for Breach of Fiduciary Duty (Derivatively on Behalf of LAS)**

81.     DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

82.     In his capacity as Chairman of LAS, as well as the ultimate principal of Park 610, Avila was a control person of LAS and owed corresponding fiduciary duties of loyalty and disclosure.

83.     As the chief executive and as an employee of LAS, Timistit owed a direct fiduciary duty of loyalty to LAS.

84.     By arranging to pay management fees in excess of what LAS properly owed,  and by paying such fees to Avila and Clemente, Avila and Timistit committed a waste of LAS's assets, and failed to exercise due care to prevent such waste, and thereby breached their fiduciary duties to LAS.

85.     As a direct and proximate result of the foregoing, LAS has been damaged in an amount to be determined at the trial of this matter.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Against Pratola, Zunda and Clemente for Civil Conspiracy/
Aiding and Abetting a Breach of Fiduciary Duty
(Derivatively on Behalf of LAS)**

86.     DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

87.     Pratola, Zunda and Clemente, with knowledge of the fact that the sums paid to Avila were excessive and were not properly paid under the Management Services Agreement or in reckless disregard of the facts known to them, intentionally assisted Avila and Timistit in carrying out their breach of fiduciary duties owed to LAS.

88.    As a direct and proximate result of the foregoing, LAS has been damaged in an amount to be determined at the trial of this matter.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against Avila and Park 610 – Breach of Fiduciary Duty

89.    DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

90.    As evidenced by the plain language of the MOU and the subsequent acts of the parties, Park 610 assumed the role of co-venturer with DIRECTV.  As DIRECTV's co-venturer, Park 610 had a fiduciary duty of loyalty, good faith and disclosure in all acts undertaken on behalf of, and with respect to the joint venture.

91.    As such, Park 610, and Avila as the sole control person of Park 610, had an obligation to refrain from misrepresenting facts and/or failing to disclose facts that would operate as a fraud upon DIRECTV and/or LAS, to refrain from committing corporate waste, and to refrain from entering into the side-deal with Pratola and Zunda.

92.    As a proximate and direct result of the foregoing breaches of fiduciary duty, DIRECTV has been damaged in an amount to be determined at trial.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Against Defendants Park 610, Avila, Timistit, Pratola, Zunda and Does 1- 10
### (Fraud)

93.    DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

94.    As detailed above, Pratola and Zunda misrepresented to DIRECTV that the Channel would be conducted in the utmost good faith as a joint venture solely between DIRECTV and Avila, whereas in actuality they planned all along secretly to substitute themselves as the holders of part or all of Avila's stake in LAS.

95.    Avila and Timistit, through their participation in the negotiation of the MOU, the LLC Agreement and the other closing documents, and through Avila's counsel, reinforced Pratola's affirmative misrepresentations and omissions.

96.    The foregoing misrepresentations were made by each of the Defendants with the knowledge that the representations were false.

97.    Each of the Defendants intended to induce DIRECTV to enter into the joint venture in reliance upon the misrepresentations.

98.    DIRECTV was justified in relying upon the Defendants' representations.  But for the Defendants' misrepresentations regarding the structure and ownership of LAS, DIRECTV would not have entered into the joint venture with Park 610.

99.    As a consequence of the Defendants' fraud, DIRECTV expended approximately $4,550,000 in capital contributions and $1,000,000 in loans.

100.    In the event that specific performance is not ordered, DIRECTV therefore prays for a judgment rescinding all agreements with Defendants and restitution of all sums paid to Defendants and LAS, whether in the form of capital contributions, loans or otherwise.

**WHEREFORE**, for the reasons set forth above, it is respectfully requested judgment be entered herein:

        i.    On Plaintiff's First Cause of Action, a judgment declaring that that Park 610 has breached the LLC Agreement and has committed one or more Events of Default as defined therein;

        ii.    On Plaintiff's Second Cause of Action, an order of specific enforcement requiring Park 610 to convey all of its membership interests in LAS to

DIRECTV pursuant to the Call Option procedures set forth in Article XIII of the LLC Agreement;

iii.  On Plaintiff's Third and Fourth Causes of action, an award of money damages to LAS to compensate for the Defendants' breach of fiduciary duty and their acts of aiding and abetting the breach of fiduciary duty;

iv.  On Plaintiff's Fifth Cause of Action, an award of money damages in an amount to be determined at trial;

v.  On Plaintiff's Sixth Cause of Action, an order rescinding all agreements between DIRECTV and the Defendants, restitution of sums paid by DIRECTV to fund LAS, and money damages;

vi.  The costs and disbursements of this action, including reasonable attorneys' fees;

vii.  An award of punitive damages; and

viii. Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       June 3, 2008

                        **MINTZ & GOLD LLP**

                        *Terence W. McCormick*
                        _____
                        Steven G. Mintz (SM 5428)
                        Terence W. McCormick (TM 2713)
                        470 Park Avenue South
                        10th Floor North
                        New York, New York 10016-6819
                        Tel:  (212) 696-4848
                        Fax: (212) 696-1231
                        mintz@mintzandgold.com
                        mccormick@mintzandgold.com
                        *Attorneys for Plaintiff*

20

## **VERIFICATION**

Plaintiff, DIRECTV Latin America, LLC, being duly sworn, deposes and says pursuant to 28 U.S.C. § 1746, under the penalty of perjury under the laws of the United States, that deponent has read the foregoing Amended Verified Complaint and knows the contents thereof; that the same are true to deponent's own knowledge, except as to those matters therein stated to be alleged on information and belief, and that as to those matters deponent believes them to be true.

Executed at New York, New York on this 3rd day of June, 2008

_____
Michael Hartman