UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
DIRECTV LATIN AMERICA, LLC, :
individually and in the right and on behalf :
of LATIN AMERICAN SPORTS, LLC, :
                                       Plaintiff, :

              v. :                      08 Civ. 3987 (VM)(GW)

PARK 610, LLC, :
CARLOS VICENTE AVILA, :
ROBERTO TIMISTIT, :
CARLOS PRATOLA, :
ALEJANDRO ZUNDA CORNELL, and :
DOES 1 through 10, :

                                  Defendants, :

             and :

LATIN AMERICAN SPORTS, LLC, :

              as a Nominal Defendant. :
-------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION TO CONFIRM AN ORDER OF ATTACHMENT
AGAINST CARLOS AVILA OBTAINED *EX PARTE***

                                                        FOX HORAN & CAMERINI LLP
                                                        V. David Rivkin (VR-6734)
                                                        825 Third Avenue
                                                        12th Floor
                                                        New York, New York 10022
                                                        Tel: (212) 480-4800
                                                         Fax: (212) 269-2383
                                                        *Attorneys for Defendant*
                                                        *Carlos Vicente Avila*

# **TABLE OF CONTENTS**

**Page No.**

TABLE OF AUTHORITIES ................................................................................................ ii
PRELIMINARY STATEMENT ......................................................................................... 1
STATEMENT OF THE CASE ............................................................................................ 1
LEGAL ARGUMENT.......................................................................................................... 4
I.    Standard for Confirmation of Orders of Attachment............................................. 4
II.   DLA- LLC Has Not Shown That It Has Valid Causes of Action Against Mr. Avila, or That There Is a Likelihood That DLA-LLC's Claims Against Mr. Avila Will Succeed on the Merits ...................................................... 5
    A.    DLA-LLC Has Failed to Shown That It Will Prevail on Its Fraud Claim Against Mr. Avila .................................................................................. 5
    B.    DLA-LLC Has Failed to Show That It Will Prevail on Its Breach of Fiduciary Duty Claims Against Mr. Avila ............................................. 9
        1.    Mr. Avila Had No Duty to Disclose Any Alleged Transfer of Interest in Tumely S.A or Loraine S.A..................................... 9
        2.    DLA-LLC Has Failed to Show That Mr. Avila Breached a Fiduciary Duty by Committing Fraud ......................................... 12
        3.    DLA-LLC Has Failed to Show That Mr. Avila Committed Corporate Waste ................................................................................ 12
CONCLUSION.................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page No(s).**

### CASES

*Bakerman v. Sidney Frank Importing Co.,*
No. Civ. A. 1844-N, 2006 WL 3927242 (Del. Ch. Oct. 16, 2006) .............................. 14

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,*
57 F.3d 146 (2d Cir. 1995) ........................................................................................ 5

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,*
98 F.3d 13 (2d Cir. 1996) ..................................................................................... 5, 8

*Brownstone Inv. Group, LLC v. Levey,*
468 F. Supp. 2d 654 (S.D.N.Y. 2007) ....................................................................... 6

*Chem. Bank v. Haseotes,*
13 F.3d 569 (2d Cir. 1994) ........................................................................................ 4

*Dallas Aerospace, Inc. v. CIS Air Corp.,*
352 F.3d 775 (2d Cir. 2003) ...................................................................................... 5

*Mills v. Polar Molecular Corp.,*
12 F.3d 1170 (2d Cir. 1993) ...................................................................................... 6

*Musket Corp. v. PDVSA Petroleo, S.A.,*
512 F. Supp. 2d 155 (S.D.N.Y. 2007) .................................................................... 4, 5

### RULES

CPLR 6201 ...................................................................................................................... 3
CPLR 6211(b) .................................................................................................................. 4
CPLR 6212(a) .................................................................................................................. 4
CPLR 6223(b) .................................................................................................................. 4
Fed. R. Civ. P. 12(b)(6) ................................................................................................... 3
Fed. R. Civ. P. 9(b) .......................................................................................................... 5

## PRELIMINARY STATEMENT

Defendant Carlos Vicente Avila, by his attorneys Fox Horan & Camerini LLP, respectfully submits this memorandum of law in opposition to the motion by plaintiff DIRECTV Latin America LLC ("DLA-LLC") to confirm a pre-judgment order of attachment applied for and obtained by DLA-LLC *ex parte* on April 29, 2008. The order of attachment restrains Mr. Avila's personal and real property found in this district.

