UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X

DIRECTV LATIN AMERICA, LLC,
individually and in the right and on behalf
of LATIN AMERICAN SPORTS, LLC,

              Plaintiff,

    v.

PARK 610, LLC,
CARLOS VICENTE AVILA,
ROBERTO TIMISTIT,
CARLOS PRATOLA,
ALEJANDRO ZUNDA CORNELL, and
DOES 1 through 10,

              Defendants,

    and

LATIN AMERICAN SPORTS, LLC,

      as a Nominal Defendant.
-------------------------------------------------X

08 Civ. 3987 (VM)(GW)

**DECLARATION OF V. DAVID RIVKIN IN OPPOSITION TO PLAINTIFF'S MOTION TO CONFIRM AN ORDER OF ATTACHMENT OBTAINED BY PLAINTIFF _EX PARTE_**

V. DAVID RIVKIN, an attorney authorized by law to practice in the State of New York and this Court, declares under penalties of perjury as follows:

1.     I am a member of the bar of this Court and a member of the firm Fox Horan & Camerini LLP, attorney for defendants Park 610 LLC, Carlos Avila and Roberto Timistit.

2.     I submit this declaration in opposition to the motion by DIRECTV Latin America LLC ("DLA-LLC") to confirm the order of attachment against the personal and real property of defendant Carlos Avila situated in this district, which DLA-LLC

applied for an obtained <u>ex parte</u> on or about April 29, 2008.  A copy of the order of attachment is annexed hereto as <u>Exhibit 1</u>.

3.      I submit this declaration also for the purpose of annexing certain documents referenced in the Memorandum of Law in Opposition to Plaintiff's Motion to Confirm the Order of Attachment submitted herewith, and to affirm facts to which I have personal knowledge.

4.      Annexed hereto as <u>Exhibit 2</u> is a copy of the "Verified Complaint" in this action that states that "the sole member of [DLA-LLC] is <u>DIRECTV Latin America, Inc.</u>, a corporation organized under the laws of the <u>State of California</u>, having its principal place of business at 2230 East Imperial Highway, El Segundo, CA 90245." (Complaint, ¶7, Emphasis Added)

5.      Annexed hereto as <u>Exhibit 3</u> is a copy of the Rule 7.1 Statement filed by plaintiff DLA-LLC in this case that states that "[DLA-LLC's] parent company is <u>DIRECTV Latin America, Inc.</u>, a non-publicly held <u>Delaware Corporation</u>." (Emphasis added.)

6.      On June 18, 2008 have personally conducted a corporation search using the website of California Secretary of State.  A search for entities with the word "DIRECTV" in their name yielded 11 results.  There was no record of any entity registered with the California Secretary of State's office under the name "DIRECTV Latin America, Inc."  A printout of the search results is attached hereto as <u>Exhibit 4</u>.   The website that I searched is accessible at: <u>http://kepler.sos.ca.gov/corpdata/ShowList</u>.

7.     On June 18, 2008 have personally conducted a corporation search using the website of Delaware Secretary of State. A search for entities with the word DIRECTV in their name yielded 32 results. There was no record of an entity registered with the Delaware Secretary of State's office under the name "DIRECTV Latin America, Inc." A printout of the search results is attached hereto as Exhibit 5. The website that I searched is accessible at: https://sos-res.state.de.us/tin/controller.

8.     Annexed hereto as Exhibit 6 is a copy of a press release from the website http://dtv.client.shareholder.com/releasedetail.cfm?ReleaseID=286316 dated January 30, 2007 which states that plaintiff DLA-LLC is actually "100% owned by the DIRECTV Group, Inc."

9.     DIRECTV Group, Inc. is a publicly traded company. On page 3 of its 10-K filing with the Securities and Exchange Commission dated February 25, 2008, DIRECTV Group, Inc. stated that DLA-LLC is its "wholly owned subsidiary" and describes how in January 2007, DIRECTV Group, Inc. purchased Darlene Investments LLC's 14% minority interest in DLA-LLC to become the sole member of DLA-LLC. The first 8 pages of the filing are attached hereto as Exhibit 7. The full 10-K filing may be found at http://shareholder.api.edgar-online.com/efx_dll/edgarpro.dll?FetchFilingRTF1?sessionid=LPgiWI8JdRgq_DT&ID=5753742&PageBreakStyleID=2

10.     On the same page (3), DIRECTV Group, Inc. describes how in December 23, 2006, News Corporation agreed to sell its 41% interest in DIRCTV Group, Inc. to Liberty Media Corporation. Upon information and belief, the transaction closed

in the first quarter of 2008, and subsequently Liberty Media Corporation now own approximately 48% of the stock in DIRECTV Group.

**WHEREFORE**, for the reasons set forth the Memorandum of Law in Opposition to Plaintiff's Motion to Confirm the Order of Attachment, and in the Declaration of Carlos Avila submitted herewith, I respectfully request that the motion for the confirmation of the order of attachment be denied in all respects.

I declare under penalties of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 18, 2008 in New York, New York.

V. DAVID RIVKIN

EXHIBIT
ONE

*MARRERO, S.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

DIRECTV LATIN AMERICA, LLC,
individually and in the right and on behalf
of LATIN AMERICAN SPORTS, LLC,

                Plaintiff,

        v.

PARK 610, LLC,
CARLOS VICENTE AVILA,
ROBERTO TIMISTIT,
CARLOS PRATOLA,
ALEJANDRO ZUNDA CORNELL and
DOES 1 through 10,

                Defendants,

        and

LATIN AMERICAN SPORTS, LLC,

             as a Nominal Defendant.
------------------------------------------------------------X

