**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------X

DIRECTV LATIN AMERICA, LLC,                   :
individually and in the right and on behalf   :
of LATIN AMERICAN SPORTS, LLC,                :            **08 Civ. 3987 (VM)(GW)**
                                              :
                        Plaintiff,            :
                                              :
            v.                                :
                                              :
PARK 610, LLC,                                :
CARLOS VICENTE AVILA,                         :            **DECLARATION OF**
ROBERTO TIMISTIT,                             :            **CARLOS V. AVILA IN**
CARLOS PRATOLA,                               :            **OPPOSITION TO PLAINTIFF'S**
ALEJANDRO ZUNDA CORNELL, and                  :            **MOTION TO CONFIRM A**
DOES 1 through 10,                            :            **PRE-JUDGMENT ORDER OF**
                                              :            **ATTACHMENT OBTAINED**
                        Defendants,           :            ***EX PARTE* BY PLAINTIFF**
                                              :
            and                               :
                                              :
LATIN AMERICAN SPORTS, LLC,                   :
                                              :
        as a Nominal Defendant.               :
-------------------------------------------------X

Carlos V. Avila, pursuant to 28 U.S.C. §1746, under penalty of perjury under the

laws of the United States of America, declares as follows:

    1.      I am the Chairman of Latin American Sports, LLC ("LAS") and the

founder of Park 610 LLC ("Park 610").

    2.      I have personal knowledge of the facts stated herein, and I submit this

declaration in opposition to the motion by DIRECTV Latin America LLC ("DLA-LLC")

to confirm the order of attachment against my personal and real property situated in this

district, which DLA-LLC applied for an obtained *ex parte* on or about April 29, 2008.

3.    I have over 40 years experience in media and sports programming, and have an extensive network of industry contacts throughout the world that enable me to identify sports programming opportunities and negotiate deals and acquire rights for highly sought after sports programming properties and content. In 1977, I created my own billboard company. In 1982, I created Torneos y Competencias, which today is one the most renowned sports production companies in Latin America, in which DLA-LLC has recently acquired an interest of approximately 35%. In 1985, I acquired the world rights for professional Argentine soccer until 2014 as well as the rights for South American soccer championships such as Copa Libertadores and Copa Sudamericana (similar to the European Cup). I was involved in the creation of TyC Sport, a 24-hour broadcasting channel similar to ESPN. In 1992, I negotiated and acquired exclusive rights to transmit the soccer matches of the Argentine Football Association – Argentina's premier soccer league. In 1994 I arranged for and helped TCI (today, Liberty Media) acquire Argentina's largest cable operator at the time -- Cablevisión. I was a partner of the largest media group in Argentina, Grupo Clarín which is the owner of Argentina's main open television channel, channel 13, and Clarín, one of the leading newspapers in Argentina with a circulation of 500,000 and a key shareholder of Cablevisión / Multicanal with 3.5 million subscribers in Argentina.

4.    In February 2006, I approached DLA-LLC about creating a golf-themed channel for broadcast in Latin America. DLA-LLC expressed interest in the idea, stating that they recognized the market potential for such programming.

5.    The parties agreed to explore a joint venture partnership to launch a golf-themed channel in Latin America (the "Joint Venture"). The terms of the joint venture

were eventually set out in a Limited Liability Company Agreement dated August 22, 2006 (the "Joint Venture Agreement") entered into among LAS, DLA-LLC and Park 610. A signed copy of the Joint Venture Agreement is annexed hereto as <u>Exhibit A</u>. LAS was created to be the vehicle through which the parties would distribute golf programming in Latin America through a channel to be called Golf Channel Latin America.

6.     Under the terms of the Joint Venture Agreement, DLA-LLC agreed to contribute US$7,000,000 over three years to finance the Joint Venture. In return, DLA-LLC received the exclusive rights to broadcast the golf programming to their subscribers in Latin America for a period of years.

7.     Park 610's contribution to the Joint Venture was to procure the golf programming rights, and run the day to day operational and business management of Golf Channel Latin America.

8.     To that end, Park 610 provided the experience and business and technical know-how necessary to launch a successful sports programming property in Latin America, recruited and hired managers for the launch and operation of Golf Channel Latin America, recruited and hired a production company, recruited and hired commentators and sportscasters, secured office space and organized the operational staff, acquired technical equipment and set up the central control, arranged for connectivity and satellite capacity, produced programming, preparing business and investment plans, and developed commercial and marketing strategies.

9.      On September 1, 2006, I closed a deal with the Golf Channel Incorporated (US) to grant LAS broadcast rights for Golf Channel programming in Latin America.

10.      The Golf Channel is a very successful U.S. sports programming property that reaches over 70% of the U.S. cable television market comprising over 70 million households. The Golf Channel (US) had generally been reluctant to grant rights for its programming and brand, but because of my track record, experience and industry reputation, I was able to acquire the rights for these properties for broadcast in Latin America.

11.      In addition, through extensive personal relationships and intense negotiation, I was also able to acquire the broadcast rights for the European Golf Tour (through 2010), for the Ryder Cup competitions in 2006, 2008 and 2010, and well as rights for the PGA, LPGA, Nationwide Tour, European Tour, Champions Tour, President Cup and other competitions (together with the Golf Channel, the "Golf Programming)".

12.      Because of Park 610's greater investment in the Joint Venture by way of programming rights, management, operations and marketing, Park 610 received 55% membership interest in LAS and DLA-LLC received a smaller 45% membership interest in LAS.

13.      I am not personally a party to the Joint Venture Agreement.

14.      At the time the Joint Venture Agreement was entered into, the membership interest in Park 610 was held 50% of Tumely S.A., and 50% by Loraine S.A.. Tumely and Loraine are bearer share corporations organized under the laws of Uruguay. Tumely was formed in April, 2006 and Loraine in May, 2006.

15.    I have read the "Verified Complaint" in this case, as well as the Declaration of Michael Hartman and the attachments thereto and as the Memorandum of Law submitted therewith.

16.    Upon information and belief, DLA-LLC's motivation in bringing this lawsuit is to obtain a windfall by compelling Park 610 to forfeit its 55% majority interest in LAS to DLA-LLC for next to nothing, and to cut Park 610 out as a joint venture partner while retaining the benefits of what Park 610 has contributed, both in terms of programming rights and operational and marketing expertise.

17.    DLA-LLC's principal contention in its Complaint is that Park 610 breached the Joint Venture Agreement, thereby triggering a "call option" provision (Section 13.4 of the Joint Venture Agreement) which would require Park 610 to sell its 55% interest in LAS to DLA-LLC at or below "net book value". (Complaint, ¶¶ 29-34).

18.    Despite its near-zero "net book value," LAS has, through Park 610's efforts, acquired valuable sports programming properties and distribution agreements, which has increased LAS's fair market value into the tens of millions of dollars, and has made LAS an acquisition target.

19.    In fact, in 2007 and 2008, I together with representatives of DLA-LLC engaged in discussions with a potential multi-national corporate investor, who made it clear to us that it believes that the value of LAS to be, conservatively, in the tens of millions of dollars, notwithstanding the fact that the book value of DLA-LLC is near zero.

20.    However, neither the breach of contract claim against Park 610 in which it seeks specific performance of the "call option" provision of Joint Venture Agreement nor

the plaintiff's declaratory judgment claim serves as the basis for DLA-LLC's motion to confirm the order of attachment against me personally. Those claims, as well as the rest of plaintiff's claims against me, Mr. Timistit and Park 610 will be the subject of a forthcoming motion to dismiss.

21.     With respect to DLA-LLC underlying claims against me personally that serve as the bases for the order of attachment, DLA-LLC's claim sounding in fraud fails to identify a single false statement or omission that I made which would support its claim that I fraudulently induced DLA-LLC to enter into the Joint Venture Agreement. In fact, I made no such statements or omissions.

22.     With respect to DLA-LLC's claims that I breached a fiduciary duty by not disclosing alleged transactions involving Tumely and Loraine, as set forth more fully in the accompanying Memorandum of Law, even if such transactions occurred, there is no obligation upon me, as the Chairman of LAS to disclose a transaction involving the parent companies of any member of LAS, if the transaction has no effect on the business of LAS or DLA-LLC.

23.     No transaction complained of by DLA-LLC allegedly involving Tumely or Loraine in this case could have had any effect on LAS's business or DLA-LLC's participation or interest in LAS's business.

24.     In addition, DLA-LLC's allegations that I breached a fiduciary duty to LAS and to DLA-LLC by committing corporate waste, is absurd.

25.     The corporate waste allegation appears to stem from management fees paid by LAS to Park 610 pursuant to Management Services Agreement ("MSA") entered into between LAS and Park 610.

6

26.    The MSA pursuant to which LAS agreed to pay a management fee to Park 610 equal to 25% of all advertising sales generated by LAS was entered into contemporaneously with the execution of the Joint Venture Agreement, and was referenced in Section 2.2(ii) of the Joint Venture Agreement itself.  Indeed, a copy of the MSA was attached to the Joint Venture Agreement as <u>Appendix B</u> thereto. The payment of the 25% of the advertising sales to Park 610 was approved by DLA-LLC both by a vote of DLA-LLC's designated representatives on the board of LAS, as well as by the very execution of the Joint Venture Agreement.   Since DLA-LLC approved the arrangement, it can not now argue that the arrangement constituted corporate waste.

27.    DLA-LLC also contends that I "pressured [DLA-LLC] to pay [me] an advance on the management fees in the amount of $30,000 per month" which "[DLA-LLC] initially resisted, but [later] . . . agreed to pay" an advance of $30,000 per month for six months and to reevaluate the arrangement thereafter." (Complaint, ¶ 56).

28.    DLA-LLC admits that it agreed to pay the advance at issue.  The advance was obtained on consent from DLA-LLC, and DLA-LLC has not explained how it is that 25% cut of the advertising revenue or the advance against those payments constituted corporate waste for the purposes of its claim of breach of fiduciary duty.

29.    Moreover, as of the end of May, 2008, there has been a total of $180,000 in advances made against fees to be collected under the Management Services Agreement, and LAS has during that time generated $494,809 dollars in advertising revenue, 25% of which is $123,702 (the "Management Services Fee Earned"). Consequently, as of the end of May, 2008, the $180,000 advance is offset by more than $123,000 in Management Service Fees Earned, leaving less than $57,000 in advances

outstanding. Considering the current rate of advertising revenues, the remaining balance of the advances will have been paid off by July, 2008.

30.     I am now, and have always been the Chairman of LAS, and have now as always run LAS's business to the best of my ability using my best business judgment as to what is in the best interest of LAS.

31.     Finally, I maintain the sole power to direct or cause the direction of the management and policies of Park 610. There has never been a "Change in Control" of Park 610 as such term is used in the Joint Venture Agreement.

**WHEREFORE**, for the reasons set forth above and in the Memorandum of Law submitted herewith, I respectfully request that the motion for the confirmation of the order of attachment be denied in all respects.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Buenos Aires, Argentina on this 18th day of June, 2008.

_____
CARLOS V. AVILA

EXHIBIT A

EXECUTION COPY

LIMITED LIABILITY COMPANY AGREEMENT

OF LATIN AMERICAN SPORTS, LLC

AMONG

LATIN AMERICAN SPORTS, LLC,

DIRECTV LATIN AMERICA, LLC

AND

PARK 610, LLC

DATED

AS OF

AUGUST 22, 2006

## TABLE OF CONTENTS

PAGE

ARTICLE I        DEFINITIONS ................................................................... 1

ARTICLE II       PURPOSE ...................................................................... 8
        2.1      Purpose ...................................................................... 8
        2.2      Concurrent Documents ......................................... 8
        2.3      Initial Plans ........................................................... 8

ARTICLE III      FORMATION, OWNERSHIP AND POWERS ..... 8
        3.1      Formation ................................................................ 8
        3.2      Name ........................................................................ 9
        3.3      Initial Capital Contribution ............................... 9
        3.4      Office and Agent .................................................. 9
        3.5      Property ................................................................... 9
        3.6      Powers ..................................................................... 9

ARTICLE IV       RESTRICTIONS ON MEMBERS ....................... 9
        4.1      Restrictions on Members .................................... 9

ARTICLE V        BOARD OF DIRECTORS ................................... 10
        5.1      Directors ............................................................... 10
        5.2      Meetings ............................................................... 10
        5.3      Voting Rights; Quorum ...................................... 11
        5.4      Matters Requiring Supermajority Approval .... 11
        5.5      Modification to Supermajority Approval After Exclusive Period Termination
                 Date ........................................................................ 14
        5.6      Lack of Director Supermajority ........................ 14
        5.7      Dispute Resolution; Escalation ........................ 14
        5.8      Remuneration and Reimbursement ................. 14

ARTICLE VI       MANAGEMENT MATTERS ............................... 15
        6.1      Officers ................................................................. 15
        6.2      Annual Plan and Finance Plan .......................... 15
        6.3      Fiscal Year and Quarter ..................................... 15
        6.4      Personnel Policies ............................................... 15

ARTICLE VII      CAPITAL AND FINANCE ................................. 16
        7.1      Initial Capital Contributions ............................ 16
        7.2      Percentage of Interest ......................................... 16
        7.3      DTVLA Capital Contributions .......................... 16
        7.4      Park 610 Contribution ........................................ 18
        7.5      Impact of Capital Contributions on Members' Percentage Interest ........... 18
        7.6      Mandatory Defaulting Member .......................... 18



i

| | | |
|---|---|---|
| 7.7 | DTVLA Loan | 19 |
| 7.8 | Additional Capital | 19 |
| 7.9 | Books and Records | 20 |
| 7.10 | Annual Financial Statements | 21 |
| 7.11 | Interim Financial Statements | 21 |
| 7.12 | Inspection of Facilities and Records | 21 |
| 7.13 | Banking Matters | 21 |
| 7.14 | Allocation of Income and Losses | 21 |

**ARTICLE VIII   CASH MANAGEMENT AND DIVIDEND POLICIES** ....... 22

**ARTICLE IX   BUSINESS OPERATIONS** ........ 22

| | | |
|---|---|---|
| 9.1 | Business Dealings with the Company | 22 |
| 9.2 | Other Activities of Members and Affiliates | 22 |

**ARTICLE X   RESTRICTIONS ON TRANSFER** ........ 22

| | | |
|---|---|---|
| 10.1 | Restrictions on Transfers Generally | 22 |
| 10.2 | Sale to Third Party and Right of First Offer | 23 |
| 10.3 | Transfer to Affiliates | 24 |
| 10.4 | Admission of a Transferee as a Member | 24 |
| 10.5 | Mortgage, Pledge | 25 |
| 10.6 | Non-Recognition of Certain Transfers | 25 |

**ARTICLE XI   TAG-ALONG RIGHT** ........ 25

| | | |
|---|---|---|
| 11.1 | Transfers by Members | 25 |
| 11.2 | Notification of Proposed Transfers | 26 |
| 11.3 | Non-cash Consideration | 26 |

**ARTICLE XII   COVENANTS** ........ 26

| | | |
|---|---|---|
| 12.1 | Implementation of Agreement | 26 |
| 12.2 | Non-Competition | 27 |
| 12.3 | Members' Trademarks and Tradenames | 27 |
| 12.4 | Company Trademarks and Tradenames | 28 |
| 12.5 | Ethics | 28 |
| 12.6 | Confidentiality | 28 |
| 12.7 | Employment of Company Employees | 29 |

**ARTICLE XIII   DEFAULTS** ........ 29

| | | |
|---|---|---|
| 13.1 | Default | 29 |
| 13.2 | Effect of Default | 30 |
| 13.3 | Other Remedies | 30 |
| 13.4 | Call Procedure | 30 |
| 13.5 | Put Option | 31 |
| 13.6 | Transition | 32 |

**ARTICLE XIV   TERMINATION** ........ 32

ARTICLE XV    DISSOLUTION..............................................................32
    15.1    No Dissolution..................................................................32
    15.2    Procedure for Dissolution................................................32
    15.3    Winding Up......................................................................33
    15.4    Survival of Obligations....................................................33

ARTICLE XVI   REPRESENTATIONS AND WARRANTIES ...................33
    16.1    Representations of the Parties.........................................33
    16.2    Representations of Park 610............................................34

ARTICLE XVII  INDEMNIFICATION .................................................34
    17.1    Indemnification by Members for Unauthorized Acts, Etc............34
    17.2    Indemnification by Company of Individuals .....................35
    17.3    Indemnification by Member for Third Party Claims ..........35
    17.4    Insurance .........................................................................35
    17.5    Indemnification of Member for Proportionate Liability......35
    17.6    Indemnification Procedures.............................................36
    17.7    Remedies Cumulative......................................................38
    17.8    Survival of Indemnification.............................................38

ARTICLE XVIII CHANGES REQUIRED BY LAW ...............................39

ARTICLE XIX  ALTERNATIVE DISPUTE RESOLUTION ....................39
    19.1    Mediation........................................................................39
    19.2    Litigation........................................................................39

ARTICLE XX    MISCELLANEOUS ..................................................40
    20.1    Subsidiary Companies.....................................................40
    20.2    Advice of Legal Counsel..................................................40
    20.3    Language..........................................................................40
    20.4    Limitations on Damages...................................................40
    20.5    Amendment......................................................................40
    20.6    Waiver.............................................................................40
    20.7    Notices............................................................................40
    20.8    Counterparts....................................................................41
    20.9    Further Assurances..........................................................41
    20.10   Headings..........................................................................42
    20.11   Governing Law.................................................................42
    20.12   No Third Party Beneficiaries ...........................................42
    20.13   Entire Agreement.............................................................42
    20.14   Succession and Assignment.............................................42
    20.15   Severability.....................................................................42

The Appendices to this Agreement are:

A.    Certificate of Formation
B.    Management Services Agreement
C.    License Agreement
D.    Initial Annual Plan and Initial Finance Plan
E.    [Intentionally Omitted]
F.    Golf Channel Agreement
G.    [Intentionally Omitted]
H.    Initial Directors, Officers and Member Representatives
I.    Production Services Agreement
J.    Ownership Percentages



iv

## LIMITED LIABILITY COMPANY AGREEMENT
## OF LATIN AMERICAN SPORTS, LLC

This LIMITED LIABILITY COMPANY AGREEMENT is made and entered into as of August 22, 2006, by and among LATIN AMERICAN SPORTS, LLC, a limited liability company organized under the laws of the State of Delaware, U.S.A. (the "Company"), DIRECTV Latin America, LLC, a limited liability company organized under the laws of the State of Delaware, U.S.A. ("DTVLA") and Park 610, LLC, a limited liability company organized under the laws of the State of Delaware, U.S.A. ("Park 610") and together with DTVLA, the "Members" and each, a "Member").

WHEREAS, the Members have organized the Company for the purpose of creating, producing and distributing in Latin America, a television channel comprised of golf programming and engaging in any and all lawful business activities related to or incidental to the foregoing; and

WHEREAS, the Company and the Members desire to regulate certain aspects of the relationships among each other and with respect to their ownership, management and control of the Company.

NOW, THEREFORE, in consideration of the mutual covenants, representations and warranties, and subject to the terms and conditions contained herein, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following capitalized terms, as used herein, shall have the meaning set forth below:

"Act" means the Delaware Limited Liability Company Act, as previously or hereafter amended.

"Affiliate" means, with respect to any Person, any other Person that, directly, or indirectly, controls, or is controlled by or is under common control with, such Person. For purposes of this definition, "control" (including the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of such Person, whether through the ownership of voting securities or by contract or agency or such similar arrangement. As applied to an individual, the term "Affiliate" shall include members of such individual's immediate family (spouse and children).

"Agreement" means this Limited Liability Company Agreement and the Appendices attached hereto, each of which is hereby made an integral part of this Agreement and any amendments or additions hereto.



"Annual Plan" is the initial or any subsequent annual business plan and budget approved by the Board of Directors in accordance with, and in the form specified in, Section 6.2, the initial form of which is attached as Appendix D.

