**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
DIRECTV LATIN AMERICA, LLC,                    :
individually and in the right and on behalf    :
of LATIN AMERICAN SPORTS, LLC,                 :
                                               :
                                               :
                        Plaintiff,             :
                                               :
            v.                                 :          08 Civ. 3987 (VM)(GW)
                                               :
PARK 610, LLC,                                 :
CARLOS VICENTE AVILA,                          :
ROBERTO TIMISTIT,                              :
CARLOS PRATOLA,                                :
ALEJANDRO ZUNDA CORNELL,                       :
DIEGO CLEMENTE and DOES                        :
1 through 10,                                  :
                        Defendants,            :
                                               :
            and                                :
                                               :
LATIN AMERICAN SPORTS, LLC,                    :
                                               :
            as a Nominal Defendant.            :
-------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS PARK 610 LLC, CARLOS VICENTE AVILA AND ROBERTO TIMISTIT'S MOTION TO DISMISS THE AMENDED VERIFIED COMPLAINT

FOX HORAN & CAMERINI LLP
V. David Rivkin (VR-6734)
JooYun Kim (JK-7290)
825 Third Avenue
12th Floor
New York, New York  10022
Tel:  (212) 480-4800
Fax:  (212) 269-2383
*Attorneys for Defendants Park 610
LLC, Carlos Vicente Avila and
Roberto Timistit*

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ......................................................................... 1

FACTS ............................................................................................................... 2

LEGAL ARGUMENT ........................................................................................ 7

I.     STANDARD FOR MOTION TO DISMISS ........................................... 7

II.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR BREACH OF CONTRACT AGAINST DEFENDANT PARK 610 ........................................... 8

    A.    DLA-LLC Has Failed to Allege Plausibly that Park 610 Caused a "Change of Control" in Breach of the Joint Venture Agreement ............... 9

    B.    DLA-LLC Has Failed to Allege Plausibly that Park 610 Transferred its Membership Interest in Breach of the Joint Venture Agreement ........................................................................................... 10

    C.    DLA-LLC Has Failed to Allege Plausibly that Park 610 Breached Section 12.5 of the Joint Venture Agreement ........................................... 12

III.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR DECLARATORY JUDGMENT ........................................................................ 13

IV.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR FRAUD AGAINST DEFENDANTS PARK 610, AVILA AND TIMISTIT ..................... 14

    A.    DLA-LLC Has Failed to Identify any Misrepresentation by Defendants Park 610, Avila and Timistit ................................................ 14

    B.    DLA-LLC Has Failed to Allege Plausibly That it Relied Upon any Alleged Misrepresentation or Omission to its Detriment or State How it Was Damaged Thereby ................................................................ 16

V.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST DEFENDANTS PARK 610, AVILA AND TIMISTIT ............................................................................................... 17

    A.    DLA-LLC Has Failed to Allege Plausibly that Defendants Avila and Timistit Breached Their Fiduciary Duties to LAS ............................ 17

    B.    DLA-LLC Has Failed to Allege Plausibly that Defendants Park 610 and Avila Breached Their Fiduciary Duties to DLA-LLC ................ 20

CONCLUSION ................................................................................................... 23

## TABLE OF AUTHORITIES

**Page No(s).**

### CASES

*ALJ Capital I., L.P. v. David J. Joseph Co.,*
  15 Misc.3d 1127(A), No. 601591/06, 2007 WL 1218355 (Sup. Ct. N.Y. Co.
  Mar. 13, 2007) ............................................................................................................. 8

*ATSI Commc'ns v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007) ................................................................................... 7, 8

*Bakerman v. Sidney Frank Importing Co.,*
  No. Civ. A. 1844-N, 2006 WL 3927242 (Del. Ch. Oct. 16, 2006) ............................ 19

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,*
  57 F.3d 146 (2d Cir. 1995) ..................................................................................... 14

*Bell Atl. Corp. v. Twombly,*
  127 S.Ct. 1955 (2007) ............................................................................................ 7, 8

*Brehm v. Eisner,*
  746 A.2d 244 (Del. 2000) ........................................................................................ 19

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,*
  98 F.3d 13 (2d Cir. 1996) .................................................................................. 14, 15

*Brownstone Inv. Group, LLC v. Levey,*
  468 F. Supp. 2d 654 (S.D.N.Y. 2007) ...................................................................... 15

*Faulkner v. Beer,*
  463 F.3d 130 (2d Cir. 2006) ...................................................................................... 7

*In re NYSE Specialists Sec. Litig.,*
  503 F.3d 89 (2d Cir. 2007) ........................................................................................ 7

*Iqbal v. Hasty,*
  490 F.3d 143 (2d Cir. 2007) ...................................................................................... 8

*Kramer v. W. Pac. Indus. Inc.,*
  546 A.2d 348 (Del. 1988) ........................................................................................ 21

*Kurtzman v. Bergstol,*
  40 A.D.3d 588, 835 N.Y.S.2d 644 (2d Dep't 2007) .................................................. 17

*Marcus v. Lincolnshire Mgmt., Inc.,*
  409 F. Supp. 2d 474 (S.D.N.Y. 2006) ...................................................................... 21

*Mills v. Polar Molecular Corp.,*
  12 F.3d 1170 (2d Cir. 1993) ..................................................................................... 15

*Sofi Classics S.A. de C.V. v. Hurowitz,*
  444 F. Supp. 2d 231 (S.D.N.Y. 2006) ...................................................................... 14

*Solow v. Aspect Resources, LLC,*
 No. Civ.A. 20397, 2004 WL 2694916 (Del. Ch. Oct. 19, 2004)................................. 22

