**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
DIRECTV LATIN AMERICA, LLC,                                  :
individually and in the right and on behalf                      :
of LATIN AMERICAN SPORTS, LLC,                           :
                                                                                   :
                                        Plaintiff,                     :         **08 Civ. 3987 (VM)(GWG)**
                                                                                   :
                        v.                                                      :         **ECF CASE**
                                                                                   :
PARK 610, LLC,                                                        :
CARLOS VICENTE AVILA,                                        :
ROBERTO TIMISTIT,                                                :
CARLOS PRATOLA,                                                  :
ALEJANDRO ZUNDA CORNELL and                       :
DIEGO CLEMENTE,                                                  :
DOES 1 through 10,                                                 :
                                                                                   :
                                        Defendants,                 :
                                                                                   :
                        and                                                    :
                                                                                   :
LATIN AMERICAN SPORTS, LLC,                           :
                                                                                   :
                        as a Nominal Defendant.          :
-------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE
MOTION OF DEFENDANTS PARK 610, LLC, CARLOS VICENTE AVILA AND
ROBERTO TIMISTIT TO DISMISS THE AMENDED COMPLAINT AND IN
SUPPORT OF PLAINTIFF'S CROSS-MOTION TO AMEND THE COMPLAINT**

MINTZ & GOLD LLP
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, N.Y. 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ................................................................ 1

FACTS .................................................................................................... 3

ARGUMENT .......................................................................................... 11

I. THE AMENDED COMPLAINT STATES A CAUSE OF ACTION FOR
BREACH OF THE JOINT VENTURE AGREEMENT ........................................... 12

    A. Avila's Side-Deal With Pratola and Zunda Resulted in a Change of
Control of Park 610 and Therefore Resulted in an Event of Default
Under the Joint Venture Agreement ................................................. 12

    B. The Transfer of Tumely and/or Loraine to Pratola and Zunda
Constituted a Prohibited "Transfer" of an Indirect Beneficial
Interest in LAS and Resulted in an Independent Event of Default ............. 14

    C. The Breach of the Ethics Covenant Constituted a Third Event of Default .. 17

II. THE AMENDED COMPLAINT STATES A CAUSE OF ACTION FOR
FRAUD ARISING OUT OF THE DECEITFUL CONDUCT OF
THE PARK 610 DEFENDANTS ............................................................. 18

    A. Each of the Defendants is Jointly and Severally Liable for the
Misrepresentations of Pratola and Zunda .................................... 18

    B. Each of the Park 610 Defendants Committed Fraud by
Omitting to State a Material Fact ............................................... 18

III. THE PARK 610 DEFENDANTS BREACHED FIDUCIARY DUTIES
OWED BOTH DERIVATIVELY AND DIRECTLY TO DIRECTV ...................... 20

    A. Avila and Timistit Breached Their Duty as Corporate Officers by
Arranging to Pay Park 610 Management Fees in Excess of Those
Actually Earned ........................................................................ 20

    B. Park 610 and Avila Breached Direct Fiduciary Duties to DIRECTV .......... 21

IV. THE MOTION TO AMEND THE COMPLAINT IS MERITORIOUS AND
WILL CAUSE NO PREJUDICE TO THE PARK 610 DEFENDANTS ................. 23

CONCLUSION ...................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page**

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*,
    731 F.2d 112 (2d Cir. 1984) ......................................................... 19

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) ............................................................. 23

*Beatty v. Guggenheim Exploration Co.*,
    225 N.Y. 380, 122 N.E. 378 (1919) ............................................... 24

*Bell Atl. Corp. v. Twombly*,
    127 S.Ct. 1955 (2007) ........................................................... 11, 12

*Boddie v. Schnieder*,
    105 F.3d 857 (2d Cir. 1997) ......................................................... 11

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
    98 F.3d 13 (2d Cir. 1996) ............................................................. 20

*Cantor Fitzgerald, L.P. v. Cantor*,
    724 A.2d 571 (Del.Ch.1998) ......................................................... 22

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ......................................................... 11

*Cohen v. Koenig*,
    25 F.3d 1168 (2d Cir. 1994) ......................................................... 20

*CPC Intern. Inc. v. McKesson Corp.*,
    70 N.Y.2d 268, 514 N.E.2d 116, 519 N.Y.S.2d 804 (1987) ............... 18

*Dymm v. Cahill*,
    730 F. Supp. 1245 (S.D.N.Y. 1990) ............................................... 23

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,
    817 A.2d 160 (Del. 2002) ............................................................. 23

*In re 1st Rochdale Co-op Group, Ltd.*,
    No. 07 Civ. 7852 (DC), 2008 WL 170410 (S.D.N.Y. Jan. 17, 2008) ............ 21

*In re Fruehauf Trailer Corp.*,
    369 B.R. 817 (Bankr. D.Del. 2007) ............................................... 22

*In re GM Shareholder Litig.*,
No. Civ. A. 20269, 2005 WL 1089021 (Del. Ch. May 4, 2005) ................................... 21

*In re Tower Air, Inc.*,
416 F.3d 229 (3d Cir. 2005) ............................................................................... 21

*In re USACafes, L.P. Litigation*,
600 A.2d 43 (Del. Ch. 1991) ............................................................................. 22

*Iqbal v. Hasty*,
490 F.3d 143 (2d Cir. 2007),
*cert. granted*, 128 S.Ct. 2931 (2008) ........................................................ 11, 12

*M & A Oasis, Inc. v. MTM Associates*, L.P.,
307 A.D.2d 872, 764 N.Y.S.2d 9 (1st Dep't 2003) ....................................... 17

*Maillet v. Frontpoint Partners, L.L.C.*,
02 Civ. 7865(GBD), 2003 WL 21355218 (S.D.N.Y. June 10, 2003) ............. 23

*Manes v. Manes*,
717 N.Y.S.2d 185, 277 A.D.2d 359 (2nd Dep't 2000),
*lv. to appeal dismissed*, 96 N.Y.2d 790 (2001) ........................................... 18

*Meinhard v. Salmon*,
249 N.Y. 458 (1928) ............................................................................... 2, 21, 22

*Morales v. Quintel Entertainment, Inc.*,
249 F.3d 115 (2d Cir. 2001) ......................................................................... 13, 14

*NYCTA v. Morris J. Eisen, P.C.*,
276 A.D.2d 78, 715 N.Y.S.2d 232 (1st Dep't 2000) ........................................ 20

*Pangburn v. Culbertson*,
200 F.3d 65 (2d Cir. 1999) ............................................................................. 23

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*,
68 F.3d 1478 (2d Cir. 1995) ........................................................................... 19

*Rizel v. Bodner*,
225 A.D.2d 410, 640 N.Y.S.2d 19 (1st Dep't 1996) ....................................... 18

*S & K Sales Co. v. Nike*,
816 F.2d 843 (2d Cir. 1987) ........................................................................... 24

*Schaffer ex rel. Lasersight Inc. v. CC Investments, LDC*,
280 F.Supp.2d 128 (S.D.N.Y. 2003) ........................................................... 13, 14

*Simonds v. Simonds*,
    45 N.Y.2d 233, 380 N.E.2d 189, 408 N.Y.S.2d 359 (1978) ............................................. 24

