USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/26/10

DIRECTV Latin America, L.L.C.

v.

Park 610, L.L.C., Carlos Vicento Avila,
Roberto Timistit, Carlos Pratola,
Diego Clemente, et al.,

08 Civ. 3987(VM)

Report and Recommendation of
Magistrate Gabriel W. Gorenstein
Dated: November 23, 2009

Attachment to the Court's
Decision and Order
Dated: January 26, 2010

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/26/10

UNTED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
DIRECTV LATIN AMERICA, LLC,                  :
                                             :  08 Civ. 3987(VM)
                        Plaintiff,           :
                                             :  **DECISION AND ORDER**
    - against -                              :
                                             :
PARK 610, LLC, et al.,                       :
                                             :
                        Defendants.          :
--------------------------------------X

**VICTOR MARRERO, United States District Judge.**

## I. BACKGROUND

Plaintiff DIRECTV Latin America, LLC ("DIRECTV") brought this action alleging, among other claims, breach of fiduciary duty and fraud against defendants Park 610, LLC ("Park 610"), Carlos Vicente Avila,("Avila"), Roberto Timistit ("Timistit"), Carlos Pratola ("Pratola") and Diego Clemente ("Clemente"). The complaint arises from a joint venture between DIRECTV and Avila that contained a New York forum selection clause. The claims against Park 610, Avila and Timistit were dismissed pursuant to a settlement agreement. Now before the Court is the motion of Pratola and Clemente to dismiss the complaint on the grounds of lack of personal jurisdiction over them and forum non conveniens.

By Order dated November 23, 2009, Magistrate Judge Gabriel Gorenstein, to whom this matter had been referred for supervision of pretrial proceedings, issued a Report and Recommendation the ("Report"), a copy of which is attached and incorporated herein, recommending that the claims against Pratola and Clemente be dismissed for lack of personal jurisdiction. The Report further noted that even if personal jurisdiction existed, the action could

properly be dismissed by application of the forum non conveniens doctrine. DIRECTV filed timely objections to the Report challenging its findings and conclusions. Pratola and Clemente filed papers supporting the Report's recommendation. For the reasons stated below, the Court adopts the recommendations of the Report in their entirety.

## II. **STANDARD OF REVIEW**

A district court evaluating a Magistrate Judge's report may adopt those portions of the report to which no "specific, written objection" is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law. Fed. R. Civ. P. 72(b); see also Thomas v. Arn, 474 U.S. 140, 149 (1985); Greene v. WCI Holding Corp., 956 F. Supp. 509, 513 (S.D.N.Y. 1997). "Where a party makes a 'specific written objection ... after being served with a copy of the [magistrate judge's] recommended disposition,' however, the district court is required to make a de novo determination regarding those parts of the report." Cespedes v. Coughlin, 956 F. Supp. 454, 463 (S.D.N.Y. 1997) (citing United States v. Raddatz, 447 U.S. 667, 676 (1980)); Fed. R. Civ. P. 72(b). The Court is not required to review any portion of a Magistrate Judge's report that is not the subject of an objection. See Thomas, 474 U.S. at 149. A district judge may accept, set aside, or modify, in whole or in part, the findings and recommendations of the Magistrate Judge as to such matters. See Fed. R. Civ. P. 72(b); DeLuca v. Lord, 858 F. Supp. 1330, 1345 (S.D.N.Y. 1994).

## III. DISCUSSION

Having conducted a de novo review of the full factual record in this litigation, including the pleadings, and the parties' respective papers submitted in connection with the underlying motion and in this proceeding, as well as the Report and applicable legal authorities, the Court concludes that the findings, reasoning, and legal support for the recommendations made in the Report are warranted. Accordingly, for substantially the reasons set forth in the Report the Court adopts the Report's factual and legal analyses and determinations, as well as its substantive recommendations, in their entirety as the Court's ruling on the motion of Pratola and Clemente to dismiss DIRECTV's complaint in this action for lack of personal jurisdiction, or, in the alternative, by application of the doctrine of forum non conveniens.

## IV. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the Report and Recommendation of Magistrate Judge Gabriel Gorenstein dated November 23, 2009 Docket No. 164 is adopted in its entirety, and the objection of plaintiff (Docket No. 168), is DENIED.

The Clerk of Court is directed to withdraw any pending motions and to close this case.

**SO ORDERED.**

Dated:     NEW YORK, NEW YORK
           26 January 2010

Victor Marrero
U.S.D.J.

-4-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DIRECTV LATIN AMERICA, LLC,                    :

        Plaintiff,                               :          08 Civ. 3987 (VM) (GWG)

   -v.-                                          :          REPORT AND
                                 RECOMMENDATION
PARK 610, LLC, CARLOS VICENTE AVILA,           :
ROBERTO TIMISTIT, CARLOS PRATOLA, and
DIEGO CLEMENTE, DOES 1 through 10,             :

        Defendants.                              :
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

    Plaintiff DirecTV Latin America, LLC ("DirecTV") has sued Park 610, LLC ("Park

610"), Carlos Vicente Avila, Roberto Timistit, Carlos Pratola, and Diego Clemente. DirecTV

alleges the individual defendants – who include an employee of DirecTV – secretly conspired to

illegally share in the profit of a joint venture between DirecTV and Park 610. See Second

Amended Complaint, filed June 20, 2009 (Docket # 138) ¶¶ 1-2 ("2d Am. Compl."). DirecTV's

second amended complaint alleges five grounds for relief: (1) declaratory judgment against Park

610; (2) breach of contract against Park 610; (3) breach of fiduciary duties against Park 610 and

Avila; (4) aiding and abetting a breach of fiduciary duty against Avila, Timistit, Pratola, and

Clemente; (5) fraud against Avila, Pratola, and Timistit, and aiding and abetting fraud as against

Clemente and Timistit. Id. ¶¶ 77-108.

    Park 610, Avila, and Timistit ("Park 610 defendants") now move for a judgment

dismissing the second amended complaint as to them pursuant to Fed. R. Civ. P. 12(b)(6);

Pratola and Clemente move for a judgment dismissing the second amended complaint as to them

pursuant to Fed. R. Civ. P. 12(b)(1), (2), (3), and (6) and the doctrine of forum non conveniens,

or – in the alternative – for a stay pending the completion of proceedings in Argentina.

I.    BACKGROUND

      A.    Facts

      The following facts are alleged in DirecTV's second amended complaint and are assumed to be true for purposes of these motions.

            1.    The Venture

      DirecTV provides pay television services in Latin America and, through its subsidiaries, has approximately five million subscribers. 2d Am. Compl. ¶ 7. Before his termination, Pratola was the general manager and chief executive officer of DirecTV Argentina, S.A., which is a subsidiary of DirecTV. Id. ¶¶ 1, 15. In April 2006, Pratola recommended to his superiors at DirecTV that adding a golf programing channel would improve the company's subscriber base. Id. ¶¶ 1, 20. At Pratola's urging, DirecTV entered into negotiations with Avila, an individual with a long history of developing sports programming in Argentina, to create a joint venture that would develop and distribute such a channel in Latin America. Id. ¶¶ 21, 29. Pratola took a lead role in negotiating a memorandum of understanding and the subsequent Joint Venture Agreement between DirecTV and Avila. Id. ¶ 23. Under the agreement, the parties' joint venture was to be called Latin American Sports, LLC ("LAS"), in which Park 610 would have a 55% membership interest and DirecTV would have a 45% membership interest. Id. ¶¶ 1, 25.

      Under the agreement, DirecTV was obligated to provide up to $7 million in funding to LAS. Id. ¶ 26. Between 2006 and 2008, DirecTV provided LAS with capital contributions of $5,700,000 and loans of an additional $2,000,000. Id. ¶¶ 26-27. Avila was to act as the chairman of LAS. Id. ¶ 28. Because of Avila's experience in developing sports programming,

2

DirecTV made it clear that it was "critical" that Avila not transfer any of his ownership interest in LAS without DirecTV's prior written agreement. Id. ¶ 29. Indeed, a provision in the joint venture agreement made a change in control a default under the contract. Id. ¶ 30. Upon default, the agreement had a "call option" which provided that a defaulting member could be forced to sell its membership interest to the non-defaulting member for book value. Id. ¶ 35.

        2.     <u>Park 610</u>

Park 610 is a limited liability corporation that was formed for the purpose of being the entity through which Avila controlled his interest in LAS. Id. ¶ 40. Park 610's two members are Tumely S.A. ("Tumely") and Loraine S.A. ("Loraine"). Id. ¶ 41. In due diligence meetings during the summer of 2006, Avila represented that he was the sole owner of Tumely and Loraine, and falsely stated that he chose to own Park 610 in this manner so that he could more easily conduct intra-family transfers in the future. Id. ¶¶ 42-44. Additionally, in an e-mail dated August 24, 2006, Avila's counsel represented to DirecTV that Avila owned all of the equity in Tumely and Loraine. Id. ¶ 45. Avila's counsel also represented that, although currently in bearer form, the by-laws of the two companies would change the shares to a registered form in the future. Id. However, simultaneously and unbeknownst to DirecTV, Avila and Pratola were arranging a transfer of ownership of Tumely to an entity controlled by Pratola and non-party Alejandro Zunda Cornell ("Zunda"), the Vice President of Marketing and Sales of DirecTV Argentina. Id. ¶¶ 2 n.1, 48. Delivery of bearer shares would be an easier way to conceal the transfer inasmuch as the shares would not have to be re-registered. Id. ¶ 48.

On or about September 18, 2006, Avila and DirecTV closed their transaction by executing the Joint Venture Agreement that formed LAS. Id. ¶ 49; <u>see</u> Limited Liability

3

Company Agreement of Latin American Sports, LLC Among Latin American Sports, LLC, DirecTV Latin America, LLC, and Park 610, LLC (annexed as Ex. A to Declaration of Carlos V. Avila in Support of Defendants Park 610, LLC, Carlos V. Avila and Roberto Timistit's Motion to Dismiss the Second Amended Complaint, filed June 8, 2009 (Docket # 140)) ("Joint Venture Agreement").

### 3. The Side Deal

Before the closing, in April 2006, Pratola had formed Leraman, which would eventually become the owner of the Park 610 shares belonging to Tumely. 2d Am. Compl. ¶ 52. Around this time, a law firm in Uruguay prepared two transactional documents: first, a Tumely share purchase agreement between Avila as seller and Leramar[1] as buyer, see id. ¶ 52; see also Share Purchase Agreement By and Between Carlos Vicente Avila and Leramar S.A. (annexed as Ex. 7 to Declaration of Michael Hartman in Support of Application for a Pre-judgment Attachment Pursuant to FRCP Rule 64, filed June 12, 2008 (Docket # 16) ("Hartman Decl.")) ("Share Purchase Agreement"); and, second, a Tumely shareholders' agreement between Avila and Leramar, see 2d Am. Compl. ¶ 53; see also Agreement By and Between Carlos Vicente Avila and Leramar S.A. (annexed as Ex. 8 to Hartman Decl.) ("Draft Shareholders' Agreement"). In a blacklined draft, Avila's attorney warned Timistit, the chief executive officer of LAS and the brother-in-law of Avila, that this meant a change in control in violation of "the LAS Shareholders Agreement." 2d Am. Compl. ¶¶ 14, 54. In an attempt to avoid the transfer rules in the agreements with DirecTV, counsel for Pratola and/or Avila included a stipulation in the agreement stating that the Tumely shares would continue to be nominally held by Avila, though

---

[1] "Leramar" in these agreements was later changed to "Leraman." Id. ¶ 59.

4

they would actually be held for the benefit of Leraman – that is, Pratola and Zunda. Id. ¶ 56.

On or about November 8, 2006, all of Avila's shares in Tumely were conveyed to Leraman without providing notice to DirecTV. Id. ¶¶ 57-58. Avila also allowed his shares of Loraine either to be pledged to Leraman or to be deposited with a third party as security for his obligations under the Tumely shareholders' agreement. Id. ¶ 60.

### 4. The Management Service Agreement

As part of the joint venture, LAS entered into a "Management Service Agreement" with Park 610. Id. ¶ 62. Pratola and Zunda headed the negotiation with Avila for determining the structure of the fee and its computation. Id. ¶ 63. The Management Service Agreement provided that Park 610 would receive 25% of advertising sales created by LAS. Id. ¶ 62. In late summer or the early fall of 2007, when advertising revenue was lower than expected, Avila pressured DirecTV to pay him an advance on the management fees of $30,000 per month. Id. ¶¶ 64-65. While DirecTV resisted at first, Pratola prevailed upon it to accede to this arrangement for six months. Id. ¶ 65. Rather than giving all this money to Park 610 directly, as contemplated by the Management Service Agreement, two installments of $30,000 were wired by Timistit to Avila personally and another $30,000 was transferred to a UBS account, which named "Clemente" as the beneficiary ("the Clemente Account"). Id. ¶ 66. This account was "used by" Clemente "to assist Pratola and Zunda in carrying out the kickback." Id. ¶ 67.