For the reasons set forth below and in the accompanying Declarations of Carlos V. Avila and V. David Rivkin, both dated June 18, 2008 ("Avila Decl." and "Rivkin Decl.", respectively), DLA-LLC's motion to confirm the order of attachment should be denied.

## STATEMENT OF THE CASE

DLA-LLC and Park 610 LLC ("Park 610") are partners in a joint venture called Latin America Sports, LLC ("LAS"). (Avila Decl. ¶ 5). LAS was created in 2006 to be a vehicle through which the parties would distribute the Golf Channel in Latin America. (*Id.*). DLA-LLC contributed the initial financing, and Park 610 provided the programming content, marketing and promotional expertise, as well as the organizational and managerial skills necessary to roll-out and operate a successful niche sports programming channel in Latin America. Park 610's contributions to the joint venture ares more fully set forth in the Avila Decl. ¶¶ 6-8.

Mr. Avila is the founder of Park 610, and after LAS was created, he became Park 610's Chairman. (Avila Decl. ¶ 1). Park 610 owns a 55% membership interest in LAS, while DLA-LLC owns 45%. (Avila Decl. ¶ 12). In commencing the instant action,

DLA-LLC seeks to compel Park 610 to forfeit its 55% majority interest in LAS to DLA-LLC.

DLA-LLC's principal contention in its Complaint is that Park 610 breached certain terms of the Limited Liability Company Agreement under which LAS operates (the "Joint Venture Agreement"), thereby triggering a "call option" provision under section 13.4 of the Joint Venture Agreement, which would require Park 610 to sell its 55% interest in LAS to DLA-LLC at or below "net book value." (Complaint, ¶¶ 29-34) (Rivkin Decl. Ex. 2).

Despite its near-zero "net book value," LAS has, through Park 610's efforts, acquired valuable sports programming properties and distribution agreements, which has increased LAS's fair market value into the tens of millions of dollars, and has made LAS an acquisition target. (Avila Decl. ¶¶ 18, 19).

DLA-LLC's first and second causes of action in the Complaint seek (i) a declaratory judgment that Park 610 materially breached the Joint Venture Agreement (Complaint ¶¶ 64-70) (Rivkin Decl. Ex. 2) and (ii) specific performance of the Joint Venture Agreement (*id.* ¶¶ 71-77) -- specifically, to compel performance of the call option that would require Park 610 to sell its member interest in the LAS to DLA-LLC at "book value" -- which is to say, for no money at all.

Despite having contributed less than $6 million to the venture, DLA-LLC seeks to consolidate for itself the exclusive right to distribute the Golf Channel in Latin America (rights which were obtained by Park 610 for LAS), and to become the sole equity holder of LAS by cutting Park 610 out as a partner in the joint venture. DLA-LLC seeks to do this under the pretext that Park 610 has breached the Joint Venture Agreement.

2

DLA-LLC attempts to portray itself as an aggrieved partner in the joint venture looking to become whole. Nothing could be further from the truth. What DLA-LLC seeks in this case is nothing short of a windfall of tens of millions of dollars at Park 610's expense.

DLA-LLC's claims for breach of the Joint Venture Agreement and for a declaratory judgment to compel Park 610 to sell its interest in LAS to DLA-LLC have no basis in fact and are based predominantly on an incorrect reading of the Joint Venture Agreement. These two claims, as well as the rest of the claims in the Complaint, will be the subject of a forthcoming motion by Mr. Avila and defendants Park 610 and Roberto Timistit, to dismiss the case pursuant to Fed. R. Civ. P. 12(b)(6).

Notwithstanding the heavy emphasis in the Complaint and in plaintiff's moving papers on allegations that Park 610 breached the Joint Venture Agreement, <u>neither the first nor second causes of action (for breach of contract and specific performance) in the Complaint is a basis for the order of attachment against Mr. Avila's property.</u> In fact, Mr. Avila is not even named as a defendant on those claims. DLA-LLC also does not seek money damages in connection with the first and the second causes of action -- a necessary element for an order of attachment.[1]

Instead, DLA-LLC relies on <u>three entirely different claims</u> against Mr. Avila in his individual capacity in support of its application for an order of attachment against Mr. Avila -- two claims sounding in breach of fiduciary duty (the third and fifth causes of action), and one sounding in fraud (the sixth cause of action). It is these secondary

---

[1] CPLR § 6201 provides that an order of attachment may be granted in an action "where the plaintiff has demanded and would be entitled, in whole or in part, on in the alternative, to a money judgment against one or more defendants ...."