**JUDGE MARRERO**

08 Civ. _____

**'08 CIV 3987**

**ORDER OF ATTACHMENT**

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4-29-08
```

_Victor Marrero_ , U.S.D.J.

    Plaintiff has moved this Court for an order of attachment pursuant to Rule 64 of

the Federal Rules of Civil Procedure and Article 62 of the New York Civil Practice Law

and Rules ("CPLR"). Plaintiff has shown that it has causes of action, that it is probable

that it will succeed on the merits, that defendant Carlos Vicente Avila is a non-

domiciliary residing without the State of New York, having a domicile at Gelly 3650,

Buenos Aires, Argentina, and that the amount demanded from Defendants exceeds all

counterclaims known to Plaintiff.

**NOW THEREFORE**, for these reasons, as supported by the showings made in plaintiff's application for an order of attachment, including the Declaration of Michael Hartman dated April 28, 2008, and the exhibits thereto, it is hereby **ORDERED** that:

1.    Plaintiff's motion for an order of attachment is granted;

2.    The amount to be secured by this Order is Five Million Five Hundred and Fifty Thousand Dollars ($5,550,000).

3.    Plaintiff shall post a bond in the amount of $ _600,000.00_ as security.

4.    The United States Marshal for the Southern District of New York, or any person appointed to act in his place and stead, shall levy within his jurisdiction at any time before final judgment, upon such funds, monies, property and/or interests in property of defendant Carlos Vicente Avila, including funds, monies, property and/or interests in accounts held at JP Morgan Chase Bank within the following account:

> JP Morgan Chase Bank
> One Chase Manhattan Plaza
> New York, New York 10005
> # 400-654865

and upon any interest of Carlos Vicente Avila in real property within his or her jurisdiction, as will satisfy the aforesaid sum of $5,550,000 Dollars, ~~[and shall pay or deliver all such funds, monies, property and/or interests in property to the Clerk of the Court for the purpose of satisfying any judgment that may be obtained against the Defendants in this action.]~~ [and shall refrain from taking any property levied upon into his or her actual custody pending further order of this Court].

2

5.    Upon Plaintiff's application, and for good cause shown, the Court hereby

*appoints Cliff Perciavalle, who is employed by Plaintiff's counsel, to act in the place and*

stead of the U.S. Marshal for the purpose of serving the Order and effecting the levy

ordered hereby.

6.    The statement required by CPLR 6219 shall be served by the garnishee

upon the U.S. Marshal and plaintiff's counsel within five (5) days after service of this

Order.  Plaintiff shall move within 10 days after levy for an order confirming this order of

attachment.


Dated: New York, New York
       April 29, 2008


**SO ORDERED**

_____
U.S.D.J.    Victor Marrero

3

EXHIBIT
TWO

MINTZ & GOLD LLP
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, N.Y. 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*

RECEIVED
APR 29 2008
U.S.D.C. S.D. N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

DIRECTV LATIN AMERICA, LLC,
individually and in the right and on behalf
of LATIN AMERICAN SPORTS, LLC,

                Plaintiff,

          v.

PARK 610, LLC,
CARLOS VICENTE AVILA,
ROBERTO TIMISTIT,
CARLOS PRATOLA,
ALEJANDRO ZUNDA CORNELL and
DOES 1 through 10,

                Defendants,

          and

LATIN AMERICAN SPORTS, LLC,

           as a Nominal Defendant.

-------------------------------------------------------X

08 Civ. *3987* (VM)

**VERIFIED COMPLAINT**

      Plaintiff, DIRECTV Latin America, LLC ("DIRECTV"), through its attorneys,

Mintz & Gold LLP, as and for its Verified Complaint herein, brought derivatively on behalf of

Latin American Sports, LLC, and in its own right, alleges as follows:

## Nature of the Action

1.      This action concerns a clandestine arrangement among the Defendants in connection with a joint venture between DIRECTV and Defendant Carlos Vicente Avila ("Avila"). As part of their joint venture, DIRECTV and Avila formed a limited liability company, Latin American Sports, LLC ("LAS"), the purpose of which was to create a Spanish language television channel to broadcast golf programming in Latin America (the "Channel"). Two of the Defendants, Carlos Pratola ("Pratola") and Alejandro Zunda Cornell ("Zunda"), who were senior officers of Plaintiff's subsidiary, DIRECTV Argentina, S.A., pitched the joint venture as an opportunity for DIRECTV to develop the Channel in partnership with Avila, a prominent figure in Argentine sports media. As it turned out, however, what was supposed to be a profitable joint venture between Avila and DIRECTV turned out to be a scheme whereby Pratola, Zunda and Avila, with the assistance of Defendant Roberto Timistit ("Timistit"), secretly intended to exploit the arrangement to enrich themselves at LAS's and DIRECTV's expense. The identities of the John Doe Defendants are not presently known to DIRECTV.

2.      In late 2007, DIRECTV discovered that Avila and Timistit had secretly arranged to transfer half of Avila's beneficial ownership in LAS to a Uruguayan corporation, Leraman S.A. ("Leraman"). Upon information and belief, Leraman is controlled by Pratola and Zunda. The transfer to Leraman constituted one or more Events of Default, as defined by the Limited Liability Company Agreement of LAS (the "LLC Agreement"). More fundamentally, the transfer betrayed a fundamental assumption underlying DIRECTV's decision to invest in the transaction in the first place, namely, that Avila would operate the Channel in Latin America in partnership with DIRECTV. Instead, DIRECTV finds its economic interest in the Channel jeopardized by Avila's unilateral and undisclosed introduction into the partnership of two highly

2

objectionable co-venturers, namely Pratola and Zunda, two corrupt former employees of

DIRECTV's subsidiary who had surreptitiously placed themselves on both sides of the

transaction, in a flagrant violation of their duty of loyalty to their employer.

3.    In addition to the "bait and switch" described above, Defendants siphoned off vast

sums from DIRECTV and its subsidiary under false pretenses.  Timistit, with the assistance of

Pratola, arranged to wire vast sums of money to Avila's personal account as well as to one or

more unknown parties, believed to include Pratola and/or Zunda.

4.    Upon an Event of Default, DIRECTV has the right to compel Park 610 to sell all

of Park 610's shares in LAS to DIRECTV.   In the alternative, the conspiracy among the

Defendants entailed the breach of various fiduciary duties owed to DIRECTV and LAS, entitling

DIRECTV to damages, rescission of its agreements with Park 610 and restitution of all sums that

DIRECTV expended in furtherance of the joint venture.

### The Parties

5.    DIRECTV Latin America, LLC, is a limited liability company organized under

the laws of the State of Delaware, with its principal place of business located at 1211 Avenue of

the Americas, New York, N.Y. 10036.

6.    DIRECTV is engaged in the business of providing pay television services in Latin

America, and through its subsidiaries has approximately 5 million subscribers in the region.

7.    The sole member of DIRECTV Latin America, LLC, is DIRECTV Latin

America, Inc., a corporation organized under the laws of the State of California and having its

principal place of business at 2230 East Imperial Highway, El Segundo, CA 90245.

3

8.    Defendant Park 610, LLC, is a limited liability company organized under the laws of the State of Delaware.  Upon information and belief, the principal place of business of Park 610 is located at 9999 Collins Avenue, Bal Harbour, FL 33154.

9.    Upon information and belief, Park 610 has two members, Tumely S.A. and Loraine S.A., each of which is a corporation organized and existing under the laws of Uruguay.

10.    Upon information and belief, Defendant Carlos Vicente Avila is a citizen of Argentina, having a domicile at Gelly 3650, Buenos Aires, Argentina.

11.    Avila is the Chairman of LAS.

12.    Upon information and belief, Defendant Roberto Timistit ("Timistit") is a citizen of Argentina, with a domicile at Cabildo 480, General Pacheco, Partido de Tigre, Provincia Buenos Aires.

13.    Timistit is the chief executive officer of LAS, and is the brother-in-law of Defendant Avila.

14.    Defendant Carlos Pratola is a citizen of Argentina, with a domicile at Villanueva 1350 PB (1426) Ciudad de Buenos Aires, Republica Argentina.  Until his employment was terminated, Pratola was the General Manager and Chief Executive Officer of DIRECTV Argentina, S.A.

15.    Defendant Alejandro Zunda is a citizen of the United States of America, with a domicile at Ruta Panamericana, Ramal Pilar, Km. 43.5, Barrio Ayres del Pilar, lote V16 (1669) Del Viso, Pilar, Provincia de Buenos Aires República Argentina.  Until his termination, Zunda was the Vice President of Marketing and Sales of DIRECTV Argentina, S.A.

4

16.     Nominal Defendant LAS is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at Balcarce 510, Buenos Aires, Argentina.

17.     LAS has two members, Defendant Park 610, LLC ("Park 610") and DIRECTV. Defendant Park 610 is the holder of 55% of the membership interest of LAS and DIRECTV holds the remaining 45% of LAS.

### Jurisdiction and Venue

18.     The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.  Accordingly, this Court possesses subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332.

19.     In the LLC Agreement, Defendant Park 610 irrevocably agreed to submit to the jurisdiction of the courts in New York, New York, and stipulated to the application of New York law.  Venue is otherwise proper as to all the other Defendants pursuant to 28 U.S.C. §§1391(a)(3) and 1391(d), as the Defendants are subject to personal jurisdiction in this District and/or are aliens.

### Substantive Allegations

Pratola Proposes the Joint Venture with Avila