"Park 610" is defined in the first paragraph of this Agreement.

"Board of Directors" and "Board" means the board of directors of the Company.

"Business" is defined in Section 2.1.

"Buying Member" is defined in Section 13.4.

"Call Option" is defined in Section 13.2.

"Call Membership Interests" is defined in Section 13.4.

"Capital Call" is defined in Section 7.8.

"Capital Contribution" means each contribution made by a Member to the Company as provided in Article VII.

"Certificate of Formation" means the certificate of formation of the Company, in the form of Appendix A.

"Chairman" means the Chairman of the Board of Directors of the Company.

"Change of Control" means the occurrence after the Effective Date of any of the following events:

(a)    any Person (other than the Person who controls a Member on the date hereof) becomes the beneficial owner, directly or indirectly, of more than 50% of the then outstanding voting shares or other equity rights of a Member; or

(b)    a Member consolidates with, or merges with or into, another Person or sells, assigns, conveys, transfers, leases or otherwise disposes of all or substantially all of its assets to any Person, or any Person consolidates with or merges with or into a Member where in such event, as a result of such transaction, the Persons who were stockholders of the parent (as defined under "Related Party") immediately prior to such transaction thereafter own securities representing 50% or less of the total combined voting power of the surviving or resulting Person or the Person to whom such assets are sold; or

(c)    any stockholder, member or prospective stockholder or member of a Member is granted (i) supermajority voting rights as a stockholder, member or director, (ii) the right to appoint a majority of the members of the Board of Directors or (iii) otherwise obtains effective control of a Member, other than through this Agreement; or



2

(d)      the Board of Directors of a Member approves, or a Member enters into, an agreement providing for a transaction, event or development that constitutes (or would constitute if consummated) a Change of Control of a parent pursuant to (a), (b) and (c) above;

and,

(e)      with respect to Park 610, a Change of Control shall also be deemed to have occurred if, at any time after the date hereof, Carlos Avila, an Argentine citizen, ceases to own, directly or indirectly, the majority of the total voting power of the then outstanding voting equity of Park 610, unless Carlos Avila, directly or indirectly, maintains the power to direct or cause the direction of management and policies of Park 610.

"Company" is defined in the first paragraph of this Agreement.

"Competitor" means a Person engaged in Direct Competition.

"Concurrent Documents" are the documents listed in Section 2.2, as they may be hereafter amended from time to time.

"Confidential Information" is defined in Section 12.6.

"Default Rate" means a rate of interest equal to the rate per annum announced from time to time by Citibank, N.A. at its principal office as its prime rate (which rate shall change when and as such announced prime rate changes) plus 300 basis points but in no event more than the maximum rate of interest permitted to be collected from time to time under applicable usury laws.

"Defaulting Member" is defined in Section 13.1.

"Director" means a member of the Board of Directors of the Company.

"Director Supermajority" is defined in Section 5.4.

"Dispute" is defined in Section 5.7.

"Dispute Notice" is defined in Section 5.7.

"DTVLA" is defined in the first paragraph of this Agreement.

"DTVLA Loan" is defined in Section 7.7.

"Effective Date" is August 22, 2006.

"Event of Default" is defined in Section 13.1.

"Exclusive Period Termination Date" means the earlier of (a) August 1, 2009, except in the event that DTVLA exercises the option to extend such exclusivity pursuant to Section 5 of the License Agreement, in which case such date shall be August 1, 2010, or (b) the date on which DTVLA makes an election in accordance with Section 7.3(d).



3

"Fair Market Value", as to any property, means the price at which a willing seller would sell and a willing buyer would buy such property having full knowledge of the facts, and assuming each party acts on an arm's-length basis with the expectation of concluding the purchase or sale within a reasonable time in a transaction intended by the seller to maximize sale proceeds, both buyer and seller having reasonable knowledge of the facts and circumstances relevant to the Company; provided, however, that, in the case of Membership Interests, such price shall not include any premium for the control of the entity represented by such Membership Interests or any discount for the lack thereof. In any case where there is no agreement as to the Fair Market Value of any property among the Members, such dispute shall be determined by an appraiser selected jointly by the Members from among the reputable and globally recognized investment banks or other appropriate experts in the valuation of property such as the property in question or, if the Members are not able to agree on the selection of an appraiser within 30 days, each Member shall select an appraiser within 15 days after the expiration of such 30-day period, from among such investment banks or other experts (excluding the Company's certified public accountants at the time, and such accountants' Affiliates), who shall, in each case, independently determine the Fair Market Value of the property in question within 30 days from its or their respective appointment. The Fair Market Value determination of the single appraiser selected by agreement of the applicable Members shall be final and binding on the applicable Members. In the event of the selection of one appraiser by each of the relevant Members, (i) if the Fair Market Value determination of such appraiser with the higher determination is less than 120% of the Fair Market Value determination of such appraiser with the lower determination, Fair Market Value shall equal the average of the determinations by such appraisers, and such Fair Market Value determination shall be final and binding on the applicable Members, and (ii) otherwise, such appraisers shall, within 15 days after the last of their respective determinations is announced to the applicable Members, appoint another deadlock appraiser. The deadlock appraiser shall, within 15 days of its appointment, decide which one of the respective determinations of the previous appraisers more accurately reflects the Fair Market Value of the property in question and that determination shall constitute the "Fair Market Value". Such Fair Market Value determination of the deadlock appraiser shall be final and binding on the Members. If the appraisers are unable for whatever reason to appoint a deadlock appraiser within such 15-day period, any party may elect to have the matter resolved in accordance with the provisions of Article XIX. The Members shall share equally the expense of any appraiser jointly selected by them, and each shall bear the expense of the appraiser it individually selects, if any. If pursuant to this definition, there is a need to appoint a deadlock appraiser, the member whose appraiser's Fair Market Value determination was not selected as the Fair Market Value shall bear all costs and expenses of the deadlock appraiser.

"Finance Plan" means the initial or any subsequent finance plan approved by the Board of Directors in accordance with, and in the form specified in, Section 6.2, the initial form of which is attached as Appendix D.

"GAAP" means the then current generally accepted accounting principles as used in the U.S.A.

"General Manager" is defined in Section 6.1.

4

"Golf Channel Agreement" means the License Agreement dated as of September 1, 2006 between TGC Inc. and the Company, a copy of which is attached hereto as Appendix F, as it may be hereafter amended from time to time in accordance with the terms hereof.

"Governmental Authority" means any government or political subdivision or department thereof, any governmental or regulatory body, commission, board, bureau, agency or instrumentality or any court, whether domestic or foreign, federal, state or local.

"Income" has the meaning set forth in Section 7.14.

"Indebtedness" in defined in Section 5.4.

"Indemnifying Party" is defined in Section 17.6(a).

"Indemnitee" is defined in Section 17.6(a).

"Initial Annual Plan" means the initial business plan and budget of the Company attached as Appendix D.

"Initial Capital Contribution" is defined in Section 7.1.

"Initial Directors" means the individuals identified as initial director designees in Appendix H.

"Intention Notice" is defined in Section 10.2(a).

"Interest Notice" is defined in Section 10.2(b)(i).

"Interested Member" is defined in Section 10.2(b)(i).

"Latin America" means México, the Caribbean and Central and South America, including Brazil.

"License Agreement" means the signed and executed License Agreement between the Company and DTVLA, a copy of which is attached hereto as Appendix C and which is dated as of August 1, 2006, as it may be hereafter amended from time to time, pursuant to which the Company will provide DTVLA with all necessary rights to distribute the Channel in Latin America, excluding Mexico and Puerto Rico.

"Lien" means any lien, mortgage, encumbrance, pledge, charge, lease restriction, easement, servitude, right of others or security interest of any kind, including any thereof arising under conditional sales or other title retention agreements.

"Losses" has the meaning set forth in Section 7.14.

"Management Services Agreement" means the Management Services Agreement between the Company and Park 610 in the form of Appendix B and dated as of August 1, 2006



as it may be hereafter amended from time to time, pursuant to which Park 610 will perform day-to-day management services for the Company.

"Mandatory Defaulting Member" is defined in Section 7.6.

"Mediation Notice" is defined in Section 19.1.

"Member" and "Members" are defined in the first paragraph of this Agreement and includes Member's permitted assigns.

"Member Representative" is defined in Section 5.7.

"Membership Interest(s)" means the limited liability company interests issued by the Company to the Members in consideration of Capital Contributions, and having the powers, rights, qualifications, limitations and restrictions set forth in this Agreement and under applicable law.

"Mexican Programming Fees" means the Dollar amount of any fees received by the Company in respect of the distribution of the Golf Channel Latin America in the United Mexican States, minus any taxes payable by the Company associated with such fees or costs associated with the distribution in Mexico which are not reflected in the Annual Plan.

"Non-Defaulting Member" is defined in Section 7.6(b).

"Offer Notice" is defined in Section 10.2(b).

"Offer Price" is defined in Section 10.2(b)(ii).

"Offering Member" is defined in Section 10.2(b).

"Option Exercise Period" is defined in Section 10.2(a)(i).

"Ownership Percentage" means the percentage of the total Membership Interests of the Company owned by a Member, as set forth on Appendix J, as the same may be adjusted from time to time in accordance with the terms hereof.

"Party" means any of the Company or the Members.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organizations or Governmental Authority.

"Production Services Agreement" means the Production Services Agreement between Latin American Sports, LLC and New Hollywood Producciones S.A., a copy of which is attached hereto as Appendix I and which is dated as of August 1, 2006, as it may be hereafter amended from time to time, pursuant to which TGC, Inc. will provide Latin American Sports, LLC the exclusive right to distribute certain golf-related programming.



"Proposed Purchaser" is defined in Section 11.1.

"Purchase Option" is defined in Section 10.2(a).

"Put Option" is defined in Section 7.3(e).

"Put Membership Interests" is defined in Section 13.5.

"Related Party" of any Person (other than an individual) shall mean (i) any person who is an individual, corporation, partnership or other entity owning all of the outstanding capital stock of such Person ("parent"), (ii) a wholly-owned subsidiary of the Person or any parent of such Person or (iii) a Person all of the ownership of which is held by one or more Related Parties. With respect to any individual, "Related Party" means members of such individual's immediate family and any trust all the beneficiaries of which are such individual or members of his immediate family.

"Remaining Members" are defined in Section 10.2(a).

"Required DTVLA Debt Limit" is defined in Section 7.7.

"Seller Group" is defined in Section 11.1.

"Selling Member" is defined in Section 10.2(a).

"Successor Member" is defined in Section 10.4.

"Tag-Along Members" is defined in Section 11.1.

"Tag-Along Notice" is defined in Section 11.2.

"Third Party Claim" is defined in Section 17.6(a).

"Transfer" means (i) any sale, assignment or transfer of securities, (ii) a sale, assignment or transfer of any economic interest and/or a voting interest ("Interest") in an entity that, directly or indirectly, holds any securities, (iii) a pledge or hypothecation of securities or Interest or any interest therein, (iv) sale, assignment or a transfer of securities convertible into or exchangeable for or other options or rights to acquire securities or Interest or (v) any other direct or indirect, voluntary or involuntary, sale, assignment or transfer of securities or Interest or any interest therein, whether pursuant to a Change of Control or otherwise.

"U.S.A." means the United States of America.

"US$" or "Dollars" means lawful currency of the United States of America.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phase "without limitation." The word "will"



7

shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all referenced herein to Articles, Sections, and Appendices shall be construed to refer to Articles and Sections of, and Appendices to, this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## ARTICLE II
## PURPOSE

2.1    Purpose.  The purpose of the Company is to create, produce, promote and operate a Spanish and Portuguese language television Channel comprised of golf programming for distribution in Latin America and to engage in such other lawful activities as the Members may determine in accordance with the terms hereof (the "Business").

2.2    Concurrent Documents.  Prior to or contemporaneous herewith, the following documents (the "Concurrent Documents") have been executed and delivered by the Members and/or the Company and/or the relevant third party:

(i)    The Certificate of Formation in the form of Appendix A (delivered to the Members);

(ii)    The Management Services Agreement set forth on Appendix B (executed by the Company and Park 610);

(iii)    The License Agreement set forth on Appendix C (executed by the Company and DTVLA);

(iv)    The Production Services Agreement set forth on Appendix I (executed by the Company and New Hollywood Producciones S.A.); and

(v)    The Golf Channel Agreement between TGC, Inc. and the Company set forth on Appendix F.

2.3    Initial Plans.  The Members hereby adopt (i) the Initial Annual Plan in the form of Appendix D and (ii) the Finance Plan in the form of Appendix D.

## ARTICLE III
## FORMATION, OWNERSHIP AND POWERS

3.1    Formation.  The Company was organized as a limited liability company under the laws of the State of Delaware, effective August 22, 2006.  The Members caused to be



8

executed and filed a certificate of formation (a copy of which is attached hereto as Appendix A) on such date in the Office of the Secretary of State of Delaware. From time to time, the Company shall execute and cause to be filed, and the members agree to execute, such certificates, filings and documents in such jurisdictions as may be necessary or appropriate in connection with the conduct of the Business.

3.2    Name.  The business of the Company shall be conducted under the name "Golf Channel Latin America" or such other or additional name or names and variation thereof as all the Members may from time to time determine.

3.3    Initial Capital Contribution.  Appendix J sets forth the Ownership Percentage in the Company of each Member, which shall be adjusted from time to time to the extent necessary to reflect accurately any exchanges, redemptions, capital contributions, admission of additional members or similar events having an effect on the Members' Ownership Percentage.

3.4    Office and Agent.  The Company shall continuously maintain a registered office and a designated and duly qualified agent for service of process on the Company in the State of Delaware.

3.5    Property.  Except as otherwise provided in this Agreement, the Concurrent Documents or any other contract to which the Company is or becomes a party and as to which the Members have consented or the procedures of Section 5.4 have been followed, (i) all assets and property, whether real, personal or mixed, tangible or intangible, including contractual rights, owned or possessed by the Company shall be owned or possessed in the name of and by the Company and (ii) no Member individually shall have any separate ownership or right of possession in such assets, property or rights.

3.6    Powers.  Subject to and modified by the terms and conditions of this Agreement and the Certificate of Formation, the Company may exercise all of the powers and privileges granted by this Agreement and by law (including, without limitation, the Act) to the Company.

## ARTICLE IV
## RESTRICTIONS ON MEMBERS

4.1    Restrictions on Members.  No Member may, without the written consent of the other Members:

(i)    confess a judgment against the Company;

(ii)    make any agreement with any third party on behalf of, or otherwise purport to bind, the other Members or the Company or do any act which binds the other Members or the Company, except as otherwise permitted pursuant to this Agreement;



(iii) do any act that would make it impossible for the Company to carry on the Business;

(iv) assign the property of the Company or any rights to such property (a) in trust for creditors of such Member, (b) pursuant to the assignee's promise to pay the debts of the Member, or (c) for any other reason whatsoever, or otherwise cause any property of the Company to be encumbered by any Lien;

(v) release any of its Affiliates, from any obligation under, or related to, this Agreement or the Concurrent Documents; or

(vi) waive the Company's rights to sue or enforce such rights.

## ARTICLE V
## BOARD OF DIRECTORS

5.1 _Directors._ Except as explicitly set forth in Article VI, the management of the business and affairs of the Company is reserved to, and vested in, the Board of Directors. The Board of Directors shall consist of five (5) members; two (2) members shall be designated by DTVLA and three (3) members shall be designated by Park 610. The Initial Director designees and the Chairman are identified in Appendix H.

The Company shall use its best efforts to assure the election of all such designees. Each Member hereby consents to and approves the election of the Initial Directors as directors effective as of the date set forth in Appendix H to serve in such capacity until their successors are duly elected and qualified or until their earlier resignation or removal.

The Board of Directors shall elect from among the Directors a Chairman who shall preside at all meetings of the Board and shall remain as Chairman until he or she is removed due to death or disability, retires or resigns or is removed by a vote of the Board in accordance with the terms hereof. Each Member shall have the right to remove any or all of its designated Directors, including the Chairman, at any time; provided that if such Director is the Chairman, the Board shall elect a new Chairman in accordance with the requirements of Section 5.4 hereof. Any such removal shall be effective upon notice to the Company. Such notice shall set forth the name, address, and telephone and facsimile numbers of the individual(s) to replace the removed person(s). Any Directors, including the Chairman, may resign from the Board of Directors. Such resignation shall be effective upon written notice to the Company. Upon any such resignation or death of a Director, the Member that originally designated such Director shall designate a successor therefor; provided that if such Director is the Chairman, the Board shall elect a new Chairman in accordance with the requirements of Section 5.4 hereof. The removal of or resignation by a Director shall not invalidate any act of such Director taken prior to the receipt of the applicable notice by the Company.

5.2 _Meetings._ The Board of Directors shall hold regular meetings as the Board may determine and such other meetings as the Board of Directors deems appropriate, and shall establish meeting times, dates, places and requisite notice requirements and adopt rules or procedures consistent with the terms of this Agreement, which shall include rules and procedures



10

for the dissemination of written information to the Directors concerning the items to be acted upon at any regular or special meeting of the Board. Any meeting notice shall include a proposed agenda for the meeting. Any Director may call a special meeting of the Board for any purpose by giving the other Directors at least ten (10) calendar days' notice thereof, except in the case of an emergency, in which case, such notice as is practicable shall be sufficient. Regular meetings of the Board of Directors shall be held at the Company's main office unless otherwise determined by the Board. The Chairman shall preside at all meetings of the Board of Directors.

5.3    Voting Rights; Quorum. Each Director shall be entitled to cast one vote in voting on all matters submitted to the Board of Directors. Three (3) Directors, including at least one (1) Director designated by DTVLA, shall constitute a quorum, provided, however, that if at least one Director named by DTVLA does not attend a scheduled meeting of the Board of Directors, the Chairman shall immediately call another meeting in accordance with the terms hereof to be held within the next seven (7) days. The agenda for the subsequent meeting shall be identical in all respects to the proposed agenda previously sent to the Directors. The quorum for such meeting shall be three (3) Directors, regardless of whether any of such Directors was designated by DTVLA. Under no circumstances, however, shall this reduction in the quorum requirements have any impact on the Director Supermajority requirements under Section 5.4. Provided a quorum is present and except as provided in Section 5.4 and elsewhere in this Agreement, the affirmative vote, either in person or by proxy, of three (3) of the Directors shall be the act of the Directors.