*Space, Inc. v. Simowitz,*
 No. 08 Civ. 2854 (SAS), 2008 WL 2676359 (S.D.N.Y. Jul. 8, 2008) ...................... 7, 8

*Spitzer v. Schussel,*
 48 A.D.3d 233, 850 N.Y.S.2d 431 (1st Dep't 2008) ................................................... 14

*William Kaufman Org., Ltd. v. Graham & James LLP,*
 269 A.D.2d 171, 703 N.Y.S.2d 439 (1st Dep't 2000) ................................................. 22

## RULES

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 1

Fed. R. Civ. P. 9(b) ................................................................................................ 8, 14

## PRELIMINARY STATEMENT

Defendants Park 610 LLC ("Park 610"), Carlos Vicente Avila and Roberto Timistit, by their attorneys Fox Horan & Camerini LLP, respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the Amended Verified Complaint ("Complaint" or "Compl.") filed by plaintiff DIRECTV Latin America LLC ("DLA-LLC"). A copy of the Complaint is attached as Exhibit 1 to the Declaration of V. David Rivkin, dated July 25, 2008 ("Rivkin Decl.")

At its heart, this dispute involves claims by DLA-LLC against Park 610 for breach of a joint venture agreement entered into between those two entities in 2006 to launch and operate a golf-themed television channel in Latin America. As set forth below, no breach of the joint venture agreement has occurred.

In its Complaint, DLA-LLC attempts to portray itself as a business partner scorned. The truth, however, is that despite all its rhetoric about "bait and switch" tactics and "mysterious" wire transfers, DLA-LLC has received exactly what it has bargained for and more – a 45% membership interest in a successful joint venture to distribute the Golf Channel in Latin America with Carlos Vicente Avlia at its helm, overseeing day to day operations.

DLA-LLC's motive for commencing the lawsuit is transparent: to seize from Park 610 its 55% membership interest and investment in the joint venture without paying for it. By claiming that Park 610 has breached the joint venture agreement, DLA-LLC seeks to exercise a Call Option in the agreement, which if permitted, would result in DLA-LLC obtaining Park 610's 55% interest in the joint venture for next to nothing, and in Park 610 forfeiting its entire interest and investment in the joint venture to DLA-LLC.

Even if DLA-LLC's allegations in its Complaint are taken as true, under the plain reading of the joint venture agreement at issue, no breach could have or did take place. In addition to its principal allegation of breach of contract, DLA-LLC also interposes claims against Park 610 as well as against individual defendants Carlos Vicente Avila and Roberto Timistit sounding in breach of fiduciary duty and fraud. These claims likewise lack merit, as will be shown below, and must, therefore, be dismissed.

**FACTS**

**Parties**

Defendant Park 610 is a Delaware limited liability company. Park 610 has two members, Tumely S.A. ("Tumely") and Loraine S.A. ("Loraine"), each a Uruguayan corporation, and each holding a 50% interest in Park 610. (Compl. ¶¶ 8, 9, 41).

Plaintiff DLA-LLC is a Delaware limited liability company. (Compl. ¶ 5).

DLA-LLC and Park 610 LLC ("Park 610") are partners in a joint venture called Latin America Sports, LLC ("LAS"), a nominal defendant in this action. LAS is a Delaware limited liability company. Park 610 owns a 55% membership interest in LAS, while DLA-LLC owns a 45% membership interest in LAS. (Compl. ¶¶ 17, 18).

Defendant Carlos Vicente Avila is the founder of Park 610, and he became LAS's Chairman after it was created. (Compl. ¶ 11). Mr. Avila has over 40 years experience in media and sports programming, and has an extensive network of industry contacts throughout the world. His experience and contacts enable him to identify sports programming opportunities, and to negotiate deals and acquire rights for highly sought after sports programming properties and content. *See* Declaration of Carlos V. Avila in Support of Defendants' Motion to Dismiss, dated July 24, 2008 ("Avila Decl.") ¶ 3.

2

Mr. Avila's resume of accomplishments in the sports and media industry are legion. In 1977, he created his own billboard company. In 1982, he created Torneos y Competencias, which today is one of the most renowned sports production companies in Latin America (in which DLA-LLC has recently acquired an interest of approximately 35%). *Id.* In 1985, he acquired the world rights for professional Argentine soccer through 2014 as well as the rights for South American soccer championships such as Copa Libertadores and Copa Sudamericana (similar to the European Cup). *Id.* He was involved in the creation of TyC Sport, a 24-hour broadcasting channel similar to ESPN. *Id.* In 1992, he negotiated and acquired exclusive rights to transmit the soccer matches of the Argentine Football Association – Argentina's premier soccer league. In 1994 he arranged for and helped TCI (today, Liberty Media) acquire Argentina's largest cable operator at the time – Cablevisión. *Id.* He partnered with the largest media group in Argentina, Grupo Clarín, which is the owner of Argentina's main open television channel, channel 13, and Clarín, one of the leading newspapers in Argentina with a circulation of 500,000 and a key shareholder of Cablevisión / Multicanal with 3.5 million subscribers in Argentina. *Id.*

Defendant Roberto Timistit is the Chief Executive Officer of LAS. (Compl. ¶ 13). Neither Mr. Avila nor Mr. Timistit are parties to the joint venture agreement or any related agreement, nor personally own any membership interest in LAS or in Park 610, nor have they personally guaranteed any of Park 610's obligations under the joint venture agreement or any related agreements.