*Sofi Classic S.A. de C.V. v. Hurowitz*,
    444 F.Supp.2d 231 (S.D.N.Y. 2006) .................................................................. 20

*Solow v. Aspect Resources, LLC*,
    No. Civ. A. 20397, 2004 WL 2694916 (Del. Ch. Oct. 19, 2004) ..................................... 22

*Stewart v. Jackson & Nash*,
    976 F.2d 86 (2d Cir. 1992) ............................................................................. 20

*Thomson-CSF, S.A. v. American Arbitration Ass'n*,
    64 F.3d 773 (2d Cir. 1995) ............................................................................ 17

*Tobias v. First City Nat'l Bank and Trust Co.*,
    709 F. Supp. 1266 (S.D.N.Y. 1989) .................................................................... 23

*Wall v. CSX Transportation, Inc.*,
    471 F.3d 410 (2d Cir. 2006) ........................................................................... 20

*William Kaufman Org., Ltd. v. Graham & James LLP*,
    269 A.D.2d 171, 703 N.Y.S.2d 439 (1st Dep't 2000) .................................................. 22

*Zoren v. Genesis Energy, L.P.*,
    836 A.2d 521 (Del. Ch. 2003) ......................................................................... 23

## Statutes and Other Authorities

Fed.R.Civ.P. 12(b)(6) ........................................................................... 11, 16, 21

Fed.R.Civ.P. 15(a) ............................................................................... 23

Fed.R.Civ.P. 23.1 ................................................................................ 24

Section 13 of the Securities Exchange Act of 1934, 15 U.S.C. § 78m ...................... 13, 15

Section 16 of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) .................... 13, 15

17 C.F.R. § 240.13d-3(a) ........................................................................ 13

Restatement (Second) of Contracts § 237 ......................................................... 16

## PRELIMINARY STATEMENT

This action concerns a corrupt kickback scheme whereby the Defendants sought to enrich themselves at the expense of the plaintiff, DIRECTV Latin America, LLC ("<u>DIRECTV</u>").  On one side of the kickback scheme are the movants, Carlos Vicente Avila ("<u>Avila</u>"), his brother-in-law Roberto Timistit ("<u>Timistit</u>") and Avila's holding company, Park 610, LLC ("<u>Park 610</u>" and, together with Avila and Timistit, the "<u>Park 610 Defendants</u>").  On the other side of the conspiracy are two of DIRECTV's own former corporate officers, Carlos Pratola ("<u>Pratola</u>") and Alejandro Zunda Cornell ("<u>Zunda</u>"), and their confederate, Diego Clemente ("<u>Clemente</u>").  In 2006, the Park 610 Defendants agreed to share with Pratola and Zunda the fruits of a proposed joint venture between Avila and DIRECTV – at the very time when Pratola and Zunda were supposed to be representing DIRECTV's interests in an arm's-length transaction with Avila.

The joint venture is a 24-hour pay television channel dedicated exclusively to golf programming (the "<u>Channel</u>"), conducted through Latin American Sports, LLC ("<u>LAS</u>").  Approximately a year after the closing of the joint venture transaction, DIRECTV discovered that Avila had conveyed a majority stake in Park 610 to Leraman, S.A. ("<u>Leraman</u>"), a shadow company secretly controlled by Pratola and Zunda, in contravention of three distinct provisions of the Limited Liability Company Agreement among Park 610, DIRECTV and LAS (hereafter the "<u>Joint Venture Agreement</u>").

DIRECTV has plainly stated a cause of action against Park 610 for breaches of the Joint Venture Agreement.  Avila's clandestine transfer of the beneficial ownership of Park 610 constituted actionable Events of Default under the Joint Venture Agreement on at least three levels:

- The kickback resulted in a prohibited "Change of Control" of Park 610 inasmuch as Avila secretly transferred all voting and equity rights of one of two companies that own Park 610 and at least part of the voting and/or equity rights of the other;

- Even if the kickback did not result in a "Change of Control," it violated the Joint Venture Agreement as an illicit transfer of the beneficial ownership of LAS; and

- The conveyance was a material breach of the ethics covenant in the Joint Venture Agreement, which prohibited, among other things, dealing with persons having a conflict of interest.

The Call Option on an Event of Default for which DIRECTV seeks specific performance is not a "windfall," as the Park 610 Defendants suggest, but the bargained-for remedy, negotiated at arm's length among sophisticated parties for *exactly* the type of misconduct alleged herein.

The same conduct constituted a blatant fraud upon DIRECTV. Avila's convenient failure to mention to DIRECTV that he was giving a kickback to DIRECTV's own representatives during the negotiation of the joint venture was a material omission. DIRECTV was entitled to know who its business partners were (Avila, and only Avila), and it was further entitled to assume that its own corporate officers were not placing themselves on both sides of the transaction – with the assistance of the Park 610 Defendants. Obviously, if Avila had disclosed his side-deal, DIRECTV would never have closed the transaction with Avila.

The scheme further constituted an egregious breach of fiduciary duty. Under the common law of the State of New York, joint venturers such as Park 610 owe their partners a strict duty of undivided loyalty. *See Meinhard v. Salmon*, 249 N.Y. 458 (1928)(Cardozo, *C.J.*). This duty extends to Avila as the control person of Park 610.

In addition to opposing the motion of the Park 610 Defendants, DIRECTV separately cross-moves for leave to file a Second Amended Complaint for several reasons. DIRECTV seeks to conform the complaint to the amended Rule 7.1 disclosure statement, which now identifies two members of DIRECTV. The Second Amended Complaint further seeks the

imposition of a constructive trust as an alternative remedy for the breaches of fiduciary duty, in the event that the Court determines that those same acts do not technically violate the Joint Venture Agreement.  The amendment would also join Clemente as a defendant as to two causes of action and assert new claims for aiding and abetting the breach of fiduciary duty and the fraud.

## FACTS

### 1.  The Parties

As the vehicle through which the parties conduct the joint venture, LAS has only two members, DIRECTV and Defendant Park 610.  Defendant Park 610 is the holder of 55% of the membership interest of LAS and DIRECTV holds the remaining 45% of LAS.  (Compl. ¶18).

DIRECTV is engaged in the business of providing pay television services in Latin America and, through its subsidiaries, has approximately 5 million subscribers in the region. (Compl. ¶6).[1]  Park 610 is a holding company through which Avila owns his beneficial interest in LAS.  (Compl. ¶40).  Park 610, in turn, is owned in equal portions by two Uruguayan corporations, Tumely S.A. ("Tumely") and Loraine S.A. ("Loraine").  (Compl. ¶¶9, 41).

Avila and each of the other individual defendants are citizens of the Republic of Argentina.  (Compl. ¶¶12-16).   Avila is the Chairman of LAS. Timistit is the chief executive officer of LAS, and is the brother-in-law of Defendant Avila.  (Compl. ¶13).