The second amended complaint provides details of several transfers of $30,000, id. ¶ 69-70, though the only specific date it provides relates to a transfer on May 11, 2007, thus rendering it unclear whether these transfers are the same as those described as beginning after "late summer or the early fall of 2007," see id. ¶ 64. As for the May 11, 2007 transfer, Clemente "sent

5

wire instructions to Zunda on that date for payment to Banco UBS Financial Services" in New York. Id. ¶ 69. That same day, Timistit arranged a transfer of $30,000 to the Clemente Account. Id. ¶ 70. Subsequently, Timistit arranged three additional transfers, and on each occasion, $20,000 was sent to Avila's JP Morgan account and $10,000 was sent to the Clemente Account. Id. Pratola pushed for DirecTV to continue these advances for an additional six months, but DirecTV refused. Id. ¶ 71.

In the fall of 2007, Zunda and Pratola exchanged emails suggesting great interest in and excitement about a possible sale of part of Park 610's interest in LAS, even though Zunda's compensation from DirecTV Argentina was not linked to LAS. Id. ¶ 72.

　　　　5.　　Dismissal and Use of Call Option

After DirecTV learned of the above transactions, DirecTV confronted Pratola and Zunda. Id. ¶ 73. When Pratola and Zunda provided insufficient explanations for these events, they were fired. Id. On March 25, 2008, DirecTV notified Avila that it had learned of the above transactions and attempted to exercise the call option in section 13 of the LAS agreement. Id. ¶ 74. Avila refused to honor this request on the ground that no breach had occurred. Id. ¶ 75.

　　B.　　Procedural Background

The procedural history of this case was discussed in a prior opinion. See DirecTV Latin America, LLC v. Park 610, LLC, 2009 WL 692202, at *3-4 (S.D.N.Y. Mar. 18, 2009) ("DirecTV I"), adopted by 614 F. Supp. 2d 446 (S.D.N.Y. Apr. 30, 2009) ("April 30 Decision and Order"). It is only repeated here to the extent relevant.

　　　　1.　　Argentinian Employment Action

On December 20, 2007, Pratola commenced a mandatory mediation proceeding in

6

Argentina against DirecTV Argentina and DirecTV for wrongful dismissal. See Affidavit of

Lisandro Allende, filed June 9, 2009 (Docket # 146) ("Allende Aff.") ¶ 5. The mediation was

unsuccessful. Id. Subsequently, on September 15, 2008, Pratola brought a lawsuit in the courts

of Argentina. Id. ¶ 6; Complaint (annexed as Ex. B to Allende Aff.) ("Argentinian Complaint").

In 2009, DirecTV filed an answer in that lawsuit. Allende Aff. ¶ 7; Answer to Complaint

(annexed as Ex. C to Allende Aff.) ("Argentinian Answer").

## 2. The Instant Action

On April 29, 2008, DirecTV commenced this action by filing a complaint against Park

610, Avila, Timistit, Pratola, and Zunda. See Verified Complaint, filed Apr. 29, 2008 (Docket

# 1). On June 12, 2008, DirecTV filed an amended complaint, which added Clemente as a

defendant. See Amended Complaint, filed June 12, 2008 (Docket # 36).[2]

_____

[2] Beginning with the filing of the original complaint, DirecTV obtained orders of
attachment against property of Clemente, Zunda, Avila, and Pratola. See Orders of Attachment,
filed Apr. 29, 2008 (Docket ## 3-5, 10-12); Order of Attachment, filed June 5, 2008 (Docket
# 25). On May 12, 2008, DirecTV made a motion to confirm the orders of attachment against
Zunda, Avila, and Pratola. See Notice of Motion to Confirm Orders of Attachment, filed May
12, 2008 (Docket # 15); Hartman Decl.; Declaration of Terence W. McCormick, Esq. in Support
of Motion to Confirm Orders of Attachment, filed June 12, 2008 (Docket # 17); Memorandum of
Law in Support of Plaintiff's Motion to Confirm the Orders of Attachment, filed June 12, 2008
(Docket # 18). On June 18, 2008, Avila filed an opposition to the motion to confirm the
attachment against him. See Memorandum of Law in Opposition to Plaintiff's Motion to
Confirm an Order of Attachment Obtained Ex Parte, filed June 18, 2008 (Docket # 46) ("Avila
Opp'n to Attachment"); Declaration of V. David Rivkin in Opposition to Plaintiff's Motion to
Confirm an Order of Attachment Obtained by Plaintiff Ex Parte, filed June 18, 2008 (Docket
# 47); Declaration of Carlos V. Avila in Opposition to Plaintiff's Motion to Confirm a Pre-
Judgment Order of Attachment Obtained Ex Parte by Plaintiff, filed June 18, 2008 (Docket # 48)
("Avila Decl."). On July 9, 2008, DirecTV filed a reply to the Avila opposition. See
Memorandum of Law in Reply to Defendant Avila's Opposition to the Motion to Confirm the
Order of Attachment, filed July 9, 2008 (Docket # 50). DirecTV's motion to confirm the order
of attachment as to Clemente was granted as unopposed. See Order, filed Aug. 8, 2008 (Docket
# 65). Following the Court's prior Report and Recommendation, see DirecTV I, 2009 WL
692202, at *12, the attachment against Zunda was removed and the remaining attachments were

The various defendants filed motions to dismiss on a number of different theories. The Court raised, sua sponte, the issue of diversity jurisdiction. See DirecTV I, 2009 WL 692202, at *1. After receiving additional briefing from the parties on this issue and on the issue of forum non conveniens, this Court recommended dismissal of LAS and Zunda as parties due to lack of subject matter jurisdiction. Id. at *5-7. Further, the Court recommended the dismissal of the derivative, fiduciary duty, and fraud claims because the Court found LAS was a necessary party to those claims as written. Id. at *8-11. However, the Court recommended giving DirecTV leave to file an amended complaint consistent with the recommendation. Id. at *12. This Report and Recommendation was adopted in its entirety. See April 30 Decision and Order.

DirecTV's second amended complaint omits LAS and Zunda as parties and asserts five grounds for relief: (1) declaratory judgment against Park 610; (2) breach of contract against Park 610; (3) breach of fiduciary duties against Park 610 and Avila; (4) aiding and abetting a breach of fiduciary duty against Avila, Timistit, Pratola, and Clemente; and (5) fraud against Avila, Pratola, and Timistit, and aiding and abetting fraud, as against Clemente and Timistit. See 2d Am. Compl. ¶¶ 77-109.

### 3. Current Motions to Dismiss

On June 8, 2009, Park 610, Avila, and Timistit filed a motion to dismiss for failure to state a claim. Pratola and Clemente followed with their own motion to dismiss raising various issues including (1) forum non conveniens, (2) lack of personal and quasi in rem jurisdiction, (3) failure to plead fraud with particularity, (4) an argument that the forum selection clause in Pratola's employment agreement required any suit to be brought in Argentina, (5) failure to state

---

allowed to remain in place, see April 30 Decision and Order.

a claim for aiding and abetting liability against Clemente, and (6) an argument that DirecTV

seeks relief that cannot be granted in this action.[3]  We begin by discussing the personal

jurisdiction motion and then turn to the motion to dismiss for failure to state a claim.

## II.   PERSONAL JURISDICTION MOTION

### A.   Standard of Review

Upon motion, the Court is required to dismiss an action against any defendant over whom

it lacks personal jurisdiction. See Fed. R. Civ. P. 12(b)(2). On a Rule 12(b)(2) motion to

dismiss for lack of personal jurisdiction, the plaintiff "bears the burden of showing that the court

has jurisdiction over the defendant." In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204,

206 (2d Cir. 2003) (per curiam) (citation omitted); accord DiStefano v. Carozzi N.A., Inc., 286

---

[3] See Notice of Motion to Dismiss the Second Amended Complaint, filed June 8, 2009
(Docket # 139); Declaration of Carlos V. Avila in Support of Defendants Park 610, LLC, Carlos
V. Avila and Roberto Timistit's Motion to Dismiss the Second Amended Complaint, filed June
8, 2009 (Docket # 140); Declaration of V. David Rivkin in Support of Defendants Park 610,
LLC, Carlos V. Avila and Roberto Timistit's Motion to Dismiss the Second Amended
Complaint, filed June 8, 2009 (Docket # 141); Memorandum of Law in Support of Defendants
Park 610 LLC, Carlos Vicente Avila and Roberto Timistit's Motion to Dismiss the Second
Amended Complaint, filed June 8, 2009 (Docket # 142) ("Park 610 Mem."); DirecTV's
Memorandum of Law in Opposition to the Motion of Defendants Park 610, LLC, Carlos Vicente
Avila and Roberto Timistit to Dismiss the Second Amended Complaint, filed June 30, 2009
(Docket # 151) ("Opp'n to Park 610"); Reply Memorandum of Law in Further Support of
Defendants Park 610 LLC, Carlos Vicente Avila and Roberto Timistit's Motion to Dismiss the
Second Amended Complaint, filed July 14, 2009 (Docket # 153) ("Park 610 Reply"); Notice of
Motion of Defendants Carlos Pratola and Diego Clemente to Dismiss the Second Amended
Complaint or for a Stay of this Action Pending Completion of Legal Proceedings in Argentina,
filed June 9, 2009 (Docket # 143); Memorandum of Law in Support of Motion to Dismiss this
Action as Against Defendants Carlos Pratola and Diego Clemente or for a Stay of this Action
Pending Completion of Legal Proceedings in Argentina, filed June 9, 2009 (Docket # 144)
("Pratola Mem."); Memorandum of Law in Opposition to Motion by Defendants Pratola and
Clemente to Dismiss or for a Stay, filed June 23, 2009 (Docket # 150) ("Opp'n to Pratola");
Reply Memorandum of Law in Further Support of Motion to Dismiss this Action as Against
Defendants Carlos Pratola and Diego Clemente or for a Stay of this Action Pending Completion
of Legal Proceedings in Argentina, filed June 30, 2009 (Docket # 152).

9

F.3d 81, 84 (2d Cir. 2001); <u>Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez</u>, 171 F.3d 779, 784 (2d Cir. 1999). Where, as here, the court does not conduct an evidentiary hearing on the issue of personal jurisdiction, "the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." <u>DiStefano</u>, 286 F.3d at 84 (citing <u>Bank Brussells Lambert</u>, 171 F.3d at 784); <u>accord</u> <u>Am. Rock Salt Co. v. Frontier-Kemper Constructors, Inc.</u>, 2003 WL 1342970, at *1 (W.D.N.Y. Mar. 3, 2003).

To make this showing, a plaintiff may demonstrate "'through [its] own affidavits and supporting materials, containing [a] [good faith] averment of facts that, if credited . . ., would suffice to establish jurisdiction over the defendant.'" <u>In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.</u>, 399 F. Supp. 2d 325, 330 (S.D.N.Y. 2005) (quoting <u>Whitaker v. Am. Telecasting, Inc.</u>, 261 F.3d 196, 208 (2d Cir. 2001)) (brackets and omission in original). In deciding whether the plaintiff has met this burden, the pleadings and affidavits must be viewed in the light most favorable to the plaintiff, with all doubts resolved in its favor. <u>See</u>, <u>e.g.</u>, <u>DiStefano</u>, 286 F.3d at 84 (citing <u>CutCo Indus., Inc. v. Naughton</u>, 806 F.2d 361, 365 (2d Cir. 1986)); <u>Whitaker</u>, 261 F.3d at 208 (citing <u>A.I. Trade Fin., Inc. v. Petra Bank</u>, 989 F.2d 76, 79-80 (2d Cir. 1993)). "However, conclusory allegations are not enough to establish personal jurisdiction." <u>Gmurzynska v. Hutton</u>, 257 F. Supp. 2d 621, 625 (S.D.N.Y. 2003) (citation and internal quotation marks omitted), <u>aff'd</u>, 355 F.3d 206 (2d Cir. 2004); <u>accord</u> <u>Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co.</u>, 2001 WL 1468168, at *3 (S.D.N.Y. Nov. 19, 2001) ("The plaintiff [in opposing a 12(b)(2) motion] cannot rely merely on conclusory statements or allegations; rather, the prima facie showing must be 'factually supported.'") (citations omitted).