3

claims against Mr. Avila that serve as the alleged bases for the attachment that DLA-LLC obtained *ex parte*, and which it now seeks to confirm.

As set forth more fully below, DLA-LLC has failed to satisfy the legal requirements necessary to confirm the order of attachment against Mr. Avila. Specifically, DLA-LLC has failed to show that it is more likely than not that it will prevail on the merits of any of the three claims against Mr. Avila that serve as the basis for the attachment against his property. Additionally, plaintiff has failed to show that there is any need for continuing the levy against Mr. Avila's property.

## LEGAL ARGUMENT

I.   **Standard for Confirmation of Orders of Attachment**

Rule 64 of the Federal Rules of Civil Procedure provides that the remedy of attachment is governed by state law. *Chem. Bank v. Haseotes*, 13 F.3d 569, 572 (2d Cir. 1994). CPLR §§ 6211(b), 6212(a), and 6223(b) provide that the party seeking to confirm an order of attachment bears the burden of establishing the grounds for the attachment, the need for continuing the levy, and the probability for success on the merits. *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F. Supp. 2d 155, 160 (S.D.N.Y. 2007) (Marrero, J.) (citing *Davila Pena v. Morgan*, 149 F. Supp. 2d 91, 93 (S.D.N.Y. 2001)).[2]

"Probability of success on the merits for purposes of an order of attachment requires that the moving party demonstrate that it is more likely than not that it will

---

2   CPLR 6212(a) specifically requires that,

> [T]he plaintiff . . . show, by affidavit and such other written evidence as may be submitted, [1] that there is a cause of action, [2] that is probable that the plaintiff will succeed on the merits, [3] that one or more grounds for attachment provided in section 6201 exist and [4] that the amount demanded from the defendant exceeds all counterclaims known to plaintiff.

4

succeed on its claims and must show proof stronger than that required to make a *prima facie* case." *Id.*

"Satisfaction of the statutory criteria, however, does not guarantee that a court will issue such relief. Such relief is discretionary, and since attachment is a harsh remedy, the court must exercise care in its application." *Id.*

## II. DLA-LLC Has Not Shown That It Has Valid Causes of Action Against Mr. Avila, or That There Is a Likelihood That DLA-LLC's Claims Against Mr. Avila Will Succeed on the Merits

### A. DLA-LLC Has Failed to Shown That It Will Prevail on Its Fraud Claim Against Mr. Avila

To succeed on its claim for fraud, plaintiff must ultimately show that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir. 1995) (*quoted in Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19 (2d Cir. 1996)). Under New York law, each element of a fraud must be proven by clear and convincing evidence. *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 784-85 (2d Cir. 2003) (citing *Hutt v. Lumbermens Mut. Cas. Co.,* 95 A.D.2d 255, 256-57, 466 N.Y.S.2d 28, 30 (2d Dep't 1983)).

In addition, Fed. R. Civ. P. 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy the "particularity" requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2)

5

identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993); *see also Brownstone Inv. Group, LLC v. Levey,* 468 F. Supp. 2d 654, 659 (S.D.N.Y. 2007).

DLA-LLC's proposed claim sounding in common law fraud fails to satisfy both the pleading requirement and the proof requirement necessary to show a probability of success on the merits.

In its submission to the Court, DLA-LLC fails to identify a single statement or omission by Mr. Avila that was untrue or misleading and that was relied upon by DLA-LLC to its detriment. For example, in section (A)(2) of its Memorandum of Law in Support of Plaintiff's Motion to Confirm the Orders of Attachment, dated May 12, 2008 ("Plaintiff's Brief"), DLA-LLC argues that "there is a cause of action against Avila", but then is silent as to what statement or omission by Mr. Avila to DLA-LLC is the basis for its claim of fraud. (Plaintiff's Brief at 2-6). The subsequent section of Plaintiff's Brief titled "Documentary Evidence Establishes an Overwhelming Probability that [DLA-LLC] will succeed on the Merits in this Case" (Plaintiff' Brief at 6-8) is likewise silent as to what statement or omission by Mr. Avila was relied upon by DLA-LLC to its detriment.