20.     In April 2006, Pratola suggested to his superiors at DIRECTV, Richard Nerod and Jacopo Bracco, that the company could increase its subscriber base in the Latin American market by offering the Channel as part of its package of sports programming.

21.     At Pratola's urging, DIRECTV entered into discussions with Avila with a view toward forming a joint venture to develop and distribute the Channel in Latin America.

22.    In or about July 2006, on behalf of DIRECTV, Pratola took a lead role in negotiating a Memorandum of Understanding (the "MOU") between DIRECTV and Avila, as well as negotiating the definitive transactional documents, including the LLC Agreement.

23.    Among the issues that Pratola discussed with Avila was the structure of the joint venture, including the amount and proportion of DIRECTV's equity and debt funding for the Channel.

24.    Pursuant to its undertakings in the LLC Agreement, DIRECTV, in consideration for its 45% interest in LAS, had the obligation to provide up to $7 million of funding to LAS. DIRECTV contributed capital to the joint venture from its account in New York. During the calendar year 2006, DIRECTV made a capital contribution of $1,500,000, exclusive of a pre-launch payment by DIRECTV Argentina made pursuant to the MOU. In 2007, DIRECTV contributed capital in the amount of $2,500,000. In 2008, DIRECTV paid an additional contribution of approximately $550,000.

25.    In addition, during the calendar year 2007, DIRECTV extended $1,000,000 in loans to the joint venture.

26.    In addition to its financial contribution, DIRECTV has certain approval rights typical of a minority investor in a joint venture. While Avila was the Chairman of LAS, DIRECTV had the right to designate two members of the Board of Directors of LAS, whereas Avila designated three. DIRECTV further had the right, among other things, to consult with Avila regarding the selection of the venture's general manager and other key employees. DIRECTV was also the exclusive distributor of the Channel in the major Latin American television markets and reviewed and approved the budget.

27.     Although DIRECTV was supplying all of the funding, it received only 45% of the membership interest in LAS, whereas Avila received 55%. Pratola had convinced DIRECTV that Avila would not accept less than a majority stake in the venture in exchange for his contribution to the venture, which consisted principally of procuring the desired golf programming rights, producing the Channel, and selling advertising.[1]

28.     Avila has a long history of developing sports programming in Argentina, and his personal commitment to developing the Channel in the Latin American market was material to DIRECTV's decision to invest in the joint venture, as was the absence of corrupt DIRECTV insiders in the economics of the transaction. DIRECTV insisted and made clear to Avila and his representatives that it was critical for DIRECTV that Avila not transfer any portion of his beneficial ownership in LAS without DIRECTV's knowledge and prior written consent.

29.     Consistent with this understanding, among the material terms of the LLC Agreement is that a "Change of Control" of LAS constitutes an Event of Default under Section 13.1(e) of the LLC Agreement.

30.     One of the events described in the LLC Agreement as a Change of Control is the following:

> (a)     any Person (other than the Person who controls a Member on the date hereof) becomes the beneficial owner, directly or indirectly, of more than 50% of the then outstanding voting shares or other equity rights of a Member;

31.     Upon information and belief, through the Leraman Shareholders Agreement, Avila secretly agreed indirectly to convey to Pratola and Zunda in excess of 50% of the "voting shares or other equity rights" of Park 610.

---

[1]     As it turned out, the larger Avila's share of LAS, the more room there was for Pratola and Zunda to secure a "broker's fee" from Avila in the form of the transfer of Tumely to Leraman.

32.     Furthermore, Avila's transfer of the Tumely shares violated the LLC Agreement irrespective of whether such transfer constituted a Change of Control.  An attempted transfer of the membership interests of LAS, other than in compliance with the LLC Agreement, constitutes an independent Event of Default pursuant to <u>Section 13.1(c)</u> of the LLC Agreement.[2]

33.     Furthermore, any other material breach of the Agreement would violate <u>Section 13.1(d)</u> of the LLC Agreement, subject to a cure provision.  Such a material breach would include, among other things, violations of the ethical prohibition set forth in <u>Section 12.5</u> of the LLC Agreement against dealing with persons having a conflict of interest (like Pratola and Zunda).

34.     Upon an Event of Default, the non-defaulting member has a right pursuant to <u>Section 13.2</u> of the LLC Agreement to require the defaulting member to sell all of its membership interests in LAS (the "Call Option").  Upon a Change of Control, the non-defaulting member has the right to compel the defaulting member to sell its shares for their net book value. In the event of a Transfer of membership interests in LAS other than in accordance with the LLC Agreement, the Call Option price is eighty percent (80%) of the net book value of the membership interests.

<u>The Funding of the Channel</u>

35.     Pursuant to the MOU, between the time when Avila and DIRECTV executed the MOU and closed the joint venture transaction, DIRECTV was to make a "pre-launch" advance

---

[2]     The LLC Agreement defined the term "Transfer" as: "(i) any sale, assignment or transfer of securities, (ii) a sale, assignment or transfer of any economic interest and/or a voting interest ("Interest") in an entity that, directly or indirectly, holds any securities, (iii) a pledge or hypothecation of securities or Interest or any interest therein, (iv) sale, assignment or a transfer of securities convertible into or exchangeable for or other options or rights to acquire securities or Interest or (v) any other direct or indirect, voluntary or involuntary, sale, assignment or transfer of securities or Interest or any interest therein, whether pursuant to a Change of Control or otherwise."

of $350,000 to an entity designated by Avila for the purpose of commencing operations for the Channel.

36.    On August 2, 2006, DIRECTV's loan was memorialized in a loan document and a promissory note made by New Hollywood Productions ("NHP"), an Avila-owned entity.

37.    However, at the last minute, Pratola altered the financing arrangement, causing DIRECTV Argentina (of which he was the general manager) to wire the money in two payments, one to NHP in the amount of $200,000 (617,000 pesos) and the other in the amount of $150,000 (462,750 pesos) to Carlos Avila, personally, each on August 2, 2006.

38.    On or about the same day, DIRECTV and Avila executed the MOU.

The Formation of Park 610 and LAS

39.    In August 2006, Defendant Park 610 was formed as a Delaware limited liability company. Park 610 was the entity through which Avila would hold his interest in the joint venture.

40.    Park 610, in turn, was owned in equal portions by two Uruguayan corporations, Tumely S.A. ("Tumely") and Loraine S.A. ("Loraine").

41.    In response to requests from DIRECTV for confirmation as to Avila's ownerhip of Park 610, Avila's counsel, Matias de Larrechea, represented to DIRECTV by e-mail dated August 24, 2006 that Avila owned all of the equity of Tumely and Loraine. De Larrechea further advised that the shares of Tumely and Loraine were in bearer form, but that a subsequent change to the by-laws of the respective companies would change the form of stock ownership to registered form.

42.    In fact, at the same time that Avila was preparing to close the joint venture with DIRECTV, Pratola and Zunda were working with Avila to arrange a transfer of the ownership of

9

Tumely to an entity to be formed by and on behalf of Pratola and Zunda. Thus, delivery of bearer shares would be an easier way to conceal the Transfer, since the shares would not have to be re-registered.

43.    On or about September 18, 2006, DIRECTV closed the transaction with Avila.

The Secret Side Deal to Convey Tumely to Pratola and Zunda

44.    Upon information and belief, in or about April 2006, around the same time that he introduced the joint venture proposal to DIRECTV, Pratola was arranging with his own counsel to form a corporation called Leraman, S.A. ("Leraman"), which would become the beneficial owner of the shares of Park 610 then held by Tumely.

45.    Later, around the same time that the joint venture was about to close, Pratola's counsel, a law firm in Uruguay, was preparing two transactional documents: (i.) the "Tumely S.A. Share Purchase Agreement, by and between Carlos Vicente Avila (the "Seller") and Leramar S.A. (the "Buyer")(hereafter referred to in this Complaint as the "Stock Purchase Agreement") [3] and (ii.) the "Tumely S.A. Shareholders Agreement by and between Carlos Vicente Avila and Leramar S.A. (hereafter referred to in this Complaint as the "Shareholders Agreement").[4]

46.    Upon information and belief, Timistit was actively engaged in discussions between Avila's counsel, Hector Viana, and the owners of Leraman regarding the negotiation and drafting of the Stock Purchase Agreement and the Shareholders Agreement. The brazenness of the arrangement is revealed by one comment included in a blacklined draft of the agreement, directed from Viana to Timistit, which warned, "THIS MEANS A CHANGE OF CONTROL IN

---

[3]    The title of the document discovered by DIRECTV is "Contrato de Compraventa de Acciones de Tumely S.A. Entre Carlos Vicente Ávila (el "Vendedor") Y Leramar S.A. (el "Comprador").

[4]    The title of the document discovered by DIRECTV is "Convenio de Sindicación de Accionistas de Tumely."

PARK 610 THAT IS IN VIOLATION OF THE LAS SHAREHOLDERS AGREEMENT. AS LONG AS THE RESTRICTION IS IN PLACE, AVILA MUST MAINTAIN MANAGEMENT."