5.4    Matters Requiring Supermajority Approval. Notwithstanding anything herein to the contrary, the affirmative vote, either in person or by proxy, of at least four (4) of the Directors, including both Directors designated by DTVLA, and two Directors designated by Park 610 (a "Director Supermajority") shall be required to take action on any of the following matters:

(i)    any material change to the overall basic business policy and direction of the Company set forth in the Initial Annual Plan, a copy of which is set forth on Appendix D;

(ii)    approval, amendment or revision of the Annual Plan and the Finance Plan;

(iii)    distribution of cash or other property of the Company to the Members;

(iv)    approval of any contract or commitment not included in the approved Annual Plan which (i) obligates the Company to spend or commit to spend in excess of US$50,000 (or its equivalent in other currencies), individually or, together with all other contracts or commitments entered into and not included in the Annual Plan, US$150,000 (or its equivalent in other currencies) in the aggregate, or (ii) has a term longer than three years;

(v)    entering into, amending or terminating a contract or agreement or otherwise entering into, amending or terminating any transaction or dealings with a Member, a Director or an Affiliate of a Member or Director, including, without limitation



11

the Management Services Agreement (in a form other than that attached hereto as Appendix B), the License Agreement attached hereto as Appendix C and the Production Services Agreement attached hereto as Appendix I, except as otherwise provided herein;

(vi)    amending, assigning, extending or terminating the Golf Channel Agreement or any of the rights granted thereunder, or entering into any discussions regarding such actions with TGC Inc. or any other holder of the rights granted under the Golf Channel Agreement, except as otherwise provided herein;

(vii)    unless previously approved in an Annual Plan or a Finance Plan, acceptance of the terms of any bonds, loans, guarantees, or indebtedness of the Company, individually or in the aggregate, in excess of US$30,000 or the issuance by the Company of a guarantee of the obligations of any other Person (collectively, "Indebtedness");

(viii)    adoption and amendment of employee benefit and compensation plans for employees of the Company;

(ix)    material change of the Business of the Company;

(x)    determination of the policy for the distribution and use of the excess cash flow and the covering of the losses of the Company, other than as provided in this Agreement and the applicable Annual Plan;

(xi)    establishment and maintenance of a policy for a risk management program (including insurance) for (a) all assets and properties of the Company, (b) all potential legal liabilities arising out of Company activities, (c) all statutory or other legal responsibilities regarding employees and (d) other possible exposures of the Company;

(xii)    decisions with respect to the hiring and firing of key personnel and setting or changing the annual compensation of key personnel, including, in each case and without limitation, the General Manager;

(xiii)    decisions with respect to any filings with or public comments to any Governmental Authority;

(xiv)    approval of any significant action or transaction not in the ordinary course of the Business of the Company and not previously approved in an Annual Plan or a Finance Plan;

(xv)    entering into any agreement or commitment the effect of which is to make the Company liable for special, punitive or consequential damages;

(xvi)    creation of any Liens upon any assets or properties of the Company, other than (a) any imperfections of title or other liens that, individually or in the aggregate, are not substantial in character or amount and do not materially impair the value of or materially interfere with the use of any of the assets or properties subject thereto or (b) liens relating to obligations approved under this Section 5.4;



12

(xvii)    adoption of the financial statements of the Company for each Fiscal Year;

(xviii)    alteration of any provision of the Certificate of Formation or the passing of any resolution inconsistent herewith or the amendment of this Agreement;

(xix)    any call for additional capital and the form thereof (whether debt, equity or capital contribution) not previously included in and approved with respect to an Annual Plan or Finance Plan and not otherwise contemplated by Section 7.3(f) or Section 7.7(a);

(xx)    subscription, purchase or acquisition of stock or any other equity interest in, or all or substantially all of the assets of, another corporation, partnership, trust, limited liability company, or other entity (other than a temporary investment of cash in marketable securities);

(xxi)    voluntary winding up, dissolution or liquidation of the Company, the filing of a petition in bankruptcy or for reorganization under any bankruptcy law, consent to having an order for relief entered against it under any bankruptcy or similar law, or otherwise having the Company adjudicated bankrupt or insolvent, the making of an assignment for the benefit of creditors, or the appointment of a receiver, trustee or custodian for a substantial portion of its business or properties by virtue of an allegation of insolvency or any similar action under any law;

(xxii)    creation, issuance, grant, or sale of any Membership Interest or rights to subscribe for, convert into or otherwise acquire a Membership Interest except authorized Transfers as permitted under this Agreement;

(xxiii)    reorganization, consolidation, combination or merger, or sale, transfer or other disposition of all or substantially all of the assets of the Company;

(xxiv)    consolidation, sub-division, increase, reduction, diminution, redemption or cancellation of any Membership Interest;

(xxv)    incorporation of any subsidiary;

(xxvi)    decisions with respect to and supervision of any investments made by, or on behalf of the Company, except as provided in the Annual and Financial Plans;

(xxvii)    decisions with respect to any agreement in principle to initiate (including the filing of a counterclaim) or settle any legal or regulatory proceedings or arbitration, other than routine debt collection, or to initiate arbitration, where the amount in controversy or the value to the Company (as determined by the Chairman) exceeds US$30,000 (or its equivalent in other currencies);

(xxviii)    appointment or removal of the accountants or auditors or any counsel to the Company;



13

(xxix)    naming the Chairman of the Board of Directors;

(xxx)    entering into any agreement to license or distribute (a) the content produced by the Company or (b) rights held by the Company to any third party; and

(xxxi)    entering into any agreement to effect any of the above.

5.5    Modification to Supermajority Approval After Exclusive Period Termination Date. After the Exclusive Period Termination Date, the matters listed in subsections (iv), (viii), (xi), (xii), (xxviii), (xxix) and (xxx) of Section 5.4 shall not be subject to Supermajority Approval and, therefore, shall be adopted by the affirmative vote of the simple majority of the Directors, subject always to the remaining terms of this Agreement.

5.6    Lack of Director Supermajority. If a resolution concerning any of the matters in Section 5.4 is proposed and not agreed to by a Director Supermajority, the officers of the Company may, and shall have the responsibility to, continue to manage the day-to-day affairs of the Company in the Company's sole best interest within the bounds of the specifically approved matters of the Company's then current Annual Plan.

5.7    Dispute Resolution; Escalation.

(a)    In the event a resolution concerning matters in Section 5.4 has been proposed at a meeting of the Board of Directors and has not been passed by a Director Supermajority, unless such resolution is either withdrawn or otherwise dealt with to the satisfaction of a Director Supermajority, said matter (a "Dispute") shall, upon written request of any Director given to the Board (the "Dispute Notice"), immediately be referred to the principal representative of each Member (as identified on Appendix H hereto (each a "Member Representative")). If the Member Representatives have not resolved the Dispute within fifteen (15) days of the delivery of the Dispute Notice to the Board, the Member Representatives shall refer the Dispute to the principal officer of Park 610 and a Senior Vice President of DTVLA, respectively (or successors to such persons having similar functions), who shall attempt to resolve the dispute.

(b)    In the event that any Dispute referred to above is not resolved at the end of the 30-day period following delivery to the Board of a Dispute Notice, the Parties shall continue to cooperate in good faith to attempt to resolve the Dispute.

5.8    Remuneration and Reimbursement. No Director, unless working for the Company on a full-time basis, shall be remunerated for services to the Company. The Company shall reimburse reasonable travel and other costs and expenses incurred by Directors, or committee members in connection with attending meetings of the Board of Directors and other services performed for or on behalf of the Company upon presentation of receipts for such reimbursable costs and expenses.



14

## ARTICLE VI
## MANAGEMENT MATTERS

6.1  Officers.  The day to day operations of the Business conducted by the Company in Latin America, including, but not limited to, affiliate and advertising sales and promotion policies and actions and the hiring and relationship with the production service provider, shall be conducted by a general manager to be appointed by Park 610 in consultation with DTVLA and approved by the Board of Directors in accordance with Section 5.4 (the "General Manager"). The General Manager, will have the authority to appoint such other officers as may be necessary or desirable to carry out the day-to-day management of the Business of the Company in Latin America.   A list of the initial officers of the Company is included on Appendix H attached hereto.

6.2     Annual Plan and Finance Plan.  The Parties have approved a five (5) year business plan, which is attached hereto as Appendix D (the "Initial Annual and Finance Plan"). The General Manager shall prepare or cause to be prepared the Annual Plan and the Finance Plan at least ninety (90) calendar days in advance of the commencement of each Fiscal Year.  The Annual Plan and the Finance Plan shall be subject to the approval of the Board of Directors in accordance with Section 5.4 hereof.

Each subsequent Annual Plan shall include a three (3) year business and marketing plan for the Company which shall set forth pro forma balance sheets, income statements, cash flow projections and capital budgets on a quarterly basis for the first two (2) years and on an annual basis for the final year.  The Annual Plan shall also include production and personnel plans and such other matters as the Board of Directors deems appropriate.  The Finance Plan shall include a three (3) year budget of capital expenditures, expenses, a cash flow forecast, amounts to be financed through Member capital contributions, and third party borrowings on a quarterly basis for the first two (2) years and on an annual basis for the final year, and such other matters as the Board of Directors deems appropriate.

The Members shall cause their respective employees and Directors to cooperate in good faith to finalize by the thirtieth day before the end of the then current fiscal year any Annual Plan or Finance Plan to be submitted for Board of Directors approval.  The production planning schedules shall be approved by the Board of Directors prior to the commencement of each annual period.

6.3     Fiscal Year and Quarter.  The fiscal year of the Company shall begin January 1st and end December 31st.  Fiscal quarters shall be calendar quarters.

6.4     Personnel Policies.

(a)     The General Manager shall determine the employment needs of the Company in accordance with the Annual Plan.  The General Manager shall determine whether to fulfill such needs by hiring independent employees of the Company or by requesting the secondment of employees from the Members.



(b)  Any seconded employees when performing such services for the Company, shall report to and take direction from the General Manager or his designees. Unless the parties otherwise agree, the seconded employees shall, however, at all times remain employees of DTVLA or Park 610 or their respective Affiliates, as the case may be, for the purposes (without limitation) of employment, termination of employment, compensation for loss of office, statutory employment rights, benefits, and other personnel policies.

(c)  Each Member shall be compensated on a monthly basis (or on such other periodic basis as such Member and the Company may agree) by the Company for the costs, including salary, benefits and other compensation (including travel and lodging) associated with any seconded employees and shall provide the Company with an invoice itemizing such costs.

(d)  The Company shall seek to deal directly with its employees, without any external intermediary parties, and shall cause the adoption of such personnel policies and practices as appropriate in order to reasonably achieve such results. The Company shall establish personnel practices that fairly reward employees for services rendered in a manner consistent with common business practices in their location of employment.

(e)  Employees of the Company shall execute agreements regarding the confidentiality of information learned by them in the course of their employment, and other matters deemed appropriate by the Board of Directors. No Member shall recruit employees of the Company in a manner intended to circumvent restrictions on disclosure of proprietary or confidential information used in the Company.

### ARTICLE VII
### CAPITAL AND FINANCE

7.1  Initial Capital Contributions. The dollar amounts or other property or obligations shown in the Initial Annual Plan as "Paid In Capital" shall constitute each Member's respective initial capital contribution (the "Initial Capital Contribution"). The values of such Initial Capital Contribution set forth below and in the Initial Annual Plan will be deemed to be the amount of such Member's Initial Capital Contribution.

7.2  Percentage of Interest. The Members in the aggregate shall own all of the Membership Interests in the Company. The initial Ownership Percentage of each Member in the Company shall be as follows: Park 610, 55%; and DTVLA, 45%. Such Ownership Percentages may change from time to time in accordance with the terms hereof in which case Appendix J shall be amended to reflect such change.

7.3  DTVLA Capital Contributions.

(a)  Subject to Section 7.3(b) and 7.3(d), in exchange for its 45% ownership interest in the Company, DTVLA shall contribute funds to the Company as needed in an amount sufficient to cover the Company's acquisition of programming rights and its operating and production costs (including pre-launch expenses approved by DTVLA) set forth in the Initial Annual Plan, up to the following maximum amounts, except as contemplated in Section 7.3(f):



| Period | Maximum Amount |
|---|---|
| July 1, 2006 to December 31, 2006 | US$1,500,000 |
| January 1, 2007 to July 31, 2007 | US$1,500,000 |
| August 1, 2007 to January 31, 2008 | US$1,000,000 |
| February 1, 2008 to July 31, 2008 | US$1,000,000 |
| August 1, 2008 to January 31, 2009 | US$1,000,000 |
| February 1, 2009 to July 31, 2009 | US$1,000,000 |

     (b)    DTVLA's Capital Contributions shall be made in U.S. dollars, in cash or immediately available funds, up to the maximum amounts described above and as established in the Initial Annual Plan pursuant to mandatory capital calls of the General Manager on no less than thirty (30) days' prior notice to DTVLA. The notice shall specify the amount of funds to be provided, the date on which funds are to be provided and the account of the Company to which such funds are to be transmitted.

     (c)    Any portion of the above maximum capital contributions that is not funded by DTVLA during the corresponding period shall be carried over to the subsequent period and shall increase DTVLA's obligations for such subsequent period by the amount carried forward. Subject to the provisions of Section 7.3(f) below, in no event shall DTVLA's aggregate maximum amount of capital contributions exceed US$7,000,000 unless otherwise agreed by DTVLA.

     (d)    DTVLA shall have the option to reduce such funding commitment by up to a year and below the aggregate limit set forth above in connection with a reduction of the DTVLA exclusivity period for the distribution of the Golf Channel in Latin America, as provided in the License Agreement. The option shall entitle DTVLA to limit its funding responsibilities to the amounts required during the twelve months immediately following the exercise of such option. At any time on or after August 1, 2007, DTVLA may, by written notice to the Company and each other Member, elect that its capital contributions under Section 7.3(a) shall cease on the first anniversary of the Exclusive Period Termination Date. For the avoidance of doubt, none of the foregoing shall cause DTVLA's 45% Ownership Percentage to be reduced or its rights hereunder revised.

     (e)    If DTVLA makes an election under Section 7.3(d), DTVLA shall also have the right to require Park 610 to purchase its Membership Interests (the "Put Option") as provided in Section 13.5 and Park 610 shall have the right to require DTVLA to sell its Membership Interests (the "Call Option") as provided in Section 13.4.

     (f)    If the Exclusive Period (as defined in the License Agreement) is extended for all of Latin America for a fourth year (from August 1, 2009 to July 31, 2010) pursuant to Section 5 of the License Agreement, DTVLA's capital contribution obligations shall



be increased by a maximum aggregate amount of US$2,000,000 (but only to the extent such funds are required by the Company), which shall be paid in accordance with the terms hereof during such additional year of the Exclusive Period.

(g)    For any period for which DTVLA has an obligation to contribute funds under Section 7.3(a) or 7.3(f), the obligation of DTVLA to make contributions under Section 7.3(a) or 7.3(f) shall be reduced by an amount equal to the Mexican Programming Fees received by the Company during such period or any prior period, which were not previously used to offset DTVLA's funding obligations, in each case net of any unbudgeted costs directly related to the distribution of the Golf Channel in Mexico. In addition, to the extent not already applied to reduce DTVLA's capital contributions, the Company shall refund to DTVLA an amount equal to all Mexican Programming Fees received at any time that relate to periods for which DTVLA made capital contributions under Section 7.3(a) or 7.3(f), up to a maximum of the total capital contributions made by DTVLA for such period.

7.4    Park 610 Contribution. In exchange for its Membership Interest, Park 610 has procured and negotiated the Golf Channel Agreement for execution by the Company and provided other valuable consideration, the receipt and sufficiency of which are recognized by each of the Company and DTVLA.

7.5    Impact of Capital Contributions on Members' Percentage Interest. In the event that the Members make their respective contributions pursuant to Sections 7.3 and 7.4 (including, without limitation, the contribution established in Section 7.3(f)), then no additional Membership Interests shall be issued in connection with such contributions and each Member's Ownership Percentage shall remain the same as prior to the making of such contribution.

7.6    Mandatory Defaulting Member. If any Member (the "Mandatory Defaulting Member") fails to contribute timely all or any portion of the mandatory contributions as per Sections 7.3 and 7.4., the Company may after giving such Mandatory Defaulting Member five (5) days to cure such default, elect to exercise one of the following remedies (provided, however, that a Mandatory Defaulting Member (or its designee on the Board) shall not be permitted to vote with respect to the election of any of the following remedies by the Company):

(a)    Taking such action, including court proceedings, as the Board may deem appropriate to obtain payment by the Mandatory Defaulting Member of the portion of the Mandatory Defaulting Member's Mandatory Capital Contribution that is in default, together with interest thereon at the Default Rate from the date that the capital contribution was due until the date that payment is made, all at the cost and expense of the Mandatory Defaulting Member; or

(b)    Causing the Company to reduce the Ownership Percentage of the Mandatory Defaulting Member and increase the Ownership Percentage of the other Member (the "Non-Defaulting Member"), and permitting the other Member to advance all or any portion of the capital contribution required of the Mandatory Defaulting Member. The percentage decrease in the Ownership Percentage of the Mandatory Defaulting Member under these circumstances (and the concomitant percentage increase in the Ownership Percentage of the Non-Defaulting Member) shall be determined by dividing the dollar amount that the Mandatory Defaulting Member failed to contribute by the Fair Market Value (as defined in this Agreement) of the



18

Company at the time of calculation (after giving effect to any portion of the Defaulting Member's Mandatory Capital Contribution made by the Non-Defaulting Member).

    7.7    <u>DTVLA Loan</u>.

        (a)    If, at any time prior to the Exclusive Period Termination Date, the Board of Directors determines that the capital contribution provided by DTVLA under Section 7.3(a) is insufficient to cover the Company's operating and production costs due to a shortfall in the projected revenues contained therein, upon notice from the Company of such circumstances, DTVLA shall provide debt financing to the Company (each such financing, a "<u>DTVLA Loan</u>") in an amount to be agreed by the Members up to a maximum aggregate amount (per calendar year) of US$1,000,000 (the "<u>Required DTVLA Debt Limit</u>"). Amounts loaned to the Company under a DTVLA Loan shall accrue interest at a market interest rate to be determined by the Parties and shall be repaid by the Company in equal quarterly installments over two years commencing from the first anniversary of the Exclusive Period Termination Date.

        (b)    Upon request by the Company or the Board of Directors, DTVLA shall have the option to provide a DTVLA Loan to the Company in circumstances other than those set forth in Section 7.7(a) above, including, without limitation, in an amount greater than the Required DTVLA Debt Limit or in the event of increased costs or changes in the Annual Plan that are approved in accordance with Section 5.4 above. DTVLA's exercise of such option shall be in its sole discretion.

        (c)    At any time on or before the third anniversary of the Exclusive Period Termination Date, DTVLA may, at its option, require the Company to convert any accrued and unpaid amounts due under any DTVLA Loan, in a net aggregate amount of up to US$1,000,000, into Membership Interests at the ratio of US$250,000 of debt for Membership Interests equaling one percent (1%) of the total number of Membership Interests issued and outstanding at such time. The Members agree to cause the Certificate of Formation to be amended so as to modify the authorized capital structure as may be required to effect such a conversion.

    7.8    <u>Additional Capital</u>.

        (a)    The anticipated financing needs of the Company for the next five (5) years are set forth in the Initial Finance Plan. If, at any time on or after the Exclusive Period Termination Date, the Board of Directors determines that it is not possible or economically desirable or feasible (due, for example, to high interest rates or unfavorable terms) for the Company to obtain third party financing and there is no agreement between the parties to use a DTVLA Loan pursuant to Section 7.7(b), the Board of Directors shall notify the Members of the amount of additional capital needed by the Company (subject to the approval of the Board as set forth in Section 5.4) and whether such capital will be in the form of debt, equity or capital contribution (a "<u>Capital Call</u>"). Each Capital Call also shall specify the intended use of the funds and, assuming approval by the Members, the Company shall be authorized to use such funds only for the purposes so specified and approved. Each Member shall provide additional capital to the Company in the form agreed by the Board of Directors on a pro rata basis in accordance



19

with each Member's Ownership Percentage in the amounts and at the times specified by the Board of Directors.

(b)    If a Member intends not to fund a Capital Call approved by the Board of Directors, such Member shall promptly notify the Chairman who will promptly notify the other Members. In addition, if a Member fails to fund the approved Capital Call when due, the Chairman shall promptly provide written notice of such failure to the other Members no later than the day following the date such funds were due. Any Member may fund all or any part of the unfunded commitment, pro rata in accordance with such Member's Ownership Percentage, provided such funding is made within twenty (20) days following receipt of written confirmation of the dilution value to be applied pursuant to Section 7.8(c). In the event any other Member does not fund its respective pro rata portion of the unfunded commitment, any remaining unfunded amount shall be offered to those Members who chose to fund their pro rata portion of the unfunded commitment, pro rata based upon their Ownership Percentage.

(c)    Any Member that fails to fund a Capital Call approved by the Board of Directors shall be deemed to have breached its obligations under this Agreement and, notwithstanding any preemptive rights and rights of first refusal in respect of Membership Interests of the Company, its Ownership Percentage shall be diluted and the Ownership Percentages of the Other Members will be increased pro rata. The non-participating Member and the participating Member shall use reasonable and good faith efforts to agree to a fair and equitable dilution formula within ten (10) Business Days after the date of the capital contribution. If they are unable to agree to a formula, the participating Member shall appoint a single appraiser, at the non-participating Member's cost and expense, to determine the Fair Market Value of the Company using the methodology set forth in the definition of Fair Market Value (except for the provisions dealing with the naming of appraisers). Such single appraiser's determination of Fair Market Value shall be conclusive and binding on the Parties, and the Members' Ownership Percentages will be adjusted to reflect the capital contribution of the participating Members using a valuation of the Company equal to 80% of the Fair Market Value determined by the single appraiser.