**The Joint Venture**

In February 2006, Mr. Avila approached DLA-LLC about creating a golf-themed channel for broadcast in Latin America. DLA-LLC expressed interest in the idea, recognizing the market potential for such programming. *See* Avila Decl. ¶ 4. The parties agreed to explore a joint venture partnership to launch a golf-themed channel in Latin America (the "Joint Venture").[1] The terms of the Joint Venture were eventually set out in a Limited Liability Company Agreement dated August 22, 2006 (the "Joint Venture Agreement") entered into among LAS, DLA-LLC and Park 610. A copy of the Joint Venture Agreement is attached as Exhibit A to the Avila Declaration. LAS was created to be the vehicle through which DLA-LLC and Park 610 would distribute golf programming in Latin America in the form of a channel to be called "Golf Channel Latin America." *Id.* ¶ 5.

Under the terms of the Joint Venture Agreement, DLA-LLC was obligated to contribute up to $7,000,000 in financing, while Park 610 agreed to provide programming content, marketing and promotional expertise, as well as the experience, organizational skills, and the business management and technical know-how necessary to launch a successful sports programming channel in Latin America. (Joint Venture Agreement, §§ 7.3, 7.4).

To that end Park 610 recruited and hired managers for the launch and operation of Golf Channel Latin America. It recruited and hired a production company,

---

[1]     Despite DLA-LLC's contention in the Complaint that Carlos Pratola and Alejandro Zunda Cornell took leading roles in negotiating with Park 610 LLC, in fact others such as Jacopo Bracco, Senior Vice President and General Manager of DIRECTV PanAmericana and Richard C. Nerot, Vice President of Programming of DLA-LLC also had prominent roles in negotiating on behalf of DLA-LLC.

commentators, sportscasters and other on-air personalities, secured office space and organized the operational staff. It acquired technical equipment and set up the central control, arranged for connectivity and satellite capacity, produced programming, prepared business and investment plans, and developed commercial and marketing strategies. *See* Avila Decl. ¶ 8.

By all accounts, the roll-out of Golf Channel Latin America has been a huge success. The channel is up and running, advertising revenue has been steadily increasing, and the high profile of the channel's roll-out has garnered interest from at least one investor, a preeminent sports media conglomerate, who has estimated that the "fair market value" of Golf Channel Latin America to be in the tens of millions of dollars, *see id.* ¶ 19, (even though the Joint Venture's "book value" today is close to zero because it is still in the start-up phase). The channel continues to attract and obtain highly sought after programming content, and its viewership is growing steadily. Mr. Avila remains the chairman of LAS, and continues to run the Joint Venture's business to the best of his abilities, and using his business judgment as to what is in the best interest of LAS. *See id.* ¶ 30.

**<u>DLA-LLC's Allegations of Breach of the Joint Venture Agreement</u>**

Despite the vitality of LAS and the exponential increase in the market value of DLA-LLC's investment in the Joint Venture, DLA-LLC contends that Park 610 has breached the agreement in various ways, and that such breaches constitute "Events of Default" as defined in Section 13.1 of the Joint Venture Agreement.

Specifically, DLA-LLC alleges that there has been (1) an "occurrence of Change of Control of a Member" constituting an Event of Default pursuant to Section 13.1(e) of

the Joint Venture Agreement; (2) an "attempt by a Member to Transfer any of its Membership Interests other than in accordance with the terms of [the Joint Venture Agreement]" constituting an Event of Default pursuant to Section 13.1(c) of the Joint Venture Agreement, and (3) a violation of Section 12.5 of the Joint Venture Agreement, which prohibits "Members" of LAS from, *inter alia*, doing "business . . . [with a] person that results in conflict of interest or embarrassment to the Company or any of the Members." (Compl. ¶¶ 30-35).

Pursuant to Section 13.2 of the Joint Venture Agreement, a Non-Defaulting Member has the right to require the Defaulting Member to sell all of its Membership Interest (the "Call Option") to the Non-Defaulting Member as provided in Section 13.4.

Section 13.4 of the Joint Venture Agreement sets forth a Call Option Procedure whereby in the case of an Event of Default, as alleged in this case by DLA-LLC, Park 610 would be required to sell its 55% interest in LAS for either "net book value" or "80% of net book value," depending on the nature of the Event of Default.

By asserting that the above outlined Events of Default have occurred, even though the allegations in the Complaint do not amount to such violations of the Joint Venture Agreement, DLA-LLC is not seeking to vindicate its rights or to recover any "damages" that it has suffered. Rather, recognizing that the Joint Venture's true worth, or "fair market value," is in the tens of millions of dollars, DLA-LLC has concocted purported "breaches" of the Joint Venture Agreement in order to take away Park 610's Membership Interest in LAS for "net book value," or next to nothing. This Court should not permit DLA-LLC to obtain such a windfall.

More importantly, the facts alleged by DLA-LLC in its Complaint, even if taken as true, do not amount to a breach of the Joint Venture Agreement, nor are DLA-LLC's allegations sounding in breach of fiduciary duty and fraud sufficient to withstand dismissal.

## LEGAL ARGUMENT

### I.    STANDARD FOR MOTION TO DISMISS

"When deciding a defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must 'accept as true all of the factual allegations contained in the complaint,' *Space, Inc. v. Simowitz*, No. 08 Civ. 2854 (SAS), 2008 WL 2676359, at *1 (S.D.N.Y. Jul. 8, 2008) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1975 (2007)), and 'draw all inferences in the light most favorable to the non-moving party,'" *id.* (quoting *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)). "Nevertheless, the court needed not accord 'legal conclusions, deductions or opinions couched as factual allegations a presumption of truthfulness.'" *Id.* (quoting *In re NYSE Specialists*, 503 F.3d at 95).