### 2.  The Joint Venture

In April 2006, Pratola suggested to his superior at DIRECTV, Jacopo Bracco, that the company could increase its subscriber base in the Latin American market by offering the

---

[1]  DIRECTV has two members: (i) DIRECTV Latin America Holdings, Inc., a corporation organized under the laws of the State of California, and (ii) and DIRECTV International, Inc., which is a Delaware corporation.  DIRECTV Latin America Holdings, Inc. and DIRECTV International, Inc., each has a principal place of business at 2230 East Imperial Highway, El Segundo, CA 90245.  The Amended Complaint had misidentified DIRECTV Latin America, Inc., as the sole member of DIRECTV.  This has already been remedied in a revised Rule 7.1 disclosure statement.  By DIRECTV's cross-motion, DIRECTV moves to amend the pleadings to reflect this fact.  (McCormick Decl., Exhibit 2).

Channel as part of its package of sports programming. (Compl. ¶21). At Pratola's urging, DIRECTV entered into discussions with Avila with a view toward forming a joint venture to develop and distribute the Channel in Latin America. (*Id.*, ¶22).

In return for promising to fund up to $7 million of financing to the joint venture (which DIRECTV continues to do), DIRECTV received a 45% equity interest in LAS.[2] Avila, through his indirect beneficial ownership of Park 610, received 55% of the equity of the joint venture. The reason why DIRECTV agreed to apportion the ownership of the joint venture in this way was because Pratola had convinced DIRECTV that Avila would not accept less than a majority stake in the venture in exchange for his contribution to the venture, which consisted principally of procuring the desired golf programming rights, producing the Channel (through Avila's own company, New Hollywood Productions), and selling advertising.[3] (Compl. ¶28).

Avila's participation as the sole partner in the joint venture was material and critical to DIRECTV's decision to invest in the enterprise. (Compl. ¶29). As the Park 610 Defendants themselves helpfully explain in their memorandum of law, Avila has a long history of developing sports programming in Argentina. (Def. Mem. at 2-3; Avila Decl. at ¶3). DIRECTV's faith in the future of the venture depended upon the contribution and reliability of Carlos Vicente Avila. It also goes without saying that DIRECTV implicitly understood, and was entitled to assume, that it was not about to be burdened by the presence of corrupt DIRECTV insiders in the economics of the transaction. Thus, DIRECTV insisted and made clear to Avila

---

[2]     In addition to its financial contribution, DIRECTV has certain approval rights typical of a minority investor in a joint venture. While Avila is the Chairman of LAS, DIRECTV has the right to designate two members of the Board of Directors of LAS, whereas Avila designates three. DIRECTV further has the right, among other things, to consult with Avila regarding the selection of the venture's general manager and other key employees. DIRECTV is also the exclusive distributor of the Channel in the major Latin American television markets and reviewed and approved the budget. (Compl. ¶27).

[3]     As it turned out, the larger Avila's share of LAS, the more room there was for Pratola and Zunda to secure a "broker's fee" from Avila in the form of the transfer of Tumely to Leraman. DIRECTV was therefore induced by fraud to give Park 610 the portion of LAS that ultimately found its way to Pratola and Zunda.

and his representatives that it was critical for DIRECTV that Avila not transfer any portion of his beneficial ownership in LAS without DIRECTV's knowledge and prior written consent. (Compl. ¶29).

Consistent with this understanding, among the material terms of the Joint Venture Agreement is that a "Change of Control" of Park 610 constitutes an Event of Default under Section 13.1(e) of the Joint Venture Agreement. (Compl. ¶30). One of the events defined in the Joint Venture Agreement as a "Change of Control" is the following:

> any Person (other than the Person who controls a Member on the date hereof) becomes the beneficial owner, directly or indirectly, of more than 50% of the then outstanding voting shares or other equity rights of a Member; (Compl. ¶31).

However, in November 2007, DIRECTV learned that, Avila had secretly agreed to convey to a company called Leraman, S.A. ("Leraman") over 50% of the "voting shares or other equity rights" of Park 610 by transferring 100% of the equity of Tumely and some of the equity rights of Loraine to Leraman. Pratola and Zunda control Leraman. (Compl. ¶2; 32; 45-53).

Avila's transfer of Tumely and/or Loraine (which was an indirect transfer of Park 610's beneficial ownership of LAS) violated the Joint Venture Agreement irrespective of whether such transfer constituted a Change of Control. Any attempted transfer of the membership interests of LAS, other than in compliance with the Joint Venture Agreement, constitutes an independent Event of Default pursuant to Section 13.1(c) of the Joint Venture Agreement.

Specifically, the Joint Venture Agreement defines the term "Transfer" as:

> (i) any sale, assignment or transfer of securities, (ii) a sale, assignment or transfer of any economic interest and/or a voting interest ("Interest") in an entity that, directly or indirectly, holds any securities, (iii) a pledge or hypothecation of securities or Interest or any interest therein, (iv) sale, assignment or a transfer of securities convertible into or exchangeable for or other options or rights to acquire securities or Interest or (v) any other direct or indirect, voluntary or involuntary, sale, assignment or transfer of securities or Interest or any interest therein, whether pursuant to a Change of Control or otherwise. (Compl. ¶33).

Furthermore, any other material breach of the Agreement would violate Section 13.1(d) of the Joint Venture Agreement, subject to a cure provision. Such a material breach would include, among other things, violations of the ethical prohibition set forth in Section 12.5 of the Joint Venture Agreement against dealing with persons having a conflict of interest (like Pratola and Zunda). (Compl. ¶34).

Upon an Event of Default, the non-defaulting member has a right pursuant to Section 13.2 of the Joint Venture Agreement to require the defaulting member to sell all of its membership interests in LAS (the "Call Option"). Upon a Change of Control, the non-defaulting member has the right to compel the defaulting member to sell its shares for their net book value. In the event of a Transfer of membership interests in LAS other than in accordance with the Joint Venture Agreement, the Call Option price is eighty percent (80%) of the net book value of the membership interests. (Compl. ¶35).

In their memorandum of law, the Park 610 Defendants seek to minimize the seriousness of their misconduct by characterizing the transfer of Tumely and/or Loraine to Leraman (really, to Pratola and Zunda) as a mere parent-level transaction (Def. Mem. at 11). However, during the diligence phase of the original transaction, in response to requests from DIRECTV for confirmation that *Avila* was the sole owner of Park 610, Avila's counsel, Matias de Larrechea, represented to DIRECTV by e-mail dated August 24, 2006 that Avila owned all of the equity of Tumely and Loraine. De Larrechea further advised that the shares of Tumely and Loraine were in bearer form, and reinforced Avila's representation by asserting that a post-closing change to the by-laws of the respective companies would change the form of stock ownership to registered form. (Compl. ¶42). This was not done.

In truth, however, at the same time that Avila was preparing to close the joint venture with DIRECTV, Pratola and Zunda were working with Avila to arrange a transfer of the ownership of Tumely to Leraman, an entity to be formed by and on behalf of Pratola and Zunda. Thus, delivery of bearer shares would be an easier way to conceal the Transfer, since the shares would not have to be re-registered. (Compl. ¶43). On or about September 18, 2006, DIRECTV closed the joint venture transaction with Avila. (*Id*. ¶44).