Personal jurisdiction over a non-domiciliary defendant is determined by reference to the

10

law of the state in which the court sits. See Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997). Furthermore, in a diversity action, personal jurisdiction is determined by the law of the forum in which the federal court sits. See Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985) (citations omitted). Therefore, we apply New York law.

B.     Personal Jurisdiction Pursuant to the New York Long-Arm Statute

DirecTV argues that there is long-arm jurisdiction over Clemente and Pratola under both New York Civil Practice Law and Rules ("C.P.L.R.") section 302(a)(1) and section 302(a)(2). See Opp'n to Pratola at 14. We consider each in turn.

1.     C.P.L.R. § 302(a)(1)

C.P.L.R. § 302(a)(1) provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state." This section extends personal jurisdiction over a non-domiciliary defendant provided two requirements are met.

First, the defendant must "'transact business' within the state." See, e.g., CutCo Indus., 806 F.2d at 365; Johnson v. Ward, 4 N.Y.3d 516, 519 (2005). The Second Circuit, applying New York law, has stated that:

> A non-domiciliary "transacts business" under C.P.L.R. 302(a)(1) when he purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws.
>
> No single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper.

CutCo Indus., 806 F.2d at 365 (citations and quotation marks omitted) (brackets in original). While the defendant "need not be physically present" in the state for a court to exercise in

11

personam jurisdiction, "there must be some transaction attributable to the one sought to be held which occurs in New York." Bank Brussels Lambert, 171 F.3d at 787-88 (citing Ferrante Equip. Co. v. Lasker-Goldman Corp., 26 N.Y.2d 280, 284 (1970)) (emphasis in original).

Second, the claim against the non-domiciliary must arise out of that business activity. Id. at 787; accord Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996); Johnson, 4 N.Y.3d at 519. "A "claim aris[es] from a particular transaction when there is some articulable nexus between the business transacted and the cause of action sued upon or when there is a substantial relationship between the transaction or the claim asserted." Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006) (citations and internal quotation marks omitted). A relationship that is "merely coincidental" is insufficient. See id. at 104 (citing Johnson, 4 N.Y.3d at 520). A court must decide whether this connection has been established by evaluating "the totality of circumstances surrounding defendants' activities in New York in connection with the matter giving rise to the lawsuit." Andy Stroud, Inc. v. Brown, 2009 WL 539863, at *4 (S.D.N.Y. Mar. 4, 2009) (citation and internal quotation marks omitted).

"Although the New York Court of Appeals has held that '[§ 302(a)(1)] is not limited to actions in contract,' § 302(a)(2) and § 302(a)(3) are considered the more appropriate provisions for tort actions." Barricade Books, Inc. v. Langberg, 2000 WL 1863764, at *3 (S.D.N.Y. Dec. 19, 2000) (citations omitted) (brackets in original). Finally, in applying § 302(a)(1), "New York courts have cautioned . . . that 'defendants, as a rule, should be subject to suit where they are normally found, that is, at their pre-eminent headquarters, or where they conduct substantial business activities. Only in a rare case should they be compelled to answer a suit in a

12

jurisdiction with which they have the barest of contact.'" Hutton v. Priddy's Auction Galleries, 275 F. Supp. 2d 428, 439 (S.D.N.Y. 2003) (citing McKee Elec. Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 383 (1967)).

2.  C.P.L.R. § 302(a)(2)

C.P.L.R. § 302(a)(2) states that jurisdiction may be exercised over a non-domiciliary who in person or through an agent "commits a tortious act" within New York. "To satisfy New York's long-arm statute, the complaint must 'adequately frame[ ] a cause of action in tort arising from those acts.'" Pi, Inc., v. Quality Prods., Inc., 907 F. Supp. 752, 760 (S.D.N.Y. 1995) (citation omitted) (brackets in original); accord Bank Brussels Lambert, 171 F.3d at 785 (plaintiff must aver facts sufficient to establish commission of tort).

New York courts and the Second Circuit have "consistently interpreted § 302(a)(2) jurisdiction narrowly," Carlson v. Cuevas, 932 F. Supp. 76, 79 (S.D.N.Y. 1996) (citing cases); accord Barricade Books, Inc., 2000 WL 1863764, at *3 (citing cases), and have held that "to qualify for jurisdiction under this subsection, 'a defendant's act or omission [must have] occur[red] within the State.'" Bank Brussels Lambert, 171 F.3d at 789-90 (quoting Kramer v. Vogl, 17 N.Y.2d 27, 31 (1966)) (brackets in original); accord Bensusan Rest. Corp., 126 F.3d at 28-29 (same) (collecting cases); Barricade Books, Inc., 2000 WL 1863764, at *3 (same); see also Team Obsolete Ltd. v. A.H.R.M.A. Ltd., 2002 WL 719471, at *3 (E.D.N.Y. Mar. 1, 2002) ("to establish jurisdiction under . . . [section 302(a)(2)], a person must be physically present within the state when the tortious act is committed"); Yellow Page Solutions, 2001 WL 1468168, at *8 ("Under § 302(a)(2) a defendant's physical presence in New York is a prerequisite to jurisdiction."); Carlson, 932 F. Supp. at 80 ("To subject non-residents to New York jurisdiction

13

under § 302(a)(2) the defendant must commit the tort while he or she is physically in New York State.").

C.      Analysis

        1.      Factual Allegations Regarding Pratola and Clemente's Contacts with New York

                a.      Pratola

At the time this action was commenced, Pratola was a citizen of Argentina and a domiciliary of Buenos Aires, Argentina. 2d Am. Compl. ¶ 15. Until he was terminated, Pratola was employed as the general manager and chief executive officer ("CEO") of DirecTV Argentina, and was located in Argentina. Id. In his capacity as general manager and CEO of DirecTV Argentina, id., Pratola participated in "numerous conference calls with DIRECTV's management [including Richard Nerod] in New York, discussing the terms of the proposed joint venture with Avila" between March and August 2006, id. ¶¶ 22, 47. Approximately 20 conference calls were made. See Declaration of Richard Nerod in Opposition to the Motion of Carlos Pratola to Dismiss the Complaint, filed Nov. 3, 2008 (Docket # 87) ("Nerod Decl.") ¶¶ 2-4. In turn, DirecTV contributed capital to LAS, the joint venture with Avila, "from its account in New York," see 2d Am. Compl. ¶ 26, and from 2006 to 2008, paid $5.7 million to the joint venture in capital and an additional $2 million in loans, id. ¶¶ 26-27. Additionally, two transfers, each for $30,000 of "management fees" were made to a JPMorgan account held personally in the name of Avila. 2d Am. Compl. ¶ 66.[4] Finally, Timistit later "arranged wire transfers on three

_____

[4] The second amended complaint does not specify the location of the JPMorgan bank account. For the purposes of this motion, we will assume that it was in New York inasmuch as this assumption does not affect the outcome.

14

subsequent occasions, in each case in the amount of $20,000 to Avila's JPMorgan account." Id. ¶ 70.

### b. Clemente

At the time this action was commenced, Clemente was a citizen of Argentina and lived in Buenos Aires, Argentina. 2d Am. Compl. ¶ 16. At no time relevant to "this action was Clemente employed by LAS or otherwise engaged to provide goods or services to LAS." Id. ¶ 17. Clemente's only role in this case is that he gave instructions to Zunda for payment to the Clemente Account in New York, id. ¶ 69, and four transfers totaling $60,000 were made by Timistit into the Clemente Account, see id. ¶¶ 66, 70.

However, neither the second amended complaint nor DirecTV's opposition papers explains with any specificity how the account was involved in the challenged actions, other than as a repository of the management fees payable to Avila. The second amended complaint states only that these funds were paid "for the benefit of Pratola and Zunda as part of the cash kickbacks from Park 610." Id. ¶ 107. In its opposition papers, DirecTV refers the Court to its papers seeking an order of attachment for further explanation. See Opp'n to Pratola at 14-15. But those documents merely state that "DIRECTV also has evidence of highly suspicious wire transfers that were supposedly paid as part of Avila's management fee." McCormick Decl. Ex. 2 at 6.

### 2. Application of C.P.L.R. § 302(a)(1) to Pratola and Clemente

#### a. Pratola

To show that Pratola fits within section 302(a)(1), DirecTV points to the "numerous telephone conference calls between Pratola and DIRECTV's management in New York." See

15

Opp'n to Pratola at 17 & n.9 (citing 2d Am. Compl. ¶ 20; Nerod Decl. ¶ 4). But section 302(a)(1) permits jurisdiction over Pratola only if these "numerous telephone conference calls" show that Pratola transacted business within New York and that the claim against him arose out of his business contacts with New York. See Johnson, 4 N.Y.3d at 519.

To determine whether these phone calls are sufficient to subject Pratola to jurisdiction under the "transact business" prong of § 302(a)(1), we must look at the "quality" of these communications, see Fischbarg v. Doucet, 9 N.Y.3d 375, 380-83 (2007); accord Andy Stroud, Inc., 2009 WL 539863, at *4 ("a court must look to the quality or depth of the communications rather than their quantity or breadth" (citation omitted)). In addition, "communications into New York will only be sufficient to establish personal jurisdiction if they were related to some transaction that had its center of gravity inside New York, into which a defendant projected himself." Maranga v. Vira, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) (internal citations and quotation marks omitted).

First, it is doubtful that the phone calls, with nothing more, would be of the quality or depth that would constitute the transaction of business. When contacts with New York have been found sufficient to support personal jurisdiction, a defendant "on his own initiative . . . project[ed] himself" into New York to engage in a "sustained and substantial transaction of business." See, e.g., Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 18 (1970). Thus, courts applying New York law have declined to extend jurisdiction over defendants simply on the basis of telephone calls and other communications sent to New York. See, e.g., Bank Brussels Lambert, 171 F.3d at 788 (defendant's communication "with plaintiff in New York by phone, fax and possibly mail" insufficient to justify jurisdiction); Digital Lab Solutions, LLC v.

16

Stickler, 2007 WL 700821, at *3 (S.D.N.Y. Mar. 7, 2007) (under C.P.L.R. § 302(a)(1),

"'[t]elephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction") (quoting Int'l Customs Assocs. v. Ford Motor Co., 893 F. Supp. 1251, 1261 (S.D.N.Y. 1995)); Hutton, 2003 WL 21511946, at *9 ("conducting contractual negotiations by phone, fax or mail with a party in New York does not constitute the transaction of business within the state" (citation and quotation marks omitted)); Kimco Exch. Place Corp. v. Thomas Benz, Inc., 34 A.D.3d 433, 434 (2d Dep't 2006) ("The defendants' acts of faxing the executed contracts to New York and of making a few telephone calls do not qualify as purposeful acts constituting the transacting of business." (citations omitted)).

Certainly, "'[i]f the purpose of the calls is for the defendant to actively participate in business in New York, then they alone may support a finding of New York long arm jurisdiction under C.P.L.R. § 302(a)(1).'" Digital Lab Solutions, 2007 WL 700821, at *3 (quoting Carlson, 932 F. Supp. at 78). But, "where a defendant's 'contacts with New York consist of telephone calls, fax transmissions, and correspondence in connection with the negotiation of a contract that has a center of gravity well outside the state,' there is no personal jurisdiction under C.P.L.R. § 302(a)(1)." Id. (quoting Palace Exploration Co. v. Petroleum Dev. Co., 41 F. Supp. 2d 427, 434 (S.D.N.Y. 1998)). In the instant case, the center of gravity of the transaction at issue was indisputably outside New York. The defendants here are four foreign nationals, all of whom live in Argentina. Id. ¶¶ 11, 13, 15-16. Park 610 is incorporated in Delaware with its principal place of business in Florida. Id. ¶ 9. The agreement which DirecTV bases its claims on was negotiated by an Argentinian subsidiary of DirecTV, id. ¶¶ 1, 15, 23. DirecTV engaged Avila

because he had a "long history of developing sports programming in Argentina." 2d Am. Compl. ¶ 29. The finalized LAS LLC agreement appears to have been entered into in Argentina, since it was negotiated by Pratola in "a lead role" and by Avila. 2d Am. Compl. ¶ 23. LAS is a Delaware, not a New York limited liability company. See LLC Agreement (Aug. 22, 2006) (annexed as Ex. A to Avila Decl.), at App. A. Most significantly, the purpose of the venture was to broadcast the channel in Latin American countries. 2d Am. Compl. ¶¶ 1, 20-21. Thus, no part of the contract was to take place in New York. See Berkshire Capital Group, LLC v. Palmet Ventures, LLC, 307 F. App'x 479, 481 (2d Cir. 2008) (no jurisdiction where contract was to be performed entirely outside of New York); Palace Exploration Co., 41 F. Supp. 2d at 434 (no jurisdiction where defendant's contacts with New York consisted of "telephone calls, fax transmissions, and correspondence in connection with the negotiation of a contract that ha[d] a center of gravity well outside the state.").