Nor does DLA-LLC's "Verified Complaint" shed light on what alleged misrepresentation or omission Mr. Avila made. (Complaint ¶¶ 91-97) (Rivkin Decl. Ex. 2). For example, in paragraph 91 of the Complaint, DLA-LLC states that "Pratola and Zunda misrepresented to [DLA-LLC] that the Channel would be conducted in the utmost good faith as a joint venture solely between [DLA-LLC] and Avila, whereas in actuality they planned all along secretly to substitute themselves as the holders of part or all of

6

Avila's stake in LAS." There is no mention of any statement or omission by Mr. Avila as part of this allegation.

In the Complaint, DLA-LLC alleges that that Mr. Avila "through [his] participation in the negotiation of the MOU [memorandum of understanding], the [Joint Venture Agreement] and the other closing documents [forming LAS], and through Avila's counsel reinforced Pratola's affirmative misrepresentations and omissions" and that "[b]ut for the Defendants' misrepresentations . . . would not have entered into the joint venture with Park 610." (Complaint ¶¶ 92, 95) (Rivkin Decl. Ex. 2). Again, DLA-LLC fails to mention any actual "misrepresentations" by Mr. Avila that it relied upon to its detriment.

DLA-LLC simply fails to identify any statement made by Mr. Avila in the course of negotiating the MOU or the Joint Venture Agreement that was untrue at the time the MOU was being negotiated or at the time Park 610 and DLA-LLC entered into the Joint Venture Agreement.[3]

To the extent that DLA-LLC seeks to accuse Mr. Avila of giving it the impression that Park 610 would discharge its obligations under the Joint Venture Agreement when there was allegedly no plan to do so, such allegations may not support a claim for fraud. It is black letter law that even intentionally false statements regarding a party's intent to

---

[3] It is noteworthy that the Joint Venture Agreement contains a merger clause, which provides that the Joint Venture Agreement "constitutes the entire agreement among the Parties, and supersedes any prior understandings, agreements, or representations by or among the parties, written or oral, to the extent they related in any way to the subject matter hereof." (Joint Venture Agreement § 20.13) (Avila Decl. Ex. A). As such, the negotiations concerning the "MOU" referred to by DLA-LLC (which was not executed in the first place) cannot serve as the basis for any fraud claim, as the Joint Venture Agreement expressly disavows any representation made prior to the execution of the Joint Venture Agreement.

fulfill the terms of the contract, when there was no such intention, is not sufficient to support a claim of fraud. *See Bridgestone/Firestone,* 98 F.3d at 19.

Having failed to identify any fraudulent misrepresentation or omission by Mr. Avila, it logically follows that DLA-LLC has also failed to establish that it relied upon any such mysterious statement or omission to its detriment. Additionally, DLA-LLC fails to show how it was damaged as a result of its purported reliance on any statement or omission of Mr. Avila, alleging only that had it not relied upon Mr. Avila's "representations" it would not have entered into the joint venture with Park 610, and that it "expended approximately $4,550,000 in capital contributions and $1,000,000 in loans" that it now wants back, together with a judgment rescinding the Joint Venture Agreement. (Complaint ¶¶ 94-97) (Rivkin Decl. Ex. 2).

In fact, DLA-LLC's investment in the Joint Venture has yielded spectacular returns for DLA-LLC, as the fair market value of LAS has increased exponentially over the two years in which LAS has been in operation. (Avila Decl. ¶¶ 18, 19). Consequently, Park 610 has not been damaged in any way, even if there had been an alleged misrepresentation or omission by Mr. Avila.[4] For these reasons, DLA-LLC has failed to show that it has properly pleaded fraud, much less that it is more likely than not that it will prevail on such a fraud claim.

---

[4] It is not coincidental that DLA-LLC's fraud claim is pleaded in the alternative. A refund of its investment and a rescission of the Joint Venture Agreement is not DLA-LLC's objective. Its objective is to obtain a windfall by forcing Park 610 to forfeit its multi-million dollar interest in LAS for next to nothing.