47.     After Pratola and/or Zunda reviewed Mr. Viana's mark-up of the Shareholders Agreement, on October 12, 2006, Zunda asked Timistit to send him the contact information of "you guys' lawyer" in Uruguay (*i.e.*, Viana). The next day, Zunda forwarded the information from Timistit to Praola's personal e-mail account.

48.     Since any formal transfer of the shares of Tumely in the name of a beneficial owner other than Avila would violate the LLC Agreement, Pratola's and/or Avila's counsel contrived a stipulation in the Leraman Shareholders Agreement whereby the shares of Tumely would ostensibly continue to be held nominally by Avila, but would in actuality be held for the benefit of Leraman (*i.e.*, Pratola and Zunda).

49.     Upon information and belief, the transaction whereby Avila conveyed all of the shares of Tumely to Leraman closed on or about November 8, 2006.

50.     No notice was given to DIRECTV of the transfer of Tumely before it was concluded.

51.     Upon information and belief, Leraman and Avila entered into an amendment to the Purchase Agreement in December 2006 to correct the misspelling of the name of Leraman in the execution copy of the document, in which it had been misspelled "Leramar."

52.     Upon information and belief, Avila has further agreed with Leraman to restrictions upon the transfer of his shares in Loraine, and either to pledge his shares of Loraine to Leraman and/or to deposit them with a third party as security for the performance of his obligations under the Shareholders Agreement.

11

The Fleecing of LAS

53.    As part of the joint venture transaction, LAS entered into a "Management Services Agreement" with Park 610.  The Management Services Agreement provides for the payment to Park 610 of a management fee equal to 25% of all advertising sales generated by LAS (from the sale of commercial advertising on the Channel).

54.    Pratola and Zunda led the negotiation with Avila on the structuring of the fee and its computation.

55.    In the late summer or early fall of 2007, advertising revenues were not materializing as planned, and sales were far below the amount that would generate a significant management fee.

56.    Avila therefore pressured DIRECTV to pay him an advance on the management fees in the amount of $30,000 per month.  DIRECTV initially resisted, but after energetic lobbying by Pratola, DIRECTV agreed to pay an advance of $30,000 per month for six months and to reevaluate the arrangement thereafter.

57.    As had been the case of the pre-launch funding of the Channel, the payment of moneys to Avila was carried out under highly irregular circumstances.  Timistit initially arranged for two transfers of $30,000 to a JPMorgan account held in the name of Avila, personally, rather than to Park 610, as would have been required under the Management Services Agreement.  Another transfer in the amount of $30,000 transfer was made to an account at UBS with the beneficiary information titled as "Clemente," a nominee believed to serve as a laundering account for the benefit of Pratola and Zunda.  Timistit later set up three transfers of $20,000 to Avila's JPMorgan account and $10,000 to the "Clemente" account.

58.    While Pratola should have had no particular concern in the matter, he attempted to persuade DIRECTV to continue the advance payments of the management fee for another six months.  DIRECTV refused to acquiesce in any further pre-payments of the management fee.

59.    Upon a "Change of Control" of Park 610, moreover, the Management Service Agreement would have terminated automatically.  Thus, the payments made to Avila (and Clemente) were not only irregular, and probably far in excess of what had actually been earned, but were not owed to Park 610 at all (much less to Avila himself, or the mysterious "Clemente") because the Change of Control had already happened in November 2006.

60.    During the fall of 2007, Pratola learned of a potential business combination regarding LAS that, if consummated, would have involved the purchase of a significant portion of Park 610's interest in the joint venture.  Pratola immediately advised Zunda of the possibility.  Zunda thereafter responded "I'm buying candles all-out," implying that he was praying for the possibility a transaction were consummated, even though Zunda's compensation from DIRECTV Argentina was not contingent upon LAS.  While the transaction did not come to pass, Pratola and Zunda already had an undisclosed personal stake in LAS through Leraman or otherwise, such that they would cash in on any gains realized on the acquisition of LAS.  Shortly thereafter, Avila wrote to Pratola, referring to the potential acquisition, saying, "Carlitos [Pratola], it's looking good, right?  Please give me a call!!  A hug, Carlos [Avila]."

61.    Shortly after, following the receipt of evidence indicating the Pratola and Zunda had engaged in the conspiracy with Avila and Timistit with regard to the Leraman transaction, DIRECTV confronted each of Pratola and Zunda about the transaction.  When confronted with the evidence against them, neither Pratola nor Zunda offered a satisfactory explanation of their conduct.   Ultimately, DIRECTV Argentina fired Pratola and Zunda for their self-dealing.

13

62.    By letter dated March 25, 2008, DIRECTV notified Avila that it had discovered his illicit transfer of Tumely to Leraman and exercised the Call Option at the price set forth in Section 13.4 of the LLC Agreement.  Avila denied that an Event of Default had taken place and has refused to tender his membership interests in LAS, as required by the LLC Agreement.

63.    The corrupt agreement among and between the several Defendants to entice DIRECTV into the joint venture under false pretenses, as well as to assist Avila in the improper collection of management fees, are evidenced by the above-cited communications and the overt acts of each of the conspirators.  Each act of the several Defendants was undertaken at the direction and for the benefit of the other Defendants and caused injury to each of LAS and DIRECTV.

## AS AND FOR A FIRST CAUSE OF ACTION
### For a Declaratory Judgment Against Park 610

64.    DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

65.    The transfer of ownership of the shares of Tumely and the pledge or deposit of Loraine's stock constituted a Change of Control of Park 610 within the meaning of the LLC Agreement because Leraman became the beneficial owner of more than 50% of the equity rights of Park 610, and Avila ceased to have the sole power to direct or cause the direction of the management and policies of Park 610.

66.    Even if the foregoing transaction did not amount to a Change of Control, it constituted a Transfer within the meaning of the LLC Agreement that was not in accordance with the terms of the LLC Agreement and/or a material breach of the LLC Agreement.

67.    In either case, Avila's transfer of the beneficial ownership of Park 610 constituted an Event of Default, as defined in Article XIII of the LLC Agreement.

14

68.     Despite being confronted with conclusive evidence of his conspiracy with the other Defendants, Avila has denied that the transactions described in this Complaint have taken place and has refused to comply with DIRECTV's exercise of the Call Option.

69.     Inasmuch as the majority of the directors of LAS are appointed by Avila, a demand upon the Board would be futile, Avila being personally interested in the transactions challenged herein. The other members appointed by Avila are members of his family.

70.     By reason of the foregoing, there is an actual and justiciable controversy among the parties regarding DIRECTV's rights upon the event(s) of default arising from the Transfer of Park 610. DIRECTV therefore seeks a judicial declaration of its rights pursuant to CPLR § 3001.

## AS AND FOR A SECOND CAUSE OF ACTION
### For Breach of Contract – Specific Performance of the LLC Agreement

71.     DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

72.     Upon an Event of Default on the part of Park 610, DIRECTV is entitled to exercise the Call Option in accordance with the procedures set forth in Article XIII of the LLC Agreement.

73.     The LLC Agreement is a valid contract between DIRECTV and Park 610.

74.     DIRECT has performed its contractual obligations under the LLC Agreement and is ready, willing, and able to fulfill its remaining obligations.

75.     Park 610 is able but unwilling to convey its membership interests in LAS.

76.     DIRECTV has no adequate remedy available at law.

77.     Accordingly, DIRECTV is entitled to a judgment directing Park 610 to comply with the Call Option and sell all of its membership interests in LAS to DIRECTV.

15

## AS AND FOR A THIRD CAUSE OF ACTION
### Against Avila and Timistit for Breach of Fiduciary Duty (Derivatively on Behalf of LAS)

78.    DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

79.    In his capacity as Chairman of LAS, as well as the ultimate principal of Park 610, Avila was a control person of LAS and owed corresponding fiduciary duties of loyalty and disclosure.

80.    As the chief executive and as an employee of LAS, Timistit owed a direct fiduciary duty of loyalty to LAS.

81.    By arranging to pay management fees in excess of what LAS properly owed,  and by paying such fees to Avila and Clemente, Avila and Timistit committed a waste of LAS's assets, and failed to exercise due care to prevent such waste, and thereby breached their fiduciary duties to LAS.

82.    As a direct and proximate result of the foregoing, LAS has been damaged in an amount to be determined at the trial of this matter.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Against Pratola and Zunda for Civil Conspiracy/
### Aiding and Abetting a Breach of Fiduciary Duty
### (Derivatively on Behalf of LAS)

83.    DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

84.    Pratola and Zunda, with knowledge of the fact that the sums paid to Avila were excessive and were not properly paid under the Management Services Agreement or in reckless disregard of the facts known to them, intentionally assisted Avila and Timistit in carrying out their breach of fiduciary duties owed to LAS.