7.9    Books and Records. The books of account for the Company shall be kept and maintained at the principal office of the Company or at such other place as the Board of Directors may determine from time to time. The books of account shall be maintained on an accrual basis in accordance with GAAP consistently applied with reference to all Company transactions. The books and records shall include the designation and identification of any property in which the Company owns a beneficial interest. Such records shall also include, without limitation, the ownership of property (real, personal, and mixed), as well as any property in which the Company owns an interest and the title to which has been recorded or is maintained in the name of one of the Members without designation of the Company. The Company shall keep full and complete books of account, which shall be maintained in a manner that provides sufficient assurance that the transactions of the Company are recorded in a manner to comply with this Agreement and all applicable laws. The Parties shall cause the Company to preserve all relevant books and records for not less than five years from the date of their creation or for such period as required by law.



7.10     Annual Financial Statements.  No later than forty (40) days following the end of each fiscal year, the General Manager shall cause to be prepared and delivered to each Member a profit and loss statement for the Company and a statement of changes in financial position for such fiscal year, and a balance sheet for the Company, prepared in accordance with GAAP.  Independent auditors shall be appointed to audit the annual financial statements of the Company.  The initial independent auditors shall be selected by the Board of Directors in accordance with Section 5.4 hereof, and the Board of Directors may appoint other independent auditors in their place from time to time in the same manner, provided, however, that notwithstanding any other provision of this Agreement, such independent auditor shall be a "Big Four" internationally recognized accounting firm.  The independent auditors shall audit the financial statements prepared by the Company in accordance with GAAP.

7.11     Interim Financial Statements.  (a)  As soon as practicable (but no later than ten (10) days) after the end of each month, the General Manager shall cause to be prepared and delivered to each Member, an income statement for the Company and a statement of changes in financial position for such month and for the portion of the Fiscal Year then ended, and a balance sheet for the Company as at the end of such month, prepared in accordance with GAAP and on a basis consistent with the Company's Annual Financial Statements.

(b)      As soon as reasonably practicable after the end of each Fiscal Year of the Company, and in any event no later than six (6) months after the end of such Fiscal Year, the Company shall provide each Member with the appropriate Schedule K-1 setting forth such Member's share of the profits or losses of the Company (subject to Section 7.14 below) for the prior Fiscal Year, in a form acceptable to such Member.

7.12     Inspection of Facilities and Records.  Each Member shall have the right to inspect the facilities of the Company and to examine the books of account and records of the Company at all reasonable times during usual business hours.  Each Member also shall have the right to audit the Company's compliance with any policies adopted by the Company.  Such right may be exercised through any agent, employee or representative of such Member designated by it, or by an independent public accountant.  The Member conducting such examination or inspection shall bear all costs and expenses incurred in connection therewith.

7.13     Banking Matters.  Funds of the Company shall be deposited in such banks or other depositories as determined by the General Manager.  Checks or other orders of withdrawal shall be drawn upon the Company's account or accounts only for purposes of the Company and shall be signed by such officers or authorized representatives as are designated by the Board of Directors, subject to any conditions or limitations which it may set.

7.14     Allocation of Income and Losses.  During the Exclusive Period (as the same may be extended from time to time), and to the extent they may be utilized by DTVLA in any manner, all Losses shall be allocated to DTVLA.  Except as set forth in the preceding sentence, or as otherwise may be agreed by the Members in writing from time to time, the Income and Losses of the Company for each taxable year of the Company shall be allocated among the Members in accordance with each Member's Ownership Percentage. The terms "Income" and "Losses" shall mean the amounts determined for the Company for each taxable year of the Company in accordance with the accounting method followed by the Company for



21

federal income tax purposes and in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Section 703(a)(1) shall be included in taxable income or loss).

### ARTICLE VIII
### CASH MANAGEMENT AND DIVIDEND POLICIES

In the event cash or cash equivalents held by the Company exceed the net anticipated cash requirements (excluding such items as reserves and capital expansion plans) of the Company for the immediately following semi-annual period (as set forth in the Annual Plan or any subsequent approved budget), such excess cash shall be applied in the following order: (i) to the repayment of all outstanding loans from Members or other debt owed by the Company to the Members on a pro rata basis and (ii) to the Members as a distribution in accordance with applicable law (including the Act).

### ARTICLE IX
### BUSINESS OPERATIONS

9.1    Business Dealings with the Company.  A Member or any Affiliate thereof may enter into contracts or agreements with the Company and otherwise enter into transactions or dealings with the Company on an arm's-length or other reasonable basis and derive and retain profits therefrom, provided that any such contract or agreement or other transaction or dealing is approved by the Board of Directors pursuant to Section 5.4(y). The validity of any such approved contract, agreement, transaction or dealing or any payment or profit related thereto or derived therefrom shall not be affected by any relationship between the Company and such Member or any of its Affiliates.

9.2    Other Activities of Members and Affiliates.  No Director, employee of the Company or seconded employee shall be obligated to reveal confidential or proprietary information belonging to any Member or a Member's Affiliates without the consent of such Member or its Affiliate, as applicable.

9.3    Business Operations.  During the Exclusive Period, whenever the Company, either directly or indirectly, or through a third-party, seeks to obtain programming rights, it shall do so for all of Latin America and shall not enter into any programming agreements that do not include rights for all of Latin America without prior written consent of DTVLA.

### ARTICLE X
### RESTRICTIONS ON TRANSFER

10.1    Restrictions on Transfers Generally.  No Member shall Transfer all or any part of its Membership Interests to any Person except as specifically permitted herein or pursuant to the Golf Channel Agreement. Notwithstanding the provisions of this Article X, in no event shall a Transfer be allowed to:



22

(i)        a Competitor without the prior written approval of DTVLA and Park 610; or

(ii)        any other Person or entities that will purchase the Membership Interests for reasons other than bona fide investments, such as to gain sensitive or protected information of the Company or the Members; or

(iii)        any person who is prohibited by law or regulation from being a participant in the Business.

10.2    Sale to Third Party and Right of First Offer.

(a)        In the event a Member ("Selling Member") desires to transfer all or any part of its Membership Interests to a person other than an Affiliate and has received a bona fide offer from such proposed transferee, the Selling Member shall deliver notice to the other Members ("Remaining Members") of its intention to transfer ("Intention Notice"), together with a copy of the offer, which shall include the purchase price and any other material terms of such offer, and the Remaining Members shall have an option ("Purchase Option") to purchase such Membership Interests at the price and conditions included in the offer.

(i)        A Member may exercise the Purchase Option by giving written notice to the Selling Member of its intention to purchase the Selling Member's Membership Interests within 30 days after receipt of the Intention Notice ("Option Exercise Period"). The purchase shall be made within 30 days after giving the written notice to the Selling Member. The purchase will be made in cash and on the same terms as the Selling Member proposed to sell the Membership Interests to the proposed transferee or as otherwise agreed by the parties.

(ii)        If the Purchase Option is not exercised within the time provided in subsection (i), the Selling Member may sell its Offered Membership Interests to the proposed transferee at a price not less than that provided in the offer and on the terms and conditions no more favorable to the third party than those set forth in the offer, within 60 days after the expiration of the Option Exercise Period (or such longer period as may be necessary to obtain any approvals required by government authorities). Notwithstanding the foregoing, the Remaining Member shall have the right to exercise its tag-along rights with respect to any such transaction in accordance with Article XI.

(b)        In the event a Member ("Offering Member") desires to transfer all or any part of its Membership Interests to a person other than an Affiliate but has not received a bona fide offer from a third party, the Offering Member must first offer its Membership Interests to the Remaining Member. The Offering Member shall deliver a notice to the Remaining Member of its desire to sell its Membership Interests and the price at which it proposes to sell its Membership Interests ("Offer Notice").



(i)        The Remaining Member shall have the option to give notice of interest in purchasing the Membership Interests ("Interest Notice") within 30 days after

23

receipt of the Offer Notice. In its Interest Notice, the Remaining Member giving such notice ("Interested Member") may agree to the price stated in the Offer Notice.

(ii)    If the Interested Member does not agree to the price stated in the Offer Notice, the Interested Member and the Offering Member shall negotiate a mutually acceptable price, which shall become the "Offer Price." Unless the parties agree to the price stated in the Offer Notice, the purchase price shall be the Offer Price. The purchase, if any, shall be made in cash.

(iii)    If the Interested Member does not agree to the price stated in the Offer Notice and an Offer Price is not determined within 15 days after the period for the giving of an Interest Notice, the Offering Member may withdraw its offer within 5 days after the expiration of such 15-day period.

(iv)    If all of the Membership Interests in the Offer Notice are not purchased by the Remaining Member, the Offer shall be deemed to have expired.

(c)    The options of the Members to purchase Membership Interests under Section 10.2(a) or Section 10.2(b) shall be exercisable pro rata in accordance with their Ownership Percentage at the time of the offer of Membership Interests. In exercising any purchase option under Section 10.2(a) or 10.2(b), a Member may purchase all, but not less than all, of its pro rata share of the number of Membership Interests proposed for sale by the Selling Member or Offering Member in its Intention Notice or Offer Notice, as applicable (its first round pro rata share). If less than all of the Members exercise their options, those Members that did exercise their options may, within the next five days, elect to purchase the offered Membership Interests for which options were not exercised, in proportion to their Ownership Percentages. This process shall be repeated until the entire amount of offered Membership Interests is purchased or until no Member elects to purchase any further offered Membership Interests. If all of the offered Membership Interests are not elected for purchase by the Members who had purchase options, those Members that did elect to purchase Membership Interests shall by mutual agreement among them locate another transferee(s) to purchase any or all remaining offered Membership Interests.

10.3    Transfer to Affiliates. Subject to Section 10.1 and Section 10.4, a Member may at any time, upon notice to the other Members, Transfer all, or any part, of its Membership Interests to an Affiliate; provided, however, that the transferor Member shall remain responsible to the other Members for all of its duties and obligations hereunder and hereby guarantees the performance by its transferee of all of such transferor Member's duties and obligations hereunder. In the event an Affiliate to which Membership Interests have been Transferred ceases to be an Affiliate, then such Affiliate shall, upon or prior to ceasing to be an Affiliate, transfer such Membership Interests back to the Member from which it acquired the Membership Interests.

10.4    Admission of a Transferee as a Member. If, in accordance with this Agreement, a Member Transfers its Membership Interests to a transferee other than a Member (the "Successor Member"), the admission of the Successor Member as a member of the Company shall be conditioned upon the receipt by the non-affiliated Member of the following:



24

(i)    The Successor Member's agreement in writing to be bound by all of the terms of this Agreement, assuming the rights, duties and obligations of the transferor Member hereunder and thereunder;

(ii)    Such other documents or instruments as may be required in order to effect its admission as a Member under this Agreement and applicable law; and

(iii)    An opinion of counsel of the transferee or transferor Member, reasonably satisfactory to the other Members, that such transfer shall not cause a dissolution of the Company, and with respect to such other matters as such other Members shall reasonably request.

In the event Membership Interests of a Member are Transferred as contemplated in this Section, the Successor Member shall (unless the transferor Member remains liable therefor) assume all obligations of the transferor Member under this Agreement, and of any other Affiliate thereof under the Concurrent Agreements which are assigned, and for any Indebtedness to the Company.

Upon a transfer pursuant to the terms of this Section, the admission of the Successor Member as a member of the Company shall occur, and for all purposes shall be deemed to have occurred, immediately prior to the Transfer of its Membership Interests by the Member. Upon such Transfer, the transferor Member shall cease to be a Member of the Company.

10.5    Mortgage, Pledge. No Member, without the consent of the other Members, shall create or permit to arise any mortgage, charge, pledge, lien or other encumbrance on its Membership Interests.

10.6    Non-Recognition of Certain Transfers. Notwithstanding any other provision of this Agreement, any Transfer of an interest in the Company in contravention of any of the provisions of this Article shall be void and ineffective ab initio, and shall not bind or be recognized by the Company.

## ARTICLE XI
## TAG-ALONG RIGHT

11.1    Transfers by Members. With respect to any proposed Transfer of Membership Interests by any Member and/or any Affiliates of such Member that directly or indirectly own Membership Interests or any interest therein and/or any Related Party of any of the foregoing (such persons being hereinafter referred to collectively as the "Seller Group") to a person or persons (the "Proposed Purchaser"), no such proposed Transfer shall be permitted to be made unless and until the proposed transferor shall have given each of the other Members (the "Tag-Along Members") the right and opportunity to Transfer Membership Interests held by such Tag-Along Members to the Proposed Purchaser. Each Tag-Along Member shall have the right to Transfer to the Proposed Purchaser a portion of its Ownership Percentage determined by multiplying (i) the Ownership Percentage of such Tag-Along Member by (ii) a fraction, the numerator of which is the total Ownership Percentage proposed to be purchased by the Proposed



25

Purchaser and the denominator of which is the Ownership Percentage of the Seller Group. The Selling Member shall, prior to any proposed Transfer, notify, or cause to be notified, all Tag-Along Members in writing of such proposed Transfer. Such notification shall be in accordance with Section 11.2. Notwithstanding the foregoing, the tag-along right provided in this Section 11.1 shall not apply to any Permitted Transfers.

11.2    Notification of Proposed Transfers. In the event of a proposed Transfer pursuant to Section 11.1, the proposed transferor shall notify in writing all Tag-Along Members of the proposed Transfer. Such notice shall be delivered on the date of the expiration of the Option Exercise Period as set forth in Section 10.2(a)(i) and shall set forth: (i) the name of the proposed transferor, the Ownership Percentage and the percentage of the transferor's total Membership Interest proposed to be sold, (ii) the name and address of the Proposed Purchaser, (iii) the proposed amount and form of consideration and terms and conditions of payment offered by such Proposed Purchaser and (iv) that the Proposed Purchaser has been informed of the tag-along right provided for in this Article XI and has agreed to purchase additional Membership Interests in accordance with the terms hereof. The Tag-Along Members' rights may be exercised by any Tag-Along Member by delivery of a written notice to the Company and the proposed transferor (a "Tag-Along Notice") within 30 days following receipt of the notice specified in the immediately preceding sentence. The Tag-Along Notice shall state the portion of its Ownership Percentage that the Tag-Along Member wishes to include in such Transfer to the Proposed Purchaser. In the event that the Proposed Purchaser does not purchase such Membership Interests on the same terms and conditions set forth in the proposed transferor's notice, then the proposed transferor shall not Transfer its Membership Interests to the Proposed Purchaser and any such attempted Transfer by the proposed transferor to such Proposed Purchaser shall be invalid. In the event no Tag-Along Members exercise their tag-along rights within the 30-day period, upon expiration of such 30-day period, the proposed transferor shall have the right, thereafter, for an additional 30-day period to Transfer the Membership Interests on the terms and conditions set forth in the proposed transferor's notice or on terms and conditions no more favorable then those offered by the Proposed Purchaser.

11.3    Non-cash Consideration. For the purpose of Section 11.1, if the proposed transferor has agreed to Transfer any Membership Interests for consideration which includes securities or other property, the consideration to be received by each Tag-Along Member for the sale of its Membership Interests shall be its pro-rata share of such non-cash consideration; provided that if any such non-cash consideration consists of securities of a non-public entity no such Transfer will be permitted unless any Tag-Along Member who is to receive such consideration is given the same rights with respect to any such securities that such Tag-Along Member has under Articles XI and XII of this Agreement so as not to diminish the ability of the Members to Transfer their membership interests in such entity on terms that are comparable to those set forth in this Agreement.



### ARTICLE XII
### COVENANTS

12.1    Implementation of Agreement. Each Member agrees that it will at all times:

26

(a)    use all means reasonably available to it (including its voting power, direct or indirect, in relation to the Company) so as to ensure that the Company and any Director nominated by it shall implement the provisions of this Agreement relating to the Company;

(b)    cause the Company to comply with all applicable laws;

(c)    cause the Business to be conducted in accordance with sound and good business practice and the highest ethical standards;

(d)    cooperate in good faith and execute such documents and take such action as may be reasonably required to give full effect to the provisions and intent of this Agreement; and

(e)    use its best endeavors to develop and expand the business of the Company.

12.2    <u>Non-Competition</u>. Except as set forth below, any Member and any Affiliate thereof may engage in other business ventures and dealings of every nature, independently or with others, and the Company shall have no right in such ventures or dealings or to the income and profits derived therefrom; provided, however, that so long as a Member is a member of the Company and for a period of two years thereafter, such Member shall not, and Park 610 shall not permit any of its Affiliates to participate in any manner in the production and distribution of a television channel devoted primarily to golf programming which is competitive with the programming offered by the Company to distributors in Latin America ("Direct Competition").

Each of DTVLA, Park 610 and their respective Affiliates acknowledges, for itself and such Affiliates: (i) that DTVLA, Park 610 and the Affiliates of Park 610, alone or in joint ventures and other business relationships with other persons, is or may be presently engaged, and may in the future be engaged, in all types of television programming ventures including the production and distribution of sports programming that may include some golf content and which are or may be competitive with the Business (but which are not in Direct Competition); (ii) that DTVLA, Park 610 and the Affiliates of Park 610 may make investments in other businesses which may be competitive with the Business as described in clause (i) above; and (iii) DTVLA sells and may sell equipment and services to entities that are or may be competitive with the Business (including those that are in Direct Competition). The activities described in clauses (i), (ii) and (iii) shall not be considered competitive to the Business and shall not constitute a violation of this Agreement.

12.3    <u>Members' Trademarks and Tradenames</u>. Except for the trademarks and trade names licensed by TGC Inc. pursuant to the License Agreement and unless otherwise provided in this or related agreements, no trademark, trade name or other trade identity owned or employed by any Member or their respective Affiliates shall be used in connection with the activities or business of the Company without the express written consent of such Member. The Company shall execute any documents necessary to ensure that any agreed use of such trade identity is properly attributed to that Member or its Affiliates. In the event a Member ceases to



27

hold Membership Interests in the Company, the remaining Members shall take such steps as may be necessary to cause the Company to remove any reference to the withdrawing Member's trademarks or other names from any business description of the Company or other products or materials used in the Company's business.

12.4    Company Trademarks and Tradenames.  Any trademark, trade name or other trade identity developed by the Company, whether solely or jointly with the Members or their Affiliates, shall be owned by the Company.  Upon dissolution or other material changes in ownership of the Company, all Members shall agree on disposition of the rights to the Company's trademarks, tradenames or trade identity.  Absent agreement, all use of such trademarks, tradenames and trade identity by the Company or any Member shall cease and shall not be used thereafter.

12.5    Ethics.  No Member, the Company nor any of their respective officers, directors, members, employees or agents shall offer, pay or give anything of value in respect of the Business, either directly or indirectly, to a government official, political party or candidate for political office to influence such person or entity in the discharge of his, her or its official duties, unless such kind of conduct complies with all applicable written laws.  The Members will not do business with any joint venture partner, distributor, agent, customer, or other person where a Member knows or suspects that payoffs or similar practices are involved in doing business and will not have a relationship with a customer or any other person that results in a conflict of interest or embarrassment to the Company or any of the Members.