"In deciding a motion to dismiss, the court is not limited to the face of the complaint, but 'may also consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.'" *Id.* at *2 (quoting *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). "However, 'before materials outside the record may become the basis for a dismissal it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.'" *Id.* at *2 (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

"To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of 'plausibility.'" *Id.* (quoting *Bell Atl. Corp.*, 127 S.Ct. at 1970)). Generally, "[a]lthough the complaint need not provide 'detailed factual allegations,' *id.* (quoting *Bell Atl.*, 127 S.Ct. at 1970), it must 'amplify a claim with some factual allegations to render the claim *plausible*,'" *id.* (quoting *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original)). Of course, for claims involving fraud, Fed. R. Civ. P. 9(b) requires that the allegations be made with particularity. Fed. R. Civ. P. 9(b).

"The standard is no longer that a complaint can be dismissed only if there is 'no set of facts' that plaintiff could prove 'which would entitle him to relief.'" *Space, Inc.*, 2008 WL 2676359, at*2 (quoting *Bell Atl.*, 127 S.Ct. at 1969). Rather, a complaint must be dismissed if the plaintiff fails to set forth "'the grounds upon which the plaintiff's claim rests through factual allegations sufficient to raise a right to relief above the speculative level.'" *Id.* (quoting *ATSI*, 493 F.3d at 98).

## II.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR BREACH OF CONTRACT AGAINST DEFENDANT PARK 610

In its second cause of action, DLA-LLC claims that Park 610 breached the Joint Venture Agreement in various ways and that such breaches constitute "Events of Default" as defined in Section 13.1 of the agreement. (Compl. ¶¶ 74-80). Under New York law, in order to establish a breach of contract claim, there must be: (a) a binding contract; (b) plaintiff's performance of the contract; (c) defendant's material breach of the contract; and (d) resulting damages. *ALJ Capital I., L.P. v. David J. Joseph Co.*, 15 Misc.3d 1127(A), No. 601591/06, 2007 WL 1218355, at *4 (Sup. Ct. N.Y. Co. Mar. 13, 2007). DLA-LLC's second cause of action for breach of contract against Park 610

(Compl. ¶¶ 74-80) must be dismissed because, as shown below, there was no breach of the Joint Venture Agreement under the facts alleged by DLA-LLC in its Complaint.

### A.    DLA-LLC Has Failed to Allege Plausibly that Park 610 Caused a "Change of Control" in Breach of the Joint Venture Agreement

DLA-LLC alleges that shares of Tumely, a Uruguayan corporation that holds a 50% interest in Park 610, were transferred to another Uruguayan corporation, Leraman S.A. ("Leraman"). (Compl. ¶¶ 45-50). DLA-LLC also alleges that Loraine, a Uruguayan corporation that holds the other 50% interest in Park 610, agreed to restrictions upon the transfers of its own shares. (Compl. ¶ 53). DLA-LLC thus concludes that the alleged transfer of the Tumely shares to Leraman, and the alleged "pledge" or "deposit" of Loraine shares constituted a Change of Control of Park 610 within the meaning of the Joint Venture Agreement. DLA-LLC is wrong.

"Change of Control" is a defined term in Article 1 of the Joint Venture Agreement, which DLA-LLC drafted. DLA-LLC relies on the following portion of the definition of a "Change of Control" (Compl. ¶ 31):

> (a) any Person (other than the Person who controls a Member on the Date hereof) becomes the beneficial owner, directly or indirectly, of <u>more than 50%</u> of the then outstanding voting shares or other equity rights of a <u>Member</u> ....

(emphasis added).

By DLA-LLC's own admission, Tumely holds <u>only 50%</u> of the "voting shares or other equity rights" in Park 610. (Compl. ¶ 41). Thus, any transfer of the shares of Tumely to Leraman could not have constituted "<u>more than 50%</u> of the then outstanding voting shares or other equity rights of" Park 610. As such, no "Change of Control"

within the meaning of Article 1 of the Joint Venture Agreement could have been possible as a result of such alleged transfer.

DLA-LLC attempts to get over the 50% hurdle by claiming that the alleged "restrictions upon the transfer of [the] shares in Loraine" together with the alleged Tumely transaction constitute a "Change of Control." (Compl. ¶ 53). This theory has no merit because a contractual restriction on the transfer of shares of Loraine does not and cannot constitute a <u>change in ownership</u>, beneficial or otherwise, of "voting shares" or any equity rights" in Loraine. Thus, even if DLA-LLC's factual allegations concerning the transfer and restrictions of the shares of Loraine and Tumely are true, no "Change of Control" could have occurred under the plain reading of the Joint Venture Agreement.

Under New York law, "if a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms may be preferable." *Waldman v. Riedinger*, 423, F.3d 145, 149 (2d Cir. 2005) (internal quotation marks and citation omitted).

**B.     DLA-LLC Has Failed to Allege Plausibly that Park 610 Transferred its Membership Interest in Breach of the Joint Venture Agreement**

Recognizing that its Change of Control argument is specious, DLA-LLC claims that the alleged transfer of the Tumely shares to Leraman "constitutes an independent Event of Default pursuant to Section 13.1(c)" of the Joint Venture Agreement "irrespective of whether such transfer constituted a Change of Control." (Compl. ¶ 33).