3.   The Secret Side Deal to Convey Tumely to Pratola and Zunda

In or about April 2006, around the same time that he introduced the joint venture proposal to DIRECTV, Pratola was arranging with his own counsel to form Leraman, which would ultimately become the beneficial owner of the shares of Park 610 then held by Tumely. (Compl. ¶45).

Later, around the same time that the joint venture was about to close, Pratola's counsel, a law firm in Uruguay, was preparing two transactional documents: (i.) the Tumely S.A. Share Purchase Agreement, by and between Carlos Vicente Avila (the "Seller") and Leramar S.A. (the "Buyer")(hereafter, the "Stock Purchase Agreement") and (ii.) the Tumely S.A. Shareholders Agreement, by and between Carlos Vicente Avila and Leraman S.A. (the "Shareholders Agreement"). (Compl. ¶46). DIRECTV discovered the existence of these documents and the details of the illicit side-deal among the Park 610 Defendants, Pratola and Zunda through a forensic examination of Pratola's and Zunda's computers at DIRECTV Argentina, S.A.

Timistit was actively engaged in discussions between Avila's counsel, Hector Viana, and the owners of Leraman regarding the negotiation and drafting of the Stock Purchase Agreement and the Shareholders Agreement. The brazenness of the arrangement is revealed by one comment included in a blacklined draft of the agreement, directed from Viana to Timistit, which

warned, "THIS MEANS A CHANGE OF CONTROL IN PARK 610 THAT IS IN VIOLATION OF THE LAS SHAREHOLDERS AGREEMENT. AS LONG AS THE RESTRICTION IS IN PLACE, AVILA MUST MAINTAIN MANAGEMENT." (Compl. ¶47).

After Pratola and/or Zunda reviewed Mr. Viana's mark-up of the Shareholders Agreement, on October 12, 2006, Zunda asked Timistit to send him the contact information of "you guys' lawyer" in Uruguay (*i.e.*, Viana). The next day, Zunda forwarded the information from Timistit to Pratola's personal e-mail account. (Compl. ¶48).

Since any formal transfer of the shares of Tumely in the name of a beneficial owner other than Avila would violate the Joint Venture Agreement, Pratola's and/or Avila's counsel contrived a stipulation in the Shareholders Agreement whereby the shares of Tumely would ostensibly continue to be held nominally by Avila, but would in actuality be held for the benefit of Leraman. (Compl. ¶49). The transaction whereby Avila conveyed all of the shares of Tumely to Leraman closed on or about November 8, 2006. (*Id.* ¶50). No notice was given to DIRECTV of the transfer of Tumely before it was concluded. (Compl. ¶51).[4]

Avila further agreed to restrictions upon the transfer of his shares in Loraine, and either to pledge his shares of Loraine to Leraman and/or to deposit them with a third party as security for the performance of his obligations under the Shareholders Agreement. (Compl. ¶53).

4. <u>Defendants' Breach of Fiduciary Duty to LAS</u>

As part of the joint venture transaction, LAS entered into a Management Services Agreement with Park 610 (the "<u>MSA</u>"). The MSA provides for the payment to Park 610 of a management fee equal to 25% of all advertising sales generated by LAS (from the sale of

---

[4]    To the extent that the Park 610 Defendants assert that DIRECTV was aware of the transaction as early as October 2006 (Rivkin Decl., Ex. 8) as the result of correspondence Pratola conducted with a third party, that would be, at best, an affirmative defense which DIRECTV will dispute at the proper time; it is not the proper subject of a motion to dismiss for failure to state a claim.

commercial advertising on the Channel). (Compl. ¶54). Pratola and Zunda led the negotiation with Avila on the structuring of the fee and its computation. (Compl. ¶55).

In the late summer or early fall of 2007, advertising revenues were not materializing as planned, and sales were far below the amount that would generate a significant management fee. (Compl. ¶56). Avila therefore pressured DIRECTV to pay him an advance on the management fees in the amount of $30,000 per month. DIRECTV initially resisted, but after energetic lobbying by Pratola, DIRECTV agreed to pay an advance of $30,000 per month for six months and to reevaluate the arrangement thereafter. (Compl. ¶57).

As had been the case of the pre-launch funding of the Channel, the payment of moneys to Avila was carried out under highly irregular circumstances. Timistit initially arranged for two transfers of $30,000 to a JPMorgan account held in the name of Avila, personally, rather than to Park 610, as would have been required under the Management Services Agreement. Another transfer in the amount of $30,000 was made to an account at UBS with the beneficiary information titled as "Clemente," which DIRECTV believes to have been established by Defendant Clemente for the benefit of Pratola and/or Zunda. (Compl. ¶58). Following this Court's grant of an Order of Attachment on June 5, 2008, DIRECTV confirmed that the UBS account was, in fact, titled in the name of Defendant Diego Clemente.

On May 11, 2007, Defendant Clemente sent wire instructions to Zunda for payment to Banco UBS Financial Services at an address of 1285 Avenue of the Americas, New York, New York, with UBS A.G. identified as an intermediary bank. (Compl. ¶59). On the same day, Timistit later set a transfer in the amount of $30,000 to the "Clemente" account. Timistit later arranged wire transfers on three subsequent occasions, in each case in the amount of $20,000 to Avila's JPMorgan account and $10,000 to the "Clemente" account. (Compl. ¶60).

While Pratola should have had no particular concern in the matter, he attempted to persuade DIRECTV to continue the advance payments of the management fee for another six months. DIRECTV refused to acquiesce in any further pre-payments of the management fee. (Compl. ¶61). Upon a "Change of Control" of Park 610, moreover, the MSA would have terminated automatically and no further fees would be owed to Park 610. (Declaration of Terence W. McCormick ("McCormick Decl."), Exhibit 1, Appendix B at ¶3). Thus, the payments made to Avila (and Clemente) were not only irregular, but were not owed to Park 610 at all (much less to Avila himself, or the mysterious "Clemente") from the moment the Change of Control occurred in November 2006. (Compl. ¶62).

During the fall of 2007, Pratola learned of a potential business combination regarding LAS that, if consummated, would have involved the purchase of a significant portion of Park 610's interest in the joint venture. Pratola immediately advised Zunda of the possibility. Zunda thereafter responded "I'm buying candles all-out," implying that he was praying for the possibility a transaction were consummated, even though Zunda's compensation from DIRECTV Argentina was not contingent upon any exit strategy for LAS. While the transaction did not come to pass, Pratola and Zunda already had an undisclosed personal stake in LAS through Leraman or otherwise, such that they would cash in on any gains realized on the acquisition of LAS. Shortly thereafter, Avila wrote to Pratola, referring to the potential acquisition, saying, "Carlitos [Pratola], it's looking good, right? Please give me a call!! A hug, Carlos [Avila]." (Compl. ¶63).

After DIRECTV uncovered evidence indicating that Pratola and Zunda had engaged in the conspiracy with the Park 610 Defendants with regard to the Leraman transaction, DIRECTV confronted each of Pratola and Zunda about the transaction. When confronted with the evidence

against them, neither Pratola nor Zunda offered a satisfactory explanation of their conduct. Ultimately, DIRECTV Argentina fired Pratola and Zunda for their self-dealing.  (Compl. ¶64).