Moreover, nothing in the facts alleged by DirecTV shows that Pratola was purposefully availing himself of the "privileges of and benefits of New York's laws." Ehrenfeld v. Bin Mahfouz, 9 N.Y.3d 501, 508 (2007). Pratola made phone calls to New York because he was involved in intra-corporate discussions with DirecTV Latin America, LLC, a Delaware company. 2d Am. Compl. ¶ 6. See Societe Generale v. Fla. Health Scis. Ctr., Inc., 2003 WL 22852656, at *3 (S.D.N.Y. Dec. 1, 2003) ("It is not clear that by soliciting . . . [a French corporation at its New York headquarters] . . . [the defendant] should be understood as having availed itself of New York law."). Thus Pratola's telephone calls did not establish the type of sustained and substantial transaction of business that would justify jurisdiction over him. See PaineWebber, Inc. v. Westgate Group, Inc., 748 F. Supp. 115, 119 (S.D.N.Y. 1990) ("[A] series

of frequent telephone calls and telecopies and the one meeting during which a modification of the agreement was memorialized . . . are insufficient to meet the 'transacting business' standard.").

The cases cited by DirecTV, see Opp'n to Pratola at 17, are consistent with this analysis, as in each of those cases, the defendant gained identifiable benefits from a "sustained and substantial transaction of business" within New York. See Fischbarg, 9 N.Y.3d at 382 & n.7 (through hiring and extensively using a New York lawyer who performed his legal services while remaining in New York, defendant sought to use the New York legal market and obtained the benefits of New York law including those set forth in "New York's 'Client Bill of Rights'"); Parke-Bernet, 26 N.Y.2d at 18 (defendant's participation in auction by phone and "active participation in the bidding which resulted in the paintings' being sold to him amounted to the sustained and substantial transaction of business" and "thereby 'invok[ed] the benefits and protections of . . . [New York's] laws' relating to the conduct of auctions") (citations omitted) (brackets in original). In addition, in both Fischbarg and Parke-Bernet, the parties projected themselves into New York with the purpose of advancing a New York relationship: an attorney-client relationship and the purchase of goods at a New York auction, respectively. Here, Pratola's only purpose was to discuss the LAS transaction with an official of a Delaware corporation who was located in New York. This was a temporary and tangential contact, as opposed to a sustained and purposeful connection to the forum state. See Sills v. Ronald Reagan Presidential Found., Inc., 2009 WL 1490852, at *7 (S.D.N.Y. May 27, 2009) ("The two factors emphasized in Fischbarg [were] the ongoing nature of the relationship and defendant's purposeful availment of the laws of New York . . . .").

Far more on point is the unpublished decision in Berkshire, in which the defendants "negotiated the agreement – a letter of intent to purchase a Chicago hotel – through telephone calls and e-mails from Illinois to New York, and ultimately returned the signed contract from Illinois to New York." 307 F. App'x at 481. Berkshire found, however, that even these facts were insufficient to create jurisdiction. Id. The court distinguished Fischbarg and Parke-Bernet on the ground that "the contract here was to be performed entirely outside of New York. The mere fact that it engaged in some contact with a New York purchaser does not mean that [defendant] transacted business in New York." Id.; see also Libra Global Tech. Servs. (UK) Ltd. v. Telemedia Int'l, Ltd., 279 A.D.2d 326, 346 (1st Dep't 2001) (defendant did "not 'project' itself into New York for jurisdictional purposes via the 45-minute video-conference, during which the parties negotiated a portion of their contract for the provision of worldwide telecommunications services"); Ljungkvist v. Rainey Kelly Campbell Roalfe/Young & Rubican, Ltd., 2001 WL 1254839, at *3 (S.D.N.Y. Oct. 19, 2001) (exchange of faxes and at least 10 phone calls between London-based defendant corporation and New York-based plaintiff artist for commission of artwork did not "project the defendants into local commerce"). Similarly, the contract being discussed here was to be performed entirely outside of New York, and the phone calls were made intra-company; that is, there was no arm's-length solicitation of a New York individual or business entity. Indeed, Pratola was arguably not even negotiating or conducting a business transaction because Pratola and Nerod were ostensibly acting on the same side of the LAS transaction. See, e.g., Kwon v. Yun, 2006 WL 416375, at *6 (S.D.N.Y. Feb. 21, 2006) (intra-corporate emails to New York employee by South Korean corporate officer and one visit to New York to discuss operations were "no more than incidental contacts"); E-Z Bowz, L.L.C.

20

v. Prof'l Prod. Research Co., Inc., 2003 WL 22064259 (S.D.N.Y. Sept. 5, 2003), at *7-8
(appearance in New York of legal advisor with direct financial interest in patent infringement
action was not "transaction of business" within the statute); Dogan v. Harbert Const. Corp., 507
F. Supp. 254, 261 (S.D.N.Y. 1980) (even physical presence in New York in relation to business,
alone will not "transform business dealings into business transactions") (citation omitted);
Ehrenfeld, 9 N.Y.3d at 509 (letters addressed to plaintiff in New York did not constitute business
transaction because subject of letters did not "seek to consummate a New York transaction or to
invoke our State's laws").

The fact that DirecTV Latin America's principal place of business is in New York and
that it wired funds from New York bank accounts to fund the venture does not change the
analysis. These facts do not locate the "center of gravity" of the transaction inside New York.
Indeed, to the extent that these facts reflect contacts with New York, they are the contacts of
DirecTV, and not Pratola. Moreover, since DirecTV argues and we accept, that this dispute does
not arise out of Pratola's employment agreement, there is no reason to impute DirecTV's New
York contacts to Pratola. See Societe Generale, 2003 WL 22852656, at *3 ("appropriate focus
of an inquiry under C.P.L.R. § 302(a)(1) is on what the non-domiciliary defendant[s] did in New
York and not on what the plaintiff[] did") (citation and internal punctuation omitted); Ljungkvist,
2001 WL 1254839, at *3 n.5 (same). In Barrett v. Tema Dev. (1988), Inc., the court held that
there was no jurisdiction in New York where the contact between the parties that occurred in
New York was not for the purpose of allowing the defendant to do business in New York, but
rather, for the defendant to conduct business in Massachusetts. 463 F. Supp. 2d 423, 433
(S.D.N.Y. 2006), aff'd, 251 F. App'x 698 (2d Cir. 2007). Here, the contact between Pratola and

21

Nerod was designed to allow DirecTV to transact business in Latin America.

In sum, there is no personal jurisdiction over Pratola under § 302(a)(1) because he has not transacted business in New York. In light of this conclusion, we need not reach the "articulable nexus" prong of the section 302(a)(1) inquiry.

b.  Clemente

As previously discussed, the second amended complaint alleges that in 2007, Timistit wired $30,000 to an account in Clemente's name, at the instruction of Clemente, which is alleged to have been for the benefit of Pratola and/or Zunda. 2d Am. Compl. ¶¶ 66, 69-71. DirecTV argues that the court has personal jurisdiction over Clemente because the Clemente Account was "an instrumentality of the conspiracy to funnel a part of the kickback to Pratola and Zunda." Opp'n to Pratola at 14.

While the maintenance of a bank account in New York "is usually insufficient to confer personal jurisdiction over a non-domiciliary defendant," Societe Generale, 2003 WL 22852656, at *4, in some cases a single transfer of funds to a bank account in New York may constitute the "transaction of business.," Correspondent Servs. Corp. v. J.V.W. Invs. Ltd., 120 F. Supp. 2d 401, 404-05 (S.D.N.Y. 2000). But in such cases, there are almost always far more contacts within the state of New York than exist in this case, including forum selection and consent to jurisdiction clauses; negotiating agreements by fax, mail, and telephone; borrowing money in New York, signing promissory notes payable in New York; and utilizing an agent in New York. See Societe Generale, 2003 WL 22852656, at *4 (collecting cases) (citations omitted).

Here, Clemente's only contact with the state of New York is through a UBS bank account in New York that received DirecTV funds wired there by Timistit. There is no claim

22

that Clemente gave any directions while located in New York or even that he has ever been to New York. It is not necessary to determine in the abstract whether the use of a single bank account can support jurisdiction under section 302(a)(1), see, e.g., Keramchemie GmbH v. Keramchemie (Canada) Ltd., 771 F. Supp. 618, 623 n.6 (S.D.N.Y. 1991) ("The passage of funds through the two bank accounts in New York held by . . . [defendant's agent or alter ego] may not suffice to show that this Court had personal jurisdiction over that . . . [agent] under C.P.L.R. § 302(a)(1)."), because we are bound to examine the "the totality of circumstances surrounding defendants' activities in New York in connection with the matter giving rise to the lawsuit," Andy Stroud, Inc., 2009 WL 539863, at *4 (citation and quotation marks omitted).

Here, Clemente's mere use of one New York bank account lacks the articulable nexus necessary to establish jurisdiction, see Societe Generale, 2003 WL 22852656, at *4 (suit must arise from use of the account), because the alleged misconduct giving rise to this action is rooted in the wrongful receipt of benefits by Pratola and Zunda – events that (a) involved exclusively persons located outside New York and (b) harmed a non-New York corporation. Moreover, the central fraud in this matter is the improper transfer of ownership of the shares in Tumely (a Uruguayan corporation) to Pratola (a citizen of Argentina) and Zunda (a citizen of the United States residing in Argentina). Even if some individuals received kickbacks from cash wired into and out of a bank account at a New York bank, the payments to these persons "could have been made anywhere and it would not have changed the nature of the plaintiffs' allegations." Leema Enters., Inc. v. Willi, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983) (no personal jurisdiction where cash payment made to defendant's New York bank account because action directly rooted in fraudulent misrepresentation causing payment, not in receipt of funds). DirecTV expressly

23

disclaims damages for any actions related to disbursing funds under the Management Service Agreement between LAS and Avila, which is the only articulated use made of the Clemente Account. See 2d Am. Compl. ¶ 71 n.7 ("For the avoidance of doubt, this Second Amended Complaint does not seek the return of the management fees diverted to the account(s) controlled by Clemente . . . ."); see also id. ¶¶ 62, 65-70 (discussing how Clemente's account was used for improper disbursement of fees under Management Service Agreement). Thus, the use of the Clemente Account was tangential to the fraud and breach of fiduciary duties for which DirecTV is seeking damages. Cf. Gulf Coast Dev. Group, LLC v. Lebror, 2003 WL 22871914 (S.D.N.Y. Dec. 4, 2003) (action directly arose out of funds maintained in defendant's New York bank account when plaintiffs argued the transfer itself was the tort).

DirecTV cites Correspondent, 120 F. Supp. 2d at 404, for the proposition that the use of a bank or brokerage account in New York will confer personal jurisdiction under section 302(a)(1). Opp'n to Pratola at 14. The facts of that case are inapposite, however. First, the holder of accounts in Correspondent maintained multiple securities accounts at a New York brokerage firm for multiple clients. Correspondent, 120 F. Supp. 2d at 404. Second, and more importantly, the causes of action in Correspondent, breach of contract and conversion, "constitute[d] the 'transaction of business' from which th[e] cause of action directly ar[ose]" – the non-return of the plaintiffs' funds which were placed into one of those accounts. Id. at 404-05 (citation omitted).

Accordingly, there is no personal jurisdiction over Clemente under section 302(a)(1).

3.      Application of C.P.L.R. § 302(a)(2) to Pratola and Clemente

As noted, to qualify for jurisdiction under section 302(a)(2), "a defendant's physical

24

presence in New York is a prerequisite to jurisdiction." Yellow Page Solutions, 2001 WL

1468168, at *8; Carlson, 932 F. Supp. at 80 ("To subject non-residents to New York jurisdiction

under § 302(a)(2) the defendant must commit the tort while he or she is physically in New York

State."). There is no suggestion that either Pratola or Clement was ever physically present in

New York and thus the statute apparently does not apply at all.