### B. DLA-LLC Has Failed to Show That It Will Prevail on Its Breach of Fiduciary Duty Claims Against Mr. Avila

In the fifth cause of action in the Complaint for breach of fiduciary duty, DLA-LLC alleges that "[a]s [DLA-LLC's] co-venturer, Park 610 had a fiduciary duty of loyalty, good faith and disclosure in all acts undertaken on behalf of, and with respect to the joint venture. (Complaint ¶ 87) (Rivkin Decl. Ex. 2).[5] In its brief, DLA-LLC argues that "Avila owed [DLA-LLC] fiduciary duties of loyalty and disclosure as to [] all acts undertaken on behalf of, and with respect to the joint venture and LAS." (Plaintiff's Brief at 5).

DLA-LLC also alleges that "[1] Avila as the sole control person of Park 610, had an obligation to refrain from misrepresenting facts and/or failing to disclose facts that would operate as a fraud upon [DLA-LLC] and / or LAS, [2] to refrain from committing corporate waste, and [3] to refrain from entering into the side deal with Pratola and Zunda." (Complaint ¶ 88) (Rivkin Decl. Ex. 2). None of these allegations have legal merit.

As set forth below, Mr. Avila did not breach any fiduciary duty to DLA-LLC or LAS.

#### 1. Mr. Avila Had No Duty to Disclose Any Alleged Transfer of Interest in Tumely S.A or Loraine S.A.

DLA-LLC contends that Mr. Avila breached his fiduciary duty to DLA-LLC by not disclosing the transfer of interest of an Uruguayan corporation called Tumely S.A. ("Tumely") to another Uruguayan corporation called Leraman S.A. (Plaintiff's Brief at

---

[5] DLA-LLC makes no specific allegation in its Complaint that Mr. Avila owned the same duty to DLA-LLC as Park 610, but states that "Avila [is] the sole control person of Park 610." (Complaint ¶ 88) (Rivkin Decl. Ex. 2).

9

4), and the "pledging" or otherwise "restricting" the shares in another Uruguayan company called Loraine S.A. ("Loraine"). (*Id.*) It is undisputed that at the time Park 610 entered into the Joint Venture Agreement with DLA-LLC, Mr. Avila was the sole shareholder of Tumely and Loraine. It is also undisputed that at the time of the creation of LAS, Park 610 was owned 50% by Tumely and 50% by Loraine.

Even if Mr. Avila owed the fiduciary duty to disclose "all acts undertaken on behalf of, and with respect to the joint venture and LAS" (Plaintiff's Brief at 5) as DLA-LLC contends, DLA-LLC fails to explain or show how Mr. Avila's alleged lack of disclosure with respect to the purported transactions concerning Tumely and Loraine is a breach of such fiduciary duty.

First, the alleged transactions involving Tumely and Loraine simply do not concern LAS or DLA-LLC, impose no obligations on LAS or DLA-LLC, create no liability for LAS or DLA-LLC, nor require LAS or DLA-LLC to take any action whatsoever as a result of the transaction. The alleged transactions do not deprive LAS or DLA-LLC of any business opportunity, do not affect LAS's management, and certainly do not affect DLA-LLC's membership interest in LAS or LAS's profits. Simply put, the alleged transaction could not have had an effect on LAS or DLA-LLC's business interests in the joint venture.

Second, to the extent that any interest in Park 610's parent companies was transferred or encumbered, such alleged transactions do not constitute "acts undertaken on behalf of, and with respect to the joint venture and LAS," as DLA-LLC argues. They would be acts undertaken on behalf of, and with respect to the parent companies of Park 610 – not the joint venture.

10

Moreover, <u>parent companies</u> of LAS's members are <u>not</u> prohibited by the Joint Venture Agreement, from transferring or encumbering their respective interests. The Joint Venture Agreement places restrictions only on transfers of "Membership Interest" (Joint Venture Agreement, §§ 10.1, 13.1 (c)), which is defined as "interest issued by [LAS] to the <u>Members</u>." (Joint Venture Agreement, Article I, emphasis added). "Members," are defined as "Park 610" and "DTVLA" (DLA-LLC), and not their affiliates, related parties or parent companies. (Joint Venture Agreement, Preamble) (Avila Decl. Ex. A). Consequently, any restrictions on transfers set forth in the Joint Venture Agreement would apply only if Park 610 were to transfer part or all of <u>its Membership Interest in LAS</u> to a third party. No transfer of Park 610's Membership Interest in LAS occurred here, and despite DLA-LLC's efforts to confuse the issue by blurring the line between Park 610 and its parent entities, the "transfers" complained of allegedly involve Loraine and Tumely, not Park 610's Membership Interest in LAS, and therefore could not have constituted a transfer of Membership Interest as defined in the Joint Venture Agreement.