85.    As a direct and proximate result of the foregoing, LAS has been damaged in an amount to be determined at the trial of this matter.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against Avila and Park 610 – Breach of Fiduciary Duty

86.    DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

87.    As evidenced by the plain language of the MOU and the subsequent acts of the parties, Park 610 assumed the role of co-venturer with DIRECTV. As DIRECTV's co-venturer, Park 610 had a fiduciary duty of loyalty, good faith and disclosure in all acts undertaken on behalf of, and with respect to the joint venture.

88.    As such, Park 610, and Avila as the sole control person of Park 610, had an obligation to refrain from misrepresenting facts and/or failing to disclose facts that would operate as a fraud upon DIRECTV and/or LAS, to refrain from committing corporate waste, and to refrain from entering into the side-deal with Pratola and Zunda.

89.    As a proximate and direct result of the foregoing breaches of fiduciary duty, DIRECTV has been damaged in an amount to be determined at trial.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Against All Defendants - Fraud

90.    DIRECTV repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

91.    As detailed above, Pratola and Zunda misrepresented to DIRECTV that the Channel would be conducted in the utmost good faith as a joint venture solely between DIRECTV and Avila, whereas in actuality they planned all along secretly to substitute themselves as the holders of part or all of Avila's stake in LAS.

17

92.     Avila and Timistit, through their participation in the negotiation of the MOU, the LLC Agreement and the other closing documents, and through Avila's counsel, reinforced Pratola's affirmative misrepresentations and omissions.

93.     The foregoing misrepresentations were made by each of the Defendants with the knowledge that the representations were false.

94.     Each of the Defendants intended to induce DIRECTV to enter into the joint venture in reliance upon the misrepresentations.

95.     DIRECTV was justified in relying upon the Defendants' representations. But for the Defendants' misrepresentations regarding the structure and ownership of LAS, DIRECTV would not have entered into the joint venture with Park 610.

96.     As a consequence of the Defendants' fraud, DIRECTV expended approximately $4,550,000 in capital contributions and $1,000,000 in loans.

97.     In the event that specific performance is not ordered, DIRECTV therefore prays for a judgment rescinding all agreements with Defendants and restitution of all sums paid to Defendants and LAS, whether in the form of capital contributions, loans or otherwise.

**WHEREFORE**, for the reasons set forth above, it is respectfully requested judgment be entered herein:

      i.    On Plaintiff's First Cause of Action, a judgment declaring that that Park 610 has breached the LLC Agreement and has committed one or more Events of Default as defined therein;

     ii.    On Plaintiff's Second Cause of Action, an order of specific enforcement requiring Park 610 to convey all of its membership interests in LAS to

DIRECTV pursuant to the Call Option procedures set forth in Article XIII of the LLC Agreement;

iii.  On Plaintiff's Third and Fourth Causes of action, an award of money damages to LAS to compensate for the Defendants' breach of fiduciary duty and their acts of aiding and abetting the breach of fiduciary duty;

iv.  On Plaintiff's Fifth Cause of Action, an award of money damages in an amount to be determined at trial;

v.  On Plaintiff's Sixth Cause of Action, an order rescinding all agreements between DIRECTV and the Defendants, restitution of sums paid by DIRECTV to fund LAS, and money damages;

vi.  The costs and disbursements of this action, including reasonable attorneys' fees;

vii.  An award of punitive damages; and

viii. Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       April 29, 2008

**MINTZ & GOLD LLP**

Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, New York 10016-6819
Tel:  (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*

## VERIFICATION

Plaintiff, DIRECTV Latin America, LLC, being duly sworn, deposes and says pursuant to 28 U.S.C. 1746, under the penalty of perjury under the laws of the United States, that deponent has read the foregoing Verified Complaint and knows the contents thereof; that the same are true to deponent's own knowledge, except as to those matters therein stated to be alleged on information and belief, and that as to those matters deponent believes them to be true.

Executed at New York, New York on this **28** day of April, 2008

Michael Hartman

EXHIBIT
THREE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------X

DIRECTV LATIN AMERICA, LLC,
individually and in the right and on behalf
of LATIN AMERICAN SPORTS, LLC,

                            Plaintiff,

           v.

PARK 610, LLC,
CARLOS VICENTE AVILA,
ROBERTO TIMISTIT,
CARLOS PRATOLA,
ALEJANDRO ZUNDA CORNELL and
DOES 1 through 10,

                       Defendants,

       and

LATIN AMERICAN SPORTS, LLC,

             as a Nominal Defendant.

-------------------------------------------------X

08 Civ. ___3987 (VM)___

RECEIVED
APR 29 2008
U.S.D.C. S.D.N.Y.
CASHIERS

## DISCLOSURE STATEMENT UNDER RULE 7.1

Pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 7.1(a), the

undersigned counsel for Plaintiff, DIRECTV Latin America, LLC, a private non-

governmental party, certifies that Plaintiff's parent company is DIRECTV Latin America,

Inc., a non-publicly held Delaware corporation.  Plaintiff's ultimate parent company,

The DIRECTV Group, Inc., a publicly traded company, indirectly owns 100% of the

equity of the Plaintiff.  Liberty Media Corporation, a publicly traded company, owns

more than 10% of the stock of The DIRECTV Group, Inc.

Dated: New York, New York
      April 29, 2008

**MINTZ & GOLD LLP**

By: _Terence W. McCormick_

Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, NY 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mccormick@mintzandgold.com
mintz@mintzandgold.com
*Attorneys for Plaintiff*
*DIRECTV Latin America, LLC*

EXHIBIT
FOUR

# California Business Portal

Secretary of State DEBRA BOWEN

| SECRETARY OF STATE | ELECTIONS & VOTER INFO | POLITICAL REFORM | CA BUSINESS PORTAL | ARCHIVES & MUSEUM | OTHER SERVICES |

## Corporations

Business Search
Corporations

| New Search |
| Search Tips |
| Field Definitions |
| Status Definitions |
| Name Availability |
| Corporate Records |
| **Business Entities Records Order Form**<br>Certificates<br>Copies<br>Status Reports |
| FAQs |
| Corporations Main Page |
| Site Search |

The information displayed here is current as of "JUN 13, 2008" and is updated weekly. It is not a complete or certified record of the Corporation.

For information about certification of corporate records or for additional corporate information, please refer to **Corporate Records**. If you are unable to locate a record, you may request a more extensive search by ordering a status report. Fees and instructions for ordering a status report are included on the **Business Entities Records Order Form**. Certificates and/or certified copies can also be requested using the order form.

Results of search for " **DIRECTV** "

***Click on the name of the corporation for additional information.***

| Corp Number | Date Filed | Status | Corporation Name | Agent for Service of Process |
|---|---|---|---|---|
| C2210020 | 1/26/2000 | surrender | DIRECTV BROADBAND, INC. | CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE |
| C2374215 | 1/22/2002 | surrender | DIRECTV BROADBAND, INC. | C T CORPORATION SYSTEM |
| C1953193 | 11/13/1995 | surrender | DIRECTV ENTERPRISES, INC. | C T CORPORATION SYSTEM |
| C2499632 | 2/27/2003 | active | DIRECTV FINANCING CO., INC. | CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE |
| C1783626 | 5/10/1996 | active | DIRECTV INTERNATIONAL, INC. | CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE |
| C1758420 | 2/9/1995 | active | DIRECTV LATIN AMERICA HOLDINGS, INC. | CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS |

|  |  |  |  | INCORPORATING SERVICE |
|---|---|---|---|---|
| C1947484 | 8/30/1995 | active | **DIRECTV MERCHANDISING, INC.** | CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE |
| C1753117 | 10/31/1994 | merged out | **DIRECTV OPERATIONS, INC.** | C T CORPORATION SYSTEM |
| C1675521 | 10/31/1990 | active | **DIRECTV, INC.** | CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE |
| C1592321 | 7/14/1987 | active | **THE DIRECTV GROUP, INC.** | CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE |
| C2213294 | 2/23/2000 | suspended | **VALLEY DIRECTV INC.** | JOHN BENTLEY |

Copyright ©2001 California Secretary of State. **Privacy Statement.**

EXHIBIT
FIVE



## State of Delaware
### The Official Website for the First State



Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites

State Directory | Help | Search Delaware [        ] [GO]    Citizen Services | Business Services | Visitor Info.

**Department of State: Division of Corporations**

HOME
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

SERVICES
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status
Validate Certificate

INFORMATION
Corporate Forms
Corporate Fees
UCC Forms and Fees
UCC Searches
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request

Frequently Asked Questions

## General Information Name Search

### 32 Matches found

* Required Field

* Entity Name: [ DIRECTV                    ] or File Number: [          ]

This field is not case sensitive.

[ Search ]

| FILE NUMBER | ENTITY NAME |
|---|---|
| 3014964 | DIRECTV A AA AAA AGENT INC. |
| 4229592 | DIRECTVA, L.P. |
| 3159768 | DIRECTV BROADBAND, INC. |
| 3329920 | DIRECTV BROADBAND, INC. |
| 3510405 | DIRECTV CARIBBEAN, LLC |
| 3030366 | DIRECTV CUSTOMER SERVICES, INC. |
| 2448711 | DIRECTV ENTERPRISES, LLC |