12.6    Confidentiality.  So long as a Member is a member of the Company and for a period of five years thereafter, each Member shall maintain confidential all Confidential Information exchanged among them during the course of both their negotiations and their performance of this Agreement.  During such period, no Member shall disclose such Confidential Information to any third party, either directly or indirectly, without the prior written consent of the Member disclosing such Confidential Information, except such disclosures to its employees or other persons as are necessary in connection with the performance of the Business or for any other proper purpose under this Agreement or as required by law.  Each Member shall take all necessary measures to procure that all persons to whom it discloses the Confidential Information as permitted hereunder is made aware of and complies with the Member's obligations of confidentiality under this Agreement as if such persons were parties to this Agreement. "Confidential Information" means all information of the Company or any of the Members designated as such, whether orally or in writing, except such information which:

(i)      is or becomes publicly known through no wrongful act on the receiving party's part; or

(ii)     is, at the time of disclosure under this Agreement, already known to the receiving party without restriction on disclosure; or

(iii)    is, or subsequently becomes, rightfully and without breach of this Agreement, in the receiving party's possession without any obligation restricting disclosure; or



28

(iv)     is independently developed by the receiving party without breach of this Agreement; or

(v)     is explicitly approved for release by written authorization of the disclosing party.

12.7    Employment of Company Employees. Each Member agrees not to actively solicit for employment by it any active Company employee or any employee of the other party who becomes known to it as a result of the Company activities, without prior approval of the other party.

## ARTICLE XIII
## DEFAULTS

13.1    Default. Each of the following events shall constitute an "Event of Default" hereunder:

(a)     the failure by a Member to fund a Capital Call in accordance with the terms of Sections 7.3 or 7.8 and such failure shall have continued unremedied for a period of thirty days after notice of default;

(b)     a breach or violation of Section 12.5;

(c)     the attempt by a Member to Transfer any of its Membership Interests other than in accordance with the terms of this Agreement;

(d)     any other material breach of this Agreement (not otherwise referred to in this Section 13.1) which is not cured after 30 days notice and opportunity to cure (provided if the breach is of a nature that it cannot be cured within 30 days, this period shall be extended so long as the Defaulting Party or the Company is making reasonable best efforts to cure such default);

(e)     occurrence of a Change of Control of a Member;

(f)     a Member fails to pay its debts generally as they become due or make an assignment for the benefit of its creditor generally;

(g)     the voluntary filing of a petition or action in bankruptcy or insolvency or the like by a Member, or the entry of a final judgment or order sustaining a petition or action taken by a Member creditors; and

(h)     the liquidation, dissolution or winding up of or ceasing by a Member to conduct business.

The Member committing the Event of Default is referred to as the "Defaulting Member" and the other Members are each referred to as a "Non-Defaulting Member" and collectively as the "Non-Defaulting Members."

29

13.2    Effect of Default.  Any Non-Defaulting Member shall have the right to require the Defaulting Member to sell all of its Membership Interests (the "Call Option") as provided in Section 13.4.

13.3    Other Remedies.  Subject to any restrictions contained in this Agreement, each Party shall be entitled to pursue any and all remedies which it has at law or in equity upon the breach by a Party of any other provision of this Agreement.

13.4    Call Procedure.  Upon the exercise of a Call Option in accordance with this Article XIII, the Defaulting Member shall become bound to sell all and not less than all of its Membership Interests in accordance with the terms set forth in this section.  Likewise, upon the exercise of a Call Option by Park 610 in accordance with Section 7.3(e) hereof, DTVLA shall become bound to sell all and not less than all of its Membership Interests in accordance with the terms set forth in this section.  The Membership Interests required to be sold by the Defaulting Member or DTVLA, as the case may be, are referred to herein as the "Call Membership Interests".

(a)    The purchase price of the Call Membership Interests shall be:

(i)    in the case of an Event of Default under Section 13.1(e), Section 13.1(f), Section 13.1(g) or Section 13.1(h), their net book value;

(ii)    in the case of an Event of Default under any other Section, eighty percent (80%) of the net book value of the Call Membership Interests; and

(iii)    in the case of the exercise by Park 610 of its rights under Section 7.3(e), the Fair Market Value of the Call Membership Interests.

(b)    The Non-Defaulting Members or, in the case of a Call Option exercised by Park 610 pursuant to Section 7.3(e), the Members other than DTVLA, shall be entitled to purchase the Call Membership Interests pro-rata in accordance with their Ownership Percentage; provided, however, that in the event a Non-Defaulting Member or other Member does not exercise its Call Option, the Non-Defaulting Members or other Members who do exercise their Call Option (the "Buying Members") will have the right to purchase the remaining Call Membership Interests pro rata based upon the Ownership Percentage of each Buying Member.

(c)    (i)    In the case of the Call Option that may be exercised after the occurrence of an Event of Default, the Company shall promptly notify the Non-Defaulting Members in writing of the occurrence of an Event of Default and of the identity of the Defaulting Member.  The Non-Defaulting Members must give written notice to the Chairman (who shall give such written notice to all the Members, including the Defaulting Member) of their intent to exercise the Call Option within 30 days of the Company's notice.  Failure by a Non-Defaulting Member to deliver this notice within such 30-day period shall constitute a waiver by a Non-Defaulting Member to exercise its Call Option.  The Non-Defaulting Members must exercise their Call Option within 60 days of the notice of the Company to the Non-Defaulting Members, otherwise their



30

corresponding Call Options shall be deemed to have expired; provided, however, in the event a Buying Member shall fail to complete its portion of the call within such 60-day period, the remaining Buying Members shall have an additional 10 days from the expiration of such 60-day period to complete the purchase of all Call Membership Interests.

(ii)    In the case of the Call Option that may be exercised by Park 610 pursuant to Section 7.3(e) hereof, Park 610 must give written notice to the Chairman (who shall give such written notice to all the Members, including DTVLA) of its intent to exercise the Call Option within 30 days of receipt of DTVLA's notice provided pursuant to Section 7.3(d). Failure by Park 610 to deliver this notice within such 30-day period shall constitute a waiver by Park 610 of its right to exercise the Call Option under these circumstances. Park 610 must exercise its Call Option within 60 days after the end of the Exclusive Period, otherwise its Call Option shall be deemed to have expired, unless the failure to exercise the Call Option is due to failure by DTVLA to cooperate in a timely manner in order to expedite the closing of the transfer of the Call Membership Interests or the failure to have determined the Fair Market Value in accordance with the definition thereof (due to no fault of Park 610), in which case Park 610's right to exercise the Call Option shall be extended for such reasonable time as is necessary to determine the Fair Market Value.

(d)    The Buying Members shall be entitled to receive the Call Membership Interests duly endorsed by the Defaulting Member or DTVLA, as the case may be, and the Defaulting Member or DTVLA, as the case may be, shall deliver such Call Membership Interests to the Buying Members upon payment therefor.

13.5    Put Option.  Upon the exercise of a Put Option by DTVLA, Park 610 shall become bound to purchase all but not less than all of the Membership Interests of DTVLA ("Put Membership Interests") in accordance with the terms set forth in this section.

(a)    The purchase price of the Put Membership Interests shall be their Fair Market Value.

(b)    In the case of the Put Option that may be exercised by DTVLA pursuant to Section 7.3(e) hereof, DTVLA must give written notice to Park 610 of its intent to exercise the Put Option within 30 days of issuance of the notice provided pursuant to Section 7.3(d). Failure by DTVLA to deliver this notice within such 30-day period shall constitute a waiver by DTVLA of its right to exercise the Put Option. DTVLA must exercise its Put Option within 60 days after the end of the Exclusive Period, otherwise its Put Option shall be deemed to have expired, unless the failure to exercise the Put Option is due to failure by Park 610 to cooperate in a timely manner in order to expedite the closing of the transfer of the Put Membership Interests.

(c)    For the avoidance of doubt, the Put Option and the Call Option pursuant to Section 7.3(e) may be exercised and effective simultaneously, and the expiration of one shall not affect the validity and effectiveness of the other.



31

(d)     Upon receipt of title to the Membership Interests, Park 610 shall deliver to DTVLA an amount in cash equal to the Fair Market Value of the Membership Interests.

13.6     Transition.  In the event of an exercise of a Call Option or Put Option, the Members shall work together for an orderly transition of seconded employees to return to the Member whose Membership Interests are purchased by the other Members or the Company, as the case may be, and the Member whose Membership Interests are purchased shall retain its seconded employees in the Company for up to one year, at the option of the Buying Members or the Company, as the case may be.

## ARTICLE XIV
## TERMINATION

Unless otherwise terminated as provided hereunder, this Agreement shall continue for so long as the Company maintains its corporate existence.  Except for Sections that provide that such Sections shall survive termination, this Agreement shall terminate as a result of any of the following occurrences provided that, until dissolution is completed in accordance with Article XV, the relationship of the parties shall continue to be governed by this Agreement;

(a)     upon the order of any Governmental Authority having jurisdiction and authority to order the termination of this Agreement;

(b)     with respect to any Member, upon such Member and its Affiliates ceasing to be a Member of the Company by reason of a Transfer of Membership Interests permitted hereunder; or

(c)     with respect to all of the Members, upon the Company being wound up or otherwise dissolved.

## ARTICLE XV
## DISSOLUTION

15.1     No Dissolution.  Except as otherwise permitted herein, no Member shall permit to exist any event of dissolution under applicable law within its control and in the event of any event of dissolution of the Company other than pursuant to Section 5.4, the Members agree to cause the reformation of the Company in the form existing immediately prior to such event of dissolution.

15.2     Procedure for Dissolution.  The Company shall be dissolved and its affairs shall be wound-up if agreed by the Board of Directors in accordance with Section 5.4.  In such event, the Members shall proceed as promptly as practicable to wind-up the affairs of the Company and to distribute the assets thereof in accordance with any agreement of the Members and applicable law, but the business and assets of the Company shall be liquidated in an orderly and business-like manner, and final accounting shall be made by the Company.  The accountants to the Company shall review the final accounting and shall render their opinion with respect thereto.



32

15.3    Winding Up.  Dissolution of the Company shall be effective on the day on which the event giving rise to the dissolution occurs, but the Company shall not terminate until the assets of the Company shall have been distributed as provided herein.  The business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement until the Company is terminated as aforesaid.  Upon the dissolution of the Company:

(a)    All non-cash assets of the Company shall be liquidated for cash for the best value realizable under the circumstances, provided that the Members shall have a preemptive right to purchase such non-cash assets for the same price and for the same convertible currency which the Company could have obtained from a third party in accordance with the applicable laws and regulations.

(b)    After all such assets of the Company have been converted to cash, within each class of priority of the creditors of the Company, and to the extent permitted by the applicable laws and regulations, foreign convertible currency assets shall be used first to discharge liabilities in the same foreign convertible currency and then in any other foreign convertible currency.

(c)    Any surplus of the Company's assets in cash, which is remaining after the settlement of the Company's debts, shall be distributed to the Members in proportion to their respective Interest Percentage.

15.4    Survival of Obligations.  The Members further agree that all obligations under this Agreement which require, by their terms, performance after the termination of this Agreement for any reason whatsoever, including but not limited to the payment to the Members of their respective shares of the dividends of the Company shall be considered to survive the termination hereof until their performance has been completed.  In addition, the obligations set forth in Article 20 hereof shall be considered to survive the termination hereof indefinitely.

## ARTICLE XVI
## REPRESENTATIONS AND WARRANTIES

16.1    Representations of the Parties.  Each of the Members and the Company represents and warrants to the others as follows:

(a)    it is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and it has the power to enter into this Agreement and all of the Concurrent Documents to which it is a party and to carry out the transactions contemplated herein and therein;

(b)    the execution, delivery and performance of this Agreement and the Concurrent Documents to which it is a party have been duly authorized and no further internal authorization is necessary on its part;

(c)    this Agreement and the Concurrent Documents to which it is a party are legally binding on and enforceable against it in accordance with the terms of such agreements, subject to the limitations imposed by the laws of bankruptcy, reorganization and



33

creditors' rights generally and except as enforcement thereof may be limited as to certain equitable remedies;

(d)     the entering into of this Agreement and the Concurrent Documents to which it is a party does not, and the consummation by it of the transactions contemplated herein and therein shall not violate or cause a default under or breach of (a) its certificate of formation, or other charter or governing documents, (b) any material judgment, order or decree applicable to it or its properties and assets or (c) any material contract, agreement, indenture or other instrument to which it is a party or by which it or its property is bound;

(e)     no consent, approval, authorization of, or designation, declaration or filing with any Governmental Authority or with any person not a party to this Agreement is required to be obtained by it in connection with the valid execution, delivery and performance of this Agreement and the Concurrent Documents to which it is a party;

(f)     there is no action, suit or proceeding pending or, to its knowledge, threatened, against or affecting it in any court or before or by any Governmental Authority which would materially and adversely affect its performance of its obligations hereunder or under any of the Concurrent Documents to which it is a party; and

(g)     (i) it is not involved in any transaction or other situation with any employee, officer, director or Affiliate which may be generally characterized as a "conflict of interest," including, but not limited to, direct or indirect interests in the business of Competitors, suppliers or customers of the Company and (ii) there are no situations with respect to the Company which involved or involves (A) the use of any corporate assets for unlawful contributions, gifts, entertainment or other unlawful expenses related to political activity, (B) the making of any direct or indirect unlawful payments to government officials or others from corporate funds or the establishment or maintenance of any lawful or unrecorded funds, (C) the violation of any of the provisions of The Foreign Corrupt Practices Act of 1977, as amended, or any rules or regulations promulgated thereunder of the United States, (D) the receipt of any illegal discounts or rebates or any other violation of the antitrust laws, as amended, (E) any investigation by any Government Authority which could subject the other Parties to any damage or penalty in any civil, criminal or governmental litigation or proceeding or which would have an adverse effect on the Company or the Business or (F) any action which would violate any of the provisions of this Agreement.

(h)     Representations of Park 610.  Park 610 represents and warrants to each of the other Parties that Carlos Avila indirectly owns 100% of the economic and voting interests in Park 610.

<h2 style="text-align:center">ARTICLE XVII<br>INDEMNIFICATION</h2>

17.1    Indemnification by Members for Unauthorized Acts, Etc.  Each Member shall indemnify and hold the other Members, each Affiliate, officer, director and employee thereof and the Company harmless from and against any and all claims, causes of action, payments, obligations, expenses (including without limitation reasonable fees and disbursements



34

of counsel) and losses (collectively "Losses") arising out of or in any way connected with any action, commitment, contract, covenant or undertaking of such Member for and on behalf of the Company which (i) was not within the scope of its authority hereunder, (ii) required the approval of the Members or the Board of Directors, but for which no such approval was obtained, (iii) was in violation of the terms of this Agreement or any Concurrent Document to which such Member is a party, (iv) was a breach of any representation or warranty set forth in this Agreement or any Concurrent Document or any certificate delivered pursuant hereto or (v) was in non-fulfillment by it of any covenant under this Agreement or any Concurrent Document.

17.2    Indemnification by Company of Individuals.  The Company, shall, to the fullest extent permitted by applicable law, indemnify any individual made, or threatened to be made, a party to an action or proceeding whether civil or criminal (including an action or proceeding by or in the right of the Company or any other Person for which any member of the Board of Directors, any committee or any officer of the Company served in any capacity at the request of the Company), by reason of the fact that such individual (or such individual's testator or intestate) was a Member or officer or served another Person in such capacity by reason of such request, against judgments, fines, amounts paid in settlement and reasonable expenses, including attorney's fees actually and necessarily incurred as a result of such action or proceeding, or any appeal therein, in each case except to the extent that such individual's actions or inactions constituted gross negligence or willful misconduct.  Such indemnification shall be a contract right and shall include the right to be paid advances of any expenses reasonably expected to be incurred by such individual in connection with such action, suit or proceeding, consistent with the provisions of applicable law in effect at any time.  Indemnification shall be deemed to be "permitted" within the meaning of the first sentence of this Section if it is not expressly prohibited by applicable law.

17.3    Indemnification by Member for Third Party Claims.  Each Member shall indemnify and hold the Company harmless from and against Losses by seconded employees or employees of such Member relating to employee benefits, violations or labor laws such as, for example, wrongful discharge, discrimination and harassment, or any laws relating to an employees' tenure with the Member.

17.4    Insurance.  The Company may, to the full extent permitted by law, purchase and maintain insurance against any liability that may be asserted against any Person entitled to indemnity pursuant to Section 17.2.

17.5    Indemnification of Member for Proportionate Liability.

(i)    Each Member agrees to, and does hereby indemnify and hold harmless the other Members, and to the extent set forth below the Member and other Affiliates of the other Member, from and against all Losses arising out of a liability or obligation of the Company to the extent necessary to accomplish the result that no Member (together with its Affiliates) shall bear any portion of a liability or obligation of the Company in excess of such Member's Ownership Percentage.  Without limiting the generality of the foregoing, a Loss shall be deemed to arise out of a Company liability or obligation if it arises out of or is based upon the conduct of the business of the Company or the ownership of the property of the Company.



35

(ii)     The foregoing indemnification shall be available to an Affiliate of a Member with respect to a Loss arising out of a Company liability or obligation which is paid or incurred by such Affiliate as a result of such Affiliate directly or indirectly owning or controlling a Member or as a result of the fact that an individual employed or engaged by the Company is also a director, officer or employee of such Affiliate.

(iii)     The foregoing shall not inure to the benefit of any Member (or an Affiliate of a Member) in respect of any Loss which: (i) arises out of or is based upon the gross negligence or willful misconduct of such Member (or an Affiliate of such Member); or (ii) is a tax, levy or similar governmental charge not imposed upon the Company or on its property.  It is understood and agreed that, for the purposes of the foregoing sentence, no Loss shall be deemed to arise out of or be based upon the gross negligence or willful misconduct of any Member (or any such Affiliate) solely because it arises out of or is based upon the gross negligence or willful misconduct of a director, officer or employee of such Member or Affiliate if at the time of such negligence or misconduct such director, officer or employee was an employee assigned to the Company or was a member of the Board of Directors.

17.6     <u>Indemnification Procedures</u>.

(i)     <u>Procedures for Indemnification of Third Party Claims</u>.

(a)     If a person entitled to indemnification hereunder (an "<u>Indemnitee</u>") shall receive notice or otherwise learn of the assertion by a Person (including, without limitation, any Governmental Authority) who is not a party to this Agreement, of any claim or of the commencement by any such Person of any action (a "<u>Third Party Claim</u>") with respect to which another party (an "<u>Indemnifying Party</u>") may be obligated to provide indemnification pursuant hereto, such Indemnitee shall give such Indemnifying Party written notice thereof promptly after becoming aware of such Third Party Claim, provided that the failure of any Indemnitee to give such notice shall not relieve the related Indemnifying Party of its obligations under this Article, except to the extent that such Indemnifying Party is prejudiced by such failure to give notice.  Such notice shall describe the Third Party Claim in reasonable detail and, if ascertainable, shall indicate the amount (estimated if necessary) of the Loss that has been or may be sustained by such Indemnitee.

(b)     An Indemnifying Party may elect to defend or to seek to settle or compromise, at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, any Third Party Claim.  Within 30 days of the receipt of notice from an Indemnitee in accordance with Section 17.6(i)(a) (or sooner, if the nature of such Third Party Claim so requires), the Indemnifying Party shall notify the Indemnitee of its election whether the Indemnifying Party shall assume responsibility for defending such Third Party Claim, which election shall specify any reservations or exceptions.  After notice from an Indemnifying Party to an Indemnitee of its election to assume the defense of a Third Party Claim, such Indemnifying Party shall not be liable to such Indemnitee under this



36

Article for any legal or other expenses (except expenses approved in advance by the Indemnifying Party) subsequently incurred by such Indemnitee in connection wit the defense thereof; provided that if, in the Indemnitee's reasonable judgment, a conflict of interest between the Indemnitee and such Indemnifying Party exists in respect of such claim, the Indemnitee shall have the right to employ separate counsel to represent such Indemnitee at its own expense who shall be entitled to participate in such defense. If an Indemnifying Party elects not to assume responsibility for defending a Third Party Claim, or fails to notify an Indemnitee of its election as provided in this Section such Indemnitee may defend or (subject to the remainder of this Section 17.6(i)(b) and Section 17.6(i)(d)) seek to compromise or settle such Third Party Claim at the expense of the Indemnifying Party. Neither an Indemnifying Party nor an Indemnitee shall consent to entry of any judgment or enter into any settlement of any Third Party Claim which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnitee, in the case of a consent or settlement by an Indemnifying Party, or the Indemnifying Party, in the case of a consent or settlement by the Indemnitee, of a written release from all liability in respect of such Third Party Claim.