The Joint Venture Agreement, which was drafted by DLA-LLC, places restrictions only on transfers of "Membership Interest," which is defined as "interest issued by [LAS] to the <u>Members</u>." (Joint Venture Agreement, §§ 10.1, 13.1(c), Art. I)

(emphasis added). "Members" are defined as "Park 610" and "DTVLA" (DLA-LLC), and not their affiliates, related parties or parent companies. (Joint Venture Agreement, Preamble).[2] Consequently, restrictions on transfers set forth in the Joint Venture Agreement would apply, if at all, only if Park 610 were to transfer part or all of its Membership Interest in LAS to a third party. No transfer of Park 610's Membership Interest in LAS occurred here, and despite DLA-LLC's efforts to confuse the issue by blurring the line between Park 610 and its parent entities, the alleged "transfers" complained of by DLA-LLC involve the shares of Loraine and Tumely, and do not involve Park 610's Membership Interest in LAS. These alleged "transfers," therefore do not, and cannot, constitute transfers of Membership Interests as defined in the Joint Venture Agreement.

More telling than the plain language of the Joint Venture Agreement is the conduct of DLA-LLC's own parent company, DIRECTV Group, Inc.,[3] which regularly engages in mass transfers of its own shares. According to DLA-LLC's reading of the

---

[2]    Neither Mr. Avila not Mr. Timistit are "Members" under the Joint Venture Agreement.

[3]    DLA-LLC alleges in its Complaint that its sole member is a California corporation called DIRECTV Latin America, Inc. (Compl. ¶ 7). In its original Rule 7.1 Statement, however, DLA-LLC alleged that its sole member is a Delaware corporation called DIRECTV Latin America, Inc. *See* Rivkin Decl. Ex. 2 (DLA-LLC's Rule 7.1 Statement). Neither California nor Delaware had a record of an entity by the name DIRECTV Latin America, Inc. *See* Rivkin Decl. Exs. 3, 4. Furthermore, in SEC filings and press releases, a publicly traded company called DIRECTV Group, Inc. claims to be the sole owner of DLA-LLC. *See* Rivkin Decl. Exs. 5, 6. These facts were brought to the attention of DLA-LLC's counsel as early as June 18, 2008. On or about July 22, 2008, more than a month later, DLA-LLC finally amended its Rule 7.1 Statement to reflect that DLA-LLC was actually owned 99.5% by a California corporation called DIRECTV Latin America Holdings, Inc. and that a Delaware corporation called DIRECTV International, Inc. owns the remaining 0.5% of DLA-LLC. *See* Rivkin Decl. Ex. 7. Nevertheless, despite being urged by counsel for plaintiff DLA-LLC to amend its pleadings to reflect these facts, DLA-LLC has refused to do so. *See* Rivkin Decl. ¶ 11. In any event, DLA-LLC concedes in its Rule 7.1 Statement that DIRECTV Group, Inc. does indeed own 100% of DLA-LLC. *See* Rivkin Decl. Exs. 2, 7.

Joint Venture Agreement, such transfers would have constituted an Event of Default under Section 13.1(c) of that agreement.

For example, in December 2006 Liberty Media Corporation entered into an agreement to purchase News Corporation's 41% interest in DIRECTV Group, Inc. The transaction closed in the first quarter of 2008. Since then, Liberty Media Corporation purchased an additional 78.3 million shares of DIRECTV Group, Inc.'s common stock in a private transaction, increasing its beneficial ownership to approximately 48%. *See* Rivkin Decl. Ex. 5 (The DIRECTV Group, Inc. press release), Ex. 6 (The DIRECTV Group, Inc. Form 10-K for the fiscal year ended December 31, 2007). Under DLA-LLC's own reading of Section 13.1(c), the transfer by DIRECTV Group, Inc. of its shares to a third party constitutes a violation of the restriction on transfer provision, as well as an Event of Default. The irony of DLA-LLC's position is obvious.[4]

For these reasons, the allegations of transfer or restraint of shares of Tumely or Loraine did not, and could not, have constituted a breach on the prohibition of transfer of Membership Interest under the plain reading of Section 13.1(c) of the Joint Venture Agreement, and DLA-LLC's claim to that effect must be dismissed.

### C.  DLA-LLC Has Failed to Allege Plausibly that Park 610 Breached Section 12.5 of the Joint Venture Agreement

DLA-LLC further contends that Park 610 violated Section 12.5 of the Joint Venture Agreement, but is not specific as to what actions amounted to such violation. (Compl. ¶ 34). Section 12.5 can be broken down into two parts. The first part restricts

---

[4]      In addition, DLA-LLC was aware of the possible transaction involving shares in Tumely, as early as October, 2006, *see* Rivkin Decl. Ex. 8, yet made no effort to advise Park 610 that DLA-LLC considered the transaction to be problematic.

Members[s], the Company [and] any of their respective officers, directors, members, employees or agents" from offering, paying or giving anything of value in respect of the Business to any political party or candidate to influence such a political party of candidate.

No such allegations are made in this case by DLA-LLC.

The second part of Section 12.5 restricts "<u>Members</u>" (but <u>not</u> any of their respective officers, directors, members, employees or agents) from

. . . do[ing] business with any joint venture partner, distributor, agent, customer or other person where a Member knows or suspects that payoffs or similar practice are involved in doing business and will not have a relationship with a customer or any other person that results in a conflict of interest or embarrassment to the Company or any of the Members.

Whatever claim DLA-LLC has with respect to alleged transactions involving Tumely or Loraine, these were not business transactions involving a "Member," since neither Tumely nor Loraine is a Member as defined in the Joint Venture Agreement.  Since Section 12.5 restricts only certain actions by Members, no violation of Section 12.5 could have occurred under the plain reading of the Joint Venture Agreement, and DLA-LLC's claim alleging a breach of Section 12.5 of the Joint Venture Agreement must be dismissed.