By letter dated March 25, 2008, DIRECTV notified Avila that it had discovered his illicit transfer of Tumely to Leraman and exercised the Call Option at the price set forth in <u>Section 13.4</u> of the Joint Venture Agreement.  Avila denied that an Event of Default had taken place and has refused to tender his membership interests in LAS, as required by the Joint Venture Agreement. (Compl. ¶65).

**<u>ARGUMENT</u>**

In considering a motion to dismiss pursuant to Rule 12(b)(6), the federal courts construe the complaint broadly, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007).  In this case, of course, the question of "plausibility" does not even arise because the Amended Complaint identifies several documents that establish the particulars of Park 610's side-deal with DIRECTV's employees and quotes damning e-mail correspondence.  Nor is this a case where the allegations set forth in the pleading or the context in which they are offered suggest a need for "additional subsidiary facts" to justify proceeding to discovery.  *See Iqbal v. Hasty*, 490 F.3d 143, 166 (2d Cir. 2007), *cert. granted*, 128 S.Ct. 2931 (2008).  Thus, on the facts presented in the Amended Complaint this Court need only determine whether DIRECTV "assert[s] a cognizable claim and allege[s] facts that, if true, would support such a claim."  *Boddie v. Schnieder*, 105 F.3d 857, 860 (2d Cir. 1997).  For the reasons that follow, the motion of the Park 610 Defendants must be denied in all respects.

# I.

## THE AMENDED COMPLAINT STATES A CAUSE OF ACTION FOR BREACH OF THE JOINT VENTURE AGREEMENT

A. Avila's Side-Deal With Pratola and Zunda Resulted in a Change of Control of Park 610 and Therefore Resulted in an Event of Default Under the Joint Venture Agreement

A "Change of Control" of Park 610 constitutes an Event of Default under Section 13.1(e) of the Joint Venture Agreement and takes place when:

> any Person (other than the Person who controls a Member on the date hereof) becomes the beneficial owner, ***directly or indirectly***, of more than 50% of the then outstanding voting shares or other equity rights of a Member. (Compl. ¶¶30, 31)

(Emphasis supplied). By definition, the transfer of all the shares of Tumely to Leraman resulted in a conveyance of 50% of the outstanding voting shares or other equity rights of Park 610. The transfer of *any portion* of Loraine, therefore, would result in an Event of Default.

The Amended Complaint alleges that Avila agreed with Leraman either to pledge his shares of Loraine to Leraman and/or to deposit them with a third party as security for the performance of his obligations to Leraman (Pratola and Zunda) under the Leraman Shareholders Agreement. (Compl. ¶53). These allegations are more than sufficient by themselves to allege a plausible ground upon which to allow a claim to go forward under Section 13.1(e) of the Joint Venture Agreement. *Twombly*, 127 S.Ct. at 1965; *Iqbal v. Hasty*, *supra*, 490 F.3d 143 at 166.

The Park 610 Defendants apparently confine themselves to the self-serving assertion that "a contractual restriction on the transfer of shares of Loraine does not and cannot constitute a change in ownership, beneficial or otherwise, of 'voting shares' or any 'equity rights' in Loraine. (Def. Mem. at 10). This argument is futile for two reasons. First, the important allegation here is that a "Change of Control" of Park 610 took place, (Compl. ¶68) and DIRECTV has alleged numerous facts tending to sustain that allegation. Second, a contractual restriction on the transfer

of the shares of Loraine or a pledge of those shares would constitute a change in beneficial ownership. While the term "beneficial ownership" is not itself defined within the Joint Venture Agreement, its meaning may be discerned by analogy to the securities laws, which have given rise to a well-developed body of caselaw around the concept of beneficial ownership.

For example, under Section 13 of the Securities Exchange Act of 1934, beneficial ownership of an equity security is defined as follows:

"(a)     For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

> (1)     Voting power which includes the power to vote, or to direct the voting of, such security; and/or
>
> (2)     Investment power which includes the power to dispose, or to direct the disposition of, such security."

*See* 17 C.F.R. § 240.13d-3(a). Similarly, Section 16 of the Securities Exchange Act of 1934 requires persons who have or share a direct or indirect pecuniary interest in certain equity securities publicly to report their holdings, and follows the definition set forth in Section 13. *See Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 122 (2d Cir. 2001). *See also Schaffer ex rel. Lasersight Inc. v. CC Investments, LDC,* 280 F.Supp.2d 128 (S.D.N.Y. 2003)(Marrero, *J.*). The indicia of beneficial ownership in this context embrace concepts of control, agreements regarding the holding or disposition of securities, and direct or indirect pecuniary interest.[5]

DIRECTV is not in a position to identify the precise degree of control that Pratola and Zunda acquired over the shares of Loraine, S.A., in the Tumely Shareholders Agreement because the forensic search of their computers did not yield the final execution versions of the document. The draft Shareholders Agreement, previously filed in support of DIRECTV's motion for a pre-

---

[5]     *See also* Black's Law Dictionary 142 (5th ed. 1979)(defining a beneficial owner as, among other things, "[o]ne who does not have title to property but has rights in the property which are the ordinary incident of owning the property").

judgment attachment, however, gives Leraman a "Right to Veto" certain corporate acts, including transfers, reorganization, merger and other matters involving voting rights in Loraine, Park 610 or LAS. (*See* McCormick Decl. at <u>Exhibit 3</u>, p. 3-4). On the facts alleged in the Amended Complaint, Avila's undertakings in the Shareholders Agreement either to pledge his shares of Loraine and/or deposit them with a third party, along with the other allegations of concerted action with Pratola and Zunda, suggest "group" action of the sort described in *Morales* and *Schaffer*, and give rise to an inference of shared control over Loraine (and/or Park 610).

Similarly, while the term "equity rights," as used in the Joint Venture Agreement, is also undefined, any agreement by Avila to *limit* his own rights with respect to the shares of Loraine (or Park 610) implies the creation of a corresponding equity right in Leraman or, in reality, Pratola and Zunda. In any case, DIRECTV has alleged facts suggesting a plausible reason to believe that the Park 610 Defendants conveyed something more than 50% of the beneficial ownership of Park 610 to Leraman, thereby triggering an Event of Default. By the same token, the facts alleged in the Amended Complaint suggest an equally strong likelihood that, through the conveyance of Tumely and the concomitant pledge, escrow deposit or other restrictions upon Loraine, Leraman acquired "effective control of a Member [Park 610], other than through this [Joint Venture] Agreement," thereby constituting a separate Change of Control. (*See* definition of "Change of Control," at subparagraph (c)(iii)). The proper course at this stage is to proceed to discovery on that issue and compel the Defendants to explain the substance of the transaction.

B. The Transfer of Tumely and/or Loraine to Pratola and Zunda
Constituted a Prohibited "Transfer" of an Indirect Beneficial Interest in
<u>LAS and Resulted in an Independent Event of Default</u>

The Amended Complaint further alleges ample facts to support DIRECTV's claim that a transfer of 100% of the stock of Tumely to Leraman resulted in an independent Event of Default

under the Joint Venture Agreement because the result of that transfer was the conveyance of an indirect interest in Park 610's "Membership Interest" in LAS.