DirectTV, however, points to case law that allows acts committed in New York "by the

co-conspirator of an out-of-state defendant pursuant to a conspiracy" to subject the out-of-state

defendant to jurisdiction under C.P.L.R. § 302(a)(2). See Opp'n to Pratola at 15-16 (citing

Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991). The

premise of this theory is that the co-conspirator is acting as the agent of the out-of-state

defendant. Chrysler Capital Corp., 778 F. Supp. at 1266. To allow the exercise of jurisdiction

over Pratola and Clemente under this theory, DirecTV must:

> Allege[] facts sufficient (1) to establish a prima facie case of conspiracy, (2) to
> warrant the inference that the . . . [non-domiciliary] defendants were members of
> that conspiracy, (3) to demonstrate that a putative co-conspirator committed a tort
> or transacted business within New York within the meaning of C.P.L.R. 302(a)(1)
> or (a)(2), and (4) to justify the finding of an agency relationship between the
> putative co-conspirator acting in New York and the . . . [non-domiciliary]
> defendants.

Daventree Ltd. v. Republic of Azer., 349 F. Supp. 2d 736, 759 (S.D.N.Y. 2004) (citations

omitted).

To establish a prima facie case for conspiracy under New York law, a plaintiff must

assert an underlying tort, as well as "(a) a corrupt agreement between two or more persons,

(b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in

furtherance of a plan or purpose, and (d) the resulting damage or injury." Chrysler Capital

Corp., 778 F. Supp. at 1267 (citing Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986)). Furthermore, the existence of a conspiracy is "a mixed question of law and fact," and a court "cannot accept plaintiffs' conclusory assertions on those issues." Daventree, 349 F. Supp. 2d at 760 (citations and internal quotation marks omitted).

Here, DirecTV has not asserted a claim for civil conspiracy in its second amended complaint but instead makes claims only for aiding and abetting the Park 610 breach of fiduciary duty and fraud. See 2d Am. Compl. ¶¶ 94-109. It does not even argue how each of the elements of a civil conspiracy have been met in this case. See Opp'n to Pratola at 16. In any case, even if the facts in the second amended complaint were to be construed as stating a conspiracy claim, DirecTV similarly makes no argument as to precisely who it contends was acting as an agent for Pratola and Clemente and what acts this person or persons undertook in New York. See id. at 16-17. DirecTV makes mention only of the same acts of Pratola and Clemente already discussed: specifically, (1) Pratola's telephone calls to Nerod and (2) the same Clemente Account transaction. Id. at 17-18. DirecTV identifies no other actions in New York by any other defendant as forming a basis for jurisdiction. See generally Drake v. Lab. Corp. of Am. Holdings, 2007 WL 776818, at *11 (E.D.N.Y. Mar. 13, 2007) (no long-arm jurisdiction exists where none of defendants alleged co-conspirators were in New York).

As for the telephone calls, there is no claim that Pratola was "physically" present in New York when they occurred and thus they do not form a basis for jurisdiction under section 302(a)(2). See, e.g., Ahava Food Corp. v. Donnelly, 2002 WL 31757449, at *3 (S.D.N.Y. Dec. 9, 2002); accord Knight-McConnell v. Cummins, 2005 WL 1398590, at *3 (S.D.N.Y. June 13, 2005) (collecting cases); Stein v. Annenberg Research Inst., 1991 WL 143400, at *3 (S.D.N.Y.

July 19, 1991) ("federal cases construing § 302(a)(2) . . . have uniformly held that jurisdiction under [this] section cannot be predicated on telephone calls made or letters mailed into this state"). As for the account allegedly in Clemente's name, once again there is no claim that Clemente was present in New York, and thus, it too cannot serve as the basis for jurisdiction under section 302(a)(2).[5]

In sum, there is no basis for jurisdiction over Pratola and Clemente under section 302(a)(2).

D.    Request for Additional Discovery

In a brief footnote, DirecTV requests that, should it be unsuccessful on this motion, it be given an opportunity to conduct discovery to assist it in acquiring additional facts to prove jurisdiction. See Opp'n to Pratola at 18 n.10. "A district court has wide latitude to determine the scope of discovery, and is typically within its discretion to deny jurisdictional discovery

---

[5] Some of the cases listed by DirecTV, see Opp'n to Pratola at 16, are contrary to New York Court of Appeals' precedent requiring that defendants be physically present in New York to come within section 302(a)(2), see Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 460 ("Feathers"), cert. denied, 382 U.S. 905 (1965). As the Second Circuit has noted, "Feathers adopted the view that C.P.L.R. § 302(a)(2) reaches only tortious acts performed by a defendant who was physically present in New York when he performed the wrongful act" and "[i]n the absence of some indication by the New York Court of Appeals that its decision[ ] in Feathers no longer represent[s] the law of New York, we believe it would be impolitic for this Court to hold otherwise." Bensusan Rest. Corp., 126 F.3d at 28-29; accord Knight-McConnell, 2005 WL 1398590, at *3 ("In general, to obtain jurisdiction under [C.P.L.R. § 302(a)(2)], the defendant must be physically present within New York while committing the tort."); Griffin-Baez v. Inst. for Responsible Fatherhood & Family Revitalization, 2002 WL 1143738, at *2 (S.D.N.Y. May 29, 2002) (C.P.L.R. § 302(a)(2) "'only reaches tortious acts performed by a defendant who was physically present in New York when committing those acts'") (quoting Family Internet, Inc. v. Cybernex, Inc., 1999 WL 796177, at *7 (S.D.N.Y. Oct. 6, 1999)). Other cases listed by DirecTV are distinguishable because, unlike here, a substantial relationship existed between the transaction and plaintiff's asserted claim. Section 302(a)(2) requires that the cause of action at issue "aris[e] from" the tortious act committed in New York state.

27

when the plaintiff has not made out a prima facie case for jurisdiction." Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic, 582 F.3d 393, 401 (2d Cir. 2009) (internal citations and punctuation marks omitted); see also Drake, 2007 WL 776818, at *9 (court may grant discovery where, although no prima facie showing of jurisdiction is made, a plaintiff has "made a sufficient start toward establishing personal jurisdiction") (internal quotation marks and citation omitted). Here DirecTV has made no argument suggesting that additional discovery would reveal grounds for jurisdiction and has not even pointed to any particular discovery that it seeks. Thus, the request for an opportunity to conduct discovery should be denied.

## E.  Conclusion

For reasons stated above, the claims against Pratola and Clemente should be dismissed for lack of personal jurisdiction.[6]

---

[6] The Court notes that even if there were personal jurisdiction over Pratola and Clemente, the suit against them would properly be dismissed on forum non conveniens grounds anyway. In considering the applicability of this doctrine, a court "determines the degree of deference properly accorded the plaintiff's choice of forum[,] . . . considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute[, and] balances the private and public interests implicated in the choice of forum." Norex Petroleum v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005) (internal citations omitted), cert. denied, 547 U.S. 1175 (2006). While typically a plaintiff's choice of forum is entitled to great deference, DiRienzo v. Philip Servs. Corp., 294 F.3d 21, 28 (2d Cir.), cert. denied, 537 U.S. 1028 (2002), here, the degree of deference to DirecTV's choice of forum as to Pratola and Clemente should be limited inasmuch as DirecTV is incorporated in California, see 2d Am. Compl. ¶ 8; it is suing four foreign nationals, all of whom live in Argentina, id. ¶¶ 11, 13, 15-16, and a corporation incorporated in Delaware and with its principal place of business in Florida, id. ¶ 9; and its suit involves an agreement negotiated by an Argentinian subsidiary of DirecTV, id. ¶¶ 1, 15, 23, that was to be performed in Latin America, id. ¶¶ 1, 20-21. Even if we consider the fact that DirecTV has an office in New York, "[w]here an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against forum non conveniens dismissal is diminished." Sussman v. Bank of Isr., 801 F. Supp. 1068, 1073 (S.D.N.Y. 1992), aff'd, 990 F.2d 71 (2d Cir. 1993); accord CCS Int'l, Ltd. v. ECI Telesystems, Ltd., 1998 WL 512951, at *7 (S.D.N.Y. Aug. 18, 1998) (collecting cases). Numerous courts have found Argentina to be an

adequate alternative forum. See Warter v. Boston Sec., S.A., 380 F. Supp. 2d 1299, 1309-11 (S.D. Fla. 2004) (collecting cases) ("Each of Plaintiffs' claims, fraud, . . . conspiracy to commit fraud and breach of fiduciary duty, is available under Argentine law."); MasterCard Int'l Inc. v. Argencard Sociedad Anonima, 2002 WL 432379, at *7 (S.D.N.Y. Mar. 20, 2002); Am. BankNote Corp. v. Daniele, 45 A.D.3d 338, 346 (1st Dep't 2007). Additionally, related litigation is already pending in the Argentinian courts as to Pratola. See Argentinian Complaint. Further, DirecTV has put forward no evidence or argument that Argentina is an inadequate forum to hear its fraud, conspiracy, and breach of fiduciary duty claims.

To compare the public and private interests, a court compares "the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." Iragorri v. United Techs. Corp., 274 F.3d 65, 74 (2d Cir. 2001). Private interest factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." Id. at 73-74 (citation and quotation marks omitted). Here, the majority of the relevant evidence is likely to be in Argentina or Uruguay, given that all of the defendants are domiciled in Argentina and the majority of the alleged events occurred in those two countries. See 2d Am. Compl. ¶¶ 1-2. Further, DirecTV is a large corporation with subsidiaries in Argentina that plainly is able to handle the burden of a lawsuit in that country, while Pratola and Clemente are individuals for whom litigating in the United States is likely to present a great burden. The proximity of witnesses also points towards dismissal, though this is less a factor given that the case will continue against the other defendants. In the related Argentinian action, all seven of the witnesses DirecTV intends to call reside in Argentina. See Argentinian Answer at 132. In response to a prior Order by the Court, defendants Pratola, Clemente, and then-defendant Zunda previously indicated that they would tentatively call 20 witnesses, all of whom resided in Argentina. See Supplemental Affidavit of David C. Burger Submitted in Compliance with this Court's Order, Dated December 29, 2009, filed Jan. 23, 2009 (Docket # 115) ¶ 2. While DirecTV suggests that it may call additional, non-Argentinian witnesses should the case be brought in New York, of these eight additional witnesses, only three are in New York State while the remainder are dispersed across the United States. See Declaration of Carlos Sangiorgio, filed June 23, 2009 (Docket # 148) ¶ 18. The hardships that would be suffered by DirecTV in litigating this action in Argentina appear minimal, given that it is already litigating a related action in Argentinian courts. By contrast, in addition to the difficulties typically found in litigating in a country far from home, Pratola will be forced to litigate the related issues in two different forums, and face potentially inconsistent results. The public interest factors – including courtroom congestion, the interest in "having localized controversies decided at home," the interest in avoiding the imposition of jury duty on a community lacking an interest in the litigation, and the need to apply foreign law, Iragorri, 274 F.3d at 74 – do not favor New York. Notably, "there is a significant interest in having localized matters decided in the local forum in accordance with domestic law governing the case." Turedi

## III. FAILURE TO STATE A CLAIM

### A. Standard of Review

A party may move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) where the opposing party's complaint "fail[s] to state a claim upon which relief can be granted." While a court must accept as true all of the allegations contained in a complaint, that principle does not apply to legal conclusions. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (citation, internal quotation marks, and brackets omitted). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 129 S. Ct. at 1949, and thus a court's first task is to disregard any conclusory statements in a complaint, id. at 1950.  ＊

---

v. Coca Cola Co., 460 F. Supp. 2d 507, 527 (S.D.N.Y. 2006), aff'd, 2009 WL 1956206 (2d Cir. July 7, 2009). By retaining jurisdiction, this Court would spend United States tax resources to decide a matter that could be decided in an Argentinian court with DirecTV suing Argentinian citizens for conduct occurring primarily in Argentina.

Finally, a forum non conveniens dismissal of Pratola and Clement is appropriate despite the fact that suit would continue as against other defendants. The Court recognizes that "[t]here is a strong policy favoring the litigation of related claims in the same tribunal in order that pretrial discovery can be conducted more efficiently, duplicitous litigation can be avoided, thereby saving time and expense for both parties and witnesses, and inconsistent results can be avoided." Wyndham Assocs. v. Bintliff, 398 F.2d 614, 619 (2d Cir.), cert. denied, 393 U.S. 977 (1968). While the Court would normally be troubled by the fact that the suit is being divided into two different courts, the remaining defendants have indicated their willingness to proceed in Argentina. Letter from V. David Rivkin to Hon. Gabriel W. Gorenstein (Feb. 6, 2009), filed Feb. 27, 2009 (Docket # 123), at 5, and there is related litigation pending in Argentina anyway.

Next, a court must determine if the complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." Id. at 1949 (citation and internal quotation marks omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion").