Indeed, DLA-LLC's own parent company, DIRECTV Group, Inc.[6] regularly engages in mass transfers of its own shares.[7] Under DLA-LLC's own definition of

---

[6] DLA-LLC states in paragraph 7 of the Complaint (Rivkin Decl. Ex. 2) that "[t]he sole member of [DLA-LLC] is DIRECTV Latin America, Inc., a corporation organized under the laws of the State of California ...." In its Rule 7.1 statement, however, DLA-LLC contradicts this allegation, stating that DLA-LLC is owned by DIRECTV Latin America, Inc. "a non-publicly held Delaware corporation." As set forth in the Rivkin Decl., there is no entity registered with the Secretary of State's office either in Delaware or in California by the name DIRECTV Latin America, Inc. (Rivkin Decl. ¶¶ 4-7). Moreover, in various press releases and in its filings with the Security Exchange Commission, DIRECTV Group, Inc, a publicly traded company is the sole owner of DLA-LLC. (Rivkin Decl. ¶¶ 8-10).

[7] For example, in 2006 Liberty Media Corporation entered into an agreement to purchase News Corporation's 41% interest in DIRECTV Group, Inc. The transaction closed in the first quarter of 2008. Since then, Liberty Media purchased an additional 78.3 million shares of

11

fiduciary duty, the transfer by DIRECTV Group, Inc. of its shares to a third party, or the failure by DLA-LLC to notify Park 610 of each such transfer by DIRCTV Group, Inc. would constitute of breach of fiduciary duty to Park 610. This cannot be the case.

For these reasons, there is no basis for DLA-LLC's claim of breach of fiduciary duty against Mr. Avila in connection with the alleged transfer of Tumely's interest to Leraman S.A. or the alleged encumbrance of Loraine.

### 2. DLA-LLC Has Failed to Show That Mr. Avila Breached a Fiduciary Duty by Committing Fraud

With respect to DLA-LLC's contention that Mr. Avila breached his fiduciary duty by "misrepresenting facts and / or failing to disclose facts that would operate as fraud," as set forth in Section (II)(A) above, DLA-LLC has failed to identify <u>a single statement or material omissions</u> by Mr. Avila that could conceivably rise to the level of fraud. Hence, if there is no evidence of fraud, DLA-LLC's contention that Mr. Avila breached a fiduciary duty to DLA-LLC by "misrepresenting facts and/or failing to disclose facts that would operate as a fraud upon [DLA-LLC and / or LAS]" is as meritless as DLA-LLC's fraud claim itself.

### 3. DLA-LLC Has Failed to Show That Mr. Avila Committed Corporate Waste

DLA-LLC also contends that Mr. Avila breached his fiduciary duty to DLA-LLC and LAS by "committing corporate waste."[8] The corporate waste allegation appears to stem from management fees paid by LAS to Park 610 pursuant to Management Services

---

DIRECTV Group, Inc.'s common stock in a private transaction, increasing its beneficial ownership to approximately 48%. (*Id.*)

[8] This claim is a repeat of DLA-LLC's third cause of action in the Complaint.

Agreement ("MSA") entered into between LAS and Park 610. (Complaint ¶¶ 53-59, 78-82, 86-89) (Rivkin Decl. Ex. 2). This claim could stretches credulity.

The MSA pursuant to which LAS agreed to pay a management fee to Park 610 equal to 25% of all advertising sales generated by LAS, was entered into contemporaneously with the execution of the Joint Venture Agreement, and was referenced in Section 2.2(ii) of the Joint Venture Agreement itself. Indeed, a copy of the MSA was attached to the Joint Venture Agreement as Appendix B. The payment equal to 25% of the advertising sales to Park 610 was approved by DLA-LLC (Joint Venture Agreement, Appendix B) (Avila Decl. Ex. A) both by a vote of DLA-LLC's designated representatives on the board of LAS, as well as by the very execution of the Joint Venture Agreement. Since DLA-LLC approved the arrangement, it can not now argue that the arrangement constituted corporate waste.