| 0935719 | DIRECT VENTURES, INC. |
| 3838629 | DIRECT VENTURES, LLC |
| 2658249 | DIRECTV EUROPE, INC. |
| 3622184 | DIRECTV FINANCING CO., INC. |
| 3217129 | DIRECTV GLOBAL DIGITAL MEDIA, INC. |
| 2567513 | DIRECTV GLOBAL, INC. |
| 3217128 | DIRECTV GLOBAL, INC. |
| 0844677 | THE DIRECTV GROUP, INC. |
| 3766676 | THE DIRECTV GROUP, INC. |
| 3535468 | DIRECTV HOLDINGS LLC |
| 3819758 | DIRECTV HOME SERVICES, LLC |
| 2210492 | DIRECT VIDEO, INC. |
| 4228556 | DIRECTVIEW HOLDINGS, INC. |
| 2442905 | DIRECT VIEW SYSTEMS INC. |
| 2516904 | DIRECTV, INC. |
| 2567514 | DIRECTV INTERNATIONAL, INC. |
| 2391773 | DIRECT VISION CORPORATION |
| 2996088 | DIRECTVISION ENTERTAINMENT, INC. |
| 2762760 | DIRECTVISION, INC. |

| 2628368 | DIRECTV LATIN AMERICA, LLC |
| 4321262 | DIRECTV LATIN AMERICA SPORTS, LLC |
| 2474203 | DIRECTV MERCHANDISING, INC. |
| 3508255 | DIRECTV MEXICO HOLDINGS LLC |
| 3903559 | DIRECTV PROGRAMMING HOLDINGS II, INC. |
| 3903554 | DIRECTV PROGRAMMING HOLDINGS I, INC. |

site map | about this site | contact us | translate | delaware.gov

# EXHIBIT
# SIX



🖨 Print page   ✉ Email page   📄 Download PDF   📇 Add to Briefcase
« Previous Release | Next Release »

## DIRECTV Group to Acquire Darlene Investments' Interests in DiRECTV Latin America

### Transaction Valued at $325 Million; DIRECTV Acquires Full Ownership of DTVLA, Eliminates All Litigation

EL SEGUNDO, Calif.--Jan. 30, 2007--The DIRECTV Group has agreed to acquire Darlene Investments LLC's 14.1 percent equity interest in DIRECTV Latin America, LLC, and resolve all outstanding disputes between the parties, for $325 million. The cash transaction, which is effective immediately, enables DIRECTV to acquire full equity ownership of DIRECTV Latin America, LLC, and eliminates all pending litigation against DIRECTV and other parties.

DIRECTV Latin America, LLC, is a multinational company which, as a result of this transaction, is 100% owned by The DIRECTV Group, Inc. Through its subsidiaries and affiliated companies, DIRECTV Latin America provides digital television service to approximately 4 million customers in Latin America.

About DIRECTV

The DIRECTV Group (NYSE:DTV) is a world-leading provider of digital television entertainment services. Through its subsidiaries and affiliated companies in the United States, Brazil, Mexico and other countries in Latin America, the DIRECTV Group provides digital television service to more than 15.6 million customers in the United States and approximately 4 million customers in Latin America.

CONTACT: DIRECTV, Inc.
Robert Mercer, 310-726-4683

SOURCE: The DIRECTV Group, Inc.

Close window | Back to top

# EXHIBIT
# SEVEN

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

     **For the fiscal year ended December 31, 2007**

OR

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

     **For the transition period from        to**

Commission file number 1-31945

# THE DIRECTV GROUP, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **52-1106564** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2230 East Imperial Highway, El Segundo, California** | **90245** |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: (310) 964-5000

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Exchange on Which Registered |
|---|---|
| **Common, $0.01 par value** | **NASDAQ Global Select Market** |

Securities registered pursuant to Section 12(g) of the Act:

**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐          Smaller reporting company ☐
(Do not check if a smaller
reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of June 30, 2007, the aggregate market value of the registrant's voting and non-voting common equity held by non-affiliates was $16,870,584,993. This amount excludes Fox Entertainment Group, Inc.'s approximately 39% ownership interest in our outstanding common stock as of such date.

As of February 21, 2008, the registrant had outstanding 1,149,197,521 shares of common stock.

Documents incorporated by reference are as follows:

| Document | Part and Item Number of Form 10-K into which Incorporated |
|---|---|
| The DIRECTV Group, Inc. Notice of Annual Meeting of Stockholders and Proxy Statement for Annual Meeting of Stockholders to be held on June 3, 2008 | Part I, Item 5 Part III, Items 10 through 14 |

**THE DIRECTV GROUP, INC.**

**TABLE OF CONTENTS**

|  | Page No. |
|---|---|
| Part I | |
| Item 1. Business | 3 |
| Item 1A. Risk Factors | 21 |
| Item 1B. Unresolved Staff Comments | 31 |
| Item 2. Properties | 32 |
| Item 3. Legal Proceedings | 32 |
| Item 4. Submission of Matters to a Vote of Security Holders | 33 |
| Part II | |
| Item 5. Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 34 |
| Item 6. Selected Financial Data | 36 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 7A. Quantitative and Qualitative Disclosures About Market Risk | 60 |
| Item 8. Financial Statements and Supplementary Data | |
| Report of Independent Registered Public Accounting Firm | 61 |
| Consolidated Statements of Operations for the Years Ended December 31, 2007, 2006 and 2005 | 62 |
| Consolidated Balance Sheets as of December 31, 2007 and 2006 | 63 |
| Consolidated Statements of Changes in Stockholders' Equity and Comprehensive Income for the Years Ended December 31, 2007, 2006 and 2005 | 64 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2007, 2006 and 2005 | 65 |
| Notes to the Consolidated Financial Statements | 66 |
| Supplementary Data | 103 |
| Item 9. Changes In and Disagreements with Accountants on Accounting and Financial Disclosure | 104 |
| Item 9A. Controls and Procedures | 104 |
| Item 9B. Other Information | 107 |
| Part III | |
| Item 10, 11, 12, 13 and 14 | 107 |
| Part IV | |
| Item 15. Exhibits and Financial Statement Schedules | 107 |
| Signatures | 117 |

1

**THE DIRECTV GROUP, INC.**

**CAUTIONARY STATEMENT FOR PURPOSE OF THE "SAFE HARBOR" PROVISIONS
OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995**

This Annual Report on Form 10-K may contain certain statements that we believe are, or may be considered to be, "forward-looking statements" within the meaning of various provisions of the Securities Act of 1933 and of the Securities Exchange Act of 1934. These forward-looking statements generally can be identified by use of statements that include phrases such as we "believe," "expect," "estimate," "anticipate," "intend," "plan," "foresee," "project" or other similar words or phrases. Similarly, statements that describe our objectives, plans or goals also are forward-looking statements. All of these forward-looking statements are subject to certain risks and uncertainties including, without limitation, risk factors discussed in more detail in Item 1A of this Annual Report, which could cause our actual results to differ materially from historical results or from those expressed or implied by the relevant forward-looking statement. The forward-looking statements included in this Annual Report are made only as of the date of this Annual Report and we undertake no obligation to publicly update these forward-looking statements to reflect subsequent events or circumstances.

2

## THE DIRECTV GROUP, INC.

### PART I

### ITEM 1.   BUSINESS

The DIRECTV Group, Inc. is a leading provider of digital television entertainment in the United States and Latin America. Our two business segments, DIRECTV U.S. and DIRECTV Latin America, which are differentiated by their geographic location, are engaged in acquiring, promoting, selling and/or distributing digital entertainment programming via satellite to residential and commercial subscribers.

- *DIRECTV U.S.*   DIRECTV Holdings LLC and its subsidiaries, which we refer to as DIRECTV U.S., is the largest provider of direct-to-home, or DTH, digital television services and the second largest provider in the multi-channel video programming distribution, or MVPD, industry in the United States. As of December 31, 2007, DIRECTV U.S. had over 16.8 million subscribers.

- *DIRECTV Latin America.*   DIRECTV Latin America, or DTVLA, is a leading provider of DTH digital television services throughout Latin America. DTVLA is comprised of: PanAmericana, which provides services in Venezuela, Argentina, Chile, Colombia, Puerto Rico and certain other countries in the region through our wholly-owned subsidiary, DIRECTV Latin America, LLC, or DLA LLC; our 74% owned subsidiary, Sky Brasil Servicos Ltda., which we refer to as Sky Brazil; and our 41% equity method investment in Innova, S. de R.L. de C.V., or Sky Mexico. As of December 31, 2007, PanAmericana had approximately 1.7 million subscribers, Sky Brazil had approximately 1.5 million subscribers and Sky Mexico had approximately 1.6 million subscribers.

In January 2007, we acquired Darlene Investments LLC's 14% minority interest in DLA LLC for $325 million in cash and resolved all outstanding disputes with Darlene. During 2006, we completed a series of transactions that reorganized our DTH satellite businesses in Latin America and in 2005 we completed the restructuring of our company to focus on the DTH satellite businesses by selling the last of our non-strategic businesses and investments, Hughes Network Systems, Inc., or HNS.

We were incorporated in Delaware in 1977, and our common stock trades on the The NASDAQ Global Select Market under the ticker symbol "DTV."

On December 23, 2006, News Corporation and Liberty Media Corporation, or Liberty, entered into an agreement to exchange Liberty's 16.3% ownership interest in News Corporation for News Corporation's approximately 41% ownership in us, three regional sports networks and a cash payment. The transaction has been approved by the stockholders of News Corporation and is subject to regulatory approval from the Federal Communications Commission and antitrust clearance. It is expected that the transaction will close in the first quarter of 2008.

### DIRECTV U.S.

Through DIRECTV U.S., we provide over 16.8 million subscribers with access to hundreds of channels of digital-quality video pictures and CD-quality audio programming that we transmit directly to subscribers' homes or businesses via high-powered geosynchronous satellites.