(c)    If an Indemnifying Party chooses to defend or to seek to compromise or settle any Third Party Claim, the related Indemnitee shall make available to such Indemnifying Party (in a manner that shall not unreasonably interfere with the conduct of the Indemnitee's business) any personnel or any books, records or other documents within its control or which it otherwise has the ability to make available that are necessary or appropriate for such defense, settlement or compromise, and shall otherwise cooperate in the defense, settlement or compromise of such Third Party Claim.

(d)    Notwithstanding anything in this Section 17.6(i) to the contrary, (A) neither an Indemnifying Party nor an Indemnitee shall, without the written consent of the other party, settle or compromise or consent to the entry of any judgment with respect to any Action or Third Party Claim if the effect thereof is to admit any criminal liability by, or to permit any injunctive relief or other order providing non-monetary relief to be entered against, the other party and (B) other than as provided in clause (A), neither an Indemnifying Party nor an Indemnitee may settle or compromise any claim without the consent of the other which shall not be unreasonably withheld. Subject to clause (A) of this paragraph (d), if an Indemnifying Party notifies the related Indemnitee in writing of such Indemnifying Party's desire to settle or compromise a Third Party Claim on the basis set forth in such notice (provided that such settlement or compromise includes as an unconditional term thereof the giving by the claimant or plaintiff of a written release of the Indemnitee from all liability in respect thereof) and the Indemnitee shall notify the Indemnifying Party in writing that such Indemnitee declines to accept any such settlement or compromise, such Indemnitee may continue to contest such Third Party Claim, free of any participation by such Indemnifying Party, at such Indemnitee's sole expense. In such event, the



37

obligation of such Indemnifying Party to such Indemnitee with respect to such Third Party Claim shall be equal to (1) the costs and expenses of such Indemnitee prior to the date such Indemnifying Party notifies such Indemnitee of the offer to settle or Compromise (to the extent such costs and expenses are otherwise indemnifiable hereunder) plus (2) the lesser of (x) the amount of any offer of settlement or compromise which such Indemnitee declined to accept and (y) the actual out-of-pocket amount such Indemnitee is obligated to pay subsequent to such date as a result of such Indemnitee's continuing to pursue such Third Party Claim.

       (e)    In the event of payment by an Indemnifying Party to any Indemnitee in connection with any Third Party Claim, such Indemnifying Party shall be subrogated to and shall stand in the place of such Indemnitee as to any events or circumstances in respect of which such Indemnitee may have any right or claim relating to such Third Party Claim against any claimant or plaintiff asserting such Third Party Claim or against any other Person. Such Indemnitee shall cooperate with such Indemnifying Party in a reasonable manner, and at the cost and expense of such Indemnifying Party, in prosecuting any subrogated right or claim.

      (ii)    Other Procedures for Indemnification.

       (a)    Any claim on account of a Loss which does not result from a Third Party Claim shall be asserted by written notice given by the Indemnitee to the related Indemnifying Party. Such Indemnifying Party shall have a period of 30 days after the receipt of such notice within which to respond thereto. If such Indemnifying Party does not respond within such 30 day period, such Indemnifying Party shall be deemed to have refused to accept responsibility to make payment. If such Indemnifying Party does not respond within such 30 day period or rejects such claim in whole or in part, such Indemnitee shall be free to pursue such remedies as may be available to such party under this Agreement or under applicable law.

       (b)    If the amount of any Loss shall, at any time subsequent to the payment required by this Agreement, be reduced by recovery, settlement or otherwise, the amount of such reduction, less any expenses incurred in connection therewith, shall promptly be repaid by the Indemnitee to the Indemnifying Party.

    17.7    Remedies Cumulative. The remedies provided in this Article XVII shall be cumulative and shall not preclude assertion by an Indemnitee of any other rights or the seeking of any and all other remedies against any Indemnifying Party.

    17.8    Survival of Indemnification. The agreements contained in this Article XVII shall survive any liquidation a or dissolution of the Company; provided, however, in no event shall any Member be liable for any liability or obligation incurred by the Company following such liquidation or dissolution.



# ARTICLE XVIII
## CHANGES REQUIRED BY LAW

This Agreement and the obligations and performance of the Members shall be subject to all laws, both present and future, of any Government having competent jurisdiction over the Members, and to orders, regulations licenses, directions or requests of any such Government, or any department, or agency thereof. In the event any such Government, department, or agency requires changes to the transactions contemplated by this Agreement, the Members shall enter into good faith negotiations to modify this Agreement to meet such objections or make such changes as are required to satisfy these objections or required changes. If such negotiations cannot be successfully completed within thirty (30) days of the receipt of notification of such objections or required changes, this Agreement and all the Concurrent Documents shall terminate in accordance with the termination provisions contained herein and therein.

# ARTICLE XIX
## ALTERNATIVE DISPUTE RESOLUTION

19.1    Mediation. Prior to commencing any formal litigation, the Members shall attempt to settle any dispute arising out of this Agreement through good faith consultations and negotiations. If those attempts fail, any Member may demand mediation of such dispute by written notice to the other Members (the "Mediation Notice"). The Members shall select a mediator within 15 days of receipt of such Mediation Notice by such other Members. No Member may unreasonably withhold consent to the selection of a mediator, and the Members shall share the cost of the mediation equally. The Parties may also agree to replace mediation with some other form of alternative dispute resolution, such as neutral fact-finding or a mini-trial. Mediation shall take place in New York, New York by a mutually acceptable mediator. Prior to mediation, the Members and the neutral advisor shall use their best efforts to agree on a set of ground rules for mediation. At the conclusion of mediation, the Members or designated spokesperson of the respective Members shall meet and attempt to resolve the matter.

19.2    Litigation. If any dispute cannot be resolved by the Members through negotiation, mediation or another form of alternative dispute resolution within three (3) months of the Mediation Notice, the dispute may be submitted to a court of competent jurisdiction located in New York, New York for resolution. The use of any alternative dispute resolution procedures shall not be construed under the doctrine of laches, waiver or estoppel to adversely affect the rights of either Member. Nothing in this paragraph shall prevent either Member from commencing formal litigation proceedings if (i) good faith efforts to resolve the dispute under these procedures have been unsuccessful or (ii) any delay resulting from efforts to mediate such dispute could result in serious and irreparable injury to such Member.

In the event of any litigation under this Agreement, the prevailing party shall be entitled to costs and reasonable attorney's fees. The parties hereto irrevocably waive trial by jury. In the event of any litigation, the parties hereto agree that the courts in New York, New York shall have exclusive jurisdiction to resolve any dispute, with each party hereto irrevocably consenting to such jurisdiction and venue.



### ARTICLE XX
### MISCELLANEOUS

20.1    Subsidiary Companies.  The Member agree that a Member or a wholly owned subsidiary of any Member may designate an employee to be a Director of the Company pursuant to Section 5.1 or to be an employee pursuant to Section 6.4.

20.2    Advice of Legal Counsel.  Each Member acknowledges and represents that, in executing this Agreement, it has had the opportunity to seek advice to its legal rights from legal counsel.  This Agreement shall not be construed against any Member by reason of the drafting or preparation hereof.

20.3    Language.  In the event that this Agreement or any of the Concurrent Documents are translated into any language other than English, the English version shall always control.

20.4    Limitations on Damages.  IN ANY ACTION FOR DAMAGES RELATING TO THIS AGREEMENT, NO PARTY HERETO OR PARENT OR AFFILIATE THEREOF OR BENEFICIARY HEREUNDER SHALL SEEK OR BE ENTITLED TO CONSEQUENTIAL, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES.

20.5    Amendment.  This Agreement may be amended or modified only by a writing executed by the Parties.

20.6    Waiver.  The failure by any Party at any time or times to require performance of any provision hereof shall in no manner effect such Party's right at a later time to enforce the same.  No waiver by any Party of any provision of this Agreement whether by conduct or otherwise, in any one or more instances shall be deemed a further or continuing waiver of such provision.

20.7    Notices.  All notices, requests, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered or when received if notice is given by facsimile or within five days after deposited in the mails, first class postage prepaid, addressed as follows or to such other address as shall have been designated in writing by the Party to receive notice.

If to the Company:

　　　　Latin American Sports, LLC
　　　　c/o Corporation Services Company
　　　　2711 Centerville Road, Suite 400
　　　　Wilmington, DE  19808

With Copies to:



　　　　DIRECTV Latin America
　　　　Office of General Counsel

1211 Avenue of the Americas, 6th Floor
New York, NY 10036
Facsimile: 212-462-5060

Severgnini, Robiola, Grinberg & Larrechea
Reconquista 336, 2° piso
(C1003ABH) - Buenos Aires
ARGENTINA
Attention: Matías de Larrechea
Facsimile: 5411-4394-7263

If to DTVLA:

DIRECTV de Argentina S.A.
Av. Corrientes 485, piso 5
C1043AAE) Ciudad de Buenos Aires
República Argentina
Attention: Chief Financial Officer
Facsimile: 5411-4321-2596

With a copy to:

DIRECTV Latin America, LLC
Office of General Counsel
1211 Sixth Avenue, 6th Floor
New York, NY 10036
Facsimile: 212-462-5080

if to Park 610:

Park 610, LLC
9999 Collins Ave. #17H
Bal Harbour, FL 33154
Attention: Carlos Vicente Avila
Facsimile: 305-866-6478

20.8    Counterparts.  This Agreement and any written consents required to be executed by all Parties hereunder may be executed by the Parties, in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same document.

20.9    Further Assurances.  Each of the Members agrees to execute and deliver all such other and additional instruments and documents and to do such other acts and things as may be necessary to more fully effectuate this Agreement and the Company created hereby and to carry on the business of the Company in accordance with this Agreement.

41

20.10 <u>Headings</u>.  The Article and Section headings herein are for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

20.11 <u>Governing Law</u>.  The laws of the State of New York shall apply to this Agreement.

20.12 <u>No Third Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the Company and the Members and their respective successors and permitted assigns.

20.13 <u>Entire Agreement</u>.  This Agreement, including the Concurrent Documents, constitutes the entire agreement among the Parties, and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.

20.14 <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.  No Member may assign either this Agreement or any of its rights, interest, or obligations hereunder except pursuant to the terms hereof.

20.15 <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.



42

IN WITNESS WHEREOF, the undersigned parties have duly executed this Agreement as of the date first set forth above.

LATIN AMERICAN SPORTS, LLC

By:
Name: CARLOS AVILA
Title: CHAIRMAN

By:
Name: Jacopo Bracco
Title: Senior Vice President- Panamericana

PARK 610, LLC

By:
Name: CARLOS AVILA
Title: CHAIRMAN

DIRECTV LATIN AMERICA, LLC

By:
Name: Jacopo Bracco
Title: Senior Vice President- Panamericana

43

APPENDIX A

Certificate of Formation of Latin American Sports, LLC

# Delaware

PAGE 1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF FORMATION OF "LATIN AMERICAN SPORTS,
LLC", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF AUGUST,
A.D. 2006, AT 2:12 O'CLOCK P.M.





4208640  8100

060783033

Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 4991025

DATE: 08-22-06

## STATE of DELAWARE
## LIMITED LIABILITY COMPANY
## CERTIFICATE of FORMATION

- **First:** The name of the limited liability company is Latin American Sports, LLC

- **Second:** The address of its registered office in the State of Delaware is 2711 Centreville Road Suite 400 in the City of Wilmington, DE 19808. The name of its Registered agent at such address is Corporation Service Company

- **Third:** (Use this paragraph only if the company is to have a specific effective date of dissolution.) The latest date on which the limited liability company is to dissolve is

- **Fourth:** (Insert any other matters the members determine to include herein.)

In Witness Whereof, the undersigned have executed this Certificate of Formation this 22nd day of August, 20 06.

By: _____
Authorized Person(s)

Name: Juan Marchesi
Typed or Printed

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:10 PM 08/22/2006
FILED 02:12 PM 08/22/2006
SRV 060783033 - 4208640 FILE

**APPENDIX B**

**MANAGEMENT SERVICES AGREEMENT**

This Management Services Agreement (this "Agreement") is made and entered into as of August 1, 2006 (the "Effective Date"), by and between Park 610, LLC, a Delaware limited liability company ("Park 610") and Latin American Sports, LLC ("LAS"), a Delaware limited liability company.

WHEREAS, Park 610 and LAS desire to enter into this Agreement relating to the provision by Park 610 of certain management and advisory services as set forth herein;

WHEREAS, the Board of Directors of LAS has approved an initial plan and budget for LAS, and an initial finance plan for LAS (the "Initial Plans"), each of which is attached as an Appendix to the Limited Liability Company Agreement of LAS, dated as of August 22, 2006, among LAS, Park 610 and DIRECTV Latin America, LLC (the "LLC Agreement");

WHEREAS, LAS is in the business of creating, producing, promoting and operating a Spanish and Portuguese language television Channel comprised of golf programming (the "Business");

WHEREAS, LAS' Members and Board of Directors have determined that Park 610 can provide valuable assistance to LAS in connection with the implementation of the Initial Plans; and

WHEREAS, the provision of Management Services (as defined below) by Park 610 shall constitute a portion of the consideration provided by Park 610 in exchange for its 55% ownership interest in LAS.

NOW, THEREFORE, the parties, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agree as follows:

1.    Management Services.  During the Term of this agreement, Park 610 shall, within the parameters set forth in the Initial Plans (and any subsequent budgets and plans adopted in accordance with the LLC Agreement), the LLC Agreement and as directed by the General Manager of LAS, perform management and advisory services for LAS relating to the Business (the "Management Services"). Park 610 shall perform the Management Services in good faith, in the best interest of the Company and in a professional manner in accordance with industry standards for similar companies.

2.    Management Fees.  The Management Services to be performed hereunder by Park 610 shall serve as partial consideration for the 55% Ownership Percentage in LAS granted to Park

EXECUTION COPY

## MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement (this "Agreement") is made and entered into as of August 1, 2006 (the "Effective Date"), by and between Park 610, LLC, a Delaware limited liability company ("Park 610") and Latin American Sports, LLC ("LAS"), a Delaware limited liability company.

WHEREAS, Park 610 and LAS desire to enter into this Agreement relating to the provision by Park 610 of certain management and advisory services as set forth herein;

WHEREAS, the Board of Directors of LAS has approved an initial plan and budget for LAS, and an initial finance plan for LAS (the "Initial Plans"), each of which is attached as an Appendix to the Limited Liability Company Agreement of LAS, dated as of August 22, 2006, among LAS, Park 610 and DIRECTV Latin America, LLC (the "LLC Agreement");

WHEREAS, LAS is in the business of creating, producing, promoting and operating a Spanish and Portuguese language television Channel comprised of golf programming (the "Business");

WHEREAS, LAS' Members and Board of Directors have determined that Park 610 can provide valuable assistance to LAS in connection with the implementation of the Initial Plans; and

WHEREAS, the provision of Management Services (as defined below) by Park 610 shall constitute a portion of the consideration provided by Park 610 in exchange for its 55% ownership interest in LAS.

NOW, THEREFORE, the parties, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agree as follows:

1.     Management Services.  During the Term of this agreement, Park 610 shall, within the parameters set forth in the Initial Plans (and any subsequent budgets and plans adopted in accordance with the LLC Agreement), the LLC Agreement and as directed by the General Manager of LAS, perform management and advisory services for LAS relating to the Business (the "Management Services").  Park 610 shall perform the Management Services in good faith, in the best interest of the Company and in a professional manner in accordance with industry standards for similar companies.

2.     Management Fees.  The Management Services to be performed hereunder by Park 610 shall serve as partial consideration for the 55% Ownership Percentage in LAS granted to Park 610 under the LLC Agreement.  In addition, in consideration of the Management Services to be

provided hereunder, LAS shall pay Park 610 a management fee equal to twenty-five percent (25%) of the Advertising Revenues (as defined below) of LAS during the Exclusivity Period (as such term is defined in the LLC Agreement). Notwithstanding the foregoing, if the Exclusivity Period is extended for a fourth year pursuant to the terms of the license agreement between LAS and DIRECTV Latin America, LLC dated August 22, 2006, LAS and Park 610 shall negotiate in good faith an increased management fee for such fourth year of up to fifty percent of LAS's Advertising Revenues.    The parties shall consider the degree to which DTVLA retains exclusivity of the distribution of the golf channel produced by LAS in Latin America as the primary factor in negotiating the extent of the increase in the management fee.

"Advertising Revenues" shall mean all monies effectively received by LAS in connection with the sale of advertising, net of any discounts and VAT. For purposes of clarification, any discount granted to purchasers in the sale of advertising, shall not be considered as Advertising Revenues.

The Management Fees shall be paid by LAS to Park 610 monthly in arrears, within 30 days following the receipt of a satisfactory invoice relating thereto. All sums payable by LAS hereunder shall be due and payable in United States dollars and paid by wire transfer to such bank account as Park 610 may hereafter designate in writing. Park 610 shall notify LAS of its bank account details at least five (5) days prior to LAS's next scheduled payment unless the account remains unchanged since the last payment was made. Payments to Park 610 shall be free from any deduction, whether for tax (municipal, provincial, federal or otherwise), customs, bank, transfer or similar fees or charges.

3.     Term and Termination.  This Agreement will terminate at the earlier of (a) termination by LAS (which may occur any time after the expiration of the Exclusive Period in LAS' discretion) or (b) a Change of Control (as defined in the LLC Agreement) of Park 610.

4.     Corporate Opportunities; Non-solicitation.  For the Term of this Agreement, Park 610 shall not, without the prior written consent of LAS and LAS' Board of Directors, (a) divert to any Competitor of LAS, any potentially profitable opportunities related to the Business, or (b) solicit or encourage any officer, employee or consultant of LAS to leave its employ.

5.     Confidential Information; Rights in Data.  Section 12.6 of the LLC Agreement is hereby incorporated by reference, *mutatis mutandis*.  Park 610 also agrees that all work product produced under this Agreement in the course of performing the Management Services is work for hire and the sole and exclusive property of LAS, and not Park 610.  Such work product includes, but is not limited to, any inventions, improvements, methods, discoveries, designs and know-how, whether or not suitable for trade secret, copyright or patent protection, and any formulas, recommendations, analyses, software programs or packages, or any other type of information or material developed, conceived, or reduced to practice (whether planned or unplanned) in the course of performing the Management Services. Park 610 agrees to assign and hereby assigns to LAS (or any person or entity designated by LAS) all its right, title and interest in and to all work product and all related patents, patent applications, copyrights and copyright applications. Park 610 agrees to cooperate with the efforts of LAS to protect and secure its rights in any and all such work product. Park 610 further agrees to return or dispose of any and all

2

such work product as directed by LAS upon termination of this Agreement or at any other time at the request of LAS.

6.  **No Assignment.**  Neither party may assign its rights or obligations hereunder to any third party without the prior written consent of the other party, and any purported assignment in violation hereof shall be null and void.

7.  **Independent Contractor; No Authority.**  The parties hereto acknowledge and agree that Park 610 shall perform Management Services hereunder as an independent contractor, retaining control over and responsibility for its own operations and personnel.  Neither Park 610, any of its Affiliates or any of its members, employees, or agents shall be considered employees or agents of LAS for any purpose solely as a result of this Agreement.