## III.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR DECLARATORY JUDGMENT

In its first cause of action, DLA-LLC seeks a declaration that there was an Event of Default as defined in the Joint Venture Agreement and that it is therefore entitled to exercise the Call Option thereunder.  (Compl. ¶¶ 67-73).  DLA-LLC's claim for declaratory judgment is based on allegations that Park 610 breached the Joint Venture Agreement and that such breaches constitute an Event of Default, thereby purportedly triggering DLA-LLC's right to exercise the Call Option.  These are the same allegations

underlying DLA-LLC's second cause of action for breach of contract and specific performance. Where, as here, a declaratory judgment claim is duplicative of another claim, it is "unnecessary and inappropriate." *Spitzer v. Schussel*, 48 A.D.3d 233, 234, 850 N.Y.S.2d 431, 432 (1st Dep't 2008). *See also Soft Classics S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249-50 (S.D.N.Y. 2006) (dismissing declaratory judgment as duplicative because it sought no relief that was not implicitly sought in the other causes of action). Accordingly, DLA-LLC's declaratory judgment claim should be dismissed.

## IV.   PLAINTIFF HAS FAILED TO STATE A CLAIM FOR FRAUD AGAINST DEFENDANTS PARK 610, AVILA AND TIMISTIT

In its sixth cause of action, DLA-LLC brings a claim of fraud against all defendants. (Compl. ¶¶ 93-100). To succeed on its claim for fraud, plaintiff must ultimately show that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995) (*quoted in Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996)).

### A.   DLA-LLC Has Failed to Identify any Misrepresentation by Defendants Park 610, Avila and Timistit

Fed. R. Civ. P. 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy the "particularity" requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were

fraudulent." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993); *see also Brownstone Inv. Group, LLC v. Levey,* 468 F. Supp. 2d 654, 659 (S.D.N.Y. 2007).

DLA-LLC fails to identify a single statement by Park 610, or Messrs. Avila and Timistit that was untrue or misleading and that was relied upon by DLA-LLC to its detriment. Nor does the Complaint shed light on what alleged misrepresentation or omission these defendants made. (Compl. ¶¶ 93-100). For example, in paragraph 94 of the Complaint, DLA-LLC alleges that "Pratola and Zunda misrepresented to [DLA-LLC] that the Channel would be conducted in the utmost good faith as a joint venture solely between [DLA-LLC] and Avila, whereas in actuality they planned all along secretly to substitute themselves as the holders of part or all of Avila's stake in LAS." There is no mention of any statement or omission by Park 610, Mr. Avila or Mr. Timistit as part of this allegation. To the extent that DLA-LLC seeks to accuse Park 610, Mr. Avila or Mr. Timistit of giving it the impression that Park 610 would discharge its obligations under the Joint Venture Agreement when there was allegedly no plan to do so, such allegations may not support a claim for fraud. It is black letter law that even intentionally false statements regarding a party's intent to fulfill the terms of the contract, when there was no such intention, is not sufficient to support a claim of fraud. *See Bridgestone/Firestone,* 98 F.3d at 19.

DLA-LLC also alleges that that Messrs. Avila and Timistit, through their participation in the negotiation of a memorandum of understanding, the Joint Venture Agreement and the other closing documents forming LAS, and through Avila's counsel, "reinforced Pratola's affirmative misrepresentations and omissions" and that "[b]ut for the Defendants' misrepresentations . . . would not have entered into the joint venture with

15

Park 610." (Compl. ¶¶ 95, 98). Again, DLA-LLC fails to mention any actual "misrepresentations" or "omissions" by Mr. Avila or Mr. Timistit that it relied upon to its detriment.

DLA-LLC simply fails to identify any statement made by Park 610, or Messrs. Avila and Timistit in the course of negotiating the MOU or the Joint Venture Agreement that was untrue at the time the MOU was being negotiated or at the time Park 610 and DLA-LLC entered into the Joint Venture Agreement.[5] This is sufficient reason in and of itself to dismiss the fraud claim against Park 610, Mr. Avila and Mr. Timistit.

**B.      DLA-LLC Has Failed to Allege Plausibly That it Relied Upon any Alleged Misrepresentation or Omission to its Detriment or State How it Was Damaged Thereby**

Having failed to identify any fraudulent misrepresentation or omission by defendants, it logically follows that DLA-LLC has also failed to establish that it relied upon any such mysterious statement or omission to its detriment. Additionally, DLA-LLC fails to show how it was damaged as a result of its purported reliance on any statement or omission of defendants, alleging only that had it not relied upon defendants "representations" it would not have entered into the joint venture with Park 610, and that it "expended approximately $4,550,000 in capital contributions and $1,000,000 in loans" that it now wants back, together with a judgment rescinding the Joint Venture Agreement. (Compl. ¶¶ 93-100).

---

[5]      It is noteworthy that the Joint Venture Agreement contains a merger clause, which provides that the Joint Venture Agreement "constitutes the entire agreement among the Parties, and supersedes any prior understandings, agreements, or representations by or among the parties, written or oral, to the extent they related in any way to the subject matter hereof." (Joint Venture Agreement § 20.13). As such, the negotiations concerning the "MOU" referred to by DLA-LLC (which was not executed in the first place) cannot serve as the basis for any fraud claim, as the Joint Venture Agreement expressly disavows any representation made prior to the execution of the Joint Venture Agreement.