The starting point is <u>Section 13.1(c)</u> of the Joint Venture Agreement, which provides that any attempt by a Member (*e.g.*, Park 610) to "Transfer" any of its "Membership Interests" other than in accordance with the terms of the Joint Venture Agreement constitutes an Event of Default. The parties are in agreement that the "Membership Interest" at issue is the interest in the joint venture [LAS] issued to Park 610. However, the Park 610 Defendants assert that the transfer of shares of Park 610's parent companies did not result in a "Transfer" of Park 610's Membership Interests in LAS. (Def. Mem. at 11).

The Park 610 Defendants simply pretend that the term "Transfer" is not defined in the Joint Venture Agreement. However, the agreement supplies a broad definition of the terms "Transfer" and "Interest", which encompasses any conveyance, whether direct or indirect:

> "Transfer" means (i) any sale, assignment or transfer of securities, (ii) a sale, assignment or transfer of any economic interest and/or a voting interest ("Interest") in an entity that, directly or indirectly, holds any securities, (iii) a pledge or hypothecation of securities or Interest or any interest therein, (iv) sale, assignment or a transfer of securities convertible into or exchangeable for or other options or rights to acquire securities or Interest or (v) any other direct or indirect, voluntary or involuntary, sale, assignment or transfer of securities or Interest or any interest therein, whether pursuant to a Change of Control or otherwise.

Under this definition Leraman plainly acquired at least an economic interest, even if only an indirect one, in Park 610's Membership Interests in LAS.[6] The definition of an "Interest" mirrors the statutory concept of beneficial ownership quoted above. Accordingly, even if the

---

[6] Again, by way of analogy, and putting aside the question of extraterritorial application of the Exchange Act, if the Membership Interests in LAS had been a class of equity securities registered with the Securities and Exchange Commission pursuant to Section 12 of the Exchange Act, each of Pratola, Zunda and Leraman would have been required to file reports on Form 13D or 13G, as well as Form 3 (Initial Statement of Beneficial Ownership of Securities), inasmuch as they had acquired more than 5% of that class under Section 13 and 10% pursuant to Section 16, respectively. Even if one looked only to the Tumely transfer, Leraman's acquisition of 50% of Park 610 translates into an indirect 27.5% beneficial ownership of the total equity of LAS.

15

Park 610 Defendants, Pratola and Zunda had succeeded in "papering" their way around a technical Change of Control, the facts set forth in the Amended Complaint show that they failed to read the entire Joint Venture Agreement and wound up simply triggering a separate Event of Default by effectuating a prohibited Transfer.[7]

The conveyance of Tumely and/or Loraine to Leraman was a Transfer "other than in accordance with the terms of this [Joint Venture] Agreement," and therefore an Event of Default, because it violated DIRECTV's rights in Article X and Article XI of the Joint Venture Agreement.  Section 10.2 of the LLC Agreement stipulates that DIRECTV has the right to receive prior notice of such any such transfer, so that it may exercise rights of first refusal. Article XI of the LLC Agreement similarly provides "tag-along" rights to DIRECTV, even in the case of a properly noticed transfer of Membership Interests in LAS by Park 610.  All of those rights were violated by the Leraman transaction, which was obviously structured in such a way as to conceal the transfer and circumvent the purpose of the notice provisions of the Joint Venture Agreement.  Accordingly, the Amended Complaint states a cause of action for specific performance of the Call Option in connection with this Event of Default.

---

[7]     The Park 610 Defendants do not have an answer to this argument other than to launch into a detour over a separate parent-level transfer of stock in DIRECTV's ultimate parent company, The DIRECTV Group, Inc., from News Corporation to the Liberty Media Corporation.  This argument is a red herring on several levels.   First, it is irrelevant to the question of whether the Amended Complaint alleges an Event of Default on the part of Park 610.  If, indeed, the transfer of New Corporation's 41% interest in The DIRECTV Group, Inc. in the first quarter of 2008 were an equivalent Event of Default – which DIRECTV disputes – DIRECTV's own claim against Park 610 would remain valid under Rule 12(b)(6).  Moreover, given Park 610's antecedent, material breach of the Joint Venture Agreement during 2006 and 2007, DIRECTV's own obligation to refrain from an indirect transfer of its interests in LAS under the Joint Venture Agreement (even if implicated by the conveyance to Liberty Media Corporation) was excused in any event, thereby nullifying any possible claim by Park 610.  See Restatement (Second) of Contracts § 237 (West, Westlaw through March 2008).  Most important, however, the Park 610 Defendants' reading of the contract is inconsistent with the obvious spirit and purpose of the Joint Venture Agreement.  There is a world of difference between a publicly disclosed stock swap, reported to the Securities and Exchange Commission and in the national media, on the one hand, and an illicit kickback scheme such as the transfer of Tumely and/or Loraine to Leraman, the sole and obvious object of which was to deceive DIRECTV, circumvent the Joint Venture Agreement, and enable Pratola and Zunda to put themselves on both sides of the transaction.

C.     The Breach of the Ethics Covenant Constituted a Third Event of Default.

The Park 610 Defendants employ an equally self-serving reading of the ethics covenant of the Joint Venture Agreement.  Section 13.1(b) defines a breach of the ethics covenant as an Event of Default.  Section 12.5 of the Joint Venture Agreement obligated Park 610 to refrain from doing business with *any* person when payoffs or similar practices were involved, and further agreed to avoid a transaction that would result in a conflict of interest.  Park 610's promise to DIRECTV in this regard was unambiguous, and its conduct in the Leraman transaction unmistakably breached the Joint Venture Agreement.  It is immaterial whether the transaction at issue took place at the parent company level, since the obvious purpose of the transfer of Tumely and/or Loraine to Leraman was to circumvent Park 610's duties to DIRECTV under the Joint Venture Agreement.  One may not use the corporate form as a contrivance to defeat contractual rights, *i.e.*, by organizing the corporation as part of a fraud upon another.  *See Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995).

Here, the Amended Complaint alleges that Park 610 simply used the fiction of two parent companies to contrive an end-run around the Joint Venture Agreement.  The line between Park 610, on the one hand, and Tumely and Loraine, on the other, is therefore a pure fiction and the transaction among Tumely, Loraine, Avila and Leraman is attributable directly to Park 610.  *See M & A Oasis, Inc. v. MTM Associates*, L.P., 307 A.D.2d 872, 874, 764 N.Y.S.2d 9, 12 (1st Dep't 2003).  Accordingly, whatever legerdemain Avila's and Pratola's lawyers may have come up with, it is insufficient as a matter of law to avoid the consequences of what Defendants ultimately were doing, *i.e.*, defeating DIRECTV's rights under the Joint Venture Agreement through the Leraman transaction, not to mention participating in the other part of the kickback, namely the siphoning of money to the Clemente account.  (Compl. ¶¶58-60).