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Ashcroft, 127 S. Ct. at 1949 (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "'show[n]' . . . 'that the pleader is entitled to relief.'" Id. at 1950 (quoting Fed. R. Civ. P. 8(a)).

If the allegations of a complaint show that the complained-of conduct was "not only compatible with, but indeed was more likely explained by, lawful" conduct, no claim for relief is stated. Id. at 1950; see also id. at 1951 (allegations in a complaint are rejected where there is an "obvious alternative explanation" for the conduct alleged that is more "likely").

While a court typically examines only the allegations of a pleading on a motion to dismiss, "[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (citations omitted).

31

## B. Breach of Contract Claim

The Joint Venture Agreement directs that New York law applies to the agreement, see Joint Venture Agreement § 20.11, and the parties do not dispute that New York law governs this case. Under New York law, a breach of contract claim requires proof of "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994) (applying New York law).

"[I]f a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable." Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger, 423 F.3d 145, 149 (2d Cir. 2005) (applying New York law). Whether a contract term is ambiguous is a question of law for the court. Id.; Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d 260, 263-64 (2d Cir. 1987). Once the court determines that a term is ambiguous – that is "susceptible of at least two reasonable interpretations" – selecting from potential meanings is a question for the finder of fact. See Walk-In Medical Ctrs., 818 F.2d at 264; Markman v. Westview Instruments, Inc., 52 F.3d 967, 991 (3d Cir. 1995).

DirecTV's second amended complaint relies on three portions of the Joint Venture Agreement in making its contract claim: (1) the change in control provision, (2) the transfer of interests provision, and (3) the ethics provision. We examine each of these provisions in turn.

### 1. Change of Control Provision

The Park 610 defendants argue that DirecTV fails to plausibly allege that Park 610

32

breached the Joint Venture Agreement by causing a "change of control." Park 610 Mem. at 8-10. Under the Joint Venture Agreement, a change in control occurs where "any Person (other than the Person who controls a Member on the Date hereof) become[s] the beneficial owner, directly, or indirectly, of more than 50% of the then outstanding voting shares or other equity rights of a Member." 2d Am. Compl. ¶ 31; Joint Venture Agreement at 2. The second amended complaint alleges that Tumley and Loraine each owned 50% of the shares in Park 610. Thus, the allegations that the shares of Tumley were transferred to Leraman, 2d Am. Compl. ¶¶ 52-59, are insufficient to show a change of control inasmuch as that transfer did not result in an outside person acquiring "more than 50%" of the outstanding shares or other equity rights in Park 610. The Park 610 defendants, however, also allege that there was also a change in control at Loraine because Avila "agreed with Leraman to restrictions upon the transfer of [Avila's] shares in Loraine" and agreed "either to pledge his shares of Loraine to Leraman and/or to deposit them with a third party as security for the performance of his obligations under the Shareholders Agreement." Id. ¶ 60. The issue thus becomes whether these allegations are sufficient to show that someone other than Avila became the "beneficial owner" of the shares of Loraine.

DirecTV argues that the term "beneficial owner," which is undefined in the Joint Venture Agreement, should be interpreted to accord with the definition of this term under section 13(d) of the Securities Exchange Act of 1934, see Opp'n to Park 610 at 13-15, which requires that "any entity (or group of entities) which is the beneficial owner of more than five percent of particular types of individual equity securities to disclose that fact to the [Securities Exchange Commission]." Egghead.Com, Inc. v. Brookhaven Capital Mgmt. Co., 340 F.3d 79, 83 (2d Cir. 2003) (citing 17 C.F.R. § 240.13d-3(a)). The governing regulations provide:

(a) For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

    (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or,

    (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3(a). Further, "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership . . . of all equity securities of that issuer beneficially owned by any such persons." Id. § 240.13d-5(b)(1).

This definition also applies, with some exceptions, to cases under section 16 of the Securities Exchange Act, including section 16(b), which requires disgorgement of profits for "short-swing trading" by "insiders." See id. § 240.16a-1(a)(1) ("the term 'beneficial owner' shall mean any person who is deemed a beneficial owner pursuant to section 13(d) of the Act"); Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121-22 (2d Cir. 2001).

The Park 610 defendants argue that this is an improper definition of a "beneficial owner," though they do not offer an alternative definition. See Park 610 Reply at 5. Specifically they argue that the regulation's definition was intended to be confined to particular violations of the Securities Exchange Act. Id. (quoting Morales, 249 F.3d at 122). Morales does cite language in 17 C.F.R. § 240.16a-1(a)(1) suggesting that, within section 16, the definition of "beneficial owner" should be used "solely for purposes of determining insider status." Morales, 249 F.3d at 122. However, this hardly sheds light on what the parties in this case intended when they used the term "beneficial owner." In light of the fact that this is a widely known and publicly

sanctioned definition of the term, it is certainly plausible that the parties intended this definition
to govern even if they themselves did not expressly incorporate it. Thus, at a minimum, the term
is ambiguous and accordingly should not be definitively construed without giving DirecTV the
opportunity to offer extrinsic evidence of its meaning.

The Park 610 defendants also contend that DirecTV has not sufficiently alleged facts to
show a change in control even under the broad definition of a "beneficial owner." See Park 610
Reply at 5-6. But, as noted, the second amended complaint alleges that Avila agreed "either to
pledge his shares of Loraine to Leraman and/or to deposit them with a third party as security for
the performance of his obligations under the Shareholders Agreement." 2d Am. Compl. ¶ 60.
Such an agreement – in particular the pledging of shares to Leraman – would suggest at a
minimum that Leraman shares power with Park 610 to dispose of or vote the shares of Loraine.
Thus, the Park 610 defendants' motion to dismiss on this basis should be denied.[7]

### 2.   Transfer of Interests Provision

The Park 610 defendants next argue that DirecTV failed to plausibly allege that Park 610
breached the Joint Venture Agreement by transferring its membership interest. Park 610 Mem.
at 10-12.

Under section 13.1(c) of the Joint Venture Agreement, the "attempt by a Member to
Transfer any of its Membership Interests other than in accordance with the terms of the
Agreement" is an act causing default. Joint Venture Agreement § 13.1(c). The agreement
defines the "Members" as Park 610 and DirecTV. Id. at 1. The "Membership Interests" are Park

---

[7] We do not address DirecTV's argument that there was an effective change in control
under subdivision (c)(iii), see Opp'n to Park 610 at 15, since that provision was not raised as a
basis for liability in DirecTV's second amended complaint.

610's and DirecTV's respective interests in LAS. Id. at 6. In other words, this provision prohibits Park 610 from transferring its shares of LAS to anyone except as permitted by the Agreement.

The second amended complaint, however, contains no allegation that Park 610's ownership of shares in LAS has ever changed hands. DirecTV argues that the economic interest in LAS changed hands because Leraman acquired an interest in Park 610, and thus acquired an interest in Park 610's interest in LAS. See Opp'n to Park 610 at 16-19. In support of this argument, DirecTV cites the definition of "Transfer" in the Joint Venture Agreement. Id. The definition states:

> Transfer means (i) any sale, assignment or transfer of securities, (ii) a sale, assignment or transfer of any economic interest and/or voting interest ("Interest") in an entity that, directly or indirectly, holds any securities, (iii) a pledge or hypothecation of securities or Interest or any interest therein, (iv) sale, assignment or a transfer of securities convertible into or exchangeable for or other options or rights to acquire securities or Interest or (v) any other direct or indirect, voluntary or involuntary, sale, assignment or transfer of securities or Interest or any interest therein, whether pursuant to a Change of Control or otherwise.

Joint Venture Agreement at 7.

None of these provisions appear to be triggered. Ownership of a parent company of Park 610 was transferred to Leraman, but the language of the Joint Venture Agreement only prohibits attempts by a Member – that is, Park 610 or DirecTV – to transfer an interest in LAS. It does not prevent Park 610 or DirecTV from transferring interests in itself. The cases of Eureka VIII LLC v. Niagara Falls Holdings LLC, 899 A.2d 95 (Del. Ch. 2006) and Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd. P'ship, 840 F. Supp. 770 (D. Or. 1993), cited by DirecTV, see Opp'n to Park 610 at 16-19, do not require a different result. In Oregon RSA No. 6, Inc., the court applied a subsidiary's agreement to its parent only after "piercing the corporate

36

veil." See 840 F. Supp. 779-80. In Eureka VIII LLC, the agreement specifically barred the

disposition of interests in a person holding an interest in the entity at issue. 899 A.2d at 100.

Thus, bars on parent-level transfers appeared to have been contemplated by the agreement.

Here, by contrast, the ban is only on transfers by "Members" – that is, Park 610 and DirecTV,

see Joint Venture Agreement at 1, § 13.1(c) – of their "Membership Interests" in LAS, id. at 6,

§ 13.1(c). Thus, to the extent the second amended complaint relies on the transfer of interests

provision as a ground for breach of contract, this claim should be dismissed.

### 3. The Ethics Provision

The Park 610 defendants argue that DirecTV failed to plausibly allege that Park 610

breached the Joint Venture Agreement by breaching its ethics provision. Park 610 Mem. at 12.

Section 12.5 of the Joint Venture Agreement states:

> Ethics. No Member, the Company nor any of their respective officers, directors,
> members, employees or agents shall offer, pay or give anything of value in
> respect of the Business, either directly or indirectly, to a government official,
> political party or candidate for political office to influence such person or entity in
> the discharge of his, her, or its official duties, unless such kind of conduct
> complies with all applicable written laws. The Members will not do business
> with any joint venture partner, distributor, agent, customer, or other person where
> a Member knows or suspects that payoffs or similar practices are involved in
> doing business and will not have a relationship with a customer or any other
> person that results in a conflict of interest or embarrassment to the Company or
> any of the Members.

Joint Venture Agreement § 12.5. It is the second sentence of this section – in particular, the

clause relating to "conflict of interest" – that DirecTV alleges has been breached. See 2d Am.

Compl. ¶ 35.

DirecTV does not argue that the ethical duty to avoid conflicts of interest that is

described in this section extends beyond the two members, Park 610 and DirecTV, or that Park

37

610 itself behaved in a way that violated the provision. Rather, DirecTV argues that the transaction involving Tumely, Loraine, Avila, and Leraman "is attributable" directly to Park 610 and cites to a case involving the doctrine of piercing the corporate veil. See Opp'n to Park 610 at 19 (citing Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 777 (2d Cir. 1995)).

As Thomson-CSF, S.A. notes, "[i]n some instances, the corporate relationship between a parent and its subsidiary are sufficiently close as to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other." 64 F.3d at 777. In New York, "piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Morris v. N.Y. State Dep't of Taxation & Fin., 82 N.Y.2d 135, 141 (1993); accord MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 63 (2d Cir. 2001); Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997); Miranco Contracting, Inc. v. Perel, 57 A.D.3d 956, 958 (2d Dep't 2008).[8]

Importantly, "[a] party seeking application of the alter ego doctrine must come forward with factual allegations as to both elements." Bravado Int'l Group Merch. Servs., Inc. v. Ninna,

---

[8] Typically, courts apply the law of the state of incorporation to piercing the corporate veil claims. See Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) ("[u]nder New York choice of law principles, '[t]he law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.'") (citation omitted). Thus, in this case Delaware law would apply to the attempt to pierce Park 610's corporate form, see 2d Am. Compl. ¶ 9, and Uruguayan law would control the attempt to pierce Tumely and Loraine to reach Avila, see id. ¶ 41. Neither side cites any Delaware or Uruguayan law, however, or even discusses the choice of law question. Inasmuch as the only case cited by either party on this point, see Opp'n to Park 610 at 19; Park 610 Reply at 10, is Thomson-CSF, S.A., 64 F.3d 773, which appears to apply New York law, see id. at 777 (relying exclusively on cases applying New York veil-piercing law), we apply New York law.

38

Inc., 2009 WL 2707350, at *14 (E.D.N.Y. Aug. 27, 2009) (citations, quotation marks, and brackets omitted); EED Holdings v. Palmer Johnson Acquisition Corp., 228 F.R.D. 508, 512 (S.D.N.Y. 2005). "Allegations concerning the domination element are subject to the basic pleading standard of Rule 8. Allegations concerning the fraud or wrongful act element are subject to the heightened pleading standard of Rule 9(b) to the extent that they allege fraud." Bravado Int'l Group Merch. Servs., 2009 WL 2707350, at *14 (quoting Fed. Nat'l Mortgage Assoc. v. Olympia Mortgage Corp., 2006 WL 2802092, at *7 (E.D.N.Y. Sept. 28, 2006)).