DLA-LLC further contends that "[Mr.] Avila . . . pressured [DLV-LLC] to pay him an advance on the management fees in the amount of $30,000 per month. [DLA-LLC] initially resisted, but [later] . . . agreed to pay an advance of $30,000 per month for six months and to reevaluate the arrangement thereafter." (Complaint ¶ 56) (Rivkin Decl. Ex. 2). Again, despite its alleged "resistance" to the advance, DLA-LLC admits that it agreed to pay the advance at issue. Neither Mr. Avila nor Park 610 acted illicitly in securing the advance. The advance was obtained on consent from DLA-LLC, and plaintiffs have not shown how the 25% cut of the advertising revenue or the advance against those payments constituted waste by Mr. Avila for the purposes of its claim of breach of fiduciary duty. Park 610 continues to provide management services for LAS as contemplated in the MSA.

Moreover, as of the end of May 2008, there has been a total of $180,000 in advances against fees to be collected under the MSA, and LAS has during that time generated $494,809 dollars in advertising revenue, 25% of which is $123,702 (the "Management Services Fee Earned"). Consequently, as of the end of May, 2008, the $180,000 advance is offset by more than $123,000 in Management Service Fees Earned, leaving less than $57,000 in advances outstanding. Considering the current rate of advertising revenues, the remaining balance of the advance will have been paid off by July 2008. (Avila Decl. ¶ 29).

DLA-LLC's intimates that the MSA was terminated in November 2006, and therefore Park 610 should not receive credit for 25% of all advertising sales generated by LAS since that time as provided in the MSA – including as credit to offset the $180,000 advance. (Hartman Decl. ¶ 59). Whether or not the MSA has been terminated, or whether the full $180,000 advance remains due and owing, or if part of it remains outstanding is not at issue here (although defendants strongly contend that the MSA remains in effect). The sole question here, for the purposes of DLA-LLC allegation of breach of fiduciary duty against Mr. Avila, is whether the advances constituted corporate waste. DLA-LLC has not shown that they were.

Under Delaware law, "managers of an LLC are presumed to have acted on an informed basis and in the honest belief that the decisions were in furtherance of the best interests of the LLC and its members." *Bakerman v. Sidney Frank Importing Co.*, No. Civ. A. 1844-N, 2006 WL 3927242, at *9 (Del. Ch. Oct. 16, 2006). It is the plaintiff's burden to establish facts rebutting the presumption – typically by showing facts tantamount to corporate waste. *Id.* Plaintiffs have failed to carry this burden, and have

not set forth any facts showing that the payment under the MSA and the subsequently agreed upon advanced constituted corporate waste.

Finally, DLA-LLC further seeks to besmirch Mr. Avila by claiming that "the payment of moneys to Avila was carried out under highly irregular circumstances." (Complaint ¶ 57) (Rivkin Decl. Ex. 2). This contention is the quintessential red-herring. The manner in which a payment is made on a previously agreed upon obligation has no bearing whatsoever on whether corporate waste occurred. More importantly however, the MSA clearly provides that "[a]ll sums payable by LAS [under the MSA] shall be due and payable in United States dollars and paid by wire transfer to such bank account as Park 610 may hereafter designate in writing." (MSA, Joint Venture Agreement, Appendix B) (Avila Decl. Ex. A). Consequently, the account to which payments were to be made under the MSA was always at Park 610's discretion.

## CONCLUSION

For the foregoing reasons, DLA-LLC has failed to demonstrate that it is more likely than not that it will succeed on its fraud claim and breach of fiduciary duty claims against Mr. Avila. Consequently, this court should deny, in its entirety, DLA-LLC's motion to confirm the order of attachment against Mr. Avila's property that plaintiffs applied for and obtained *ex parte*.

Dated:  New York, New York
        June 18, 2008

                                Respectfully submitted

                                FOX HORAN & CAMERINI LLP

                                By: _____
                                    V. David Rivkin (VR-6734)
                                    825 Third Avenue, 12th Floor
                                    New York, New York 10022
                                    Tel:   (212) 480-4800
                                    Fax:   (212) 709-0248

                                *Attorneys for Defendant
                                Carlos Vicente Avila*