We believe we provide one of the most extensive collections of programming available in the MVPD industry. We currently distribute to our subscribers more than 1,800 digital video and audio channels, including about 190 basic entertainment channels including over 70 XM Satellite Radio music channels, 33 premium movie channels, over 36 regional and specialty sports networks, an aggregate of over 1,400 local channels, over 101 Spanish and other foreign language special interest channels, and over 31 pay-per-view movie and event choices. Although we distribute over 1,400 local channels, a subscriber generally receives only the local channels in the subscriber's home market. As of

3

**THE DIRECTV GROUP, INC.**

December 31, 2007, we provided local channel coverage in standard definition to approximately 143 markets, covering about 94% of U.S. television households. In addition, we provided high definition, or HD, local channels in 68 markets representing 72% of U.S. TV households, as well as over 90 national HD television channels. With the expected launch of one additional satellite, we expect to extend our advantage of having the most HD channels in the industry.

We also provide premium professional and collegiate sports programming such as the NFL SUNDAY TICKET™ package, which allows subscribers to view the largest selection of NFL games available each Sunday during the regular season. Under our contract with the NFL, we have exclusive rights to provide this service through 2010, including rights to provide related HD, interactive and mobile services.

To subscribe to the DIRECTV® service, subscribers acquire receiving equipment from either us, our national retailers, independent satellite television retailers or dealers, or regional Bell operating companies, or RBOCs. Most set-top receivers provided to new and existing subscribers are leased subsequent to the introduction of a lease program on March 1, 2006.

The receiving equipment consists of a small receiving satellite dish antenna, a digital set-top receiver and a remote control, which we refer to as a DIRECTV® System. After acquiring and installing a DIRECTV System, subscribers activate the DIRECTV service by contacting us and subscribing to one of our programming packages.

**Key Strengths**

- *Large Subscriber Base.*   We are the largest provider of DTH digital television services and the second largest MVPD provider in the United States, in each case based on the number of subscribers. We believe that our large subscriber base provides us with the opportunity to obtain programming on favorable terms and secure unique and exclusive programming. We also believe that our large subscriber base contributes to achieving other economies of scale in areas such as DIRECTV System equipment purchasing, customer service, broadcast operations and general and administrative services.

- *Leading Brand Name.*   Results from a study we commissioned in 2007 indicated that over 93% of consumers in the United States are aware of the DIRECTV service. We believe the strength of our brand name is an important factor in our ability to attract new subscribers. In addition, we believe our recognized brand name enhances our ability to secure strategic alliances with programmers, distributors and other technology and service providers.

- *Substantial Channel Capacity and Programming Content.*   As a result of our significant channel capacity, we believe we are able to deliver to our subscribers one of the widest selections of local and national programming available today in the United States, including exclusive programming such as the NFL SUNDAY TICKET package and international programming. In addition, we have a substantial amount of capacity in the Ka-Band spectrum that provides us with the capability to offer the most national HD programming currently available in the industry.

- *High-Quality Digital Picture and Sound, Including HD Programming.*   Our video and audio programming is 100% digitally delivered, providing subscribers with digital-quality video and CD-quality sound. We believe this compares favorably with cable providers that frequently offer popular programming in an analog format and offer a limited selection of digital channels for an additional fee. In addition, we believe we currently offer the nation's most comprehensive selection of HD programming.

4

THE DIRECTV GROUP, INC.

***Strong Customer Service.***   We have attained top rankings in customer satisfaction studies for our industry. For example, in 2007 DIRECTV was ranked "Highest in Customer Satisfaction Among Satellite/Cable TV Subscribers" in the Southern, Western and Eastern regions of the United States, according to the J.D. Power and Associates 2007 Residential Cable/Satellite TV Customer Satisfaction Study [SM] . The three regions where DIRECTV ranked highest encompass 43 of the 48 contiguous states. In addition, we have been rated ahead of every cable company in customer service for seven consecutive years in the University of Michigan's American Consumers Satisfaction Index. We believe that providing high-quality customer service is an important element in minimizing subscriber disconnection, or churn, and attracting new subscribers.

***Valuable Orbital Slots and Satellite-Based Technology.***   We believe our regulatory authorization to use desirable orbital slots and broadcast spectrum helps sustain our position as one of the leading companies in the MVPD industry. The Federal Communications Commission, or FCC, has designated three direct broadcast satellite, or DBS, orbital slots in the Ku-Band spectrum that provide full coverage across the 48 contiguous states of the United States, often referred to as CONUS coverage. Within these three orbital slots, there are 96 assigned DBS frequencies. We hold licenses to broadcast our services from 46 of these 96 DBS frequencies. The FCC is currently considering licensing additional DBS slots for satellites that are sometimes referred to as "tweeners" which would provide CONUS coverage. See "Government Regulation—FCC Regulation Under the Communications Act" and "Risk Factors—The ability to maintain FCC licenses and other regulatory approvals is critical to our business" for more information related to these types of slots and satellites.

In addition, we hold licenses in three orbital slots (99° west longitude, or WL, 101° WL, and 103° WL) in the Ka-Band spectrum. The satellites that have been and will be launched into these orbital slots will substantially increase our channel capacity, allowing us to provide the most HD programming currently available across the United States. We also have obtained approval from the FCC to transmit our signal in the Ku-Band from one of our satellites that has been stationed at a temporary orbital location at 72.5° WL and from leased capacity on a satellite at 95° WL.

Our satellite-based service provides us with many advantages over ground-based cable television services. We have the ability to distribute hundreds of channels to millions of recipients nationwide with minimal incremental infrastructure cost per additional subscriber. In addition, we have comprehensive coverage to areas with low population density in the United States and the ability to quickly introduce new services to a large number of subscribers.

## Business Strategy

Our primary goal is to provide subscribers with the best television experience in the United States. Our strategy focuses on offering subscribers differentiated and exclusive content, attaining leadership in technology, and enhancing sales, marketing, distribution and customer service.

***Offer Differentiated and Exclusive Content.***   To fulfill our goal, we believe we must have the most extensive collection of valuable programming services available. We plan to further enhance our programming service by continuing to expand our HD programming, creating compelling new programming, launching new interactive services and video-on-demand, or VOD, and expanding international programming.

5

**THE DIRECTV GROUP, INC.**

*Expand High-Definition Programming.* We believe that having the most comprehensive offering of HD programming will provide us with a significant competitive advantage in a market segment that is expected to experience continued rapid growth. We believe we currently have the most extensive national HD programming in our industry and, with the launch of DIRECTV 11 in early 2008, we expect to extend that advantage. As a result, we will be capable of broadcasting approximately 1,500 local and 150 national HD channels to nearly all U.S. television households. Subscribers receiving local HD channels will generally only receive the channels broadcast in their home market.

*Offer Exclusive Content and Create Compelling New Programming.* We offer content which is not offered by other MVPD providers such as NFL SUNDAY TICKET, which allows subscribers to watch up to 14 games each week, most in HD. We have also signed agreements to be the exclusive MVPD provider of NCAA MEGA MARCH MADNESS®. We expect to continue to launch new programming that will differentiate us from the competition. For example, we offer The 101, a channel dedicated to the broadcast of exclusive content including series such as Passions and Project My World, and concert performances by top-rated artists. Also, along with key strategic partners, we launched the Championship Gaming Series, a new professional video gaming league that uses new technology to take viewers inside the actual game competitions. In 2008, we also plan to launch additional new shows such as Rock & a Hard Place and Supreme Court of Comedy.