8.  **Notices.**  Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by first class mail postage prepaid and return receipt requested) or sent by reputable overnight courier service (charges prepaid), or faxed, to the recipient at the address below indicated:

> To LAS:
>
> Latin American Sports, LLC
> c/o Corporation Services Company
> 2711 Centerville Road, Suite 400
> Wilmington, DE  19808
>
>
> To Park 610:
>
> Park 610, LLC
> 9999 Collins Ave. #17H
> Bal Harbour, FL 33154
> Attention:  Carlos Vicente Avila
> Facsimile: 305-866-6478

or such other address or to the attention of such other Person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Agreement shall be deemed to have been given when personally delivered, one business day after sent by reputable overnight courier service, five days after deposit in the U.S. mail or at such time as it is transmitted via facsimile, with receipt orally confirmed.

9.  **Severability.**  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced

3

in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

10.    Complete Agreement.  This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

11.    Counterparts; Facsimile Transmission.  This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.  Delivery of executed signature pages hereof by facsimile transmission shall constitute effective and binding execution and delivery of this Agreement.

12.    Amendment and Waiver.  The provisions of this Agreement may be amended and waived only by an instrument in writing signed by each of the parties hereto, and with the approval of the Board of Directors of LAS.

13.    Governing Law.  This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of New York.

14.    Definitions.  Capitalized terms used herein and not otherwise defined shall have the respective meanings given such terms in the LLC Agreement.

*    *    *    *    *

        IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

LATIN AMERICAN SPORTS, LLC

By: _____
Name: ROBERTO TIM STIT GENERAL MANAGER

PARK 610, LLC

By: _____
Name: CARLOS AVILA
Its: CHAIRMAN

4

**APPENDIX C**

## License Agreement

The following License Agreement is entered into as of August 1, 2006 between Latin American Sports, LLC ("Licensor"), a Delaware limited liability company organized and existing under the laws of Delaware and DIRECTV Latin America, LLC ("Licensee"), a Delaware limited liability company organized and existing under the laws of Delaware for the royalty-free license to distribute the television channel produced by the Licensor entitled "The Golf Channel Latin America" (the "Channel") over Licensee's direct-to-home satellite service ("Service") throughout Latin America (which shall include the Caribbean and Central and South America), excluding Puerto Rico and Mexico, subject to any necessary territorial limitations resulting from license agreements between Licensor and the content providers as informed by Licensor to Licensee from time to time (the "Territory").

1. <u>Grant of License</u>. Licensor hereby grants an irrevocable and royalty-free license to Licensee to receive and distribute the Channel via its Service during the Term (as defined in Section 4) for reception in the Territory. Such license shall be exclusive with respect to the Territory as provided in Section 5 below.

2. <u>Distribution and Delivery</u>. Licensee shall redistribute the Channel as transmitted by Licensor, in its entirety, as delivered by the Licensor without any intentional and willful editing, delays, alterations, interruptions, deletions or additions and with a signal quality equivalent to those of other channels distributed on the Licensee's DTH system. Licensor agrees that the encryption and decryption that is normally part of Licensee's signal processing does not constitute an alteration and/or other modification of the Channel. Licensor and Licensee expressly agree that neither party will charge the other for the Channel and that Licensor will provide to Licensee a decoder box or otherwise provide Licensee with sufficient technology to receive the Channel at Licensee's uplink center located at Lima 1262, in the city of Buenos Aires, Argentina, and the Licensee shall, at its sole cost and expense, obtain and maintain sufficient distribution facilities to transmit the Channel to its subscribers.

3. <u>The Channel</u>. The Channel shall consist of the entire broadcast signal of the Licensor presented on a 24-hour per day schedule, and of commercial, promotional or other announcements. Licensor and Licensee agree that no right or title in and to any content of the Channel shall vest or accrue in favor of Licensee. The parties further agree that Licensor shall retain 100% of the advertising revenues from the Channel.

4. <u>Term</u>. The term (the "Term") of this Agreement shall be co-extensive with the Exclusive Period as defined below.

5. <u>Exclusivity</u>. The license to distribute the Channel granted by Licensor to Licensee pursuant to Section 1 of this agreement shall be exclusive, with the exception of the Caribbean, to the Licensee in the Territory as from the date hereof of this agreement until July 31, 2009 (the "Exclusive Period"), provided, however, that if the Licensee exercises its right to limit its capital

EXECUTION COPY

## LICENSE AGREEMENT

The following License Agreement is entered into as of August 1, 2006 between Latin American Sports, LLC ("Licensor"), a Delaware limited liability company organized and existing under the laws of Delaware and DIRECTV Latin America, LLC ("Licensee"), a Delaware limited liability company organized and existing under the laws of Delaware for the royalty-free license to distribute the television channel produced by the Licensor entitled "The Golf Channel Latin America" (the "Channel") over Licensee's direct-to-home satellite service ("Service") throughout Latin America (which shall include the Caribbean and Central and South America), excluding Puerto Rico and Mexico, subject to any necessary territorial limitations resulting from license agreements between Licensor and the content providers as informed by Licensor to Licensee from time to time (the "Territory").

1. Grant of License. Licensor hereby grants an irrevocable and royalty-free license to Licensee to receive and distribute the Channel via its Service during the Term (as defined in Section 4) for reception in the Territory. Such license shall be exclusive with respect to the Territory as provided in Section 5 below.

2. Distribution and Delivery. Licensee shall redistribute the Channel as transmitted by Licensor, in its entirety, as delivered by the Licensor without any intentional and willful editing, delays, alterations, interruptions, deletions or additions and with a signal quality equivalent to those of other channels distributed on the Licensee's DTH system. Licensor agrees that the encryption and decryption that is normally part of Licensee's signal processing does not constitute an alteration and/or other modification of the Channel. Licensor and Licensee expressly agree that neither party will charge the other for the Channel and that Licensor will provide to Licensee a decoder box or otherwise provide Licensee with sufficient technology to receive the Channel at Licensee's uplink center located at Lima 1262, in the city of Buenos Aires, Argentina, and the Licensee shall, at its sole cost and expense, obtain and maintain sufficient distribution facilities to transmit the Channel to its subscribers.

3. The Channel. The Channel shall consist of the entire broadcast signal of the Licensor presented on a 24-hour per day schedule, and of commercial, promotional or other announcements. Licensor and Licensee agree that no right or title in and to any content of the Channel shall vest or accrue in favor of Licensee. The parties further agree that Licensor shall retain 100% of the advertising revenues from the Channel.

4. Term. The term (the "Term") of this Agreement shall be co-extensive with the Exclusive Period as defined below.

5. Exclusivity. The license to distribute the Channel granted by Licensor to Licensee pursuant to Section 1 of this agreement shall be exclusive, with the exception of the Caribbean, to the Licensee in the Territory as from the date hereof of this agreement until July 31, 2009 (the "Exclusive Period"), provided, however, that if the Licensee exercises its right to limit its capital contribution to the Licensor as provided in Section 7.3(d) of the Limited Liability Company Agreement of Licensee dated as of August 22, 2006 (the "LLC Agreement"), the Exclusive

Period shall end twelve months after the date of such exercise, and provided, further, that the Licensee shall have the option (exercisable in its sole discretion) to extend the Exclusive Period to July 31, 2010 in exchange for an increase in its capital contribution obligations as set forth in Section 7.3(f) of the LLC Agreement.

6.  Rights Required for the Distribution of the Channel.  Licensor has obtained or will obtain all necessary, trademarks, copyrights, licenses and any all other proprietary, intellectual property, music production, music performing rights and other rights necessary, in connection with or for Licensee's distribution of the Channel throughout the Territory, including, without limitation, the right to use the name of or logo of "The Golf Channel" or the names, titles or logos of the Channel or any of its programs, or the names, photographs, music likeliness or biographies of any individual participant or performers in, or contributor to, any program or any variation thereof and to perform its obligations hereunder and grant the rights granted pursuant to Section 1.  For purposes of clarification, Licensee shall be responsible for the payment to any music performing rights society or agency or author's literary and dramatic rights society or agency of such rights strictly related to the broadcast of the Channel by Licensee in the Territory.

7. Intellectual Property.    (a)  All right, title and interest in and to the Channel and the programming contained therein, including all promotional spots or other advertising materials produced or supplied by the Channel, ideas, formats and concepts contained therein or used in connection therewith (including all copyrights) shall be, as between the parties, at all times the sole and exclusive property of the Licensor, and Licensee shall not make any claim to the contrary.  Licensee shall not make any copies of any portion of the Channel and shall use its best efforts to prevent unauthorized reception of the Channel in the Territory.

(b)  The trademarks, service marks, logos and trade names "The Golf Channel", and all other names, service marks, trade names, logos and trademarks related to or associated with The Golf Channel, the Channel or designated by Licensor from time to time (collectively, the "Marks") are the sole and exclusive property of Licensor or have been licensed to the Licensor and nothing herein shall be deemed to give Licensee any proprietary right, title, or interest in or to the Marks, provided that Licensor hereby grants Licensee the limited right to use the Marks solely in connection with the promotion of the Channel during the Term of this Agreement.  Any promotional or publicity material prepared by, or for, Licensee that mentions or uses the Marks shall be in good taste and consistent with the philosophy and concept of the Channel.  Should Licensee become aware of any unauthorized copying or use of the Marks, in the Territory, it shall promptly notify Licensor in writing and shall provide Licensor with all assistance reasonably requested by Licensor in any investigation or actions taken with respect to such unauthorized conduct.  Upon the termination or expiration of this Agreement for any reason, this non-exclusive right to use the Marks in connection with the promotion of the Channel shall automatically terminate, and Licensee shall not thereafter use the Marks for any purpose whatsoever and shall return to Licensor or, at Licensor's direction, destroy any promotional or publicity materials or documents in its possession, power, custody or control that contain the Marks.




2

8.  Indemnification by Licensor.  Licensor shall indemnify and hold harmless Licensee, its Affiliated Companies (as defined below), Licensee's contractors, subcontractors and authorized distributors, local operators authorized to market, distribute and to provide Licensee's DTH services in Latin America (the "Local Operators"), and the directors, officers, employees, and agents of Licensee, such Affiliated Companies and such contractors, subcontractors, distributors and Local Operators (collectively, the "Licensee Indemnified Parties") from and against all claims, damages, liabilities, costs, expenses (including reasonable attorneys' and experts' fees) incurred in connection with any claim against a Licensee Indemnified Party arising our of or in connection with (A) Licensor's breach of any provision of this Agreement, (B) material or programming supplied by Licensor pursuant of this Agreement, including but not limited to compliance with any applicable laws or regulations applicable to the content of programming or the amount or type of advertising included in the Channel (C) the distribution or broadcast of any programming of the Channel which violates or requires payment for the use or performance of dramatic rights, (D) Licensor's advertising and marketing of the Channel and/or (E) any other materials, including advertising or promotional copy, supplied or permitted by Licensor.

In addition, Licensor shall pay and hold all Licensee Indemnified Parties harmless from any international, national, federal, district, provincial, state or local taxes or fees which are based upon revenues derived by, or the operations of, Licensor.  For the purposes of this Agreement, "Affiliated Companies" shall mean, with respect to any person or entity, any other person or entity directly or indirectly controlling, controlled by or under common control (i.e., the power to direct affairs by reason of ownership of voting stock, by contract or otherwise) with such person or entity and any member, director, officer or employee of such person or entity.

9.  Indemnification by Licensee.  Licensee shall indemnify and hold harmless Licensor, its Affiliated Companies (as defined above), and contractors, subcontractors, and each participant therein and the directors, officers, employees and agents of Licensor, (collectively, the "Licensor Indemnified Parties") from and against all claims, damages, liabilities, costs, expenses (including reasonable attorneys' and experts' fees) incurred in connection with any claim against a Licensor Indemnified Party arising our of or in connection with (A) Licensee's breach of any provision of the Agreement, including but not limited to any unauthorized distribution of the Product by Licensee outside of the Territory, (B) Licensee's advertising and marketing of the Channel (except with respect to claims relating to the specific content of advertising and marketing for which Licensor is solely responsible), and (C) any other materials, including advertising or promotional copy supplied or permitted by Licensee.

10.  No Warranties or Commitments.  Licensee represents and Licensor hereby agrees that the Direct-To-Home television service is a highly complex state of the art delivery system, subject to a potentially wide range of technical regulatory and other issues, and that any such issues could interfere with Licensee's distribution of the Channel.  Licensee shall not provide backup transponders or other backup equipment in orbit insurance or other means of assuring delivery of its signal.  Neither Licensee nor its Local Operators shall have any liability to any other person or entity with respect to any failure of Licensee or its Local Operators in the Territory to transmit or distribute the Channel or perform its obligations hereunder for any reason, including but not limited to failure which is due to (i) any failure or degradation in



3

performance of the feed source or the DTH satellite(s) or transponders on such satellites (as applicable) or of the Licensee's DTH distribution system, or of any scrambling/descrambling equipment or any other equipment. (ii) any failure at the origination and uplinking center used by Licensee, (iii) any labor dispute, fire, earthquake, flood, riot, government intervention, legal enactment, government regulation or any material change in applicable law(s), (iv) any act of war or act of God, or (v) any other cause beyond the reasonable control of Licensee or its Local Operators, as the cause may be (each a "Force Majeure").

11.  Limitation of Liability.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT SHALL ANY PARTY BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER FORESEEABLE OR NOT (INCLUDING WITHOUT LIMITATION, THOSE ARISING FROM NEGLIGENCE), OCCASIONED BY ANY FAILURE TO PERFORM OR BREACH OF ANY OBLIGATION UNDER THIS AGREEMENT FOR ANY CAUSE WHATSOEVER.

12.  Laws of New York.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

13.  Arbitration.  The parties agree to submit any disputes arising out of, relating to, or in connection with, the interpretation, execution or performance of this agreement to final and binding arbitration in accordance with the rules of the American Arbitration Association in effect on the date of this agreement.  The place of arbitration will be New York, New York and the English language will be used throughout the arbitral proceedings.  By this agreement the parties waive their right to any form of appeal or resource to a court of law or other judicial authority to the fullest extend permitted by law.

IN WITNESS WHEREOF, the undersigned parties have caused this Agreement to be executed by their duly authorized representative as of August 1, 2006.

LATIN AMERICAN SPORTS, LLC                    DIRECTV LATIN AMERICA, LLC

By: _____                 By: _____
Name: ROBERTO TINNISTIT                        Name: Jacopo Bracco
Title: GENERAL MANAGER                         Title: Senior Vice President- Panamericana

4

**APPENDIX D**

**[INITIAL PLAN TO BE INSERTED IN EXECUTION VERSION OF DOCUMENT]**

APPENDIX D

THE INITIAL PLAN OF LATIN AMERICAN SPORTS, LLC

| Cash Flow | Julio | IVA | Agosto | IVA | Septiembre | IVA | Octubre | IVA | Noviembre | IVA | Diciembre | IVA | Total Sin IVA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ingresos | | | | | | | | | | | | | |
| Abonados Directv TV | | | | | | | 29,160 | 6,135 | 29,160 | 6,135 | 29,167 | 6,135 | 87,486 |
| Abonados Claro | | | | | | | 45,261 | 9,385 | 45,261 | 9,385 | 45,261 | 9,385 | 135,783 |
| Ingreso Publicidad | | | | | | | | | | | | | |
| Ingreso Publicidad venta de LA | | | | | | | | | | | | | |
| Ingreso / Ingresos | | | | | | | | | | | | | |
| Turismo | | | | | | | | | | | | | |
| Merchandising - Varios | | | | | | | | | | | | | |
| Ingresos AAD | | | | | | | 3,917 | 823 | 3,917 | 823 | 3,917 | 823 | 11,750 |
| Sub Total Ingresos | | | | | | | 76,833 | 16,135 | 76,833 | 16,135 | 76,833 | 16,135 | 230,580 |
| | | | | | | | | | | | | | |
| Indirect Directv TV | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Total Ingresos | | | | | | | 76,833 | 16,135 | 76,833 | 16,135 | 76,833 | 16,135 | 230,500 |
| | | | | | | | | | | | | | |
| Impuesto a los Ingresos Brutos | | | | | | | 2,305 | | 2,305 | | 2,305 | | 6,910 |
| | | | | | | | | | | | | | |
| Total Ingresos Netos | | | | | | | | | | | | | 225,000 |
| | | | | | | | | | | | | | |
| Egresos | | | | | | | | | | | | | |
| Overhead | | | | | | | | | | | | | |
| Producción Tipo y Deriv/Eng | | | | 50,000 | | 35,000 | 55,000 | | 35,000 | | 35,000 | | 285,000 |
| TFX | | | | | | | 25,000 | | 25,000 | | | | 144,000 |
| PPV | | | | | | | | | | | | | 26,000 |
| TVX (Archivo) | | 15,000 | | 9,667 | | 6,667 | | | | | | | 54,000 |
| PGA Tour/Wenti... | | 75,000 | | 9,000 | | 6,000 | 9,000 | | 6,000 | | 26,000 | | 75,000 |
| PGA Tour | | 9,000 | | | | | | | | | | | 90,000 |
| Otros derechos / servicios | | | | | | | | | | | | | |
| Subtotal Mixed Overhead | | 216,667 | | 67,667 | | 87,667 | 133,000 | | 61,000 | | 78,000 | | 613,000 |
| | | | | | | | | | | | | | |
| Otros Egresos | | | | | | | | | | | | | |
| Overhead | | | | 24,671 | | 34,671 | 34,671 | | 34,671 | | 34,671 | | 973,286 |
| Soporte / gastos operativos, generales | | | | 24,271 | | 24,271 | 24,271 | | 24,271 | | 24,271 | | 124,264 |
| Bienes Raices | | | | | | | | | | | | | 16,080 |
| Mktg / Marketing | | | | 6,000 | 1,686 | 6,000 | 8,000 | 1,680 | 8,000 | 1,680 | 8,000 | 1,680 | 36,000 |
| Programas Contenidos | | | | 7,614 | 1,065 | 7,614 | 7,614 | 1,065 | 7,614 | 1,065 | 7,614 | 1,065 | 38,072 |
| Gastos Publicidad Arg | | | | | | | | | | | | | 1,275 |
| Publicidad venta LA | | | | | | | 8,760 | | 8,760 | | 8,760 | | 26,280 |
| Gastos de Promoción | | | | 25,854 | 5,380 | 25,654 | 25,654 | 5,380 | 25,854 | 5,380 | 25,654 | 5,380 | 122,288 |
| Fletes / Logística / IVA para venta/set | | | | 22,642 | 4,725 | 22,642 | 22,642 | 4,725 | 22,642 | 4,725 | 22,642 | 4,725 | 113,260 |
| Satelite Distribución | | | | | | | | | | | | | |
| Marketing/Promoción | | | | 10,000 | 2,100 | 10,000 | 10,000 | 2,100 | 10,000 | 2,100 | 10,000 | 2,100 | 54,000 |
| Viaticos | | | | 7,000 | 1,470 | 7,000 | 7,000 | 1,470 | 7,000 | 1,470 | 7,000 | 1,470 | 35,000 |
| Gastos Varios | | | | 15,363 | 3,383 | 15,363 | 16,586 | 3,383 | 16,591 | 3,383 | 15,463 | 3,383 | 79,864 |
| Total Otros Egresos | | 155,671 | | 155,671 | 19,764 | 155,671 | 210,882 | 19,764 | 161,744 | 19,764 | 185,068 | 19,764 | 1,824,877 |
| Sub Total Egresos | | 228,340 | | 223,340 | | 223,340 | 329,082 | | 233,044 | | 263,062 | | 2,137,877 |
| | | | | | | | | | | | | | |
| Management Fee | | | | | | | | | | | | | |
| Total Egresos | | 216,667 | | | | | | | | | | | 2,137,877 |
| | | | | | | | | | | | | | |
| Inversión Inicial | | | | | | | | | | | | | |
| Inversión en equipamiento técnico y de producciones | | 166,791 | 29,792 | 1,738 | | 1,738 | 1,738 | 361 | | | | | 174,691 |
| Inversión en equipamiento | | 10,000 | 3,195 | | | | | | | | | | 10,000 |
| Aseguramiento Legales e Impositivos | | 15,000 | 9,644 | | | | | | | | | | 15,000 |
| PC + software | | 5,000 | 1,064 | | | | | | | | | | 5,000 |
| Creación Logo | | 60,000 | 12,626 | | | | | | | | | | 60,000 |
| Inversión de Oficina residencia | | 10,000 | 525 | | | | | | | | | | 10,000 |
| Desarrollo Web | | 2,500 | | | | | | | | | | | 2,500 |
| Ingenería | | 8,000 | 1,680 | | | | | | | | | | 8,000 |
| Gastos preoperat y otros | | 24,472 | | | | | | | | | | | 24,472 |
| Total Inversión Inicial | | 322,818 | 350,374 | 1,738 | | 1,738 | 1,738 | 361 | | | | | 322,773 |
| | | | | | | | | | | | | | |
| Total Egresos + Inversiones IVA | | 539,485 | 350,374 | 225,000 | | 225,000 | 331,382 | | 233,044 | | 263,062 | | 2,460,650 |
| Cash Flow antes de financiación | | (305,374) | | (2,837) | | (2,837) | (245,715) | | (171,682) | | (109,972) | | (2,232,775) |