In fact, DLA-LLC's investment in the Joint Venture has yielded spectacular returns for DLA-LLC, as the fair market value of LAS has increased exponentially over the two years in which LAS has been in operation.    (Avila Decl. ¶¶ 18, 19). Consequently, Park 610 has not been damaged in any way, even if there had been an alleged misrepresentation or omission by Mr. Avila.[6]  For these reasons, DLA-LLC has failed to allege facts sufficient to maintain a claim for fraud, and plaintiff's fraud claim against Park 610, Mr. Avila and Mr. Timistit must be dismissed.

## V.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST DEFENDANTS PARK 610, AVILA AND TIMISTIT

In order to establish a claim for breach of fiduciary duty, a plaintiff must prove: (a) the existence of a fiduciary relationship; (b) misconduct by the defendant; and (c) damages that were directly caused by the defendant's misconduct. *Kurtzman v. Bergstol*, 40 A.D.3d 588, 835 N.Y.S.2d 644, 646 (2d Dep't 2007).   As set forth below, under the facts alleged by DLA-LLC in its Complaint, defendants Park 610, Mr. Avila or Mr. Timistit did not, and could not have, breached its fiduciary duty to DLA-LLC or to LAS.

### A.    DLA-LLC Has Failed to Allege Plausibly that Defendants Avila and Timistit Breached Their Fiduciary Duties to LAS

In its third cause of action, DLA-LLC alleges that Messrs. Avila and Timistit breached their fiduciary duties to LAS by committing corporate waste. The corporate waste allegation appears to stem from management fees paid by LAS to Park 610 pursuant to the Management Services Agreement ("MSA") entered into between LAS and Park 610. (Compl. ¶¶ 54-62, 81-85).  This claim has no merit whatsoever.

---

[6]    It is not coincidental that DLA-LLC's fraud claim is pleaded in the alternative.  A refund of its investment and a rescission of the Joint Venture Agreement is not DLA-LLC's objective.

The MSA, pursuant to which LAS agreed to pay a management fee to Park 610, was entered into contemporaneously with the execution of the Joint Venture Agreement, and was referenced in Section 2.2(ii) of the Joint Venture Agreement itself. Indeed, a copy of the MSA was attached to the Joint Venture Agreement as Appendix B. *See* Avila Decl. Ex. A. The management fee, equal to 25% of advertising sales for the Joint Venture, was approved by DLA-LLC – both by a vote of DLA-LLC's designated representatives on the board of LAS, as well as by the very execution of the Joint Venture Agreement. DLA-LLC contends that "[Mr.] Avila . . . pressured [DLA-LLC] to pay him an advance on the management fees in the amount of $30,000 per month. [DLA-LLC] initially resisted, but [later] . . . agreed to pay an advance of $30,000 per month for six months and to reevaluate the arrangement thereafter." (Compl. ¶ 57). Again, despite its alleged "resistance" to the advance, DLA-LLC admits that it agreed to pay the advance at issue. Neither Mr. Avila nor Park 610 acted illicitly in securing the advance. Nor did Mr. Timistit breach his fiduciary duty to LAS by arranging for the payment of these management fees. (Compl. ¶ 84). The advance was obtained on consent from DLA-LLC, and DLA-LLC has not shown how payment of 25% of the advertising revenue or the advance against those payments constituted waste by Messrs. Avila and Timistit for the purposes of DLA-LLC's claim of breach of fiduciary duty. Park 610 continues actively to provide management services for LAS as contemplated in the MSA.

Under Delaware law, "managers of an LLC are presumed to have acted on an informed basis and in the honest belief that the decisions were in furtherance of the best interests of the LLC and its members." *Bakerman v. Sidney Frank Importing Co.*, No.

---

Its objective is to obtain a windfall by forcing Park 610 to forfeit its multi-million dollar interest in LAS for next to nothing.

Civ. A. 1844-N, 2006 WL 3927242, at *9 (Del. Ch. Oct. 16, 2006). It is the plaintiff's

burden to establish facts rebutting the presumption – typically by showing facts

tantamount to corporate waste. *Id.*

> The judicial standard for determination of corporate waste is well
> developed. Roughly, a waste entails an exchange of corporate assets
> for consideration so disproportionately small as to lie beyond the range
> at which any reasonable person might be willing to trade. Most often
> the claim is associated with a transfer of corporate assets that serves no
> corporate purpose; or for which no consideration at all is received.
> Such a transfer is in effect a gift. If, however, there is *any substantial*
> consideration received by the corporation, and if there is a *good faith*
> *judgment* that in the circumstances the transaction is worthwhile, there
> should be no finding of waste, even if the fact finder would conclude
> *ex post* that the transaction was unreasonably risky.

*Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (emphasis in original). DLA-LLC has

failed to set forth any facts showing that the payment under the MSA and the

subsequently agreed upon advances constituted corporate waste. There are no allegations

in the Complaint that LAS has not received fair consideration for the management fees it

paid to Park 610.

Moreover, as of the end of June, 2008, there has been a total of $180,000 in

advances made against fees to be collected under the MSA, and LAS has during that time

generated $614,568 in advertising revenue, 25% of which is $153,642 (the "Management

Services Fee Earned"). Consequently, as of the end of June, 2008, the $180,000 advance

is offset by more than $153,000 in Management Service Fees Earned, leaving less than

$27,000 in advances outstanding. Considering the current rate of advertising revenues,

the remaining balance of the advance will have been paid off by the end of August, 2008.

(Avila Decl. ¶ 29).

Finally, DLA-LLC seeks to besmirch Mr. Avila by claiming that "the payment of

moneys to Avila was carried out under highly irregular circumstances." (Compl. ¶ 58).