**THE AMENDED COMPLAINT STATES A CAUSE OF ACTION FOR FRAUD ARISING OUT OF THE DECEITFUL CONDUCT OF THE PARK 610 DEFENDANTS**

A.    Each of the Defendants is Jointly and Severally Liable for the Misrepresentations of Pratola and Zunda

The Park 610 Defendants seek refuge in the fact that the affirmative misrepresentations alleged in the Amended Complaint were uttered by Pratola and Zunda rather than by any one of the Park 610 Defendants. (Def. Mem. at ¶¶14-15). But Defendants grossly misstate the law of fraud. The Amended Complaint alleges that Pratola and Zunda misrepresented to DIRECTV that the Channel would be conducted as a joint venture solely between DIRECTV and Avila (a representation Avila and Park 610 effectively ratified by entering into the MOU and the Joint Venture Agreement), whereas in actuality they planned all along secretly to substitute Pratola and Zunda as the holders of part or all of Avila's stake in LAS. (Compl. ¶94). The Amended Complaint further alleges ample facts supporting a conspiracy among all the Defendants, grounded upon this misrepresentation. Thus, *all* Defendants are jointly and severally liable for whatever harm flowed from it. *See CPC Intern. Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 286, 514 N.E.2d 116, 125, 519 N.Y.S.2d 804, 813 (1987); *Manes v. Manes*, 717 N.Y.S.2d 185, 277 A.D.2d 359 (2nd Dep't 2000), *leave to appeal dismissed*, 96 N.Y.2d 790 (2001). Accordingly, Pratola's, Zunda's, Avila's and Park 610's statements are attributable to each of the Defendants who participated in, aided and abetted the fraud and knew of the false and misleading representation. *See Rizel v. Bodner*, 225 A.D.2d 410, 411, 640 N.Y.S.2d 19, 20 (1st Dep't 1996).

B.    Each of the Park 610 Defendants Committed Fraud by Omitting to State a Material Fact

The Amended Complaint states a valid cause of action against each of the Park 610 Defendants for two additional reasons. First, Park 610 was engaged in a joint venture with

DIRECTV. As such, the Park 610 Defendants owed a duty to disclose all material facts surrounding the joint venture, because each party to the venture stood in a fiduciary relationship with regard to the other. *See Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1483 (2d Cir. 1995). Under such circumstances, omission to state a material fact constitutes a fraud.

Moreover, even in the absence of a relationship of trust, it is hornbook law that a party will be liable for a fraudulent omission where: (1) the party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party or (2) "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Remington Rand Corp., supra*, 68 F.3d at 1484 (2d Cir. 1995)(citing, *inter alia, Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2d Cir. 1984)). The Park 610 Defendants' duty arose from the moment when they had reason to know that DIRECTV was operating under a mistaken perception of a material fact, *i.e.*, that Park 610 was the sole co-venturer with DIRECTV.

The Amended Complaint more than adequately alleges reliance. The Amended Complaint makes clear that DIRECTV was operating on the understanding that it would be in a partnership relation with Avila (and only Avila), through Park 610, and that it was the victim of a "bait and switch" at the hands of all of the Defendants. Pratola convinced DIRECTV that Avila's ability to develop the programming content of the Channel and obtain advertising was crucial to the success of the enterprise, such that Park 610 should receive a 55% equity ownership of LAS. (Compl. ¶¶28-29). Where, as here, the wronged party would not have entered into the transaction but for the challenged misrepresentation, the element of reliance is

established.  *See, e.g., NYCTA v. Morris J. Eisen, P.C.*, 276 A.D.2d 78, 87, 715 N.Y.S.2d 232, 238 (1st Dep't 2000).

The Park 610 Defendants' reliance upon *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13 (2d Cir. 1996) for the proposition that the cause of action for fraud duplicates the claims for breach of contract is entirely misplaced.  As this Court recognized in *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F.Supp.2d 231, 245 (S.D.N.Y. 2006)(Marrero, *J.*), a misrepresentation regarding a "present fact" regarding a transaction is sufficient to sustain a cause of action sounding in fraud, independent of a claim for breach of contract.  What is at issue in this case is not a false representation as to Park 610's intent to perform under the Joint Venture Agreement in the future, but the fraudulent concealment of a present fact, *i.e.*, that the Park 610 Defendants were engaged in an illicit side-deal with Pratola and Zunda, outside the contract. Under such circumstances, an independent tort duty is also implicated and the *Bridgestone* rule does not arise.  *See id*. at 244-45 (citing *Stewart v. Jackson & Nash*, 976 F.2d 86, 88-89 (2d Cir. 1992) and *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994)).[8]

## III.

## THE PARK 610 DEFENDANTS BREACHED FIDUCIARY DUTIES OWED BOTH DERIVATIVELY AND DIRECTLY TO DIRECTV

A.     Avila and Timistit Breached Their Duty as Corporate Officers by Arranging to Pay Park 610 Management Fees in Excess of Those Actually Earned

As a threshold matter, the Park 610 Defendants apparently concede that, as of June 2008, the management service fees earned under the MSA were at least $27,000 less than the amount

---

[8]     The Park 610 Defendants' fall-back position, grounded on the merger clause in the Joint Venture Agreement may be quickly disposed of.  Under New York law, parol evidence is admissible to prove a claim of fraud in the inducement and this general rule applies even where the parties' agreement contains a merger clause.  *See, e.g., Wall v. CSX Transportation, Inc.*, 471 F.3d 410, 416 (2d Cir. 2006).  The clause at issue here could not be more generic ("constitutes the entire agreement among the Parties, and supersedes any prior understandings, agreements, or representations by or among the parties, written or oral, to the extent they related in any way to the subject matter hereof.")

paid by LAS to Park 610. (Def. Mem. at 19). Moreover, under the terms of the MSA, in the event that a Change of Control of Park 610 were to take place, the MSA would terminate. (McCormick Decl. at <u>Exhibit 1</u>, Appendix B). Since the MSA terminated by operation of law from the moment that Park 610 changed hands, any payments made to Park 610 constituted a complete waste of corporate assets.

Avila and Timistit seek to avoid responsibility for their breach of fiduciary duty by raising the business judgment rule as a defense. However, resort to the business judgment rule on a pre-discovery motion to dismiss is inappropriate as long as the plaintiff has alleged facts that give rise to a plausible derivative claim against corporate officers. *See, e.g., In re 1st Rochdale Co-op Group, Ltd.*, No. 07 Civ. 7852 (DC), 2008 WL 170410, *2 (S.D.N.Y. Jan. 17, 2008). The business judgment rule is an *affirmative defense*, which is generally not properly raised at this stage of the action. *See, e.g., In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005)("[g]enerally speaking, we will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6)"). Here, DIRECTV has alleged particularized facts to rebut the presumption that the Park 610 Defendants acted in the best interests of LAS and DIRECTV, specifically identifying the impropriety of the management fees and the diversion of those fees to Zunda's "bag man," Clemente. (Compl. ¶¶54-66).

B.  Park 610 and Avila Breached Direct Fiduciary Duties to DIRECTV

There can be no serious question that Park 610 owes a direct fiduciary duty to DIRECTV arising out of the very nature of the joint venture. *See Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928). Thus, Park 610's failure to disclose the existence of the clandestine transaction with Pratola and Zunda, which undermined a fundamental assumption underlying the joint venture, is actionable as a breach of fiduciary duty independent of its obligations *ex contractu*.