Here, DirecTV has not made factual allegations sufficient to pierce the corporate veil. The second amended complaint simply alleges that Park 610 was owned by Tumely and Loraine, 2d Am. Compl. ¶ 41; that Tumely and Loraine were in turn wholly owned by Avila, id. ¶ 42; and that Tumely and Loraine were the instruments of Avila, Pratola, and Zunda's fraudulent conduct, id. ¶¶ 52-57, 100. These facts, standing alone, do not show alter ego status. See Island Seafood Co. v. Golub Corp., 303 A.D.2d 892, 895 (3d Dep't 2003) ("While [defendant] may be the sole stockholder, director and officer of both corporations and seems to exhibit disregard of corporate formalities, this, in and of itself, constitutes insufficient proof of complete domination and control which permit a corporate veil to be pierced. Significantly, the record is devoid of evidence of [defendant's] personal use of corporate funds or that [the company] was undercapitalized.") (citations omitted); Guinan v. A.I. duPont Hosp. for Children, 597 F. Supp. 2d 485, 516 (E.D. Pa. 2009) ("There is no question that [defendant] is the president and sole owner of [the company], and therefore exerts substantial control over the company. Evidence of control, however, in the absence of other relevant evidence, is not sufficient to raise a question of fact as to whether [defendant] exercised 'complete domination' for purposes of piercing the

39

corporate veil.") (applying New York law). Bravado Int'l Group Merch. Servs., 2009 WL 2707350, at *13-15 (declining to pierce veil where plaintiff claimed, among other connections, that defendants had "a unity of interest and ownership"); In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 538 (S.D.N.Y. 2008) ("While plaintiffs have alleged common ownership and overlapping directors, these factors alone are insufficient to support an extension of liability."); see also Iqbal, 129 S. Ct. at 1949 ("'naked assertion[s]' devoid of 'further factual enhancement'" are insufficient to state a claim) (quoting Twombly, 550 U.S. at 555, 557). Thomson-CSF, S.A., the sole case cited by DirecTV, Opp'n to Park 610 at 19, actually supports dismissal of DirecTV's claim. In that case, plaintiff's showing of "common ownership" and control were deemed insufficient to pierce because there was no showing of "abandonment of the corporate structure," "absence of corporate formalities," or "intermingling of corporate finances and directorship." 64 F.3d at 777.

In sum, the breach of contract claim should be dismissed insofar as it is based on an alleged violation of section 12.5 of the Joint Venture Agreement.[9]

C. Declaratory Judgment

The Park 610 defendants next allege that DirecTV has failed to state a cause of action for a declaratory judgment. See Park 610 Mem. at 13. Declaratory judgment actions will be dismissed where they are duplicative of other relief sought in a complaint because they "will, of necessity, be resolved in the course of the litigation of the other causes of action." Sofi Classic

---

[9] Additionally, DirecTV alleges in its second amended complaint that Park 610 violated section 12.1(c) of the Joint Venture Agreement, which requires the members to "cause the Business to be conducted in accordance with . . . the highest ethical standards." 2d Am. Compl. ¶ 79 n.8. Because DirecTV's papers do not discuss this provision, this argument is deemed waived.

40

S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 249-50 (S.D.N.Y. 2006) (citing Del Greco v. CVS Corp., 337 F. Supp. 2d 475, 488 (S.D.N.Y. 2004)). DirecTV's sole argument that its declaratory claim is not duplicative is its assertion that it seeks "disgorgement of profits" to which it may be entitled to solely based on the declaratory claim. See Opp'n to Park 610 at 27. It provides no citation to any portion of the second amended complaint for this claim, however, and the Court has not been able to find any portion that seeks disgorgement as a remedy. Because the premise for DirecTV's argument opposing dismissal appears to be factually incorrect, this branch of the Park 610 defendants' motion should be granted.

D.     Fraud

The Park 610 defendants seek dismissal of DirecTV's claim for fraud on the ground that the second amended complaint's allegations are insufficient both under Fed. R. Civ. P. 12(b)(6) and under Fed. R. Civ. P. 9(b) for failure to plead fraud with particularity. See Park 610 Mem. at 14-20.

1.     Legal Standards

To prove fraud under New York law, a plaintiff must prove by clear and convincing evidence: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006) (citations omitted). An omission or failure to disclose can constitute a fraud where there is a duty to disclose. See Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 47 (2d Cir. 1993). In the absence of a fiduciary relationship, "a duty to disclose may arise if: (1) one party makes a partial or

41

ambiguous statement that requires additional disclosure to avoid misleading the other party, or

(2) one party possesses superior knowledge, not readily available to the other, and knows that the

other is acting on the basis of mistaken knowledge." Remington Rand Corp. v.

Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1484 (2d Cir. 1995) (citations and internal

quotations omitted).

Additionally, Fed. R. Civ. P. 9(b) provides: "[i]n alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake. Malice, intent,

knowledge, and other conditions of a person's mind may be alleged generally." The purpose of

Rule 9(b) is "(1) to provide a defendant with fair notice of the plaintiff's claim, (2) to protect a

defendant from harm to his or her reputation or goodwill, and (3) to reduce the number of strike

suits." Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989). In instances of affirmative

misstatements the pleadings must "(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and

(4) explain why the statements were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170,

1175 (2d Cir. 1993). By contrast, "[i]n instances where the alleged fraud is premised on an

omission, a plaintiff must specify the person responsible for the failure to speak, the context of

the omission, and the manner in which the omission misled the plaintiff." Solutia Inc. v. FMC

Corp., 456 F. Supp. 2d 429, 449-50 (S.D.N.Y. 2006) (quoting Odyssey Re (London) Ltd. v.

Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000)).

    2.    Pleading with Particularity

        a.    Alleged Affirmative Misstatements

The Park 610 defendants' main argument with regard to fraud based on misstatements is

that DirecTV has failed to plead with particularity any material misrepresentation made by the defendants. See Park 610 Mem. at 14-18.

DirecTV, however, has alleged two false statements by Avila with particularity. First, during due diligence meetings in the summer of 2006, Avila represented to DirecTV's attorney that the "sole purpose" of Park 610's ownership structure of two additional entities was to create flexibility for future intra-family transfers of ownership. See 2d Am. Compl. ¶¶ 42-43. According to DirecTV, this statement was false when made. See id. ¶ 44.[10]

Second, DirecTV cites an email dated August 24, 2006 from Avila's counsel to DirecTV on behalf of Avila stating that Avila owned all of Tumely and Loraine, that the shares of those companies were in bearer form, but that "a subsequent change to the by-laws of the respective companies would change the form of stock ownership to registered form." Id. ¶ 45. Avila was then actively planning to transfer the Tumely stocks to Pratola and Zunda, id. ¶¶ 44, 48, which Avila allegedly did shortly thereafter on November 8, 2006, id. ¶ 57.

Avila's assurances as to the purpose of the structure of ownership and the future shift to registered shares were material to DirecTV's decision to enter into the Joint Venture Agreement. Id. ¶ 46. Such false assurances can constitute misrepresentations. "[I]f a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a

_____

[10] The Park 610 defendants suggest there is nothing that plausibly supports the contention that Avila knew this statement was false when made in the summer of 2006. See Park 610 Mem. at 16. However, there is more than enough information alleged to make this claim plausible, including the fact that the entity created by Pratola to effectuate the transfer of Tumely to Leraman was formed before the diligence meeting, that drafts for the allegedly improper exchange were planned in October 2006, and that the transfer occurred in November 2006. See 2d Am. Compl. ¶¶ 52, 55-57. Further, given that the second amended complaint as a whole describes a kickback scheme, see 2d Am. Compl. ¶¶ 1-3, it is plausible that Avila would have known the future structure of the kickback scheme when the agreement to create LAS was negotiated.

misrepresentation of material existing fact upon which an action for rescission [based on fraud] may be predicated." Sabo v. Delman, 3 N.Y.2d 155, 160 (1957) (citations omitted); accord Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992).

Because DirecTV specifies the statements that it contends were fraudulent, identifies the relevant content, specifically states where and when the statements were made, and explains why the statements were fraudulent, DirecTV has pled fraud with particularity as to Avila.

While the Park 610 defendants note that DirecTV never alleges that Avila directly stated he would "always own all the equity of Park 610," see Park 610 Mem. at 15, such a direct statement is not necessary to prove fraud. A fact finder may reasonably infer that Avila's allegedly false representations were sufficiently material to induce the transaction, inasmuch as the fact finder may reasonably conclude that the statements inhibited any investigation by DirecTV into why Avila was structuring his ownership in such an unusual fashion.

No specific fraudulent statements made by Timistit are pled with particularity in the second amended complaint, however. Thus, DirecTV's claims of fraud based on affirmative statements by Timistit fail. See Sofi Classic S.A. de C.V., 444 F. Supp. 2d at 248 ("Where fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts complained of by each defendant.") (citation and internal quotation marks omitted).

> b. Aiding and Abetting Fraud

DirecTV argues that Timistit can be held liable for aiding and abetting fraud. Opp'n to Park 610 at 21. To establish liability for aiding and abetting fraud, the plaintiffs must show "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant

44

provided substantial assistance to advance the fraud's commission." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006). The heightened pleading requirements of Rule 9(b) apply. Id. at 292-93.

Here, because the second amended complaint adequately alleges that Avila committed fraud, the first element is met. The second two elements are also met. In addition to alleging generally that the parties knew of the fraudulent plan and entered into a "joint scheme" to effectuate it, see 2d Am. Compl. ¶¶ 103-04, DirecTV alleges that Timistit actively negotiated the agreements that structured the transfer of a portion of Park 610 to Pratola and Zunda, including drafts of the agreements emailed on a specific date, see id. ¶¶ 54-55. From this, a fact finder could reasonably conclude that Timistit knew of the fraud and provided substantial assistance to advance it.

Fezzani v. Bear, Stearns & Co., 592 F. Supp. 2d 410 (S.D.N.Y. 2008), cited by the Park 610 defendants, see Park 610 Mem. at 19 n.7, does not require a different result. In that case, the plaintiff only made conclusory allegations of participation in a scheme to defraud. See Fezzani, 592 F. Supp. 2d at 429.

However, no specific fraudulent statements made by Zunda or Pratola have been identified with particularity. Thus, the claim of aiding and abetting fraud must be dismissed against Timistit as to the statements made by Zunda or Pratola.

### c.     Fraudulent Concealment

The Park 610 defendants seek to dismiss DirecTV's claim of fraudulent concealment – that is to say, the claims that are based on omissions. Opp'n to Park 610 at 22. "Under New York law, fraudulent concealment requires proof of: (1) failure to discharge a duty to disclose;

45

(2) an intention to defraud, or scienter; (3) reliance; and (4) damages." <u>TVT Records v. Island Def Jam Music Group</u>, 412 F.3d 82, 90-91 (2d Cir. 2005); <u>see also</u> <u>City of N.Y. v. Smokes-Spirits.com, Inc.</u>, 541 F.3d 425, 454 (2d Cir. 2008) ("[A] fraud cause of action may be predicated on acts of concealment where the defendant had a duty to disclose material information.") (citation omitted) (brackets in original). As was previously noted,

> In the context of a business transaction, the duty to disclose arises where a party, with a duty to be complete, has made only a partial or ambiguous statement, or "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."

<u>TVT Records</u>, 412 F.3d at 91 (quoting <u>Brass v. Am. Film Tech., Inc.</u>, 987 F.2d 142, 152 (2d Cir. 1993). Claims of fraudulent omission must be made with particularity. <u>See</u> <u>Hinds County v. Wachovia Bank N.A.</u>, 2009 WL 1204345, at *15 (S.D.N.Y. Apr. 29, 2009). To meet this standard, the complaint must allege "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through the fraud." <u>Watts v. Jackson Hewitt Tax Serv. Inc.</u>, 579 F. Supp. 2d 334, 350 (E.D.N.Y. 2008) (quoting <u>Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A., Inc.</u>, 244 F.R.D. 204, 213 (S.D.N.Y. 2007)).

Here, the second amended complaint alleges that Avila failed to disclose his intent to provide Pratola and Zunda with equity of Park 610 and that the defendants obtained DirecTV's assent to the Joint Venture Agreement through this fraud. <u>See</u> 2d Am. Compl. ¶¶ 101-06. The context of the omissions and the manner in which they misled the plaintiff are also described in the second amended complaint, <u>see id.</u> ¶¶ 42-45, 48, 57, and are identical to what has previously been described with respect to Avila's affirmative misrepresentations, <u>see</u> section III.D.2(a) above. Thus, the claim as to Avila is sufficient.