*Launch Enhanced and Interactive Services.* We believe that enhanced and interactive services play an important role in the subscriber experience. For example, for the NFL SUNDAY TICKET package, we introduced Mix Channels that enable subscribers to view up to eight live games all on one screen as well as interactive services. In 2007, we introduced our exclusive NASCAR HOTPASS™ service, which offers five fully-produced channels allowing fans to follow four different drivers each with multiple camera angles, real-time statistics and team audio communications during NASCAR races. Also in 2007, we introduced new features and services to the MLB Extra Innings package such as the Strike Zone channel, which moves live from game to game to allow viewers to see all the important action and key match-ups. In 2006, we teamed up with USA Network and the U.S. Tennis Association to provide the first-ever interactive TV coverage of a major U.S. tennis event.

*Introduce Video-on-Demand Services.* We plan to introduce VOD services in 2008 for subscribers that have the new DIRECTV Plus® DVR or DIRECTV Plus® HD-DVR. The service, named DIRECTV On-Demand, will have thousands of hours of top programming from the major broadcast and cable networks, as well as movies that can be accessed from a subscriber's receiver, and programming that will be downloaded through a broadband connection for customers with a DIRECTV Plus HD-DVR.

*Expand International Programming.* We continue to expand our international programming offerings because we believe there is an underserved market for these services in the United States. As of December 31, 2007, we offered over 65 international channels in 17 languages. We believe we have leading programming packages in the following languages: Cantonese, Filipino, Korean, Russian, Spanish, and Vietnamese.

**Technology Leadership.** We believe that technological leadership will be important to our ability to introduce services that are easy to use and subscriber-friendly while also reducing costs. We believe that advancements in technology will drive subscriber demand for enhanced digital video recorders, or DVRs, and HD equipment, VOD, a whole-house entertainment solution, and portable devices.

**THE DIRECTV GROUP, INC.**

*Enhance DVR and HD Equipment.*   A cornerstone of our strategy is to use set-top receivers that incorporate DVR and HD technology. We continue to introduce features and functionality to improve the customer experience. For example, in 2006 we introduced a new HD-DVR capable of receiving and recording our new MPEG-4 HD signals. This box also incorporated interactive and, after a software download, video-on-demand functionality. Additionally in 2008, we introduced the ability to remotely schedule DVR recordings via the Internet or cell / mobile phone. Also in 2008, we expect to significantly increase the recording capacity of our HD-DVR. We also plan to introduce HD versions of our interactive applications.

*Introduce Whole-House and Portable Services.*   We believe that it is important for our subscribers to have multiple ways to access DIRECTV programming throughout the home and on devices other than the television. For example in 2007, we introduced MediaShare, a service that allows subscribers with the DIRECTV Plus HD-DVR to access applications such as pictures, music and home video from their personal computer. Also in 2007, we introduced a portable DIRECTV service called DIRECTV® Sat-Go that enables remote viewing of DIRECTV's programming. In 2008, we plan to add the ability to watch HD television programming on personal computers by accessing content that resides on the customer's HD-DVR. We also expect to introduce a home media center that will provide HD and standard-definition DVR functionality throughout the home and allow customers to access stored content, including video, photos and music, seamlessly from any connected television set in a household.

***Enhance Sales and Marketing, Customer Service, Distribution and Installation.***   We intend to continue to grow our subscriber base and reduce churn by enhancing our sales and marketing, improving the credit quality of our subscriber base, and improving our customer service, distribution and installation.

*Enhance Sales and Marketing.*   We expect to continue growing our subscriber base through marketing programs that capitalize on the strength of our brand and extensive programming. In addition, we expect that our expanded national and local HD programming will increase sales from customers purchasing access to this service. We also intend to have a greater emphasis on local advertising and marketing to ensure that our competitive strengths are effectively targeted based on demographics and geography.

*Reduce Churn and High-Risk Subscribers.*   We believe that in order to achieve further reductions in churn, we must continue to improve the overall quality of our subscriber base by implementing additional credit and identification screening policies. We review these policies on an ongoing basis to determine whether changes are required to help ensure that the quality of our subscriber base continues to improve. We believe another important factor in reducing churn is to continue increasing the penetration levels of customers purchasing HD and DVR services.

*Improve Customer Service, Distribution and Installation.*   We expect to attain the gold standard in customer service throughout a customer's lifecycle. We expect to improve customer service, distribution and installation services while also improving operational efficiencies. For example, we are improving the quality and usage of our web based customer service capabilities, improving the tools that our customer agents have at their disposal, and simplifying our customer bills. In addition, we are implementing a new work order management system to improve the scheduling and tracking of our installation and service calls. Later in 2008, we expect to integrate wireless handheld devices into this system so that our install and service technicians can improve the efficiency of their daily work orders real-time.

## THE DIRECTV GROUP, INC.

### Infrastructure

**Satellites.**     We currently have a fleet of ten geosynchronous satellites, including nine owned satellites and one leased satellite. We have seven Ku-Band satellites at the following orbital locations: 101° WL (three), 110° WL (one), 119° WL (one), 72.5° WL (one), and 95° WL (one-leased). We also have three Ka-Band satellites at our 99° WL (one) and 103° WL (two) orbital locations. The 72.5° WL orbital location is used pursuant to an arrangement with Telesat Canada. As a part of the arrangement with Telesat, we have transferred three satellites, one of which is no longer used as it was de-orbited at the end of its service life and two of which are nearing the end of their useful lives, to orbital locations controlled by Telesat, for use by Telesat for its own services in Canada.

**Satellites To Be Launched.**     DIRECTV 11 has finished construction and is planned for launch in early 2008. DIRECTV 11 will operate from our 99° WL orbital location after successful completion of in-orbit testing. DIRECTV 11 will provide us with increased capability for local and national HD channels, as well as capacity for new interactive and enhanced services once it becomes operational. DIRECTV 12 is under construction and will be ready for launch in the second half of 2009.

**Satellite Risk Management.**     We use launch and in-orbit insurance to mitigate the potential financial impact of satellite fleet launch and in-orbit failures unless the premium costs are considered to be uneconomical relative to the risk of satellite failure. The insurance generally does not compensate for business interruption or loss of future revenues or subscribers. We rely on in-orbit spare satellites and excess transponder capacity at key orbital slots to mitigate the impact of a potential satellite failure on our ability to provide service. However, programming continuity cannot be assured in all instances or in the event of multiple satellite losses.

Launch insurance typically covers the time frame from ignition of the launch vehicle through separation of the satellite from the launch vehicle. In the past, we have launched satellites without insurance. We expect to purchase launch insurance for DIRECTV 11. We do not currently expect to purchase in-orbit insurance for satellites to be launched. As of December 31, 2007, the net book value of in-orbit satellites was $1,552 million, of which $1,327 million was uninsured.

**Digital Broadcast Centers.**     To gather programming content, ensure its digital quality, and transmit content to our satellites, we have built two digital broadcast centers, located in Castle Rock, Colorado and Los Angeles, California. These facilities provide the majority of our national and local standard-definition and HD programming. We have also built five uplink facilities which are used to provide HD local channels. Our broadcast centers receive programming from content providers via satellite, fiber optic cable and/or special tape. Most satellite-delivered programming is then digitized, encoded and transmitted to our satellites. We designed each broadcast center and uplink facility with redundant systems to minimize service interruptions.

**Installation Network.**     DIRECTV HOME SERVICES® third party installation and service network performs installation, upgrades and other service call work for us. For the year ended December 31, 2007, these HSPs performed approximately 94% of all in-home visits with over 17,000 technicians from 13 outsourced companies around the United States. In addition, we and our retailers also utilize employer-based or contract installation providers, which perform the remainder of all new professional subscriber installations. We set the quality of installation and service standards, perform quality control, manage inventory and monitor the overall service network performance for nearly all of the third party installation network.

**Customer Service Centers.**     As of December 31, 2007, we used 31 customer service centers employing over 16,000 customer service representatives. Most of these customer service centers are operated by Convergys Customer Management Group, Inc., Precision Response Corporation, Sitel

8