GOLF CHANNEL PROJECT - ESTIMATED FIGURES SUBJECT TO FINAL DISCUSSION

Business Plan (Economic)

| | Initial Investment | 2006 | 2007 | 2008 | 2009 (Jan-Jul) | 2009 (Aug-Dic) | 2010 | Final Year (2012) | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | 520,854 | 2,765,480 | 1,843,212 | 1,398,391 | 2,253,472 | 34,803,905 | 13,029,749 | 50,960,745 |
| Programming Fee | | 364,583 | 1,930,650 | 2,716,000 | 2,362,500 | 1,276,854 | 10,829,495 | 13,945,513 | 26,046,063 |
| Advertising | | 19,583 | 265,000 | 289,600 | 183,960 | 1,487,500 | 4,300,000 | 5,025,000 | 18,885,533 |
| Others | | 62,567 | 346,850 | 483,368 | 417,646 | 131,567 | 343,995 | 360,671 | 1,593,877 |
| Variable Costs | | 91,146 | 182,500 | 679,000 | 590,625 | 336,448 | 3,169,196 | 1,301,436 | 4,117,507 |
| Management Fee | | | | | | | | | 1,843,271 |
| **Costs** | | 1,341,776 | 3,673,443 | 4,042,559 | 3,970,401 | 2,935,345 | 7,881,553 | 8,959,751 | 30,980,011 |
| Rights | | 547,000 | 1,585,000 | 1,792,000 | 1,176,758 | 807,708 | 2,205,430 | 2,288,602 | 10,396,298 |
| Production & Operation Costs | | 794,052 | 2,088,443 | 2,255,366 | 1,353,643 | 1,247,637 | 5,676,123 | 6,675,259 | 20,090,793 |
| Initial Investment | 470,920 | | | | | | | | 370,920 |
| **Net Finance** | (470,920) | (1,110,598) | (2,307,793) | (2,226,434) | (992,210) | (691,128) | (6,922,443) | 9,069,818 | 9,804,734 |
| **Net Finance Acumu** | (470,920) | (1,581,518) | (3,889,311) | (6,093,445) | (7,085,655) | (6,385,527) | 5,534,916 | 9,604,734 | |

(1) The figures above do not consider any tax effect. Pending to define the formal location for the Mexico
(2) The marketing expenses after the exclusivity period have being calculated considering the 5% on net revenues
(3) After the exclusivity period it not being estimated programming revenues from cable/e operators and DirecTV operation
(4) The earnings cost to Mexico and Brasil is not included
(5) It is not contemplated the possible additional operation cost, for the option of sale 60 cable operators in Brasil and Mexico, related to the exclusivity period
(6) The Net Finance in this areas is contemplated in the BP spread sheet as the DirecTV inflows









| Commercial Marketing | | $ | 253,604 |
| --- | --- | --- | --- |
| | | $ | 455,333 |
| | | $ | 96,000 |
| | | $ | 551,333 |

| Costo Derechos: | Año 2006 | Año 2007 | Año 2008 | Año 2009 | Año 2010 | Año 2011 | Total |
|---|---|---|---|---|---|---|---|
| Golf Channel | $ 725,000 | $ 750,000 | $ 780,000 | $ 1,100,000 | $ 1,200,000 | $ 1,250,000 | $ 5,670,000 |
| European Tour | $ 210,000 | $ 250,000 | $ 280,000 | $ 320,000 | $ 350,000 | $ 370,000 | $ 1,810,000 |
| LPGA | $ 200,000 | $ 65,000 | $ 70,000 | $ 80,000 | $ 100,000 | $ 120,000 | $ 607,000 |
| Ryder Cup / Solheim | $ 20,000 | $ 45,000 | $ 75,000 | $ 48,000 | $ 80,000 | $ 48,000 | $ 948,000 |
| TWI (Ladies) | $ 25,000 | $ 25,000 | $ 69,000 | $ 92,000 | $ 25,000 | $ 124,000 | $ 496,000 |
| Subtotal Derechos 2007 | $ 462,000 | $ 1,284,000 | $ 1,464,000 | $ 1,631,000 | $ 1,786,000 | $ 1,844,000 | $ 8,521,000 |
| PGA Championship | $ 75,000 | $ 225,000 | $ 160,000 | $ 225,000 | $ 361,000 | $ 165,573 | $ 697,018 |
| PGA Tour | $ 30,000 | $ 150,000 | $ 165,000 | $ 190,000 | $ 196,000 | $ 200,000 | $ 998,000 |
| Otros derechos / eventos | $ | $ 30,000 | $ 73,000 | $ 36,000 | $ 58,000 | $ 41,027 | $ 161,019 |
| Subtotal derechos Deportivos | $ 105,000 | $ 405,000 | $ 398,000 | $ 981,000 | $ 2,005,000 | $ 410,600 | $ 1,999,627 |
| Total Derechos | $ 450,000 | $ 1,330,000 | $ 1,700,000 | $ 1,832,000 | $ 2,005,200 | $ 2,254,602 | $ 10,491,322 |



## Gastos Varios

| | Mensual |
|---|---|
| Teléfono | 3,500 |
| Librería | 4,000 |
| Seguros | 1,500 |
| Internet | 1,000 |
| Web | 5,000 |
| Luz | 4,400 |
| Telefonía celular | 2,300 |
| Motos | 1,500 |
| Otros | 10,000 |
| Expensas | 2,640 |
| Gastos Administrativos (Abogados, Contadores, etc) | 13,000 |
| Alquiler oficina | - |
| Seguridad | - |
| **Total gastos en $** | **48,840** |

**Total Gastos Varios Mensuales en U$S** | 15,961

| | |
|---|---|
| Cantidad metros cuadrados | 330 |
| Costo / m2 alquiler | 0 |
| Costo / m2 expensas | 8 |



| | | Año 2006 | Año 2007 | Año 2008 | Año 2009 | Año 2010 | Año 2011 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **Ingresos publicitarios** | | | | | | | | |
| Ingresos Argentina | | $ 145,833 | $ 700,000 | $ 1,000,000 | $ 1,900,000 | $ 1,800,000 | $ 1,890,000 | $ 7,035,833 |
| Ingresos LA | | $ 218,750 | $ 1,230,000 | $ 1,716,000 | $ 2,500,000 | $ 3,000,000 | $ 3,135,000 | $ 11,849,750 |
| **Costos Publicidad** | | | | | | | | |
| Escala comisiones Argentina | $0 $900,000 $1,000,000 | $900,000 $1,000,000 $2,500,050 | 5% 5% 5% | | | | | |
| Costo Publicidad Argentina | 20% | $ 7,292 | $ 35,000 | $ 50,000 | $ 75,000 | $ 90,000 | $ 94,500 | $ 351,792 |
| Costo Publicidad LA | | $ 43,750 | $ 246,000 | $ 343,200 | $ 510,000 | $ 600,000 | $ 627,000 | $ 2,369,950 |

**APPENDIX F**

**GOLF CHANNEL AGREEMENT**

**APPENDIX H**

**INITIAL DIRECTORS AND OFFICERS OF THE COMPANY**

**EFFECTIVE AS OF AUGUST 22, 2006**

**INITIAL DIRECTORS OF THE COMPANY:**

**Park 610 Directors**

Carlos Vicente Avila
Celeste Avila
Juan Cruz Avila

**DTVLA Directors**
Jacopo Bracco (Richard Nerod, alternate)
Carlos Pratola

**INITIAL OFFICERS OF THE COMPANY:**
Carlos Avila, Chairman
Roberto Timistit, General Manager

**MEMBER REPRESENTATIVE:**

**For Park 610:**
Carlos Avila

**For DTVLA:**
Jacopo Bracco



**APPENDIX I**

**PRODUCTION SERVICES AGREEMENT**

This Production Services Agreement (the "Agreement"), dated as of August 1, 2006, is between Latin American Sports, LLC ("Latin American Sports"), a Delaware limited liability company, and New Hollywood Producciones, S.A.  ("New Hollywood"), a *sociedad anónima* organized under the laws of the Republic of Argentina.

1.  **Recitals.**

WHEREAS, New Hollywood is in the business of producing and supplying television programming for use in subscription television services, among other things, and has access to facilities used in the production and transmission of golf related programming and other audiovisual material;

WHEREAS, LAS, and Park 610 have entered into a Limited Liability Company Agreement of LAS dated as of August 22, 2006, pursuant to which they have agreed to create, produce, promote and operate a Spanish and Portuguese language television channel comprised of golf programming, which shall initially be based in part on the U.S. feed of "The Golf Channel" for distribution in Latin America (the "Channel"); and

WHEREAS, LAS wishes to acquire certain technical services and access to subscription television production and transmission facilities in connection with its operation of the Business and New Hollywood has agreed to provide such services and access to facilities to LAS in accordance with the terms and conditions set forth in this Agreement.

2.  **Production and Delivery.**

New Hollywood shall provide the production and technical services requested by LAS from time to time in connection with the production and distribution by LAS of the Channel.  New Hollywood shall perform any and all services pursuant to this Agreement in good faith and in a timely and professional manner in accordance with industry standards.  Production services provided by New Hollywood shall be of the highest production quality, meeting or exceeding LAS's production standards for its broadcasts and of a standard of quality which is commercially reasonable based upon the then-prevailing industry standard in connection with the production and transmission of subscription television services other than the Channel in the Territory.

EXECUTION COPY

## PRODUCTION SERVICES AGREEMENT

This Production Services Agreement (the "Agreement"), dated as of August 1, 2006, is between Latin American Sports, LLC ("Latin American Sports"), a Delaware limited liability company, and New Hollywood Producciones, S.A. ("New Hollywood"), a *sociedad anónima* organized under the laws of the Republic of Argentina.

1.  **Recitals.**

WHEREAS, New Hollywood is in the business of producing and supplying television programming for use in subscription television services, among other things, and has access to facilities used in the production and transmission of golf related programming and other audiovisual material;

WHEREAS, LAS, and Park 610 have entered into a Limited Liability Company Agreement of LAS dated as of August 22, 2006, pursuant to which they have agreed to create, produce, promote and operate a Spanish and Portuguese language television channel comprised of golf programming, which shall initially be based in part on the U.S. feed of "The Golf Channel" for distribution in Latin America (the "Channel"); and

WHEREAS, LAS wishes to acquire certain technical services and access to subscription television production and transmission facilities in connection with its operation of the Business and New Hollywood has agreed to provide such services and access to facilities to LAS in accordance with the terms and conditions set forth in this Agreement.

2.  **Production and Delivery.**

New Hollywood shall provide the production and technical services requested by LAS from time to time in connection with the production and distribution by LAS of the Channel. New Hollywood shall perform any and all services pursuant to this Agreement in good faith and in a timely and professional manner in accordance with industry standards. Production services provided by New Hollywood shall be of the highest production quality, meeting or exceeding LAS's production standards for its broadcasts and of a standard of quality which is commercially reasonable based upon the then-prevailing industry standard in connection with the production and transmission of subscription television services other than the Channel in the Territory.

3.  **No Agency.**

New Hollywood shall not have any right to enter into agreements on behalf of, or otherwise bind, LAS.

4.  **Fees.**

4.1  Latin American Sports will pay to New Hollywood for its services rendered hereunder such fees as the parties may agree from time to time for specific production and procurement services and projects related to the Channel. Any fees payable by Latin American Sports to New

Hollywood shall only be payable if approved by Latin American Sports and documented in an invoice in a form reasonably satisfactory to LAS.

4.2 The Fees payable under this Agreement will be inclusive of any and all applicable commissions, back up withholding taxes, income tax withholding at source, sales taxes, import or export taxes, import or export permit fees or similar taxes or charges imposed or levied against Latin American Sports, and Latin American Sports may withhold and pay any such taxes or charges to the appropriate collecting authority.

5. **Intellectual Property**. As between LAS and New Hollywood, LAS shall own all right, title and interest in all footage, promotional and other materials produced or developed in connection with the services provided by New Hollywood pursuant to this Agreement (the "LAS Material"), including without limitation, the right to use, display, modify, edit, cut, distribute or otherwise use the LAS Material in any way for any reason under any trademarks or tradenames with no additional compensation payable to New Hollywood.

New Hollywood hereby assigns to LAS, without the necessity of additional action being taken, all of the New Hollywood's right, title and interest, if any, in such LAS Material. Without limiting the generality of the foregoing, New Hollywood agrees that any material produced by it which is eligible for United States copyright protection or protection under any international treaty or foreign law covering the protection of proprietary rights including, without limitation, the Universal Copyright Convention, the Berne Copyright Convention and/or the Buenos Aires Copyright Convention shall be a work made for hire and ownership of all copyrights (including all renewals and extensions) therein shall vest in LAS. If any of the LAS Material is deemed not to be a work made for hire for any reason, the New Hollywood hereby grants, transfers and assigns all right, title and interest in the LAS Material and all copyrights in such work and all renewals and extensions thereof to LAS.

New Hollywood agrees to provide all assistance reasonably requested by LAS in the establishment, preservation and enforcement of the foregoing rights; *provided however* that LAS shall advance and/or refund any and all costs New Hollywood incurs in providing such assistance unless the enforcement thereof results from a breach or misrepresentation of New Hollywood of the terms of this Agreement.

The New Hollywood hereby agrees to and does hereby waive the enforcement of all moral rights with respect to the LAS Material, including without limitation any and all rights of identification of authorship and any and all rights of approval, restriction or limitation on use or subsequent modifications.

New Hollywood hereby grants an exclusive unlimited license to LAS for the use and inclusion of any content or material provided to LAS in any live broadcast or future rebroadcast of such content or material.

6. **Term**. The term of this Agreement (the "Term") shall be two (2) years from the date hereof. However, the Term shall be automatically extended for additional periods of one year absent thirty calendar day's notice prior to the end of the Term by one party to the other that is desires to terminate this Agreement.

2

7. **Non-Competition.** During the Term and for a period of one year thereafter, New Hollywood shall not, and shall not permit any of its affiliates, to participate in any manner in the production and distribution of a television channel devoted to golf programming which is competitive with golf programming distributed by LAS from time to time.

8. **Representations and Warranties.** LAS represents and warrants to NH that:

      (i)     the transmission content delivered to NH by LAS (and not produced by NH) for the Channel:

          (a)     libel, slander or defame any Person;

          (b)     violate or infringe any Person's statutory, contractual or common law rights, including any Person's copyright or other intellectual property; or

          (c)     contravene any law, rule or regulation imposed from time to time by any authority or agency having jurisdiction over the television programming comprising the transmission content.

9. **Indemnification.** LAS and NH shall indemnify each other and their respective shareholders, members, directors, officers, employees and agents and agrees to hold each of them harmless at all times from and after the Effective Date against and in respect of any and all losses resulting from any misrepresentation, breach of warranty or obligation of the other under this Agreement.

10. **Independent Contractors.** New Hollywood is an independent contractor under this Agreement. Neither party shall be deemed an agent of the other nor will either party have authority to enter into agreements of any kind on behalf of the other. New Hollywood, and not LAS, shall be responsible for reporting, withholding and paying all employer obligations in the nature of payroll taxes, income taxes, workers' compensation, and similar requirements of employers with respect to the New Hollywood's employees who render service to LAS or for LAS's benefit.

11. **Miscellaneous.**

      (a)  Litigation. If any dispute arising out of this Agreement cannot be resolved by the Parties through negotiation, mediation or another form of alternative dispute resolution within three (3) months, the dispute may be submitted to a court of competent jurisdiction located in New York, New York for resolution. The use of any alternative dispute resolution procedures shall not be construed under the doctrine of laches, waiver or estoppel to adversely affect the rights of either party. Nothing in this paragraph shall prevent either party from commencing formal litigation proceedings if (i) good faith efforts to resolve the dispute under these procedures have been unsuccessful or (ii) any delay resulting from efforts to mediate such dispute could result in serious and irreparable injury to such party.

      In the event of any litigation under this Agreement, the prevailing party shall be entitled to costs and reasonable attorney's fees. The parties hereto irrevocably waive trial by jury. In the event of any litigation, the parties hereto agree that the courts in New York, New

York shall have exclusive jurisdiction to resolve any dispute, with each party hereto irrevocably consenting to such jurisdiction and venue.

(b)  Choice of Law.  This Agreement shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

(c)  Notices.  Any notice, demand or other communications (each, a "Notice") which may be or is required to be sent pursuant to this Agreement must be in writing and must be:  (i) mailed by first-class mail, registered or certified, return receipt requested, postage prepaid; (ii) hand delivered personally by independent courier with the capacity to verify receipt of delivery; (iii) sent by a recognized overnight courier service (such as Federal Express or DHL); or (iv) transmitted by facsimile, with electronic confirmation of delivery, to the parties at the following addresses:

if to Latin American Sports:

Latin American Sports, LLC
c/o Corporation Services Company
2711 Centerville Road, Suite 400
Wilmington, DE  19808

if to New Hollywood Producciones S.A.:

New Hollywood Producciones S.A.
Balcarce 510
Buenos Aires (C1064AAL)
Argentina
Facsimile: 5411-43494804

Either party may designate a new address to which any Notice should be given by so notifying the other party in writing.  Each Notice that is sent in the manner described above will be deemed received for all purposes at such time as it is delivered to the addressee (with the return receipt, the courier delivery receipt or the facsimile answerback confirmation being deemed conclusive evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

(d)  Entire Agreement.  This Agreement and any attachment hereto, constitutes the full and complete understanding of the parties with respect to its subject matter and supersedes all prior written and oral agreements and understandings of any kind.

(e)  Modification / Waiver.  This Agreement may not be amended or modified or any provision or obligation waived or changed except by a writing executed by the party sought to be charged thereby.

4

(f)     Severability.  If any provision of this Agreement is to be held by a court of competent jurisdiction, for any reason, to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provision of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained herein.  The parties will endeavor to negotiate in good faith to replace the invalid, illegal or unenforceable provisions with valid provisions that will give effect to the original intentions of the parties.

(g)     No Waiver.  No failure or delay of any party in exercising any power or right under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.

(h)     Captions.  The titles of the Sections of this Agreement are for reference and convenience only and will not in any way affect the intent or interpretation this Agreement.

(i)     Successors and Assigns.  The obligations and benefits of this Agreement shall not be assignable or otherwise transferable by a party without the written consent of the other party hereto.

(j)     Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together will constitute one single agreement between the parties.

IN WITNESS WHEREOF, New Hollywood and LAS have executed this Agreement as of the date first written above to constitute a binding contract between them.

NEW HOLLYWOOD PRODUCCIONES S.A.          LATIN AMERICAN SPORTS, LLC

By: _____                    By: _____
Name: _____                    Name: _ROBERTO TIMISTIT_
                                                        _GENERAL MANAGER_

5

**APPENDIX J**

**OWNERSHIP PERCENTAGES**

**EFFECTIVE AS OF AUGUST 22, 2006**

Park 610, LLC, 55%

DIRECTV Latin America, LLC, 45%



7