DLA-LLC also alleges that as part of these purported "irregular circumstances" Mr. Timistit arranged for transfers of monies to Mr. Avila's personal account or to the account of Diego Clemente, instead of to Park 610. (Compl. ¶¶ 58, 60). This contention, however, is a quintessential red-herring. The manner in which a payment is made on a previously agreed upon obligation has no bearing whatsoever on whether corporate waste occurred. More importantly however, the MSA clearly provides that "[a]ll sums payable by LAS [under the MSA] shall be due and payable in United States dollars and paid by wire transfer to such bank account as Park 610 may hereafter designate in writing." (Joint Venture Agreement, Appendix B). Consequently, the account to which payments were to be made under the MSA was always at Park 610's discretion.

**B.    DLA-LLC Has Failed to Allege Plausibly that Defendants Park 610 and Avila Breached Their Fiduciary Duties to DLA-LLC**

In its fifth cause of action, DLA-LLC asserts a breach of fiduciary duty claim on its own behalf and alleges that "Park 610, and Avila as the sole control person of Park 610, had an obligation to refrain from misrepresenting facts and/or failing to disclose facts that would operate as a fraud upon [DLA-LLC] and/or LAS, to refrain from committing corporate waste, and to refrain from entering into the side-deal with Pratola and Zunda." (Compl. ¶ 91).

As an initial matter, to the extent that DLA-LLC's breach of fiduciary duty claim is based on allegations of corporate waste (relating to payments under the MSA), such a claim is a derivative claim belonging to LAS only, and cannot be asserted as a direct claim by DLA-LLC on its own behalf.[7]  *See Kramer v. W. Pac. Indus. Inc.*, 546 A.2d

---

[7]    Moreover, for the reasons stated above in Section V(A), DLA-LLC fails to state a derivative claim for breach of fiduciary on behalf of LAS.

348, 353 (Del. 1988) ("[a] claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation"); *Marcus v. Lincolnshire Mgmt., Inc.*, 409 F. Supp. 2d 474, 480 (S.D.N.Y. 2006) ("excessive compensation to management ... is a classic claim of corporate waste, and it is derivative because the harm alleged is to the corporation and any recovery would belong to it").

DLA-LLC's remaining claim for breach of fiduciary duty fails because DLA-LLC has not set forth facts plausibly establishing that it has suffered damages as a result of any alleged breach. Even after the most liberal reading of the Complaint, the only damages that DLA-LLC alleges it has suffered is in connection with its claim for fraud. DLA-LLC alleges that it would not have entered into the Joint Venture with Park 610 had it not been for "Defendants' misrepresentations regarding the structure and ownership of LAS" and that as a consequence, DLA-LLC expended $4,550,000 in capital contributions and $1,000,000 in loans (Compl. ¶¶ 98-99). To the extent that DLA-LLC's claim for breach of fiduciary duty relies upon that allegations of fraud, the claim must be dismissed for the reasons stated above in Section IV.

To the extent that DLA-LLC's claim for breach of fiduciary duty relies upon the transfer of Tumely shares to Leraman, it is duplicative of DLA-LLC's breach of contract claim.[8] DLA-LLC fails to allege any fiduciary duty that arises independently from the specific provisions of the Joint Venture Agreement. Indeed, one of the grounds for DLA-LLC's breach of contract claim is the violation of Section 12.5, the ethics provision in the Joint Venture Agreement. Accordingly, the breach of fiduciary duty claim must be dismissed as duplicative of the breach of contract claim. *See Solow v. Aspect Resources,*

---

[8]    DLA-LLC's breach of contract claim must be dismissed for the reasons stated above in Section II.

*LLC*, No. Civ.A. 20397, 2004 WL 2694916, at *4 (Del. Ch. Oct. 19, 2004) ("[b]ecause of the primacy of contract law over fiduciary law, if the duty sought to be enforced arises from the parties' contractual relationship, a contractual claim will preclude a fiduciary claim"); *William Kaufman Org., Ltd. v. Graham & James LLP*, 269 A.D.2d 171, 173, 703 N.Y.S.2d 439, 442 (1st Dep't 2000) (dismissing breach of fiduciary duty claim as duplicative of breach of contract claim where there was no distinction between the conduct underlying both claims).

DLA-LLC's Complaint is devoid of any allegations or facts concerning how it has been damaged as a result of Park 610 and Mr. Avila's alleged breaches of fiduciary duty. Accordingly, DLA-LLC's breach of fiduciary duty claim, brought on its own behalf, against Park 610 and Mr. Avila must be dismissed.

## CONCLUSION

For the foregoing reasons, DLA-LLC has failed to allege plausibly facts that state a claim for:  declaratory judgment; breach of contract against Park 610; breach of fiduciary duty to LAS against Messrs. Avila and Timistit; breach of fiduciary duty to DLA-LLC against Mr. Avila and Park 610; or fraud against Mr. Avila and Park 610. Accordingly, DLA-LLC's first, second, third, fifth and sixth causes of action against Messrs. Avila and Timistit, and Park 610 must be dismissed.

Dated:  New York, New York
        July 25, 2008

Respectfully submitted

FOX HORAN & CAMERINI LLP

By: _____
        V. David Rivkin (VR-6734)
        JooYun Kim (JK-7290)
        825 Third Avenue, 12th Floor
        New York, New York 10022
        Tel:    (212) 480-4800
        Fax:    (212) 709-0248

*Attorneys for Defendants*
*Carlos Vicente Avila,*
*Roberto Timistit and Park 610 LLC*