Defendants' seek to escape liability for their breach of fiduciary duty, arguing that the fifth cause of action duplicates the cause of action for breach of contract. (Def. Mem. at 21-22, citing *Solow v. Aspect Resources, LLC*, No. Civ. A. 20397, 2004 WL 2694916 (Del. Ch. Oct. 19, 2004) and *William Kaufman Org., Ltd. v. Graham & James LLP*, 269 A.D.2d 171, 703 N.Y.S.2d 439 (1st Dep't 2000)). The Park 610 Defendants are wrong. Where a fiduciary duty is expressly or implicitly contained within the contract, the claim for breach of that duty creates an independent obligation for which a defendant may be held independently liable. *See, e.g., Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571 (Del.Ch. 1998); *In re Fruehauf Trailer Corp.*, 369 B.R. 817, 830 (Bankr. D.Del. 2007)(fiduciary duty implicit in contract, motion to dismiss fiduciary claim denied). Here, a fiduciary duty is inherent in the Joint Venture Agreement by operation of the joint venture relationship itself. *Meinhard v. Salmon, supra.*

The Park 610 Defendants assert that Avila is without any fiduciary responsibility to DIRECTV even though he is the Chairman of LAS and the sole control person of Park 610. However, *In re USACafes, L.P. Litigation*, 600 A.2d 43 (Del. Ch. 1991), the Delaware court squarely held that the fiduciary duty of a corporate general partner to its limited partners equally binds the directors and control persons of the general partner as well. The *USACafes* court grounded its holding upon the principle that one who controls the property of another, as Avila surely does as the principal of Park 610, may not intentionally act in a manner that benefits himself at the expense of the investor. *See id.* at 48-50; *see also Zoren v. Genesis Energy, L.P.*, 836 A.2d 521, 528 (Del. Ch. 2003).[9]

By the same token, even if this Court were to hold that DIRECTV's cause of action against Park 610 for breach of Park 610's fiduciary duty as a co-venturer duplicates the cause of

---

[9] The same principle has been applied under New York law. *See Dymm v. Cahill*, 730 F. Supp. 1245, 1264 (S.D.N.Y. 1990); *Tobias v. First City Nat'l Bank and Trust Co.*, 709 F. Supp. 1266 (S.D.N.Y. 1989).

action for breach of contract, Avila himself is *not* a party to the Joint Venture Agreement. It therefore follows that DIRECTV's claim against Avila is ***not*** duplicative of the cause of action for breach of contract (which is necessarily asserted solely against Park 610). *See, e.g., Maillet v. Frontpoint Partners, L.L.C.*, 2003 WL 21355218 at *4 (S.D.N.Y. June 10, 2003)(sustaining fiduciary duty claims against non-parties to contract under both New York and Delaware law). *Accord, Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172-73 (Del. 2002)(where general partner separately held liable for breach of partnership agreement, control persons of general partner who were not parties to agreement held jointly and severally liable under Delaware law for aiding and abetting general partner's breach of fiduciary duty).[10]

## IV.

### THE MOTION TO AMEND THE COMPLAINT IS MERITORIOUS AND WILL CAUSE NO PREJUDICE TO THE PARK 610 DEFENDANTS

Leave to amend a complaint "shall be freely given," Fed.R.Civ.P. 15(a), and "there must be good reason to deny the motion" for leave to amend. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995). It is well settled that amendment should be liberally granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the new claim. *See Pangburn v. Culbertson*, 200 F.3d 65, 71 (2d Cir. 1999).

Here, DIRECTV seeks to add two substantive amendments that are amply supported by law. First, DIRECTV seeks to clarify the remedy sought for the breach of fiduciary duty under the fifth cause of action, to preserve for DIRECTV the benefit of its bargain. The most appropriate remedy would be a constructive trust, such that upon a sale of LAS to a third-party bidder, or the consummation of some other exit strategy, DIRECTV would receive any gain on the sale. Absent such a remedy, the Park 610 Defendants would be unjustly enriched by reason

---

[10] To the extent that the joint venture continues to operate, the cause of action for declaratory relief should not be dismissed, as disposition of the other causes of action may not afford complete relief.

of DIRECTV's investment.  *See Simonds v. Simonds*, 45 N.Y.2d 233, 241, 380 N.E.2d 189, 193, 408 N.Y.S.2d 359, 363 (1978)(citing *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919)).

DIRECTV further seeks to clarify that Defendant Clemente, who has previously been named solely as a Defendant as to the derivative claim, for aiding and abetting the breach of fiduciary duty (Fourth Cause of Action), is also a defendant under DIRECTV's cause of action for fraud.  In light of the the specific allegations of overt acts on the part of Clemente in aid of the conspiracy, he is jointly and severally liable for the fraudulent acts of his co-conspirators. (*See* Part II, A., *supra*, and cases there cited).  Similarly, the proposed Second Amended Complaint (*see* McCormick Decl., Exhibit 2) would add a new cause of action against each of Pratola, Zunda and Clemente for aiding and abetting the breach of fiduciary duty of Park 610 asserted in the Fifth Cause of Action.  A claim for aiding and abetting a breach of fiduciary duty requires (a) a breach of fiduciary obligations by another (*i.e.*, the fiduciary), (b) proof that the defendant knowingly induced or participated in the fiduciary's breach and (c) proof that the plaintiff was damaged as a result of the breach.  *See, e.g., S & K Sales Co. v. Nike*, 816 F.2d 843, 847-848 (2d Cir. 1987). Furthermore, if the Court does not hold that Avila is directly liable for breach of fiduciary duty as a control person (*see* Point III.B, *supra*), DIRECTV seeks to assert a claim against Avila for aiding and abetting the breach.

Finally, the proposed amendment would perform the ministerial function of correcting the record regarding the membership of DIRECTV, and comply with the pleading requirements of Rule 23.1(b), Fed. R. Civ. P.  None of the foregoing amendments will result in any prejudice to the Defendants, inasmuch as discovery has not yet begun.

## <u>CONCLUSION</u>

For the foregoing reasons, the motion of the Park 610 Defendants must be denied in its

entirety, and the cross-motion to amend should be granted.  To the extent that the Court should

find the allegations of the Amended Complaint insufficient for purposes of Rule 8 or Rule 9(b),

DIRECTV respectfully seeks leave to replead to cure any such deficiency.

Dated:        New York, New York
              September 5, 2008

                                        Respectfully submitted,

                                        **MINTZ & GOLD LLP**


                                        **/s/** Terence W. McCormick
                                        Steven G. Mintz (SM 5428)
                                        Terence W. McCormick (TM 2713)
                                        470 Park Avenue South
                                        10th Floor North
                                        New York, N.Y. 10016-6819
                                        Tel:    (212) 696-4848
                                        Fax:    (212) 696-1231
                                        *Attorneys for Plaintiff*
                                        *DIRECTV Latin America, LLC*


To:     V. David Rivkin, Esq.
        Fox Horan & Camerini LLP
        825 Third Avenue
        New York, New York 10022
        (*Counsel for Defendants Park 610, LLC,*
        *Carlos Vicente Avila and Roberto Timistit*)