However, as to Timistit, DirecTV has only alleged that "Avila and Timistit, through their participation in the negotiation of the [Memorandum of Understanding], the LLC Agreement and the other closing documents, and through Avila's counsel, reinforced Pratola's and Zunda's affirmative misrepresentations and omissions." 2d Am. Compl. ¶ 102. This provides insufficient context for the alleged fraud by omission and provides no suggestion of what Timistit gained through the fraud. Thus, this claim as to Timistit must fail.

### 3. Separate Fraud and Contract Claims

The Park 610 defendants suggest the fraud claim should be dismissed to the extent that DirecTV seeks to claim that Park 610 entered the contract knowing it would later break it. See Park 610 Mem. at 17 n.5 (citing Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19 (2d Cir. 1996)). Bridgestone cites copious New York case law standing for the proposition that a plaintiff may not generally recover under a fraud claim where the only allegation is a defendant's false indication that it would perform under its contract. Bridgestone/Firestone, 98 F.3d at 19. But Bridgestone/Firestone notes that under New York law, such a claim could stand if the plaintiff "demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract." Id. One example of such a claim is a claim that a misrepresentation induced the plaintiff to enter into the contract. See, e.g., Deerfield Commc'ns. Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 956 (1986) (memorandum) (refusing to dismiss fraud claim alleging a misrepresentation that was "inducement for the contract"); Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 184 (2d Cir. 2007) ("[A] claim based on fraudulent inducement of a contract is separate and distinct from a breach of contract claim under New York law."); Nash v. The New School, 2009 WL 1159166, at *3 (S.D.N.Y. Apr. 29, 2009)

47

(same). Here, the representation by Avila that Park 610's structure was designed to allow intra-family transfers and his counsel's assertion that the shares in Tumely would be changed from bearer form were allegedly made to induce DirecTV into entering the Joint Venture Agreement, see 2d Am. Compl. ¶¶ 42-43, 95, and were beyond the scope of the Joint Venture Agreement. Thus, they do not come within the bar described in Bridgestone/Firestone.[11]

### 4.    Reliance

The Park 610 defendants also argue that the fraud claim must fail because of an inadequate pleading of reliance. See Park 610 Mem. at 18-20; Gordon & Co. v. Ross, 84 F.3d 542, 545 (2d Cir. 1996) (under New York law, a plaintiff must plead that it "justifiably" relied on the defendant's misrepresentations); Park 610 Reply at 11-12. But DirecTV has adequately pled reliance by stating that Avila and his counsel's statements induced DirecTV to enter into the Joint Venture Agreement. See 2d Am. Compl. ¶¶ 103-06.

### 5.    Damages

The Park 610 defendants argue that the fraud claim must fail also because of an inadequate pleading of damages. See Park 610 Mem. at 18-20. They claim that the resulting joint venture has "yielded spectacular returns." Id. at 18. However, the second amended complaint alleges that "[a]s a consequence of the Defendants' fraud, DIRECTV expended approximately $5,700,000 in capital contributions and $2,000,000 in loans," and that DirecTV would have received a greater percentage of LAS (and thus its income) in return for this money

_____

[11] Nor is the Park 610 defendants' reference to the Join Venture Agreement's general merger clause, see Park 610 Mem. at 17 n.6 (citing Joint Venture Agreement § 20.13), sufficient to prevent evidence of Avila's oral statements given that such clauses do not typically block parol evidence of fraud in the inducement of a contract. See Fierro v. Gallucci, 2008 WL 2039545, at *13 (E.D.N.Y. May 12, 2008) ("It is well-settled that a general merger clause is generally insufficient to exclude parol evidence to show fraud in the inducement.").

48

absent the fraud. 2d Am. Compl. ¶ 108. This is sufficient to allege damages.

E.     Fiduciary Duties

The Park 610 defendants next argue that DirecTV failed to plausibly allege that the Park 610 defendants breached any fiduciary duties or aided and abetted such breach. See Park 610 Mem. at 20-23; Park 610 Reply at 15-17.

1.     Fiduciary Duty Law

Neither side explains which jurisdiction's law should apply to the fiduciary duty claims, though each cites a mix of both New York and Delaware cases. See id.; Opp'n to Park 610 at 24-26. As the outcome would be the same under either state's law, we do not address the choice of law issue.

"[E]lements of breach of fiduciary duty that must be proven by a preponderance of evidence by the plaintiff are: (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty." Legatski v. Bethany Forest Assoc., Inc., 2006 WL 1229689, at *3 (Del. Super. Ct. Apr. 28, 2006) (citations and quotation marks omitted); see also Kurtzman v. Bergstol, 40 A.D.3d 588, 590 (2d Dep't 2007) ("plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct").

To show aiding and abetting liability, a plaintiff must show "(1) the existence of a fiduciary relationship; (2) a breach of an associated fiduciary duty; (3) knowing participating in the breach by a defendant who is not a fiduciary; and (4) damages proximately caused by the breach." Carlson v. Hallinan, 925 A.2d 506, 542 (Del. Ch.), clarified by 2006 WL 1510759 (Del. Ch. May 22, 2006); see also Kaufman v. Cohen, 307 A.D.2d 113, 125 (1st Dep't 2003) ("A

49

claim for aiding and abetting a breach of fiduciary duty requires a breach by a fiduciary of obligations to another, that the defendant knowingly induced or participated in the breach, and that plaintiff suffered damage as a result of the breach.").

Absent provisions in an LLC agreement "explicitly" disclaiming the applicability of a fiduciary duty, LLC members owe each other "the traditional fiduciary duties that directors owe a corporation." Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC, 2009 WL 1124451, at *8 & n.33 (Del. Ch. Apr. 20, 2009) (collecting cases); see also Berman v. Sugo LLC, 580 F. Supp. 2d 191, 204 (S.D.N.Y. 2008) ("members of a limited liability company, like partners in a partnership, owe a fiduciary duty of loyalty to fellow members"). Similarly, "in the absence of a contrary provision in the LLC agreement, the manager of an LLC owes the traditional fiduciary duties of loyalty and care to the members of the LLC." Bay Ctr. Apartments Owner, LLC, 2009 WL 1124451, at *8; cf. Salm v. Feldstein, 20 A.D.3d 469, 470 (2d Dep't 2005) ("As the managing member of the company and as a comember with the plaintiff, the defendant owed the plaintiff a fiduciary duty to make full disclosure of all material facts."). The fiduciary duties include a duty of disclosure and candor. See Skeen v. Jo-Ann Stores, Inc., 750 A.2d 1170, 1172 (Del. 2000) ("Directors of Delaware corporations are fiduciaries who owe duties of due care, good faith and loyalty to the company and its stockholders. The duty of disclosure is a specific formulation of those general duties that applies when the corporation is seeking stockholder action."); In re CheckFree Corp. Shareholders Litig., C.A., 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007) ("[t]his 'duty of disclosure' is not a separate and distinct fiduciary duty, but it clearly does impose requirements on a corporation's board," including disclosure of "material" information); Salm, 20 A.D.3d at 470.

2.    Analysis

DirecTV has sufficiently alleged that Park 610 breached its fiduciary duties owed directly to DirecTV as co-member of an LLC, and that Avila breached his fiduciary duty owed directly to DirecTV as the manager of the LLC. For the reasons already stated, see section III.D.2 above, the second amended complaint alleges that these defendants failed to disclose material facts – specifically the transfer of a significant ownership stake in Park 610. See 2d Am. Compl. ¶¶ 1-3, 42-45, 48, 57. Similarly, Timistit's acts done to advance the indirect transfer of ownership of Park 610 to Pratola and Zunda are sufficient to show aiding and abetting liability. See id. ¶¶ 54-55.

The Park 610 defendants argue that the fiduciary duty claim against Park 610 is duplicative of the contract claims and cite Solow v. Aspect Res., LLC, 2004 WL 2694916 (Del. Ch. Oct. 19, 2004) in support of this argument. See Park 610 Reply at 16. But Solow involved claims based on "specific contractual obligations agreed upon by the parties" rather than "general fiduciary principals." Id. at *4. Here, by contrast, DirecTV is not alleging breach of fiduciary duty based on the breach of a contractual obligation. Rather, it seeks relief based on the claim that the secret deal to provide kickbacks to Pratola and Zunda violated the Park 610 defendants' fiduciary obligations.

While the Park 610 defendants can point to no provision in the Joint Venture Agreement explicitly or implicitly limiting the parties' fiduciary obligations, they argue that there is such a limitation based on an ethics provision. See Park 610 Mem. at 21 (citing Joint Venture Agreement § 12.5). But this provision simply prohibits members from activities that would constitute a conflict of interest. The provision thus does not limit any fiduciary obligation but

rather states affirmative obligations required of all parties to the agreement.

The Park 610 defendants argue that, even if a duty was owed, there were no damages and thus no liability could result. See Park 610 Mem. at 22. As with the fraud claim, DirecTV has sufficiently pled that it was harmed by defendants' actions in that DirecTV would have obtained a greater percentage of LAS had the arrangement been revealed sooner.

Thus, the Park 610 defendants' motion to dismiss on this ground should be denied.

## IV.    ATTACHMENTS

An attachment is allowed in federal court in accordance with "the law of the state where the court is located." Fed. R. Civ. P. 64. New York law provides that "[a]n order of attachment may be granted in any action . . . where the plaintiff has demanded and would be entitled . . . to a money judgment against one or more defendants, when . . . the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state." N.Y. C.P.L.R. § 6201(1). The party seeking attachment must show "that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." Id. § 6212(a). "Where a plaintiff obtains an order of attachment, the defendant can move to vacate or modify the order, and its motion will be granted unless the plaintiff can establish also 'the need for continuing the levy.'" Capital Ventures Int'l v. Republic of Arg., 443 F.3d 214, 219 (2d Cir. 2006) (citation and internal quotation marks omitted). "[T]he defendant may challenge the existence of a statutory ground for attachment and the plaintiff's likelihood of success in moving to vacate or modify." Id.

"Probability of success on the merits for purposes of an order of attachment requires that

52

the moving party demonstrate that it is more likely than not that it will succeed on its claims and must show proof stronger than that required to make a prima facie case." Musket Corp. v. PDVSA Petroleo, S.A., 512 F. Supp. 2d 155, 160 (S.D.N.Y. 2007). "'[S]uch relief is discretionary, and since attachment is a harsh remedy, the court must exercise care in its application.'" Id. (quoting Signal Capital Corp. v. Frank, 895 F. Supp. 62, 64 (S.D.N.Y. 1995)) (bracket in original).

Avila's sole defense to the attachment is that there is no probability of success against him. See Avila Opp'n to Attachment at 5-16. In addition, while Avila has submitted a declaration in opposition to the motion to confirm the attachment, see Avila Decl., he does not in this affidavit contest the key facts underlying DirecTV's allegations: specifically, the kickback scheme and the plan to transfer indirect ownership of Park 610 from Avila to Zunda and Pratola. Id.; see generally Share Purchase Agreement; Draft Shareholders' Agreement. Inasmuch as the only evidence put forth in the motion papers relating to the attachment supports DirecTV's allegations, and given that, for the reasons stated previously, those allegations support claims of fraud and breach of fiduciary duty against Avila, the only conclusion supported by the present record is that "it is more likely than not" that DirecTV will succeed on its claims.

Thus, the motion to confirm the attachment against Avila's property should be granted. However, due to the dismissal of Pratola on jurisdictional grounds, the motion to confirm the attachment against Pratola should be denied. Similarly, the existing attachment against Clemente's property should be vacated.

V.     CONCLUSION

Pratola's and Clemente's motion to dismiss (Docket # 143) should be granted, and the

claims against Pratola and Clemente should be dismissed on the ground of lack of personal jurisdiction.

Park 610, Avila, and Timistit's motion to dismiss (Docket # 139) should be granted in part and denied in part. Specifically, the following claims should be dismissed: (1) claim of declaratory judgment as to Park 610, <u>see</u> 2d Am. Compl. ¶¶ 77-82; (2) claim of breach of contract based on the transfer of interests and ethics provisions as to Park 610, <u>see id.</u> ¶¶ 33-34, 79, 83-89; (3) claim of fraud against Timistit, <u>see id.</u> ¶¶ 99-109; and (4) claim of aiding and abetting fraud as to Timistit to the extent the claim is based on statements by Pratola or Zunda, <u>id.</u>

The motion to confirm attachments (Docket # 15) should be granted as to Avila but denied as to Pratola. The attachment of Clemente's property (Docket # 65) should be vacated.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. <u>See also</u> Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Victor Marrero, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Marrero. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

Dated: November 23, 2009
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

55